# EXHIBIT 7

FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
Trenton R. Kashima, Esq. (SBN 291405)
trk@classactionlaw.com
550 West C St., Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
10/11/2018 at 05:33:00 PM
Clerk of the Superior Court
By Richard Day,Deputy Clerk

[Additional counsel listed on signature page]

Attorneys for Plaintiffs
and the Putative Classes

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

**JANE ROES 1-2, individually and on behalf of all others similarly situated,**

**Plaintiffs,**

**v.**

**DÉJÀ VU SERVICES, INC., HARRY MOHNEY, GRAPEVINE ENTERTAINMENT, INC. d/b/a DÉJÀ VU SHOWGIRLS, CATHAY ENTERTAINMENT, INC. / H.D.V. NO. 3, LLC d/b/a DÉJÀ VU SHOWGIRLS, NITE LIFE EAST, LLC d/b/a LITTLE DARLINGS, SP STAR ENTERPRISE, Inc. d/b/a DÉJÀ VU, COLDWATER, LLC d/b/a DÉJÀ VU SHOWGIRLS, NEW WAVE, INC. d/b/a VENUS FAIRE, EYEFULL, INC. d/b/a DÉJÀ VU SHOWGIRLS, CBDM REDLANDS, LLC d/b/a LARRY FLYNT'S HUSTLER CLUB, 3610 BARNETT AVE., LLC d/b/a ADULT SUPERSTORE, 4805 CONVOY, INC. d/b/a DREAMGIRLS, C.B. & D.M. ENTERTAINMENT, INC. d/b/a DÉJÀ VU SHOWGIRLS, JOLAR CINEMA OF SAN DIEGO, LTD. d/b/a JOLAR CINEMA SHOWGIRLS, PACERS, INCORPORATED d/b/a LARRY FLYNT'S HUSTLER CLUB, SHOWGIRLS OF SAN DIEGO, INC. d/b/a DÉJÀ VU SHOWGIRLS; BIJOU - CENTURY, LLC d/b/a CENTURY THEATRE, BT CALIFORNIA, LLC d/b/a BROADWAY**

Case No: 37-2018-00028014-CU-OE-CTL

**PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Judge: Hon. Timothy Taylor
Dept.: C-72
Date: Nov. 2, 2018
Time: 1:30 p.m.

**SHOWGIRLS, CHOWDERHOUSE, INC. d/b/a HUNGRY I, DEJA VU - SAN FRANCISCO, LLC d/b/a CENTERFOLDS, DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC d/b/a TEMPTATIONS / LITTLE DARLINGS, GOLD CLUB - SF, LLC d/b/a GOLD CLUB, MARKET ST. CINEMA, LLC d/b/a MARKET STREET CINEMA, S.A.W. ENTERTAINMENT, LTD. d/b/a LARRY FLYNT'S HUSTLER CLUB / CONDOR, SAN FRANCISCO GARDEN OF EDEN, LLC d/b/a GARDEN OF EDEN, SAN FRANCISCO ROARING 20'S, LLC, d/b/a ROARING 20'S, STOCKTON ENTERPRISES, LLC d/b/a DÉJÀ VU SHOWGIRLS, BOB MARTIN, INC. d/b/a DÉJÀ VU EROTIC ULTRA LOUNGE, and DOES 1-200, jointly and severally,**

**Defendants.**

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. THE CHALLENGE OF EMPLOYER CLASSIFICATION OF ENTERTAINERS AND RESULTING LITIGATION ........ 3

A. Classification of Entertainers as Employees or Independent Contractors ........ 3

B. Recurring FLSA Litigation ........ 4

III. DESCRIPTION OF THE SETTLEMENT ........ 5

A. Settlement Class ........ 7

B. Settlement Agreement ........ 7

1. Classification of Entertainers and Worker Protection ........ 7

2. Monetary Class Benefits ........ 8

3. Release of Claims and First Amended Complaint ........ 10

C. Notice to the Class ........ 11

IV. THE PARTIES' INVESTIGATION, PRIOR LITIGATION AND RECENT SETTLEMENT NEGOTIATIONS ........ 12

V. THE PROPOSED SETTLEMENT CLASS MEETS ALL THE REQUIREMENTS OF CLASS CERTIFICATION ........ 14

A. Numerosity and Ascertainability ........ 15

B. Predominance and Commonality ........ 15

C. Typicality ........ 17

D. Adequacy ........ 18

E. Superiority ........ 19

VI. THE COURT SHOULD PRELIMINARILY APPROVE THIS SETTLEMENT ........ 19

A. The Proposed Settlement Meets the Standards for Preliminary Approval ........ 19

1. The Settlement was reached after Contentious and Informed Arms' Length Negotiations ........ 21

2. The Proposed Settlement Falls Within the Range of Possible Approval ........ 21

3. The Settlement Provides the Same Relief for All Settlement Class Members 27

4. The Settlement Has No Obvious Deficiencies....28

B. The Settlement Also Warrants Approval under the FLSA....28

C. The Proposed Notice will Adequately Apprise the Class of their Rights Under the Settlement....29

D. Proposed Timeline for Events Should be Adopted....30

VII. CONCLUSION....31

# TABLE OF AUTHORITIES

## Federal Cases

*Buel v. Chowder House, Inc.*
(Cal. App. 1 Dist. 2006) 2006 WL 1545860 ........ 24

*Cho v. Seagate Tech. Holdings, Inc.*
(2009) 177 Cal.App.4th 734 ........ 21

*Classen v. Weller*
(1983) 145 Cal. App. 3d 27 ........ 17

*Dunk v. Ford Motor Co.*
(1996) 48 Cal. App .4th 1794 ........ 14, 19, 20, 21

*Falk v. Brennan*
(1973) 414 U.S. 190........ 13

*In re Cellphone Termination Fee Cases*
(2009) 180 Cal. App. 4th 1110 ........ 19

*Johnson v. GlaxoSmithKline, Inc.*
(2008) 166 Cal. App. 4th 1497 ........ 17

*Lazar v. Hertz Corp.*
(1983) 143 Cal. App. 3d 128 ........ 18

*Linder v. Thrifty Oil Co.*
(2000) 23 Cal. 4th 429 ........ 14

*Mass. Mutual Life Ins. Co. v. Sup. Ct.*
(2002) 97 Cal.App.4th 1282 ........ 14

*Matson v. 7455, Inc.*
(D. Or 2000) 2000 WL 1132110 ........ 24

*McGhee v. Bank of America*
(1976) 60 Cal. App. 3d 442 ........ 18

*Merch. v. OfficeTeam*
(Cal. Ct. App. Mar. 21, 2013, No. B241888), 2013 WL 1153648 ........ 19

*Moody v. Razooly*
(Cal. Ct. App. Feb. 25, 2003) 2003 WL 464076 ........ 23

*Rebney v. Wells Fargo Bank*
(1990) 220 Cal. App. 3d 1117 ........ 25

*Richmond v. Dart Indus., Inc.*
(1981) 29 Cal. 3d 462 ........ 14, 17, 18, 19

*Rosack v. Volvo of America Corporation*
(1982) 131 Cal. App. 3d 741 ........ 18

*Sav On Drug Stores, Inc. v. Sup. Ct.*
(2004) 34 Cal.4th 319 .......... 14

*Sav-on Drug Stores, Inc. v. Sup. Ct.*
(2004) 34 Cal. 4th 319 .......... 17

*Thurman v. Bayshore Transit Mgmt., Inc.*
(2012) 203 Cal. App. 4th 1112 .......... 22

*Trotsky v. Los Angeles Federal Savings & Loan Ass'n.*
(1975) 48 Cal.App.3d 134 .......... 22

*Vasquez v. Superior Court*
(1971) 4 Cal. 3d 800 .......... 15, 20, 27, 28

*Wershba v. Apple Computer, Inc.*
(2001) 91 Cal. App. 4th 224 .......... 15, 21

*Williams v. Sup. Ct.*
(2013) 221 Cal. App. 4th 1353 .......... 17

**<u>State Cases</u>**

*Barrentine v. Arkansas–Best Freight System, Inc.*
(1981) 450 U.S. 72 .......... 27

*Boyd v. Bechtel Corp.*
(N.D. Cal. 1979) 485 F.Supp. 610 .......... 26

*Brooklyn Sav. Bank v. O'Neil*
(1945) 324 U.S. 697 .......... 28

*Carnegie v. Household Int'l, Inc.*
(7th Cir. 2004) 376 F.3d 656 .......... 19

*Collins v. Sanderson Farms, Inc.*
(E.D. La. 2008) 568 F. Supp. 2d 714 .......... 28

*Cotton v. Hinton*
(5th Cir. 1977) 559 F.2d 1326 .......... 26

*County of Suffolk v. Long Island Lighting Co.*
(2d Cir. 1990) 907 F.2d 1295 .......... 25

*Crawford v. Lexington–Fayette Urban County Gov't*
(E.D. Ky. Oct. 23, 2008, No. 06-299) 2008 WL 4724499 .......... 28

*Dynamex Operations W. v. Superior Court*
(2018) 4 Cal. 5th 903, *reh'g denied* (June 20, 2018) .......... 3, 4

*In re GM Pick-up Truck Fuel Tank Prods. Liab. Litig.*
(3d Cir. 1995) 55 F.3d 768 .......... 20

*In re Heritage Bond Litig.*
(C.D. Cal. June 10, 2005, No. 02-ML-1475 DT) 2005 WL 1594403 .......... 20

*In re Nvidia Derivs. Litig.*
(N.D. Cal. Dec. 22, 2008, No. C-06-06110) 2008 WL 5382544 .......... 25

*In re Tableware Antitrust Litig.*
(N.D. Cal. 2007) 484 F.Supp.2d 1078 .......... 20

*In re Toys R Us*
(C.D. Cal. 2014) 295 F.R.D. 438 .......... 25

*In re Uber FCRA Litig.*
(N.D. Cal. June 29, 2017, No. 14-CV-05200) 2017 WL 2806698 .......... 23

*Knight v. Red Door Salons Inc.*
(N.D. Cal. Feb. 2, 2009, No. 08-01520) 2009 WL 248367 .......... 26

*Lynn's Food Stores, Inc. v. United States*
(11th Cir. 1982) 679 F.2d 1350 .......... 28

*Misra v. Decision One Mortg. Co.*
(C.D. Cal. Apr. 13, 2009, No. SACV070994) 2009 WL 4581276 .......... 23

*Mullane v. Central Hanover Bank & Trust Co.*
(1950) 339 U.S. 306 .......... 30

*Nat'l Rural Telecomms. Coop v. DirecTV*
(C.D. Cal. 2004) 221 F.R.D. 523 .......... 26

*Officers for Justice v. Civil Serv. Comm'n*
(9th Cir. 1982) 688 F.2d 615 .......... 19

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*
(9th Cir. 1982) 688 F.2d 615 .......... 14

*Petruzzi's, Inc. v. Darling–Delaware Co., Inc.*
(M.D. Pa. 1995) 880 F.Supp. 292 .......... 27

*Ramirez v. Benito Valley Farms, LLC*
(N.D. Cal. Aug. 25, 2017, No. 16-CV-04708) 2017 WL 3670794 .......... 22, 23

*Real v. Driscoll Strawberry Associates, Inc.*
(9th Cir. 1979) 603 F.2d 748 .......... 3, 13

*Roe v. Frito-Lay, Inc.,*
(N.D. Cal. Apr. 7, 2017, No. 14-CV-00751) 2017 WL 1315626 .......... 27

*Schwartz v. Dallas Cowboys Football Club, Ltd.*
(E.D. Pa. 2001) 157 F.Supp.2d 561 .......... 20

*True v. American Honda Motor Co.*
(C.D. Cal. 2010) 749 F.Supp.2d 1052 .......... 27

*Vasquez v. Coast Valley Roofing, Inc.*
(E.D. Cal. 2009) 670 F.Supp.2d 1114 .......... 20, 22

*Zackaria v. Wal-Mart Stores, Inc.*
(C.D. Cal. May 18, 2015, No. ED CV 12–1520) 2015 WL 2412103 .......... 23

**Statutes**

29 U.S.C. § 206 .......... 28
29 U.S.C. § 207 .......... 28
CAL. LABOR CODE § 1174 .......... 17
CAL. LABOR CODE § 1198 .......... 17
CAL. LABOR CODE § 221 .......... 17
CAL. LABOR CODE § 223 .......... 17
CAL. LABOR CODE § 226 .......... 17
CAL. LABOR CODE § 2699 .......... 1, 22
CAL. LABOR CODE § 510 .......... 17
CODE CIV. PROC. § 382 .......... 14

**Court Rules**

CAL. R. CT. 3.769 .......... 6, 19, 27, 29

## I. INTRODUCTION

Plaintiffs Jane Roes 1 and 2 ("Plaintiffs"), respectfully seek preliminary approval of their Release and Settlement Agreement (the "Settlement Agreement" or "Settlement," attached as Exhibit 1) with Defendants Déjà Vu Services, Harry V. Mohney, and the "Déjà Vu Affiliated Entities" identified on Exhibit A of the Settlement Agreement (hereinafter collectively referred to as "Defendants"), certification of a settlement class, and leave to file their First Amended Complaint ("FAC") which is attached hereto as Exhibit 2. Those Déjà Vu Affiliated Entities that present performance dance entertainment are referred to herein as the "Clubs."

Plaintiffs' claims arise from Defendants' business practice of classifying exotic dancers working at the Clubs throughout California as independent contractors, as opposed to employees. Plaintiffs allege that, as a result of the misclassification, all dancers were denied their rights under applicable state and federal wage and hour laws in a common way when Defendants failed to pay Plaintiffs and all other Class members the minimum wages and other benefits they were legally entitled to. Plaintiffs also allege that Defendants engaged in unlawful tip-sharing arrangements with the Class. In their lawsuit, Plaintiffs further allege that Defendants failed to pay the legally required overtime premium wages, as well as meal and rest period wages, resulting in unlawful wage deductions, inaccurate wage statements, and waiting time penalties under California law. Additionally, Plaintiffs seek civil penalties pursuant to the Labor Code Private Attorneys General Act of 2004 ("PAGA") Lab Code §2699 and other provisions of the California Labor Code. Defendants deny all liability and wrongdoing; assert that whether or not classified as employees, the entertainers were earning far in excess of minimum wage by IRS Form 1099 memorialized payments made to them by the Clubs; and that no class or collective action is even possible in light of the fact that all Class Members executed contracts with arbitration agreements containing elaborate waivers of class, collective, and representative actions that would be fully enforceable in light of the United States Supreme Court's recent decision on those subjects.

The proposed Settlement was only reached after an informed and thoroughly-vetted analysis of the claims and defenses and two sessions of arm's length negotiations by experienced counsel. As a cornerstone of this settlement, Defendants have agreed to convert all Class Members and

Entertainers who will be performing at the Clubs in the future, to employees in accordance with applicable law. *This has never been achieved before in dancer FLSA litigation.*

The Clubs will additionally offer employees enhanced benefits of employment for a period of at least one (1) year from the date that each Club converts the Entertainers who perform on its premises to employees).[1]

Defendants have additionally agreed to pay $1,500,000.00 in a non-reversionary fund (the "Settlement Pool") to resolve Plaintiffs' outstanding claims on a class, collective, and representative basis. After deducting any Court-approved attorneys' fees and expenses, class representative incentive payments, administration costs, and payments to the Labor & Workforce Development Agency ("LWDA"), the net settlement fund shall be distributed to all qualified Class Members based on the number of their Performance Dates relative to all other Settlement Class Members (those who have not opted out) during the relevant time period.

This Settlement provides substantial benefits and monetary recovery for Defendants' alleged wage and hour violations.[2] Plaintiffs estimate that the Settlement, if approved, would result in a $303.07 check (before tax) for the average Settlement Class Member.[3] Dancers with more performance dates will receive more than those who worked fewer dates, which is fair and based on a pro-rata damage model. This relief is immediate, does not require a Class Member to make a claim, and avoids the risk of further litigation. Accordingly, this Settlement is a fair and reasonable resolution of the parties' dispute.

---

[1] The specifics of the Enhanced Employment Benefits are set forth in the Limited National Settlement (§ 8.20 thereof) for the Greater California Clubs and in the San Francisco Settlement (§139 thereof) as set forth in Section 2.9 of the Settlement Agreement.

[2] No specific dollar valuation is claimed here for the conversion and extended offer of enhanced benefits from the prior settlement, but they obviously are worthy of value, and should be considered by the court.

[3] Past dancer settlements demonstrate that approximately 18.2% of class members participate and file a claim. Here, the settlement requires nothing to receive a check, and thus counsel expects a higher participation rate, meaning higher rate of dancers cashing their check. Assuming three times the participation rate, approximately 54.9% of the dancer will cash their check. A second mailing will go out to the 54.9% of dancer class with the remainder of the uncashed funds. Assuming 96% of those checks are cashed, only 4% of the Net Settlement Fund will distribute pursuant to Cal. Civ. Code section 384, and 96% of the Fund will be paid to 54.9% of the 5,800 class members. Kashima Decl., ¶ 8.

## II. THE CHALLENGE OF EMPLOYER CLASSIFICATION OF ENTERTAINERS AND RESULTING LITIGATION

Plaintiffs challenge Defendants' business practice of classifying dancers as independent contractors, as opposed to employees. As a result of this misclassification, dancers have been denied their rights under applicable state and federal wage and hour laws. Plaintiffs further allege that Defendants were engaged in unlawful tip-sharing arrangements with the Class.

The challenge on behalf of entertainers under the Fair Labor Standards Act ("FLSA") and California Labor Code has proven to be challenging and the source of many class action lawsuits. But this settlement represents a novel approach, mandating that the Clubs will convert *all current and future entertainers to employees*. This goes to the heart of entertainer class actions: a failure to properly classify entertainers as employees.

### A. Classification of Entertainers as Employees or Independent Contractors

The question of worker classification – as employee or independent contractor – is often the fundamental issue in an FLSA or California Labor Code case. This is because all of the FLSA's and Labor Code's worker protections - such as minimum wage and overtime rules – apply only to workers who qualify as employees. In contrast, an employer owes no such duties to an independent contract worker. Simply put, the FLSA and California Labor Code only apply to employees.

Entertainer lawsuits under the FLSA and California Labor Code, therefore, involve the question of whether an entertainer meets the test for an employee. Under the applicable FLSA test, courts utilize several factors to determine economic dependence and employment status. They are: (i) the degree of control exercised by the alleged employer; (ii) the relative investments of the alleged employer and employee; (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer; (iv) the skill and initiative required in performing the job; (v) the permanency of the relationship; and (vi) the degree to which the alleged employee's tasks are integral to the employer's business. *Real v. Driscoll Strawberry Associates, Inc.* (9th Cir. 1979) 603 F.2d 748, 754 (footnote omitted). By contrast, California has opted for the "ABC Test." On April 30, 2018, the California Supreme Court issued a landmark opinion in *Dynamex Operations W. v. Superior Court* (2018) 4 Cal. 5th 903, *reh'g denied* (June 20, 2018), clarifying the standard for determining whether workers in California should be classified as employees or as independent

contractors for purposes of the wage orders adopted by California's Industrial Welfare Commission. In so doing, the Court narrowed the definition of independent contractor, embracing a standard presuming that all workers are employees instead of contractors, and placing the burden on any entity classifying an individual as an independent contractor of establishing that this classification is proper under the newly adopted "ABC test." *Id.* at 957.

To meet this burden, the hiring entity must establish each of the following three factors, commonly known as the "ABC test":

> a. that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; and
>
> b. that the worker performs work that is outside the usual course of the hiring entity's business; and
>
> c. that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

*Id.*

On June 20, 1018 the Court denied the petition for rehearing filed by *Dynamex* on the issue of whether the Court's decision should apply retroactively or only prospectively. While Plaintiffs assert the Court's refusal to provide guidance supports the application of the ABC test on a retroactive basis, Defendants will argue the non-retroactivity of the ABC test for much of the times in dispute here Moreover, because *Dynamex* is brand new and few if any cases have been rendered since it holding, Defendants could also assert in this litigation various arguments as to why the entertainers at issue in fact satisfy the ABC test.

**B. Recurring FLSA Litigation**

At the end of discovery in a typical FLSA entertainer case, a less than clear picture exists as to whether any entertainer, let alone a class of entertainers, has been misclassified. Some dancers likely meet the test for employee status while others may not. Oftentimes discovery uncovers company practices that vary from one club location to another, or reveal that some managers fail to follow established policies. While those differences counsel against class certification, they are often overshadowed by a corporate policy to classify all entertainers as independent contractors. Thus, class certification is a hotly contested issue in most entertainer FLSA and state law cases.

For a variety of reasons, many clubs find it appropriate to classify entertainers as independent

contractors, and inappropriate to classify them as employees. For example, there are variances among entertainers in work patterns, schedules and other work engagements. Even the schedule of one entertainer can vary wildly throughout the year, let alone from year-to-year. There is also a well-established preference by many entertainers to work as independent contractors due to the nature of the work, i.e., bluntly put, they do not want an "employer" in control of any facet of their nudity beyond that required by the law.

History has shown that, in this complicated context, class settlements have largely involved the defendant making a payment of a negotiated sum of money that is then distributed pro rata to the entertainers as back wages. There may be some injunctive relief, but for the most part, the fundamental challenge of classifying the entertainers remains unresolved. Neither the clubs nor the class members experience any relief from misclassification of entertainers, and repeat litigation becomes the norm.

Subsequent to the 2011 settlement in *Doe v Cin Lan Inc. et al.* Case No. 08-cv-12719 (attached to and incorporated in the Settlement here), clubs and entertainers have tried to navigate the challenging independent contractor-employee landscape. But disputes between dancers and club owners over entertainer classification remain problematic and with mixed success for both sides.

This settlement represents a sea change in that all dancers are being converted to employees, receiving all the protections afforded employees under federal and California state worker laws.

## III. DESCRIPTION OF THE SETTLEMENT

This is not the first time the parties have faced off in a wage and hour dispute. In 2011 and 2017, the United States District Court for the Eastern District of Michigan, Southern Division, separately approved two class action settlements in *Doe v Cin Lan Inc. et al.* Case No. 08-cv-12719 (Dkt. No. 430) and *Doe v Déjà Vu Services, Inc. et al*. Case No. 16-cv-10877 (Dkt. No. 77) (the latter referred to below as the "Limited National Settlement"). The first case was heavily litigated with extensive discovery and motion practice culminating in a comprehensive nationwide class settlement. Moreover, the settlement in that case contained injunctive relief, which imposed ongoing obligations on behalf of the defendants. Likewise a sister settlement was reached in 2017 for San Francisco dancers.

The parties have agreed to once again resolve their misclassification dispute by way of settlement -- *with the one substantive difference being that this time the entertainers will be converted to employees* -- and seek court approval under California Rule of Court 3.769 and 29 U.S.C. § 216(b) of the FLSA. The Settlement Agreement was reached through extended negotiations by experienced counsel for both sides and two mediations. In fact, the same counsel that litigated, and settled, the prior Michigan-based class cases are representing the parties again here.

The settlement was reached as a result of two full day mediation sessions. Thompson Decl. at ¶16-18. The first, on July 24, 2018, consisted of a mediation with the Honorable Victor E. Bianchini in San Diego, California Although a settlement was not consummated, significant progress was made and the parties continued to negotiate in good faith to find a path to resolve their differences. On or about August 1, 2018, the Parties reached an understanding in principle as to the general settlement terms as outlined in an executed Letter of Understanding Regarding Principal Terms of Class and Collective Action Settlement. In addition to laying out the terms of settlement, the Letter of Understanding provided a specified timeframe for the Parties to negotiate a full and complete Settlement Agreement (which is now memorialized by this Agreement) or to withdraw from the settlement contemplated therein.

The second mediation took place before Mark Rudy on August 17, 2018 in San Francisco, California (the "Second Mediation") in an effort to resolve any pending matters with Shannon Liss-Riordan of Lichten & Liss. The Parties were unable to resolve their matters with Lichten & Liss at the Second Mediation, and as such proceeded prepare the Settlement Agreement.[4] Thompson Decl. at ¶18

Counsel have been negotiating the terms of this comprehensive state-wide settlement for over six months. Because of that, the terms in the Settlement build on what the parties learned since administering the prior settlements.

---

[4] The law firm of Lichten & Liss represents Entertainers against some of the Clubs and/or Affiliated Entities in California that are currently pending. Additionally, the firm has filed objections/appeals as to the San Francisco Settlement and the Limited National Settlement, Settlement Agreement Sections 2.7-2.8, 2.17-2.19.

**A. Settlement Class**

The Settlement provides for the certification of a "Settlement Class." The Settlement Class is defined as follows:

> [A]ll Class Members who, during the Class Periods, have Performed as an Entertainer at one or more of the Clubs pursuant to a Dancer Contract, and who have not timely and properly excluded themselves from the Settlement as provided for in Sections 10.3 – 10.5 of this Agreement.

> "Class Member" means any individual who Performed at one or more of the Clubs [those Affiliated Entities identified on Exhibit A of the Settlement Agreement that present performance dance entertainment] at any time during the applicable Class Periods.

The Class Period as agreed by the parties shall cover two time periods, as follows:

> "Class Period(s)" means (a) the time period from April 15, 2017 to the Preliminary Approval Date for Entertainers who Performed at one or more of the San Francisco Clubs (the "San Francisco Class Period"); and (b) the time period from February 8, 2017 to the Preliminary Approval Date for Entertainers who performed at one or more of the Greater California Clubs (the "Greater California Class Period"). An Entertainer may be subject to both Class Periods if she Performed at one or more San Francisco Clubs during the San Francisco Class Period and at one or more of the Greater California Clubs during the Greater California Class Period.

(Exhibit 1 Settlement Agreement Section III).

All Class Members allege identical FLSA and California Labor Code claims for lost wages against the primary defendants, *Déjà Vu Services, Inc. and Harry V. Mohney*, as their common joint employers under applicable federal and state law.

**B. Settlement Agreement**

Generally, the Settlement consists of the following major components:

1. Conversion of the entertainers to employees utilizing "enhanced" terms of employment (renumeration and benefits for the Settlement Class Members over-and-above what the law requires, with enhanced employment benefits for the first year after conversion);
2. Monetary class benefits (paid on a pro rata basis based on the number of Performance Dates relative to all other Settlement Class Members);
3. PAGA penalties; and
4. Representative Awards, settlement administration costs and attorneys' fees.

1. <u>Classification of Entertainers and Worker Protection</u>

In addition to monetary relief, the Settlement provides valuable non-monetary benefits to the Class Members who continue to perform at the Clubs, <u>regardless</u> of whether they exercise their right

to opt into the case. (Exhibit 1, Settlement Agreement, Article VIII). This Settlement brings to an end the extensive history of litigation by these Defendants concerning the distinction between employees and independent contractors, and provides terms of employment that are more beneficial than what the law requires.

Specifically, the Clubs shall convert all Class Members who are still performing in their facilities, and all Entertainers who will be performing in their facilities in the future, to employees in accordance with applicable law and on monetary terms that are at least as favorable as specified for employee-Entertainers in the Limited National Settlement (See Exhibit C to Settlement Agreement) for the Greater California Clubs and in the San Francisco Settlement (See Exhibit B to Settlement Agreement) for the San Francisco Clubs (with the enhanced benefits of employment set forth in those settlements being for a period of at least one (1) year from the date that each Club converts the Entertainers who perform on its premises to employees). As employees, Class Members and other subsequent Entertainers will be eligible for Social Security, Medicare, Worker's Compensation and unemployment insurance, as well as to protection under all federal, state and local laws applying to or affecting employees, including the National Labor Relations Act, Title VII of Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), the Older Workers Benefits Protection Act, the Americans with Disabilities Act, the Family Medical Leave Act and the Fair Labor Standards Act, for claims arising out of, or related in any way to, their employment or separation of employment.

In addition, the Settlement Agreement builds in a mechanism for Class Counsel to verify that the conversion to employees of the Class Members (and other Entertainers who may start Performing at the Clubs after the Preliminary Approval Date) has actually taken place.[5]

2. Monetary Class Benefits

The Settlement also includes a $1.5 million monetary fund component (the "Settlement Pool") to be made available by Defendants to pay: a) Settlement Class Members their Settlement

[5] Verification will consist of, at a minimum, Defendants providing Class Counsel with a representative sample of paychecks and other documents demonstrating conversion; accompanied (by Defense Counsel or their designees) site visits by Class Counsel to any of the affiliated Clubs; and interviews by Class Counsel with any Entertainers of their choosing who are then Performing in one or more of the Clubs.

Payments; b) the Enhancement Payments; c) the PAGA Payments; d) the Administrative Costs; and e) the Attorney Fee and Expense Award.

Entertainers will receive a pro-rata share of the Net Settlement Fund based on the number of their Performance Dates relative to all other Settlement Class Members. (Exhibit 1, Settlement Agreement, Article VII). A minimum payment of $25.00 has been established. This Settlement is not a claims-made settlement and there is no claim form that must be mailed in by a deadline in order for a Class Member to be eligible to receive settlement payments. All $1.5 million in the Settlement Pool will be paid, either as outlined above or to a charitable recipient. There is no reversion from this fund to Defendants.

To more fairly compensate entertainers with longer work histories – and thus arguably more back wages owed – the pro rata share of the Net Settlement Fund will be determined by the Settlement Administrator based on a formulaic points system, designed by the Parties for ease of administration, in the following manner: For each Settlement Class Member, she will receive one (1) point for each of her Performance Dates as contained in the Defendants records in order to determine her Individual Points Allocation. The Individual Points Allocation is intended to award higher values to Class Members who Performed on more occasions at the Affiliated Entities during the Class Periods. The maximum Individual Points Allocation a Settlement Class Member can receive is six hundred thirty-four (634) points. Once each Settlement Class Member's Individual Points Allocation is determined, the Aggregate Points Allocation will be determined by adding together the Individual Points Allocation for all Settlement Class Members. The total available "Net Settlement Fund" (the funds remaining after the payment of the Enhancement Payments to the two Class Representatives, the Administration Costs (costs incurred by the Settlement Administrator), the PAGA payment to the LWDA and the Attorney Fee and Expense Award) will then be divided by the Aggregate Points Allocation to determine a per-point dollar value, which is then multiplied by each Settlement Class Member's Individual Points Allocation to determine her pro rata share of the available Net Settlement Fund. For example, someone whose Individual Points Allocation equates to 1% of the Aggregate Points Allocation will receive 1% of the Net Settlement Fund. However, if a Settlement Class Member's pro rata share would result in a payment of less than

twenty-five dollars ($25.00) under this formula, her Settlement Payment will be increased to equal twenty-five dollars ($25.00) and the other payments adjusted accordingly.

Class Counsel may apply to the Court for an incentive award for each of the two Class Representatives (the "Enhancements Payments"), which are to be in addition to compensating them for their portion of the overall Settlement proceeds available to the Settlement Class, including the Settlement Class Member's PAGA Payment. Subject to Court approval, the Enhancement Payments for each of the Class Representatives will have two monetary components. The first, in the amount of one thousand five hundred dollars ($1,500.00), will be in recognition of each of the Class Representatives' time, efforts, and expenses incurred in coming forward as a Class Representative, assisting in the prosecution of this Action, and securing the Settlement as embodied in the Settlement Agreement. The second, in the amount of eight thousand-five hundred dollars ($8,500.00), will act as consideration for a full, general, and comprehensive release of that individual's General Released Claims, including unknown Claims. Enhancement Payments as ordered by the Court shall not exceed, in the aggregate, twenty thousand dollars ($20,000.00).

Defendants shall pay, out of and as part of the Settlement Pool, the sum of twenty thousand dollars ($20,000.00) to resolve all PAGA claims under California law for penalties for allegedly violating the Labor Code Private Attorneys General Act of 2004. From the PAGA Payments, in accordance with the Act, seventy-five percent (75%), or fifteen thousand dollars ($15,000.00), shall be paid to the LWDA as civil penalties pursuant to PAGA, and twenty-five percent (25%), or five thousand dollars ($5,000.00), shall be distributed out of the Net Settlement Fund to the Settlement Class Members in accordance with the provisions outlined above.

Defendants shall pay to Class Counsel, by way of remittance from the Settlement Administrator out of the Settlement Pool, the Attorney Fee and Expense Award as determined and ordered by the Court, through checks issued to Class Counsel in allocated amounts as determined by the Class Counsel. Lastly, Defendants will pay the cost of settlement administration.

3. <u>Release of Claims and First Amended Complaint</u>

The Settlement resolves the misclassification, PAGA and tip-splitting claims of exotic dancers working at the Clubs. An amended Class Action Complaint will be filed as part of the

Preliminary Approval process including the PAGA claims, as well as all other state law claims, defendants and class representatives. Plaintiffs are adequate class representatives because they share the same claims as the class members. Plaintiffs claimed that the alleged misclassification resulted in their sustaining certain losses, including not being paid minimum wages, being subjected to impermissible tip sharing, and not being provided other employee benefits, all of which they contended was actionable under the FLSA and California Labor Code.

Plaintiffs' claims clearly arise out of the same misclassification scheme employed by each of the Clubs and involve the same damage allegations – that Defendants failed to pay Plaintiffs and all other class members properly and as employees were entitled under federal and state wage and hour laws. Thus, as part of the current settlement, the parties stipulate to filing the First Amended Complaint in this action that more fully sets out the alleged facts, specific legal bases, and statewide character and scope of the claims.

This Settlement, and corresponding releases of claims, is expressly intended to resolve all of Defendants' pending entertainer misclassification lawsuits in the State of California. Specifically, all Class Members who do not exercise their opt-out rights will be deemed members of the Class and bound by the Settlement; thus they will have released their state law claims.

As to the FLSA, only those members who consent to join will be bound, and thus only those members will be releasing their FLSA claims. The parties have agreed that the Settlement Checks will contain opt in language indicating a class member's consent to join the settlement and release of their FLSA claims. All class members who accept their monetary benefits – by cashing the Settlement Check – will be releasing their FLSA claims. No Class Member will be able to accept the benefits but not release their claims, or split their claims, releasing one but preserving the other.

**C. Notice to the Class**

The Settlement calls for notice of the settlement to be provided to Class Members in three ways. First, the parties have agreed to mail written Class Notice. A copy of the proposed notice is attached as Exhibit D to the Settlement Agreement. Second, email addresses will be utilized, to the extent feasible and available, to provide Class Members with copies of the written Class Notice. Lastly, a short-form notice will be posted at each Club. A copy of the proposed short-form notice is

attached as Exhibit E to the Settlement Agreement.

In addition, a website with all the settlement documents and other useful information will be created and open during the pendency of the settlement administration period.

## IV. THE PARTIES' INVESTIGATION, PRIOR LITIGATION AND RECENT SETTLEMENT NEGOTIATIONS

The parties worked hard over the past months to reach the subject class settlement and jointly believe the terms described therein represent a fair and reasonable compromise of the parties' disputes and provide meaningful and reasonable relief to the Class and Defendants given the risks that both sides face in continued, as well as prospective, wage classification litigation.

In the prior cases, and since the instant action was filed, the parties have conducted both formal and informal discovery and investigation of facts. Through motion practice in the prior actions, the courts have further narrowed the legal issues presented. In addition to the parties' experience in the prior actions, motions in other dancer cases filed against Defendants have been decided, and in some instances the rulings have been appealed and remain pending.

During the course of the negotiations and since this Action was filed, Defendants asserted, and continue to assert, that they have substantial defenses to the claims included in the Action. Plaintiffs' counsel were made aware of these defenses from the prior actions, and in the current negotiations with defense counsel. Exhibit 1, Settlement Agreement, Recital 2.41; *see also Doe v Cin Lan Inc.* Case No. 08-cv-12719 (E.D. Mi.): Answer and Affirmative Defenses (Dkt. Nos. 56, 346); Defendants' Motion for Summary Judgment (Dkt. No. 55); Defendants' Joint Response to Motion to Intervene (Dkt. No. 348); Order Granting, In Part, Motion to Dismiss, February 24, 2010 at *5-12 (Dkt. No. 159).

The claims alleged in this class action have been subjected to active and hard-fought litigation in the prior cases in connection with multiple other lawsuits and rulings from across the country in the years between the prior settlements and today. Class Counsel conducted significant factual investigation both prior to and after commencing the prior suits. In *Doe v Cin Lan Inc.*, the Court ordered discovery related to Defendants' summary judgment motion on the joint employer issue and set a briefing schedule; both parties served significant amounts of written discovery (interrogatories and requests for production) and numerous deposition notices; and eventually,

documents and factual information regarding Defendants' practices and class members' files were exchanged, totaling over 13,000 pages of materials.[6]

In that same case, Class Counsel also took multiple Fed. R. Civ. P 30(b)(6) depositions of Defendants Cin Lan, Inc. and Déjà Vu Consulting, Inc., as well as the individual depositions of Harry V. Mohney and Déjà Vu officers and managers Jim St. John, Don Krontz, Joe Hall (twice), Tom Sime (twice), George Couch, Bill Morris, Aaron Davidson, and Karen Gay. As the Court docket in that action shows, many of the discovery requests and subpoenas resulted in significant disputes requiring motions to compel and/or motions for protective orders.

Defendants have produced additional information in the course of the current negotiations, including but not limited to information regarding the putative class members (*e.g.*, relevant financial data, shift information, number of class members). Defense counsel disclosed details regarding their efforts to resolve the challenges posed by the classification of entertainers since the prior settlements. Class Counsel have interviewed many entertainers as to the specifics of Defendant's employment practices and the possibility of conversion from Independent Contractors to Employees to ensure that this would be well received. (Thompson Decl. at ¶11-14; Ex. 2, Declaration of Megan Bonanni) Plaintiffs prepared an individualized damages model, which approximated the value of the Settlement Class's claims based on the data provided by Defendants and client interviews. Declaration of Trenton Kashima ("Kashima Decl."), currently filed herewith, at ¶¶3-4; Declaration of Jason Thompson ("Thompson Decl."), currently filed herewith, at ¶15.

Class Counsel believe that the information obtained in formal and informal discovery, as well as from their own independent factual investigation, was adequate to fully assess their position in the negotiations that took place, which ultimately resulted in the settlement of this case. *Id.*

In sum, Class Counsel believe the evidence obtained supports Plaintiffs' allegations that dancers were misclassified and that Defendants Déjà Vu Services, Inc. and Harry V. Mohney jointly

[6] Plaintiff served thirteen (13) interrogatories and eighty-seven (87) requests for production on each of the three defendants. Plaintiffs' Rule 30(b)(6) deposition notices sought to examine each corporate defendant on twenty-seven (27) topics. Defendants served two hundred seventy-two (272) requests for admission, twenty-seven (27) interrogatories, seven (7) requests for production, and one (1) request for inspection on Plaintiff Jane Doe 1. Additionally, both parties served subpoenas on various third parties, eight (8) served by Plaintiff and ten (10) served by Defendants.

employed them under the applicable legal tests.[7]. On the other hand, Defendants claim certain legal defenses and assert, *inter alia,* that even if Plaintiffs prevail on their misclassification claims, the dancers' common form contracts and applicable law permits for the offsetting of the payments made to the Class Members against any wages found to be due and owning here [8] As the legal and factual issues remain highly disputed, this case is appropriate for settlement.

## V. THE PROPOSED SETTLEMENT CLASS MEETS ALL THE REQUIREMENTS OF CLASS CERTIFICATION

In order to effectuate the proposed Settlement, Plaintiffs move for certification of the Settlement Class, solely for the purposes of Settlement. California favors class actions to protect individuals from fraudulent and deceptive business practices while California courts encourage use of this procedural mechanism to remedy such wrongs. *Sav On Drug Stores, Inc. v. Sup. Ct.* (2004) 34 Cal.4th 319, 340. Code of Civil Procedure section 382 authorizes the maintenance of a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." In moving to certify a class, a plaintiff assumes the burden of showing the existence of an ascertainable class and a well-defined community of interest. *Linder v. Thrifty Oil Co.* (2000) 23 Cal. 4th 429, 435. "The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." *Id., citing Richmond v. Dart Indus., Inc.* (1981) 29 Cal. 3d 462, 470; *Mass. Mutual Life Ins. Co. v. Sup. Ct.* (2002) 97 Cal.App.4th 1282, 1287.

Courts, however, should apply a lesser standard of scrutiny when reviewing certification of classes for settlement than when determining the propriety of class certification for litigation. *Dunk v. Ford Motor Co.* (1996) 48 Cal. App. 4th 1794, 1807 n.19, *as modified* (Sept. 30, 1996) *citing*

---

[7] *See e.g., Falk v. Brennan* (1973) 414 U.S. 190, 195; *Real,* 603 F.2d at, 756 (discussing test under FLSA (same).

[8] Defendants contend that even if the Entertainers performing in the Clubs are found to be employees under *Dynamex* or otherwise, the payments made to Entertainers by the Clubs may well be found by the Court to constitute wage payments, which could significantly reduce, if not totally abrogate, the minimum wage claims being asserted by the Named Plaintiffs on behalf of themselves and others. Settlement Agreement Sections 2.41.9, 2.41.11, and 2.41.12

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco* (9th Cir. 1982) 688 F.2d 615, 633. This reduced standard reflects the fact that a class settlement foregoes further litigation, and thus does not require that plaintiffs prove that the class-wide prosecution of the case would be manageable at trial. *Id.*

**A. Numerosity and Ascertainability**

In this case, the proposed Settlement Class is both numerous and ascertainable. Here, evidence produced during the course of settlement negotiations shows that the estimated Settlement Class is comprised of approximately 5,800 members. It is clear that joinder of that many people is impracticable and that the numerosity requirement is satisfied. Kashima Decl.., at ¶ 4. Each Settlement Class Member can be identified by name, address, and Social Security number. Defendants' records further provide the number of work days that each Class Member performed during the Class Period. This allows Plaintiffs to not only ascertain the identity of the Settlement Class, but also the number of performance dates, and calculate the damages owed to each Settlement Class Member.

**B. Predominance and Commonality**

The Court next must determine whether questions of law and fact common to the Class are substantially similar and predominate over questions affecting the member individually. *Wershba v. Apple Computer, Inc.* (2001) 91 Cal. App. 4th 224, 237-38. The test of predominance is not whether each class member's situation is identical, but rather, whether the common issues would be "the principal issues in any individual action, both in terms of time to be expended in their proof and of their importance, [so] that if a class suit were not permitted, a multiplicity of legal actions dealing with identical basic issues would be required in order to permit recovery by each [absent class member]." *Vasquez v. Superior Court* (1971) 4 Cal. 3d 800, 810.

In this case, each Class Member had similar job duties, were subject to the same alleged failure to pay minimum and overtime wages, were not provided meal and rest breaks (or the resulting pay premium), and were all aggrieved employees pursuant to PAGA. *See* FAC. The Class's alleged injury stems from Defendants' common business practice, *i.e.* classifying exotic dancers working at the Clubs as independent contractors, as opposed to employees.

When compared to any individual issues, such as damages, common questions of law or fact clearly predominate. The questions of: (1) whether dancers were misclassified as independent contractors; (2) whether Defendants' tip-sharing practices are unlawful; (3) whether the entities who dictated those policies, Déjà Vu Services, Inc. and Harry V. Mohney, are joint employers; (4) whether offsets apply to negate any recovery of lost wages; and (5) whether the contracts are enforceable contracts, are entirely common and must be resolved in each Class Member's case. Likewise, Defendants' defense that offsets apply to negate any recovery of lost wages, as well as the arbitration issue will require adjudication for every entertainer and will present a uniform question of law for the Court. Lastly, the joint employer issue predominates here as it will determine the all-important employer status.

If the claims are not all forced into individualized arbitration, resolution of each of these issues would be conducted by the Court by applying common laws to evidence common to each Class Member's claim. Simply put, all dancers were classified the same, for the same reasons, and without any individualized inquiry into their particular employment circumstances. Operations of the Clubs followed the same pattern by owners and management companies and the same form contracts were used for the entertainers.

Furthermore, these common questions are all resolved through uniform evidence applicable to each Class Member's claim. First, common evidence establishes that entertainers are classified for FLSA and state law purposes as independent contractors and are not paid W2 wages. Defendants do not dispute that classification of entertainers was a corporate-level decision made through their corporate representatives and that all Class Members were classified as independent contractors, as opposed to employees. Moreover, Class Members are not paid W2 wages, though those operating under the Club Performer Contract were paid contract fees and were issued a Form 1099.

In addition, the issue of common employer and the arbitration clauses present examples of common issues. This common evidence demonstrating control over Class Members' workplace conditions supports Plaintiffs' claim that Defendants Déjà Vu Services, Inc. and Harry V. Mohney are joint employers of the entire Class under the applicable economic realities and ABC tests. Likewise, the arbitration issue is a common legal issue for all entertainers and will be decided on

law equally applicable to them. Given the presence of such common issues, courts presiding over similar dancer misclassification litigation have found that such questions satisfy the commonality requirements, making certification of a settlement class proper. *See, e.g., Doe v Cin Lan Inc. et al.* Case No. 08-cv-12719 (E.D. Mi.) (Dkt. No. 430) and *Doe v Déjà Vu Services, Inc. et al*. Case No. 16-cv-10877 (E.D. Mi.) (Dkt. No. 77).

Here, common facts establish that all dancers in the Class were uniformly classified as independent contractors and subjected to similar rules and working conditions. Many of those conditions are set forth in the dancer's standard contracts. If application of these common facts to the relevant test for employment status under the wage and hour laws[9] establishes that one dancer was misclassified, it will also establish that all dancers were misclassified. Hence, the predominance requirement is satisfied.

Additionally, each Class Member's individual Settlement Payments will be determined by the duration of their employment, eliminating any individualized damages calculations. Exhibit 1, Settlement Agreement, Article VII; *Williams v. Sup. Ct.* (2013) 221 Cal. App. 4th 1353, 1365 (noting that "Trial by Formula" is an acceptable method of calculating damages); *see also Sav-on Drug Stores, Inc. v. Sup. Ct.* (2004) 34 Cal. 4th 319, 334-35 ("[I]ndividualized proof of damages is not per se an obstacle to class treatment [citation] and 'that each member of the class must prove his separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper.'"). Accordingly, the predominance requirement has been met.

**C. Typicality**

Plaintiffs' claims are also typical of those of the Class. Typicality requires that the named plaintiffs' interests in the action be aligned with those of other Class members. *Richmond*, 29 Cal. 3d at 470-75; *Classen v. Weller* (1983) 145 Cal. App. 3d 27, 46. However, "[t]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal. App. 4th 1497, 1509. Here, the core of the Class's claims all arise from violations of the same FLSA and Labor Code

[9] *Real v. Driscoll Strawberry*, 603 F.2d at 756; *Martinez v. Combs*, 49 Cal. 4th at 59-60.

sections: Defendants failed to pay all of the Settlement Class Members for all time worked and overtime time premiums (*e.g.*, 29 U.S.C. § 207, CAL. LABOR CODE §§ 510, 558, 1194 and 1198), minimum wage (*e.g.*, 29 U.S.C. § 206, CAL. LABOR CODE §§ 1194, 1197, 1198 and 1199), failure to provide accurate wage statements (*e.g.*, CAL. LABOR CODE §§ 226 and 1174), and unlawful wage deductions (*e.g.*, CAL. LABOR CODE §§ 221 and 223).

Evidence shows that the Class Representatives, like every other member of the Class, worked as exotic dancers (nude and/or topless) at Defendants' Clubs and were classified as independent contractors according to company policy. Each dancer signed a form form dancer contract sued throughout the state. In turn, the Class Representatives were treated like all other class members with Club-Performer Contracts in being paid a percentage of their dance sales in lieu of wages in order to work. Thus, the misclassification claims of the Class Representatives and the members of the Class arise from the same course of conduct by Defendants, involve the same facts, and are based on the same legal theories. Accordingly, Plaintiffs' claims coincide with those of the other Class Members.

**D. Adequacy**

The requirement that a plaintiff fairly and adequately represents the class is met by fulfilling two conditions: (1) the named plaintiff must be represented by counsel qualified to conduct the pending litigation; and (2) there are no disabling conflicts of interest between the class representative and the class. *McGhee v. Bank of America* (1976) 60 Cal. App. 3d 442, 450. The Court may presume the adequacy of the proposed representative(s) where they and members of the Class have a common interest in obtaining the same relief, and where the representatives' interests are not otherwise adverse to those of the Class. *See Lazar v. Hertz Corp.* (1983) 143 Cal. App. 3d 128, 142; *Rosack v. Volvo of America Corporation* (1982) 131 Cal. App. 3d 741, 763.

Two of the named Plaintiffs have declared their willingness to assume the responsibilities as Class Representatives, have no disabling conflicts of interest, and intend to vigilantly protect and advance the rights of the similarly situated Settlement Class. Declaration of Jason J. Thompson ("Thompson Decl."), at ¶30 concurrently filed herewith. Plaintiffs have also chosen competent and experienced counsel to pursue their claims. Kashima Decl.; Thompson Decl Exhibit A.; Declaration

of Megan Bonanni concurrently filed herewith. Thus, Plaintiffs have established a shared interest and a lack of conflicts, nothing more is required. *See Richmond,* 29 Cal.3d at 473; *McGhee,* 60 Cal.App. 3d at 487.

**E. Superiority**

Finally, settlement of the instant case as a class action is superior to any alternative. This Action involves thousands of Class Members who have all been injured in varied, but nonetheless, relatively small amounts in the low thousands of dollars.[10] The individual amounts of recovery at issue would otherwise be too small to warrant individual litigation. *Richmond*, 29 Cal.3d at 469; *Carnegie v. Household Int'l, Inc.* (7th Cir. 2004) 376 F.3d 656, 661 ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30"). But, even if the individual Class Members were inclined to seek relief, such repetitious litigation would not benefit the parties or the Court. *Richmond*, 29 Cal.3d at 469. Instead, "this state has a public policy which encourages the use of the class action device." *Richmond*, 29 Cal.3d at 473. Accordingly, this Settlement is superior to continued and individual litigations.

For these reasons, Plaintiffs request that the Court provisionally certify the Settlement Class for purposes of the proposed Settlement, appoint Jane Roes 1 and 2 as Class Representatives, and the undersigned counsel as Class Counsel.

**VI. <u>THE COURT SHOULD PRELIMINARILY APPROVE THIS SETTLEMENT</u>**

**A. The Proposed Settlement Meets the Standards for Preliminary Approval**

Pre-trial settlement of complex class actions is a judicially favored remedy. *Officers for Justice v. Civil Serv. Comm'n* (9th Cir. 1982) 688 F.2d 615, 625 ("Voluntary conciliation and settlement are the preferred means of dispute resolution."). Accordingly, the California Rules of Court set forth a two-step process for settlement of class actions:

> First, the court preliminarily approves the settlement and the class members are notified as directed by the court. (CRC, rule 3.769(c)-(f).) "The notice must contain an explanation of the proposed settlement and procedures for class members to follow in filing written objections to it and in arranging to appear at the settlement hearing and state any objections to the proposed settlement." (CRC, rule 3.769(f).) Second, the court conducts a final approval hearing to inquire into the fairness of the proposed settlement. (CRC, rule 3.769(g).)

---

[10] Under the Settlement and California class action case law, any dancer who has a sizable damage claim and who wishes to pursue that claim, can by merely opting out of the Settlement.

*In re Cellphone Termination Fee Cases* (2009) 180 Cal. App. 4th 1110, 1118. Each class settlement must be reviewed and approved by the trial court. *See* CAL. R. CT. 3.769(a); *see also Dunk,* 48 Cal.App.4th at 1800-01. Approval is a twostep process: (1) an early review by the trial court (preliminary); and (2) a subsequent fairness hearing, after notice is provided to class members (final).

While the Rules of Court are silent on a precise legal standard that should be adopted at preliminary approval, the Court should generally examine the fairness of the settlement terms and the adequacy of class notice. *Merch. v. OfficeTeam* (Cal. Ct. App. Mar. 21, 2013, No. B241888), 2013 WL 1153648, at *7 (unpublished) (citing the Los Angeles Superior Guidelines for Motions for Preliminary and Final Approval of Class Settlement). In this manner, the Court's process for preliminary approval mirrors the standards imposed by federal counterparts:

> "[The] preliminary determination establishes an initial presumption of fairness * * *." *In re General Motors Corp.*, 55 F.3d 768, 784 (3d Cir.1995) (emphasis added). As noted in the *Manual for Complex Litigation,* Second, "[i]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing * * *." *Manual for Complex Litigation*, Second § 30.44 (1985). In addition, "[t]he court may find that the settlement proposal contains some merit, is within the range of reasonableness required for a settlement offer, or is presumptively valid." *Newberg on Class Actions* § 11.25 (1992).

*In re Tableware Antitrust Litig.* (N.D. Cal. 2007) 484 F.Supp.2d 1078, 1079–80 (*citing Schwartz v. Dallas Cowboys Football Club, Ltd.* (E.D. Pa. 2001) 157 F.Supp.2d 561, 570 n.12; *Dunk,* 48 Cal.App.4th at 1802 (noting that "a presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation... ."); *see also Vasquez,* 4 Cal.3d at 821 (California courts examine the Federal Rules of Civil Procedure for guidance in interpreting state class action procedure in absence of controlling state jurisprudence).

Nevertheless, at the preliminary approval stage, a final analysis of the settlement's merits is not required. Accordingly, "[p]reliminary approval of a settlement and notice to the proposed class is appropriate: '[i]f [1] the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential

treatment to class representatives or segments of the class, and [4] falls with[in] the range of possible approval[.]'" *Vasquez v. Coast Valley Roofing, Inc.* (E.D. Cal. 2009) 670 F.Supp.2d 1114, 1125 ("*Coast Valley Roofing*") (citation and internal quotations omitted).

1. The Settlement was reached after Contentious and Informed Arms' Length Negotiations

"A presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery." *In re Heritage Bond Litig.* (C.D. Cal. June 10, 2005, No. 02-ML-1475 DT) 2005 WL 1594403, at *9; *Dunk*, 48 Cal.App.4th at 1802. Moreover, if the terms of the settlement are fair, courts generally assume the negotiations were proper. *See In re GM Pick-up Truck Fuel Tank Prods. Liab. Litig.* (3d Cir. 1995) 55 F.3d 768, 785-86.

In the instant case, the Settlement was negotiated after disclosures in two prior similar matters and an initial disclosure here of information which enabled Class Counsel to develop an individualized damages model, which approximated the value of the Settlement Class's claims on an individual and collective basis. Additionally, the parties also engaged two experienced and respected mediators in an attempt to broker a settlement. Yet, even with the assistance of neutral mediators, the parties' settlement negotiations extended well for several months and only concluded after two, non-consecutive mediation sessions. Thompson Decl. at ¶16-18. The involvement of meditators, as well as the lengthy and adversarial nature of the settlement negotiations, are all indicia of the "contentious" nature of the underlying negotiations. *See Wershba*, 91 Cal. App. 4th at 245.

2. The Proposed Settlement Falls Within the Range of Possible Approval

To determine whether a settlement is fair and reasonable, California courts considered a number of factors including the following considerations: (1) the value of the settlement; (2) the inherent risk of continued litigation; (3) the extent of discovery completed and the status of the proceedings when settlement is reached; (4) the complexity, expense, and likely duration of the litigation in the absence of a settlement; and (5) the experience and views of class counsel. *See Wershba*, 91 Cal. App. 4th at 244-45; *Dunk*, 48 Cal.App.4th at 1801. "Ultimately, the court's determination is simply an amalgam of delicate balancing, gross approximations and rough justice." *Cho v. Seagate Tech. Holdings, Inc.* (2009) 177 Cal.App.4th 734, 743.

*a. The Settlement Represents a Significant Value to the Class*

The Settlement Fund provides the Class $1,500,000.00 in total relief, as well as enhanced employment terms. Based on the total number of potential Settlement Class Members, Plaintiffs estimate the average recovery will be $303.07. Kashima Decl, at ¶9. This number is significant given that the average dancer only 56 workdays. Thompson Decl. at ¶14. Settlement Class Members will not have to take any affirmative steps to secure their monetary portion of the Settlement. Instead, these funds will be mailed directly to the Settlement Class Members. Exhibit 1, Settlement Agreement, Article XI. Thus, this recovery is not illusory or insignificant.

The valuation of the outstanding claims, and the ultimate Settlement, was informed by the parties' early informal discovery and damages model presented by the parties at mediation. Kashima Decl, at ¶¶3-4. Plaintiffs projected that the total damages for the Settlement Class was approximately $32,029,352.45 ($5,522.30 per dancer x 5800 Class Members), if Plaintiffs were successful at trial. *Id.*, ¶4.[11] Accordingly, the Settlement Fund *alone* represents approximately 4 to 5% of the full verdict value of the claims being released. *Id.*, at ¶9. This is well within the bounds of reasonableness. *See Doe v Cin Lan Inc. et al.* Case No. 08-cv-12719 (Dkt. No. 430) and *Doe v Déjà Vu Services, Inc. et al*. Case No. 16-cv-10877 (Dkt. No. 77).[12] And, of course, the amount of the Settlement Pool does not even account for the enhanced monetary terms of employment to which the Settlement Class Members will be subject in the event that this Court approves the Settlement.

The Settlement also provides recovery to the State of California in the form of stipulated PAGA civil penalties. There are no articulated standards for determining whether PAGA civil penalties provided within a class action settlement are reasonable. *Ramirez v. Benito Valley Farms,*

---

[11] Plaintiffs calculated the following average damages/penalties per dancer based on client interviews and wage statements provided by Defendants. The damage assessment assumptions reflects the uncertainty regarding the aggregate amount of hours worked, as well as the number of meal and rest breaks missed, by the Settlement Class that could be proven at trial. Kashima Decl.. at ¶4.

[12] In exchange for this relief, the Settlement Class agrees to release claims that could have, or should have, been pled in the Complaint. Accordingly, the scope of the release is also reasonable. Coast Valley Roofing, 370 F.Supp.2d at 1126 (finding a class action settlement fair because the "settlement does not release unrelated claims that class members may have against defendants."). *Cf. Trotsky v. Los Angeles Federal Savings & Loan Ass'n.* (1975) 48 Cal.App.3d 134, 147-49 ("[T]he complaint was not amended to encompass the terms of the settlement. Without amendment of the complaint the purported settlement… was outside the scope of the action and was not valid.");

*LLC* (N.D. Cal. Aug. 25, 2017, No. 16-CV-04708) 2017 WL 3670794, at *3. Instead, the court "evaluates the PAGA settlement in light of the PAGA requirement that the award not be 'unjust, arbitrary and oppressive, or confiscatory.'" *Id.* (citing CAL. LABOR CODE § 2699(e)(2)).

It is important to note that under PAGA, civil penalties (and arguably unpaid wages) are recoverable. CAL. LABOR CODE § 558, subd. (a). "Underpaid wages go[ ] entirely to the affected employee or employees as an express exception to the general rule that civil penalties recovered in a PAGA action are distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees." *Thurman v. Bayshore Transit Mgmt., Inc.* (2012) 203 Cal. App. 4th 1112, 1145. But it is not necessary for a settlement to allocate any funds towards PAGA civil penalties if the settlement benefits the aggrieved employees. *See Ramirez, supra,* 2017 WL 3670794, at *4 ("[C]lassifying the PAGA penalties in this case solely as underpaid wages is reasonable."). The Settlement Agreement, nonetheless, provides that $20,000.00 shall be allocated as civil penalties to be divide among the aggrieved employees and the State. Exhibit 1, Settlement Agreement, § 7.3. This amount is consistent with allocations that have been approved in other settlements. *See, e.g., Viceral, supra,* 2016 WL 5907869, at *8 (approving an allocation of $20,000 of a $6,000,000 settlement to the PAGA civil penalties); *In re Uber FCRA Litig.* (N.D. Cal. June 29, 2017, No. 14-CV-05200) 2017 WL 2806698, at *2 (approving an allocation of $7,500 of a $7,500,000 settlement to the PAGA civil penalties). Here, the benefit provided by the proposed Settlement is substantial and easily falls within the range of reasonableness.

*b. The Risk of the Litigation Favors Settlement*

"It can be difficult to ascertain with precision the likelihood of success at trial. The Court cannot and need not determine the merits of the contested facts and legal issues at this stage, [Citation], and to the extent courts assess this factor, it is to 'determine whether the decision to settle is a good value for a relatively weak case or a sell-out of an extraordinary strong case.'" *Misra v. Decision One Mortg. Co.* (C.D. Cal. Apr. 13, 2009, No. SACV070994) 2009 WL 4581276, at *7.

Plaintiffs are confident about the strength of their claims. Nonetheless, Plaintiffs recognize that Defendants have factual and legal defenses that, if successful, would potentially defeat or substantially impair the value of Plaintiffs' lawsuit. For example, Plaintiffs could potentially be

unable to certify a class (due to, among other reasons, the arbitration agreements with comprehensive class and collective action waivers) or prove the merits of their claims (on a classwide basis) at trial. These risks are not remote in an employment case. *See, e.g., Zackaria v. Wal-Mart Stores, Inc.* (C.D. Cal. May 18, 2015, No. ED CV 12–1520) 2015 WL 2412103, at *16 (denying certification of claims that asset protection coordinators were misclassified as exempt; although putative class members received similar training and were held to identical job expectations, an analysis of how employees actually spent their time is an individual question not amenable to resolution through collective proof). Significantly, in other cases against exotic dance clubs, despite application of the correct legal test, certain dancers have still lost on their misclassification claims at trial. *See, Moody v. Razooly* (Cal. Ct. App. Feb. 25, 2003) 2003 WL 464076 (affirming jury verdict for defendant); *Matson v. 7455, Inc.* (D. Or 2000) 2000 WL 1132110 (granting defendant nightclub's motion for summary judgment); *Buel v. Chowder House, Inc.* (Cal. App. 1 Dist. 2006) 2006 WL 1545860 (*involving one of the very Defendants here*, the Court of Appeal affirmed a jury verdict that the dancer was not an employee and was properly an independent contractor) Further, even if the dancers were to prevail on their misclassification claims, Defendants have argued that they are nevertheless entitled to complete wage offsets, negating any recovery. *See Razooly* and *Matson, supra*. The Eastern District of Michigan recognized the viability of the setoff counterclaim in its February 24, 2010 Order in the 2008 *Cin Lan* case denying Plaintiff's Motion to Dismiss the Amended Counterclaim at p. 12 (Dkt. No. 59) finding:

> As stated above, Cin-Lan's claim is for return of a portion of the dance fees it allowed Doe to keep. Cin-Lan has alleged facts sufficient to show that in the event Doe is entitled to a minimum wage as an employee, Cin-Lan may be entitled to a return of its dance fees.

Defendants have also argued in negotiations that: Class Members' income while working at the Clubs well exceeded any minimum wages and hence, any recovery would create a "windfall" for the dancers; that Defendants did not engage in unlawful tip sharing as the monies paid to dancers first went into the gross income of the Clubs before payment to the dancers and were therefore mandatory service fees, not tips; that Cal. Labor Code §§ 350 and 351 do not provide for any private

cause of action;[13] that a prerequisite to application of Cal. Labor Code §§ 350 and 351 is a finding of employment status, which has been defeated in trials; that many dancers will have difficulty proving their damages because they never filed tax returns claiming their cash income; that Plaintiffs cannot prove their joint employer allegations; that certain defendants lack the resources to sustain any judgment; and that class certification would be difficult if not impossible to obtain for the litigation class alleged.

In short, this is highly contested litigation with significant risks for both sides making settlement before trial appropriate. While the Plaintiff class could have possibly recovered more than $1.5 million dollars had they won all issues both at trial and on appeal, those goals had to be tempered against the possible inability to litigate as a class, the substantial risk of no recovery at all, and the equities involved, as the Eastern District of Michigan recognized when raising concerns about possible "windfalls" to the dancers.

"The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after several years of litigation." *In re Nvidia Derivs. Litig.* (N.D. Cal. Dec. 22, 2008, No. C-06-06110) 2008 WL 5382544, at *3. Indeed, potential appeals aside, litigating a complex case through trial is inherently perilous regardless of the strengths of merits of the claims:

> [N]othing is assured when litigating against commercial giants with vast litigative resources, particular in such complex litigation as this, which would strain the cognitive capacities of any jury. Defense judgments were hardly beyond the realm of possibility. Accordingly, this factor weighs in favor of preliminary approval.

*Rebney v. Wells Fargo Bank* (1990) 220 Cal. App. 3d 1117, 1140, *opinion modified* (June 18, 1990); *See* Kashima Decl., at ¶¶11-12.

Finally, even if Plaintiffs were successful at trial, business realities created uncertainty in Plaintiffs' ability to recover their hard-fought judgment. Potential exposure for the Settlement Class's claims, with labor code violations and PAGA penalties (unreduced) could exceed $32 million Kashima Decl., at ¶13. Thus, Plaintiffs were concerned about Defendants' ability to absorb a large judgment in this case. *Id.*; *In re Toys R Us* (C.D. Cal. 2014) 295 F.R.D. 438, 452 ("For its part, Toys risked the possibility of 'catastrophic damages' … The fact that both sides faced this type of

[13] *See generally Lu v. Hawaiian Gardens Casino, Inc.* (Cal. Aug.9, 2010) 2010 WL 3081272

all-or-nothing prospect weighs in favor of approval."); *County of Suffolk v. Long Island Lighting Co.* (2d Cir. 1990) 907 F.2d 1295, 1323–1324 (The Court should consider the ability of the defendant to withstand a greater judgment when approving a class settlement.). Accordingly, were this case to move forward, the ultimate recovery from Defendants could have been considerably less than the value achieved by this Settlement.

*c. Complexity, Expense, and Likely Duration of Further Litigation*

Continuing to litigate this action would require continued and extensive resources coupled with significant Court time to proceed through trial and post-trial motions; which can often take years. Kashima Decl., at ¶¶11-12. Furthermore, wage and hour litigation is complex and expensive, as it often necessitates extensive expert testimony, particularly with regards to damages. *Id.* But even if Plaintiffs are successful at trial, they are acutely aware that a judgment does not end the litigation. Plaintiffs fully expect that Defendants would appeal any favorable judgment. *Id.* "Avoiding such a trial and the subsequent appeals in this complex case strongly militates in favor of settlement rather than further protracted and uncertain litigation." *Nat'l Rural Telecomms. Coop v. DirecTV* (C.D. Cal. 2004) 221 F.R.D. 523, 527. Thus, "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Id.* at 526.

The value of an immediate recovery here outweighs the mere possibility of future relief after protracted and expensive litigation. This concern is particularly acute in a case such as this where the Class Members, by general nature, are more transient and difficult to find to secure testimony and evidence, and to deliver benefits to, as time goes by.[14] As a result, any considerable delay frustrates their ability to enjoy the benefits of the relief provided under the Settlement. It may be simply be too difficult to find them.

*d. The Experience and Views of Counsel*

In contemplating the preliminary approval of a proposed settlement, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Knight v. Red Door Salons Inc.* (N.D. Cal. Feb. 2, 2009, No. 08-01520) 2009 WL 248367, at *4 (*citing Boyd v. Bechtel Corp.*

[14] Exotic dancers tend to work in the industry for a limited time before moving on to other professions.

(N.D. Cal. 1979) 485 F.Supp. 610, 622); *see also Nat'l Rural Telecomms. Coop*., 221 F.R.D. at 528 (*citing Cotton v. Hinton* (5th Cir. 1977) 559 F.2d 1326, 1330). "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enters. Secs. Litig*., 47 F.3d at 378. Thus, "the Court should not without good cause substitute its judgment for [counsel's]." *Boyd*, 485 F. Supp. at 622.

Nothing suggests that Class Counsel's recommendation of settlement is unreasonable. Plaintiffs and the Settlement Class were represented by law firms having extensive class action experience, including wage and hour litigation. Kashima Decl., Ex. A; Thompson Decl. Exhibit A.; Declaration of Megan Bonanni, concurrently filed herewith. *Knight*, 2009 WL 248367, at *4. Based on that experience, and information gleaned from early discovery, Counsel was able to negotiate full conversion of the workforce from independent contractors to employees as well as a sizable monetary recovery for the Settlement Class.

3. <u>The Settlement Provides the Same Relief for All Settlement Class Members</u>

Finally, the Settlement does not improperly discriminate between any segments of the Settlement Class. *Vasquez,* 670 F.Supp.2d at 1125. Each Settlement Class Member is entitled to the same relief calculated from the same formula. Exhibit 1, Settlement Agreement, Article VII. Indeed, the only variation between the Settlement Class Members' recovery is a function of the number of their Performance Dates during the Class Period and if the individual was terminated during the Class Period (and is therefore entitled to waiting time penalties, pursuant to California Labor Code, section 203(a)). *Id*. Given that both the civil penalties and damages accrued by Settlement Class Members would be logically proportional to the amount of time worked, the payment formula established in the Settlement Agreement is both rationally based and directly related to the claims asserted. *See True v. American Honda Motor Co.* (C.D. Cal. 2010) 749 F.Supp.2d 1052, 1067 ("[D]ifferential treatment of class members may be appropriate where 'the settlement terms are rationally based on legitimate considerations.'"); *Petruzzi's, Inc. v. Darling–Delaware Co., Inc.* (M.D. Pa. 1995) 880 F.Supp. 292, 300–01 ("disparate treatment of class members may be justified by a demonstration that the favored class members have different claims or greater damages"). There is no preferential treatment.

Additionally, while the Settlement Agreement allows Class Representatives to seek an incentive award of up to $10,000 each, this payment to the Class Representatives is a sensible amount given the amount of time expended in prosecuting this case and the releases obtained. *Roe v. Frito-Lay, Inc.*, (N.D. Cal. Apr. 7, 2017, No. 14-CV-00751) 2017 WL 1315626, at *8 ("[A] $5,000 incentive award is 'presumptively reasonable' in the Ninth Circuit.") (collecting cases).

4. The Settlement Has No Obvious Deficiencies

Here, the Settlement was a product of extensive and arm's length negotiations, and involved counsel experienced in class litigation. It provides the Settlement Class real and immediate relief. Accordingly, the Settlement does not suffer any obvious deficiencies. It is for these reasons that Plaintiffs request that the Settlement be preliminarily approved.

**B. The Settlement Also Warrants Approval under the FLSA**

In addition to the standards set forth in Rule 3.769, the FLSA contains a separate standard for examining settlements. The FLSA was enacted for the purpose of protecting all covered workers from the inequities in the workplace that result from the differences in bargaining power between employers and employees. *See Barrentine v. Arkansas–Best Freight System, Inc.* (1981) 450 U.S. 728, 739. The goal of the FLSA was to ensure that each employee covered by the Act received "[a] fair day's pay for a fair day's work and would be protected from the evil of overwork as well as underpay." *Id.* at 739 (internal citation and quotations omitted). The FLSA, therefore, provides that "[a]ny employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee … affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be...." 29 U.S.C. § 216(b). The FLSA's provisions are mandatory and, except in two narrow circumstances, are generally not subject to bargaining, waiver, or modification by contract or settlement. *Brooklyn Sav. Bank v. O'Neil* (1945) 324 U.S. 697. The two circumstances in which the FLSA may be compromised are claims that are supervised by the Secretary of Labor and when a court reviews and approves a settlement in a private action for back wages under 29 U.S.C. § 216(b). *Lynn's Food Stores, Inc. v. United States* (11th Cir. 1982) 679 F.2d 1350, 1353.

The latter exception applies to this case. The Court's role in this situation is comparable to

that of a court in a settlement of a class action brought pursuant to California Code of Civil Procedure § 382. *Collins v. Sanderson Farms, Inc.* (E.D. La. 2008) 568 F. Supp. 2d 714, 719 (comparing FLSA settlements to Rule 23(e) settlements); *Vasquez,* 4 Cal.3d at 821 (California courts examine the Federal Rules of Civil Procedure for guidance in interpreting state class action procedure in absence of controlling state jurisprudence). "In essence, the Court must ensure that the parties are not, via settlement of the plaintiffs' claims, negotiating around the clear FLSA requirements of compensation for all hours worked, minimum wages, maximum hours, and overtime." *Collins, supra,* 568 F. Supp. 2d at 719. citing 29 U.S.C. §§ 206, 207. The existence of a question as to the plaintiffs' entitlement to compensation under the FLSA serves as a guarantee that the parties have not manipulated the settlement process to permit the employer to avoid its obligations under the FLSA. Thus, to ensure that the plaintiffs have not abandoned their rights under the Act, "the court must determine whether such a question, or *bona fide* dispute, exists." *Crawford v. Lexington–Fayette Urban County Gov't* (E.D. Ky. Oct. 23, 2008, No. 06-299) 2008 WL 4724499, *3.

The Settlement Agreement in this case resolves a "*bona fide* dispute" under the FLSA and contains terms that seek to avoid further actions under the FLSA and other state wage and hour laws. Both sides aggressively advocated their positions, which clearly demonstrated that the legal and factual issues presented in this action did not necessarily favor either side. This *bona fide* dispute justifies settlement in this matter. Moreover, for all the foregoing reasons discussed in the context of Rule 3.769 standards, the settlement is a fair and reasonable compromise and should be approved under the appropriate FLSA standards.

### C. The Proposed Notice will Adequately Apprise the Class of their Rights Under the Settlement

Assuming the Court determines the Settlement is fair and adequate, it should also order that notice be sent to the Class. Manual for Complex Litig., § 21.632 at 321. Pursuant to California Rules of Court, rule 3.769(f), "[t]he notice must contain an explanation of the proposed settlement and procedures for class members to follow in filing written objections to it and in arranging to appear at the settlement hearing and state any objections to the proposed settlement."

The proposed notice meets all of these requirements. The Class Notice is neutral, written in

an easy-to-understand and clear language, and provides entertainers with (1) basic information about the Action; (2) a description of the benefits provided by the Settlement; (3) an explanation of how Class Members can exercise their right to object to or opt-out of the Settlement; (4) an explanation that any claims against Defendants that could have been litigated in this action will be released; (5) a schedule of the names of counsel for the Class and information concerning attorney's fees and incentive awards; and (6) the date and time of the fairness hearing, along with an explanation of eligibility to appear. Exhibit 1, Settlement Agreement, Exhibits D and E thereto.

Collectively, the notice regime is predicted to directly reach a vast majority (if not all) of the Class. The Class Notice will be provided *via* First Class U.S. Mail and, where available, email. Settlement Agreement, Article V. Defendants shall provide Class Members' addresses and email addresses, drawn from its own records, to the Settlement Administrator. *Id*. If the Class Notice is returned to the Settlement Administrator as non-delivered, it will be resent to any forwarding address provided; otherwise, the Settlement Administrator will attempt to determine a correct address by lawful use of skip-tracing, or other search using the name, address and/or Social Security number of the Class Member involved. *Id*. In addition to the mailed and emailed notice, Defendants shall prominently display the details of the Settlement Pool in each Club's Entertainer dressing room. The Posted Notice shall remain posted until the Opt Out Period expires. *Id*.

This process will ensure that the Class receives the best practicable notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co*. (1950) 339 U.S. 306, 314. Similarly, it will also ensure that the individual settlement payments will be provided to the correct address.

**D. Proposed Timeline for Events Should be Adopted**

If the Court preliminarily approves the Settlement Agreement, the parties envision the following schedule:

| Event | Date |
|---|---|
| Defendants to provide Class Member list to Settlement Administrator | 30 days from the date of the Court's Order Granting Preliminary Approval |
| Settlement Administrator to mail Class Notice | 20 days after receiving Class Member List |
| Class Counsel to file Motion for Attorney's fees, | 14 days before Response Deadline |

| | |
|---|---|
| costs, and class representative service awards | |
| Deadline for Class Members to opt-out and/or object to the Settlement Agreement ("Response Deadline") | 60 days after mailing of Class Notice |
| Plaintiffs to file Motion for Final Settlement Approval | 15 days after the Response Deadline |
| Final Approval Hearing | To be determined by the Court |

The Plaintiffs respectfully request that the Court adopt the above settlement schedule and provide the parties a hearing date for Final Approval.

## VII. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant their request for leave to file the First Amended Complaint, certify the Settlement Class, appoint Jane Roes 1 and 2 as Class Representatives and the undersigned counsel as Class Counsel, and preliminarily approve the Settlement.

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

Dated: October 11, 2018

By: ____________________________

Jeffrey R. Krinsk, Esq.
jrk@classactionlaw.com
Trenton R. Kashima, Esq.
trk@classactionlaw.com
550 West C St., Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

Megan A. Bonanni, Esq. (*pro hac vice forthcoming*)
mbonanni@pittlawpc.com
PITT MCGEHEE PALMER & RIVERS P.C.
117 West 4th Street, Suite 200
Royal Oak, MI 48067
Telephone: (248) 939-5081

Jason J. Thompson (*pro hac vice forthcoming*)
jthompson@sommerspc.com
SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700

Southfield, Michigan 48076
Telephone: (248) 355-0300
Facsimile: (248) 436-8453

*Attorneys for Plaintiffs*
*and the putative class*

# EXHIBIT 1

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

**JANE ROES 1-4, individually and on behalf of all others similarly situated,**

**Plaintiffs,**

**v.**

**DÉJÀ VU SERVICES, INC., HARRY MOHNEY, GRAPEVINE ENTERTAINMENT, INC., d/b/a DEJA VU SHOWGIRLS, CATHAY ENTERTAINMENT INC./ H.D.V. NO.3, LLC d/b/a DEJA VU SHOWGIRLS, NITE LIFE EAST, LLC d/b/a LITTLE DARLINGS, SP STAR ENTERPRISE, INC. d/b/a DEJA VU, COLDWATER, LLC d/b/a DEJA VU SHOWGIRLS, NEW WAVE, INC. d/b/a VENUS FAIRE, EYEFULL, INC. d/b/a DEJA VU SHOWGIRLS, CBDM REDLANDS, LLC d/b/a LARRY FLYNT'S HUSTLER CLUB, 3610 BARNETT AVE., LLC d/b/a ADULT SUPERSTORE, 4805 CONVOY, INC., d/b/a DREAMGIRLS, C.B. & D.M. ENTERTAINMENT, INC. d/b/a DEJA VU SHOWGIRLS, JOLAR CINEMA OF SAN DIEGO, LTD. d/b/a JOLAR CINEMA SHOWGIRLS, PACERS, INCORPORATED d/b/a LARRY FLYNT'S HUSTLER CLUB, SHOWGIRLS OF SAN DIEGO, INC. d/b/a DEJA VU SHOWGIRLS, BIJOU – CENTURY, LLC d/b/a CENTURY THEATRE, BT CALIFORNIA, LLC d/b/a BROADWAY SHOWGIRLS, CHOWDERHOUSE, INC. d/b/a HUNGRY I, DEJA VU – SAN FRANCISCO, LLC d/b/a CENTERFOLDS, DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC d/b/a TEMPTATIONS/ LITTLE DARLINGS, GOLD CLUB – S.F., LLC d/b/a GOLD CLUB, MARKET ST. CINEMA, LLC d/b/a MARKET STREET CINEMA, S.A.W. ENTERTAINMENT, LTD., d/b/a LARRY FLYNT'S HUSTLER / CONDOR, SAN FRANCISCO GARDEN OF EDEN, LLC d/b/a**

Case No: 37-2018-00028014-CU-OE-CTL

**RELEASE AND SETTLEMENT AGREEMENT**

**GARDEN OF EDEN, SAN FRANCISCO ROARING 20'S, LLC, d/b/a ROARING 20'S, STOCKTON ENTERPRISES, LLC d/b/a DEJA VU SHOWGIRLS, BOB MARTIN, INC. d/b/a DEJA VU EROTIC ULTRA LOUNGE, and DOES 1-200, jointly and severally,**

**Defendants.**

---

**RELEASE AND SETTLEMENT AGREEMENT**

## I. INTRODUCTION

1.1 This Release and Settlement Agreement (which, together with all attached exhibits, is referred to collectively herein as the "Agreement") is entered into between Plaintiffs Jane Roes 1-2 (sometimes the "Named Plaintiffs" or the "Class Representatives") to this Action[1], on behalf of themselves and all others similarly situated (the Named Plaintiffs and all Class Members are collectively referred to hereinafter simply as the "Plaintiffs"), and Defendants Deja Vu Services, Inc. (formerly known as Deja Vu Consulting, Inc., and hereinafter "Services"), Harry Mohney ("Mohney"), along with all of the additional Affiliated Entities identified in Exhibit A attached hereto and incorporated by reference (Services, Mohney, and the Affiliated Entities are collectively referred to in the balance of this Agreement as the "Defendants"). This Agreement settles – except for those matters specifically reserved herein – collective claims brought pursuant to the provisions of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq*. -- the "FLSA") and class action claims under various California labor, and labor-related, laws pursuant to California Code of Civil Procedure 382 and California Rule of Court 3.760 et seq. (all collectively simply "Rule 3.760"). Upon execution of this Agreement, Final Approval by the Court, and the Judgment

[1] Capitalized terms and phrases contained in this Introduction and in the Recitals portion of this Agreement are specifically defined in Article III herein or elsewhere in this Agreement.

becoming Final, it is the express intent of the Parties to resolve all Claims – except those specifically reserved herein – which were brought (both initially and by way of the amendment permitted under this Agreement), or which could have been brought based upon the facts pled, by the Class Representatives, by all "opt in" Class Members who file a Consent to Join this Action, and by all Class Members who have declined to Opt Out of the Settlement Agreement and who therefore constitute the Rule 3.760 Settlement Class. The Settlement shall become fully operative upon the date that the Judgment becomes Final.

## II. <u>RECITALS</u>

2.1 On June 25, 2008, an individual identified as Jane Doe 1 (the "Cin-Lan Plaintiff") filed suit in the United States District Court for the Eastern District of Michigan, Southern Division, Case No. 2:08-cv-12719, alleging that she and all Entertainers who Performed at Cin-Lan, Inc. ("Cin-Lan"), in Lansing, Michigan, and/or at eight (8) other identified adult entertainment establishments in Michigan, were misclassified as non-employees or as "independent contractors" by their alleged employer, Cin-Lan, and also contending that Deja Vu Consulting, Inc. ("Consulting," now Services) was their joint employer (the "Cin-Lan Action"). The Cin-Lan Plaintiff claimed that this alleged misclassification resulted in her sustaining certain losses, including not being paid minimum wages, being subjected to impermissible tip sharing, and not being provided other employee benefits, all of which she contended was actionable under the FLSA and the Michigan Minimum Wage Act ("MWL").

2.2 Mohney was later added as a defendant to the Cin-Lan Action wherein the Cin-Lan Plaintiff alleged that he was her joint employer as well.

2.3 The defendants in the Cin-Lan Action, Cin-Lan, Consulting and Mohney (the "Cin-Lan Defendants"), vigorously contested the joint employer allegations as well as the

misclassification claims asserted by the Cin-Lan Plaintiff, and filed Counterclaims against her and against the putative class for, among other things, offset, breach of contract, fraud and unjust enrichment.

2.4 Following comprehensive discovery and the undertaking of extensive motion practice, which resulted in, among other things, the court refusing to dismiss the Cin-Lan Defendants' counterclaims against the Cin-Lan Plaintiff and the putative class, the parties to the Cin-Lan Action engaged in lengthy settlement negotiations that extended over a more than six (6) month period, in an effort to reach a resolution. Such negotiations resulted in extending the scope and resolution of the Cin-Lan Action to include Entertainer Claims against all exotic dance establishments that were at the time affiliated with Consulting (the "Consulting-Affiliated Clubs"), which included numerous Clubs located in the State of California. That resolution was ultimately approved by the federal court in 2011 (the "Cin-Lan Settlement").

2.5 At the time of the settlement negotiations surrounding the Cin-Lan Action, seven (7) substantially similar lawsuits and three (3) state labor law claims were pending, all of which alleged that Entertainers Performing at certain Consulting-Affiliated Clubs were misclassified as non-employees or as "independent contractors" and nine (9) of which involved Claims in the State of California. Those matters and proceedings were all, pursuant to the court granting a motion under the All Writs Act, 28 USC § 1651, stayed and eventually resolved by, the Cin-Lan Settlement.

2.6 In seeking to obtain a satisfactory resolution of the Cin-Lan Action, class counsel, the firm of Sommers Schwartz, P.C., and in particular attorney Jason Thompson (sometimes collectively "Sommers Schwartz"), sought and obtained the input of numerous class members in regard to the relief that they desired to obtain out of any possible settlement, and did not find at

the time any significant desire of such individuals to require, as a condition of such settlement, conversion of Entertainers who Performed at the Consulting-Affiliated Clubs to employees. The Cin-Lan Settlement, as approved by the court, did not include `the conversion of Entertainers who Performed at Consulting-Affiliated Clubs into employees of those nightclubs.

2.7 On August 8, 2014, two Entertainers identified as Jane Does 1-2 filed suit against SFBSC Management, LLC ("SFBSC"), in the U.S. District Court, Northern District of California, Case No. 3:14-cv-03616-LB, asserting that they, and all Entertainers who Performed at eleven nightclubs in San Francisco, California, were misclassified as independent contractors but were really employees of the nightclubs and joint employees of a management company (SFBSC) that provided management and consulting services to the nightclubs (the "San Francisco Litigation").

2.8 In March of 2017, following extensive motion practice, an appeal to the Ninth Circuit United States Court of Appeals, three mediations under the auspices of the Ninth Circuit mediation program, and lengthy negotiations, the parties to the San Francisco Litigation executed a Class Action Settlement Agreement and Release (the "San Francisco Settlement," attached as ***Exhibit B*** and incorporated herein by reference) that settled, pursuant to and limited by the terms thereof, the San Francisco Litigation. Irrespective of and over objections submitted by the Firm of Lichten & Liss-Riordan, P.C. ("Lichten & Liss") on behalf of nine Entertainers (Nicole Hughes, Penny Nunez, Angelynn Hermes, Elana Pera, Sarah Murphy, Poohrawn Mehraban, Gypsy Vidal, Tiffany Zoumer and Devon Locke; "the San Francisco Objectors"), the federal district court granted preliminary approval of the San Francisco Settlement on April 14, 2017 (the "San Francisco Preliminary Approval Date"), and after additional objections submitted by Lichten & Liss (the "San Francisco Objections") granted final approval of the San Francisco Settlement on September 14, 2017.

2.9 The San Francisco Settlement provides certain injunctive relief going forward with regard to the way that the nightclubs subject to that settlement classified and treated the Entertainers, including the creation of an "enhanced offer of employee status" pursuant to which each settling nightclub's management personnel were required to give Entertainers the unfettered option of performing as employees, who were to be guaranteed to earn at least fifteen dollars ($15.00) an hour and commissions of at least twenty percent (20%) of the dance fees earned from their Performances in excess of the first one hundred fifty dollars ($150.00) generated by their sale of private dances per Date of Performance. The settling nightclubs were also required, pursuant to the San Francisco Settlement, to present Entertainers with a "Selection Document" which explains that, while Entertainers who choose employee status give up certain controls that independent contractors are afforded (such as the freedom to select the dates and times of their Performances), Entertainers who select the enhanced employment offer are entitled to all rights, benefits, and privileges afforded other non-managerial employees of the settling nightclubs.

2.10 Lichten & Liss, on behalf of the San Francisco Objectors, appealed the granting of final approval of the San Francisco Settlement, and that appeal is pending, at the time of execution of this Agreement, in the Ninth Circuit United States Court of Appeals (the "San Francisco Appeal").

2.11 On March 10, 2016, an unidentified Entertainer designated as Jane Doe 1 filed suit in the United States District Court for the Eastern District of Michigan, Southern Division, Case No. 1:16-cv-10877, alleging that she and all other Entertainers who performed at DV Saginaw, LLC ("Deja Vu Saginaw"), were misclassified as non-employees or as "independent contractors," by their alleged employer, Deja Vu Saginaw, and asserting that Services and Mohney were joint

employers of Entertainers (including Jane Doe 1) who Performed at Deja Vu Saginaw (the "Michigan Litigation").

2.12 On September 16, 2016, Deja Vu Saginaw, Services and Mohney filed a motion to compel plaintiff Jane Doe 1 into individualized arbitration and to dismiss or stay the Michigan Litigation.

2.13 Subsequent thereto and following substantial and lengthy negotiations, counsels in the Michigan Litigation ultimately negotiated a potential resolution thereof which included the expansion of the Michigan Litigation to include all then-existing nightclubs throughout the United States that were then affiliated, in any way, with Services or Mohney, with the exception of those nightclubs located in San Francisco, California; those nightclubs already being under suit in the San Francisco Litigation and potentially subject to a separate settlement that ultimately resulted in the San Francisco Settlement.

2.14 In February of 2017, the parties to the Michigan Litigation executed a Release and Settlement Agreement (the "Limited National Settlement"; attached as ***Exhibit C*** and incorporated herein by reference) that settled, pursuant to and limited by the terms thereof, the Michigan Litigation.

2.15 At the time of the settlement negotiations surrounding the Michigan Litigation, at least six (6) substantially similar lawsuits and two (2) state labor claims (both of which arose in the State of California) were pending, all of which alleged that Entertainers Performing at certain nightclubs affiliated with Services were misclassified as non-employees or as "independent contractors." Those matters and proceedings were all, pursuant to the court granting a motion under the All Writs Act, stayed and eventually resolved by, the Limited National Settlement.

2.16 The firms of Sommers Schwartz and Pitt McGehee Palmer & Rivers, P.C. ("Pitt McGehee") acted as co-class counsel in the Michigan Litigation as well.

2.17 The federal district court granted preliminary approval of the National Settlement on February 7, 2017 (the "Limited National Settlement Preliminary Approval Date"), and over objections submitted by Lichten & Liss on behalf of two California Entertainers named Brittney Halverson and Eva Cabrera (the "California Limited National Settlement Objections") and other objectors, the district court granted final approval of the Limited National Settlement on June 16, 2017, and through an amended order dated October 27, 2017.

2.18 The Limited National Settlement provides certain injunctive relief going forward with regard to the way that the nightclubs subject to that settlement classified and treated the Entertainers, including, but not limited to, the ability of Entertainers to freely select, under the terms, protections, and limitations provided for therein, to work at the nightclubs subject to that settlement as employees or to Perform under non-employee structures (collectively referred to as Independent Professional Entertainers, or "IPE's"); an "assessment" process that would govern whether Entertainers could perform as IPE's if they so desired or were required to work as employees; protections for IPE's; and an "enhanced" offer of employment to entice Entertainers to select to work as employees of those nightclubs as opposed to Performing as IPE's, by which they would receive remuneration over-and-above the wage rates required by law and additional benefits not legally required for employees.

2.19 Along with certain other objectors, Lichten & Liss, on behalf of the California Objectors, appealed the granting of final approval of the Limited National Settlement, and that appeal is pending, at the time of execution of this Agreement, in the Sixth Circuit United States Court of Appeals (the "Limited National Settlement Appeal").

2.20 On April 30, 2018, the California Supreme Court issued a decision in the case of *Dynamex Operations West, Inc. v. Superior Court* (2018), 4 Cal.5th 903 ("*Dynamex*"), whereby it adopted use of a Massachusetts "ABC" test to differentiate the distinction between employees and independent contractors for purposes of enforcing the California Industrial Welfare Commission Wage Orders over the previous common law standards as set forth in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341.

2.21 On May 21, 2018, the United States Supreme Court issued a decision in three combined appeals under the caption of *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ("*Epic*"), whereby the Court held that employer-mandated arbitration agreements that contain class and collective action waivers were legal, enforceable, and did not violate either the National Labor Relations Act or the Norris-Laguardia Act. Defendants assert that the holding in *Epic* also requires that any Claims under California's Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, *et seq*. ("PAGA") be litigated in individualized arbitration.

2.22 On or about May 31, 2018, four Entertainers identified anonymously as Jane Roes 1-4 filed a Class and Collective Action Complaint for Violation of the FLSA and State Law (the "Complaint") in the Superior Court of the State of California, County of San Diego, in a case generally captioned as *Jane Roes 1-4 v. Deja Vu Services, Inc*., Case No. 37-2018-00028044-CU-OE-CTL, on their own behalf and, purportedly, as representatives of a class and collective on behalf of other "similarly situated" individuals, against certain businesses where exotic dance entertainment is presented to a consenting adult audience and against related persons and entities (the "Action"). The four Entertainers (two of whom are the Class Representatives here) alleged that Defendants misclassified exotic dance entertainers who performed in certain facilities as part

of their business practice polices, resulting in violations of various California and federal labor laws.

2.23 In the Action, the Named Plaintiffs assert Claims throughout the potentially-applicable statutes of limitations; that being three (3) years under the FLSA (back to May 31, 2015) and four (4) years (back to May 31, 2014) under the California Labor Code.

2.24 Subsequent to the filing of the Action, the Named Plaintiffs have submitted a letter to the California Labor and Workforce Development Agency (the "LWDA") pursuant to the PAGA, and intended to file an amended complaint to add a claim under the PAGA if the LWDA does not act within the specified statutory period of time (the "PAGA Amendment").

2.25 Sommers Schwartz and Pitt McGehee, class counsels approved by the court in the Michigan Litigation (and for Sommers Schwartz, approved by the court in the Cin-Lan Action as well), also request to be appointed as co-Class Counsel in this Action, and since the Clubs at issue here were, by-and-large, included as defendants in the Cin-Lan Action and the Michigan Litigation, they therefore have extensive knowledge in regard to the Claims asserted herein, the potential counterclaims that the Defendants can and could raise in this Action (or in any ordered arbitration proceeding), and the business operations of the Defendants in general and in specific as they relate to the Entertainers who perform in the Clubs. Sommers Schwartz and Pitt McGehee are assisted in this Action by California counsel Trent Kashima of Finkelstein & Krinsk, LLP, who has an active California wage and hour law practice.

2.26 The Named Plaintiffs contend through the Action, and have contended in subsequent discussions, negotiations, and proceedings described below, that irrespective of the terms of the Limited National Settlement and the San Francisco Settlement, both of which permit Entertainers to perform as independent contractors at the nightclubs subject to those settlements

so long as they meet the standards as set forth in those agreements, *Dynamex* requires, rather, that all Entertainers performing in California be classified and treated as employees for all purposes. The Named Plaintiffs further contend that *Dynamex* is to be applied retroactively. As a result, the Named Plaintiffs assert, on behalf of themselves and similarly situated Entertainers, that they are entitled to certain employment benefits, including wages and PAGA penalties, for the times they performed in the designated Clubs during the statute of limitations.

2.27 The Defendants deny each and every one of these allegations and assertions of the Named Plaintiffs.

2.28 Both the Limited National Settlement and the San Francisco Settlement have been construed and interpreted, consistent with due process, to have settled and resolved, pursuant to the terms of those settlements, all Claims, except those specifically preserved therein, arising out of, related to, or that could have been asserted in, the respective litigation matters up to and including the preliminary approval dates of those settlements.

2.29 Accordingly, and because the Clubs here are the same as the nightclubs involved in the San Francisco Settlement and the California nightclubs involved in the Limited National Settlement, in subsequent negotiations and proceedings (again discussed below), the Parties, and in particular the Named Plaintiffs, have acknowledged that irrespective of the class and collective periods alleged in the Action (and set forth in Section 2.23 above), the class periods here -- assuming those settlements are upheld on appeal -- are limited by the Limited National Settlement and the San Francisco Settlement, and such class periods can only then be from the preliminary approval dates in those settlements on forward. Consequently, the Parties agree that the relevant Class Periods subject to this Settlement here are from February 8, 2017 for Clubs that are subject to the Limited National Settlement (defined below as the “Greater California Clubs”) and from

April 15, 2017 for Clubs subject to the San Francisco Settlement (defined below as the "San Francisco Clubs").

2.30 In an effort to resolve their disputes, minimize the incurrence of substantial but potentially unnecessary attorneys' fees, and bring a close to the Action, the Parties conducted a full day mediation with the Honorable Victor E. Bianchini on July 24, 2018, in San Diego, California (the "First Mediation"). While the Parties were unable to consummate a settlement at the First Mediation, they continued to negotiate in good faith to find a path to resolve their differences.

2.31 On or about August 1, 2018, the Parties reached an understanding in principle as to the general terms under which the Action could be settled through the execution of a Letter of Understanding Regarding Principal Terms of Class and Collective Action Settlement (the "Letter of Understanding"), that broadly laid out the terms of settlement and that provided a period for the Parties to attempt to negotiate a full and complete settlement agreement (which is now memorialized by this Agreement). The Letter of Understanding provided, for a limited period of time, an opportunity for the Parties to withdraw from the settlement contemplated therein.

2.32 In addition to the San Francisco Appeal and the Limited National Settlement Appeal, Lichten & Liss represent Entertainers against some of the Clubs and/or Affiliated Entities (the "Pending Lichten & Liss Matters"), to wit:

a) *Hughes et al. v. S.A.W. Entertainment LTD, et al.*, No. 3:16-cv-03371-LB (N.D. Cal.)

b) *Pera et al. v. S.A.W. Entertainment, LTD*, No. 3:17-cv-00138-LB (N.D. Cal.)

c) *Mehraban v. Gold Club-S.F., LLC, et al.*, No. 17-5288 (N.D. Cal.)

2.33 In an effort to resolve the San Francisco Objections, the San Francisco Appeal, the California Limited National Settlement Objections, the Limited National Settlement Appeal, and the Pending Lichten & Liss Matters, the Parties, together with Shannon Liss-Riordan of Lichten & Liss, and within the time period provided for the Parties to withdraw from the Letter of Understanding as extended, conducted an additional full day mediation before Mark Rudy on August 17, 2018 in San Francisco, California (the "Second Mediation"). The Parties were unable to resolve their disputes with Lichten & Liss at the Second Mediation, and then proceeded forward to consummate the Settlement and the preparation of this Agreement.

2.34 Plaintiffs intend to file, in accordance with this Settlement, a First Amended Class and Collective Action Complaint for Violation of the FLSA and State Law ("First Amended Complaint for Settlement") that more fully sets forth the proper Defendants included in the Action and the causes of action asserted against the Defendants which are to be resolved by this Agreement if so approved by the Court, including the PAGA Amendment.

2.35 Class Counsel have obtained, both through their work in the Cin-Lan Action and the Michigan Litigation and here through their own investigation and extensive informal discovery provided through Defense Counsel, information regarding Defendants' policies and practices regarding the putative class' activities at the Clubs, the Dancer Contracts or other agreements executed between those establishments and Entertainers, and the number of Class Members who Performed during the Class Periods -- and currently Perform -- at the Clubs.

2.36 In their investigation into the matters pertaining to the Action and thorough their work in the Cin-Lan Action and the Michigan Litigation, Class Counsel have spoken to and otherwise communicated with numerous Entertainers who would be Class Members of this

Settlement. Those Entertainers do not currently work at the Clubs under an employment relationship but, rather, Perform under an independent contractor business structure as IPE's.

2.37 In light of all of the above, Class Counsel have engaged in extensive arms-length negotiations with Defense Counsel with a view toward achieving substantial benefits for the Class Members and to comprehensively address the worker misclassification issue, while avoiding the cost, delay and uncertainty of further litigations, trials, and appellate review.

2.38 In their investigations, Class Counsel has come to learn that the Clubs collect revenues directly from customers for the purchase of entertainment performances, take those sums into their gross receipts, and then pay the Entertainers for their services by way of Form 1099-MISC payments (the "Independent Contractor Model").

2.39 Even if the Entertainers performing in the Clubs are found to be employees in this Action under *Dynamex* or otherwise, the payments made to Entertainers by the Clubs using the Independent Contractor Model may well be found by the Court to constitute wage payments, which could significantly reduce, if not totally abrogate, the minimum wage claims being asserted by the Named Plaintiffs on behalf of themselves and others. More specifically, in their investigation of the Independent Contractor Model, Class Counsel have also determined that such method of operation does not appear to suffer from the operational problems noted in the decision of *Hart v. Rick's Cabaret International, Inc.*, 967 F.Supp.2d 901 (S.D. N.Y. 2013), whereby that court rejected the use of IRS Form 1099-MISC payments to offset minimum wage obligations under the FLSA due to the failure of Rick's Cabaret to track and issue IRS Form 1099-MISC's on all mandatory entertainment charges collected by the Entertainers Performing at that establishment.

2.40 In the Cin-Lan Action, the Cin-Lan Defendants had asserted both legal and contractual counterclaims against the Cin-Lan Plaintiff and the putative class there contending,

among other things, that the mandatory entertainment charges to customers but collected and retained by the Entertainers, were – in the event that the Entertainers were reclassified to have been employees – the lawful property and income of that establishment, which would then have to be legally returned by the Entertainers to Cin-Lan upon a misclassification finding; with the business then being able to use those sums to pay any minimum wages found to be due. These are, in part, the counterclaims that the court refused to dismiss in the Cin-Lan Action.

2.41 During the course of the negotiations, and since this Action was filed, Defendants have asserted, and continue to assert, both formally and in discussions with Class Counsel, that they have substantial defenses – predicated in part on the matters set forth above – to the Claims brought by the Named Plaintiffs. The Named Plaintiffs, for their part, dispute the validity of these defenses. Nevertheless, these defenses, asserted by the Defendants, include, but are not limited, to the following:

2.41.1 The Plaintiffs and each and every one of them, have executed Dancer Contracts that contain legally valid and binding arbitration clauses, which include comprehensive waivers of class and collective action proceedings and that therefore preclude Plaintiffs from proceeding: a) in any forum other than in individualized arbitration; or b) as a Federal Rule of Civil Procedure Rule 23 (or similar state law) class or as a collective under § 216(b) of the FLSA;

2.41.2 The waivers of class and collective actions contained in the arbitration clauses also compel any PAGA Claims into individualized arbitration in light of the ruling in *Epic*;

2.41.3 Entertainers are properly classified as independent contractors because, among other things, they perform if, when, where and for whom they choose; they are not

paid by the hour; they are not terminable at will; they control their profits and losses; they must exercise independent initiative in order to successfully engage in their professional occupation; they perform at other businesses; they intended to be independent contractors and/or non-employees; and they specifically rejected the ability to become Club employees when that option was offered to them;

2.41.4 Entertainers specifically fall within the statutory exemptions for professionals;

2.41.5 Defendants' policies and practices with respect to permitting the Entertainers at the Clubs to classify themselves as independent contractors and/or as non-employees are fully lawful and legally enforceable. Moreover, the applicable agreements signed by the Entertainers are clear and unambiguous, and are not unlawful, unfair, deceptive, fraudulent, misleading, wrongful or unenforceable in any way;

2.41.6 Any application of *Dynamex* to these Clubs would be unlawful since the Limited National Settlement and the San Francisco Settlement, both of which have been approved by federal district courts, specifically permit the Entertainers to perform as independent contractors at the Clubs so long as the standards for doing so, as set forth in those settlements, are met, and would thereby violate the orders of those courts;

2.41.7 The Entertainers fully satisfy the legal standards under *Dynamex* of being independent contractors as written or as modified to apply to the work circumstances of entertainers;

2.41.8 *Dynamex* cannot be applied retroactively consistent with due process;

2.41.9 Entertainers earn more income as IPE's than they would as employees, and after offset of non-tip service charge monies paid to the Entertainers, the Entertainers would not be entitled to any compensation, damages or restitution of any kind;

2.41.10 Joint employer liability cannot be imposed upon the Defendants in the circumstances here;

2.41.11 A variety of formal rulings from the Internal Revenue Service ("IRS") and the United State Department of Labor ("DOL") support the position of the Defendants that the mandatory entertainment charges collected from customers by Entertainers are, in fact, "service charges" and not tip income, which could be used, under applicable law, to satisfy any minimum wage obligations found to be due if the Entertainers there were ultimately found to have been the employees of the applicable establishments. Those rulings included FLSA 2005-31, 2005 WL 3308602 (DOL Wage-Hour); WH-305, 1975 WL 40930 (DOL Wage-Hour); WH-386, 1976 WL 41739 (DOL Wage-Hour); Rev. Ruling 77-290; Rev. Ruling 65-282; Rev. Ruling 59-252; Rev. Ruling 58-220; and Rev. Ruling 58-515. None of these formal rulings have been abrogated or superseded by the IRS or the DOL. Moreover, The IRS has also issued Rev. Ruling 2012-18 which, the Defendants contend, further supports the conclusion that the mandatory entertainment charges paid by customers to the Clubs are services charges and not the tip income of the Entertainers. And, California follows federal law on the distinctions between service charges and tip income. As such, it is likely that this defense would establish that Class Members earned far more than minimum wage, exclusive of tips, while Performing at the Clubs; thereby negating any claims for monetary remuneration, damages or other penalties;

2.41.12 The Clubs pay the Entertainers through IRS Form 1099-MISC payments, and such payments would fully satisfy any minimum wage obligations found to be due;

2.41.13 Because the mandatory charges to customers cannot under the law be considered to be tips, the Class Members have no valid claims for tip confiscation;

2.41.14 Because of the numerous contractual provisions in the Dancer Contracts, signage in the Clubs, and enforced Club polices, the Class Members cannot prevail on any Claims of mandatory and improper tip pooling;

2.41.15 The Class Members normally work far less than forty (40) hours per week and far less than eight (8) hours per day, thereby negating any Claims for overtime compensation;

2.41.16 The Class members lack standing to bring any Claims for minimum wage or overtime payments since they do not report their tip income to the Clubs and the Clubs do not then make deductions from their "wages." In the unlikely event that the Class Members were found to have been employees of the Clubs, any remaining wages theoretically found to be due and owning would be required to be remitted, under the provisions of eh Internal Revenue Code and California tax law, to the Internal Revenue Service and state taxing authorities as withholdings due on the tip income earned by the Class Members;

2.41.17 The Entertainers have been offered and afforded with all breaks required under California law for employees;

2.41.18 The daily receipts provided by the Clubs to the Entertainers fully comply with, and satisfy the requirements under the California Labor Code for the remittance of wage statements; and

2.41.19 Neither a finding of "willfulness," and therefore entitlement to liquidated damages or other penalties, nor an extended statute of limitations, can be sustained because, among other things: a) the Clubs have obtained rulings which hold that classifying Entertainers as independent contractors or as non-employees is both appropriate and "reasonable" under the law; b) the Clubs have obtained rulings which hold that Entertainers were not in fact "employees" under the methods of operation at issue herein; and c) the Limited National Settlement and the San Francisco Settlement -- both of which have been approved by federal district courts and which govern, through injunctive relief afforded by the courts, the operations of the Clubs vis-à-vis the Entertainers who Perform therein -- specifically permit the Entertainers to perform as independent contractors so long as the standards for doing so as set forth in those settlements are met.

2.41.20 Under the circumstances set forth above, no PAGA penalties could be assessed because to do so would be unjust, arbitrary and oppressive, or confiscatory in accordance with Cal. Labor Code § 2699(e)(2).

2.42 As such, Defendants deny each and every one of the Claims that are asserted, that will be asserted by way of the amendment permitted by this Agreement, or that could have been asserted, by the Named Plaintiffs in the Action, including but not limited to Claims alleging worker misclassification; entitlement to employment wages, benefits, penalties or other remuneration; and the imposition of joint employer liability. More specifically, Defendants deny that *Dynamex* requires the Clubs to "convert" the Entertainers to employees. Nevertheless, in an effort to end this prolonged and recurring litigation based on worker misclassification of the Entertainers and to buy their peace, Defendants agree that the Clubs will convert the Entertainers who perform in their facilities to employees under the terms as set forth herein. Defendants' decision to enter into

this Agreement and to conditionally consent to class and collective treatment of Plaintiffs' Claims shall not be construed as any form of admission of wrongdoing, liability, or the propriety of certifiability of the Claims. Rather, all wrongdoing and liability, and the certifiability of Claims except for the limited purpose of settlement, is expressly and specifically denied by each and every one of the Defendants.

2.43 Likewise, a material component of this Settlement is the agreement of the Defendants to, in fact, convert the Class Members to employees as provided for in Section 8.1, and provide to them, subject to the terms of this Agreement, with all legal benefits and protections afforded employees under both federal and California law. A failure by the Defendants to implement and achieve the conversion as provided for would constitute a material breach of this Agreement, subjecting them to the contempt and injunctive powers reserved to the Court herein in order to enforce the terms this Agreement as well as to claims for breach of contract as reserved to the Settlement Class Members in Section 11.2.

2.44 Notwithstanding their differing view on the merits of the various Claims and potential counterclaims in this Action, and in measured consideration of the forgoing, and as a consequence of the negotiations between the Parties and of Class Counsels' extensive investigations, analysis, and discovery, both formally (in the Cin-Lan Action) and informally (here and in the Michigan Litigation), the Parties agree to settle the Action under the terms and conditions memorialized in this Agreement; believing such Settlement to be fair, reasonable, adequate, and in the best interests of the Class and the general public.

**NOW THEREFORE,** in consideration of the foregoing and of the promises and mutual covenants contained herein, and other good and valuable consideration, the adequacy of which is acknowledged, it is hereby agreed by and among the undersigned Parties as follows:

## III. DEFINITIONS

As used in this Settlement Agreement and the attached exhibits, the following words and phrases shall have the meanings specified in this Article. Capitalized words and phrases in such definitions, not previously explained, are further defined herein.

3.1 "Administrative Costs" means the administrative costs of settlement incurred by the Settlement Administrator, including but not limited to preparation and copying of the Class Notice, mailing of the Class Notice, website maintenance, tracking Class Members who have requested exclusion from the Settlement by the submission of an Opt Out Form and the consequent preparation of the Opt Out List, the administration, calculation and remittance of Settlement Checks, the remittance of other payments provided for in this Agreement, and any other reasonable fees and costs incurred or charged by a jointly approved Settlement Administrator in connection with the execution of its duties under this Agreement.

3.2 "Affiliated Entities" means those business entities that are identified on the attached ***Exhibit A***. Those entities are businesses that currently are, or that at any time during the Class Periods were, either: A) parties to an agreement or contract with Services whereby they receive(d) either consulting or management services, or licensing rights, from Services; B) parties to an agreement or contract with Global Licensing, Inc. ("Global"), whereby they receive(d) licensing rights from Global; C) owned, either wholly or in part, directly or indirectly, by either Mohney or Jason Cash Mohney; or D) tenants of Mohney or Jason Cash Mohney, either directly or indirectly.

3.3 "Aggregate Points Allocation" means the combined sum of the Individual Points Allocations.

3.4 "Attorney Fee and Expense Award" means such funds that Class Counsel or any other attorney may receive directly from Defendants or through an Order of the Court to

compensate them for their work in the Action and obtaining the Settlement for the Class pursuant to their Claims under Section 216(b) of the FLSA and Rule 3.760 for state law claims.

3.5 "Claim(s)" means, when used alone herein and not as a part of another specifically defined phrase, any and all past, present and future claims, actions, demands, causes of action, suits, debts, obligations, damages, and rights or other assertions of liability or wrongdoing, of any conceivable kind, nature and description whatsoever, whether known or unknown, whether existing or potential, whether fixed or contingent, whether asserted or not, recognized now or hereafter and whether expected or unexpected, pursuant to any theory of recovery and whether at law, in equity or otherwise, including but not limited to those based in contract, tort, common law, federal, state or local law, statute, ordinance, or regulation, and whether for compensatory, consequential, punitive or exemplary damages, statutory damages, penalties, interest, attorneys' fees, costs, or disbursements (including but not limited to those incurred by Class Counsel or any other counsel representing the Class Representatives or any Settlement Class Members), that a Person may have.

3.6 "Class" means the group of all current and former Entertainers who Performed at one or more of the Clubs at any time during the applicable Class Periods.

3.7 "Class Counsel" means Trenton Kashima of the law firm of Finkelstein & Krinsk, LLP, Jason Thompson of the law firm of Sommers Schwartz, P.C., and Megan Bonanni of the law firm of Pitt McGehee Palmer & Rivers, P.C.

3.8 "Class Member" means any individual who Performed at one or more of the Clubs at any time during the applicable Class Periods.

3.9 "Class Notice" means the proposed notice to putative Class Members which shall conform in all material respects to the document attached as ***Exhibit D***.

3.10 "Class Period(s)" means, for purposes of the Settlement and this Agreement: (a) the time period from April 15, 2017 to the Preliminary Approval Date for Entertainers who Performed at one or more of the San Francisco Clubs (the "San Francisco Class Period"); and b) the time period from February 8, 2017 to the Preliminary Approval Date for Entertainers who performed at one or more of the Greater California Clubs (the "Greater California Class Period"). An Entertainer may be subject to both Class Periods if she Performed at one or more San Francisco Clubs during the San Francisco Class Period and at one or more of the Greater California Clubs during the Greater California Class Period.

3.11 "Class Representatives" means the Named Plaintiffs, each of whom has been separately identified to Defense Counsel and whose identities will be filed under seal with the Court, or any other person(s) duly appointed as additional or successor representatives of the Settlement Class.

3.12 "Clubs" means those Affiliated Entities identified on the attached ***Exhibit A*** that present performance dance entertainment to the consenting adult public on their premises.

3.13 "Consent to Join" means a Class Member's consent to join as a party plaintiff to the FLSA Claims asserted in this Action pursuant to 29 U.S.C. § 216(b). A Class Member's Negotiation of a Settlement Check shall serve as that Class Member's Consent to Join.

3.14 "Court" means the Superior Court for the State of California, County of San Diego.

3.15 "Dance Fee Payments" shall have the same meaning as that phrase is defined in Section 3.31 of the Limited National Settlement attached as ***Exhibit C***.

3.16 "Dancer Contract" means a contract entered into between an Entertainer and a Club, which permits the Entertainer to Perform, and to engage in personal entertainment performances for remuneration, upon the Club's premises.

3.17 "Date of Performance" means the date(s) an Entertainer Performed or Performs pursuant to a Dancer Contract at a Club. For purposes of this definition, one Date of Performance shall include any connected block of time that an Entertainer is on the premises of a Club in order to Perform, regardless of the fact that the Date of Performance extends over more than one calendar day. By way of illustration only, if an Entertainer commences Performing on a Tuesday night at 9:00 p.m., and completes her Performances at 2:00 a.m. on Wednesday morning and then leaves the Club, that period will be considered for purposes of this Agreement to constitute one Date of Performance. If the same Entertainer then returns to a Club on Wednesday evening and again commences Performing (which may carry over to Thursday morning), that will constitute a second Date of Performance.

3.18 "Defense Counsel" means Clark Hill, PLC, and Edith A. Thomas and Associates.

3.19 "Designated Club" means the Club at which the Settlement Class Member last Performed prior to entry of the Preliminary Approval Order.

3.20 "Effective Date" means seven (7) days after which both of the following events have occurred: (a) the Final Approval Order and Judgment have been entered, and (b) the Judgment has become Final.

3.21 "Enhancement Payments" means the amount approved by the Court to be paid to the Class Representatives identified in Section 9.5 for the purposes set forth therein, in addition to their respective Settlement Payment and their Settlement Class Member's PAGA Payment.

3.22 "Entertainer(s)" means Persons who dance, Perform, and/or entertain, or who have danced, Performed or entertained, on the premises of an exotic dance nightclub or "gentlemen's club" (including but not limited to one of the Clubs)

3.23 "ERISA" means the Employee Retirement Income Securities Act of 1974, 29 U.S.C. § 1001, *et seq.*

3.24 "Exclusion/Objection Deadline" means the final date, established by and set forth in the Preliminary Approval Order, by which a Class Member may either: (a) object to any aspect of the Settlement pursuant to Section 10.1; or (b) request to be excluded from the Settlement pursuant to Section 10.3.

3.25 "Fairness Hearing" means the hearing that is to take place after the entry of the Preliminary Approval Order and after the Notice Date for purposes of: (a) determining whether the Settlement should be approved as fair, reasonable, and adequate; (b) entering the Final Approval Order and Judgment and dismissing the Action with prejudice; (c) ruling upon an application for Enhancement Payments by the Class Representatives and other individuals; (d) ruling upon an application by Class Counsel for an Attorney Fee and Expense Award; and (e) certifying the Opt Out List.

3.26 "Final," when referring to the Judgment or to the Settlement, means that: (a) the Judgment is a final, appealable judgment; and (b) either (i) no appeal has been taken from the Judgment as of the date on which all times to appeal therefrom have expired, or (ii) an appeal or other review proceeding of the Judgment having been commenced, such appeal or other review is finally concluded and no longer is subject to review by any court, whether by way of appeal, petitions for rehearing or re-argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been finally resolved in such manner that affirms the Judgment in its entirety.

3.27 "Final Approval" means formal and written approval of the Settlement by entry of the Final Approval Order and the Judgment by the Court.

3.28 "Final Approval Order" means the order that the Class Representatives will seek from the Court, to be agreed upon by the Parties, memorializing the Court's Final Approval of the Settlement.

3.29 "FLSA Claims" means any Claims of whatsoever kind or nature under, or pursuant to, the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.

3.30 "General Release Form" means the form the Parties will negotiate and execute, which outlines the Claims being released by the Named Plaintiffs. Within seven (7) days of the date on which the Court enters the Final Approval Order, the Class Representatives shall each sign and execute a copy of the General Release Form without any deletion or amendment to any language in said form.

3.31 "General Released Claims" means any and all Claims by the Class Representatives against the Released Parties or against any one or group of them (including unknown Claims covered by California Civil Code Section 1542 as quoted in this Agreement), arising during the period from the beginning of the Class Representatives' first interaction with Defendants to the Effective Date, for any type of relief that can be released as a matter of law, including, without limitation, Claims for wages, damages, unpaid costs, penalties (including civil and waiting time penalties), retaliatory conduct, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief, with the exception of any Claims which cannot be released as a matter of law. The General Released Claims include, but are not limited to, the Settlement Class Members' Released Claims, the Participating Class Members' Released Claims, any Claims under, pursuant to, or arising out of the California Labor Code (including sections 132A, 4553 *et seq*.) or any applicable California Industrial Welfare Commission Wage Orders, and any and all Claims under, pursuant to, or arising out of any and all state and federal

discrimination statutes, including, without limitation, the California Fair Employment and Housing Act, California Government Code section 12940 *et seq.*; the Unruh Civil Rights Act, California Civil Code section 51 *et seq.*; the California Constitution; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.*; the Employee Retirement Income Security Act of 1964, 29 U.S.C. §1001 *et seq.*; and all of their respective implementing regulations and interpretive guidelines.

3.32 "Greater California Clubs" means those Clubs listed on ***Exhibit A*** that are not located in San Francisco, California; those being Grapevine Entertainment, Inc., d/b/a Deja Vu Showgirls; Cathay Entertainment, Inc., d/b/a Deja Vu Showgirls; Nite Life East, LLC, d/b/a Little Darlings; SP Star Enterprise, Inc., d/b/a Deja Vu; Coldwater, LLC, d/b/a Deja Vu Showgirls; Eyefull, Inc., d/b/a Deja Vu Showgirls; 3610 Barnett Ave., LLC, d/b/a Adult Superstore; Jolar Cinema of San Diego, LTD, d/b/a Jolar Cinema Showgirls; Showgirls of San Diego, Inc., d/b/a Deja Vu Showgirls; Stockton Enterprises, LLC, d/b/a Deja Vu Showgirls; Hollywood & Vine Club, LLC, d/b/a Deja Vu Showgirls; Deja Vu Showgirls-Sacramento, LLC, d/b/a Deja Vu Showgirls; DV of LA, LLC, d/b/a Deja Vu of LA – Main St.; EF5 Acquisitions Group, LLC, d/b/a Deja Vu Showgirls Torrance; and JGMA, Anaheim Hospitality, Inc., d/b/a Sam's After Dark.

3.33 "Individual Points Allocation" means the number of points assigned to each Settlement Class Member pursuant to the formula described in Section 7.4.1 that is to be used to determine the amount of her Settlement Payment.

3.34 "Judgment" means the final judgment to be entered in the Action upon Final Approval of the Settlement and entry of the Final Approval Order, in a form that is approved by and acceptable to all Parties.

3.35 "Legally Authorized Representatives" means an administrator/administratrix, personal representative, or executor/executrix of a deceased Person's estate; a guardian, conservator, or next friend of an incapacitated Person; and/or any other legally appointed Person responsible for handling the business affairs of another Person. All rights and obligations of Class Members, Participating Class Members, Settlement Class Members and Class Representatives as set forth in this Agreement extend to their Legally Authorized Representatives as well.

3.36 "Litigation Expenses" means any expenses incurred by Class Counsel in connection with the prosecution and resolution/settlement of the Action, and includes all Court-approved litigation costs.

3.37 "Negotiate," "Negotiated," or "Negotiation" with regard to a Settlement Check means the endorsement and cashing by the Settlement Class Member of the Settlement Check, resulting in a "cancelled" check.

3.38 "Net Settlement Fund" means the Settlement Pool less the Enhancement Payments, the portion of the PAGA Payments paid to the LWDA, the Attorney Fee and Expense Award, and the Administrative Costs.

3.39 "Notice Date" means the date of the initial distribution of the Class Notice to Class Members.

3.40 "Opt Out" or "Opted Out" means the mechanism for a Class Member to opt out of the Settlement as set forth in Sections 10.3 – 10.5.

3.41 "Opt Out Form" means a document in any fashion where a Class Member timely expresses a clear intent to be excluded from the Settlement.

3.42 "Opt Out List" means the list of all Class Members who timely and properly, in accordance with Section 10.3, submitted an Opt Out Form.

3.43 "Opt Out Period" means a period of sixty (60) days from the Notice Date, within which time a Class Member's request to be excluded from the settlement (by submission of an Opt Out Form) must be signed by the Class Member, mailed to the Settlement Administration, and be postmarked.

3.44 "PAGA Claims" mean all civil penalties sought against the Defendants pursuant to California's Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, *et seq*.

3.45 "PAGA Payments" means the payments made pursuant to Section 7.3 of this Agreement to resolve all PAGA Claims.

3.46 "Participating Class Member(s)" means the Class Representatives and all Class Members who Negotiate a Settlement Check.

3.47 "Participating Class Members' Released Claims" means, for a Participating Class Member, her Settlement Class Members' Released Claims, together with any and all FLSA Claims she may have from the beginning of her applicable Class Period(s) up to and including her Participating Class Member's Settlement Check Filing Date.

3.48 "Parties" means, collectively, the Class Representatives, Settlement Class Members, and Defendants, and "Party" means any one of them.

3.49 "Perform(s)," "Performed," "Performing," and "Performances" means all acts of entertaining, dancing, and/or engaging in entertainment services, and all activities related thereto, at an exotic dance nightclub or "gentlemen's club" (including but not limited to at the Clubs or at any one or group of them).

3.50 "Person" means any individual, corporation, partnership, association, affiliate, joint stock company, estate, trust, unincorporated association, entity, government and any political subdivision thereof, or any other type of business or legal entity.

3.51 "Plan of Allocation" means the plan for allocating the Net Settlement Fund between and among Settlement Class Members as set forth in Article VII and as approved by the Court.

3.52 "Posted Notice" means a notification which is to be posted in the Entertainer dressing room of each Club announcing the existence of the Settlement Pool and the ability of Entertainers to seek remuneration therefrom, in a form as attached as ***Exhibit E***.

3.53 "Preliminary Approval Date" means the date on which the Court enters the Preliminary Approval Order and thus: (a) preliminarily approves the Settlement, including the Exhibits hereto, and (b) enters an order providing for distribution of the Class Notice to the Class Members, an opportunity to be excluded, or to Opt Out, from the Settlement, and an opportunity to submit timely objections to the Settlement; and setting the Fairness Hearing.

3.54 "Preliminary Approval Order" means the order that the Class Representatives will seek from the Court. Entry of the Preliminary Approval Order shall constitute preliminary approval by the Court of the Settlement as embodied by this Agreement.

3.55 "Released Claims" shall be construed as broadly as possible to effect complete finality over the Action and the Claims asserted therein. "Released Claims" include the General Released Claims, the Settlement Class Members' Released Claims, and the Participating Class Members' Released Claims.

3.56 "Released Defendants" means Services, Mohney, and each and every one of the Affiliated Entities identified in ***Exhibit A***, together with each and every one of their respective current, former, and future: Owners (either direct or indirect, including but not limited to partners, shareholders, members, parent companies, holding companies, trusts and/or trustees), officers, directors, managers, employees, agents, representatives, non-Entertainer contractors, insurers, reinsurers, attorneys (including but not limited to Defense Counsel), auditors, accountants,

bookkeepers, experts, subsidiaries, affiliates, divisions, licensees, licensors, consultants, heirs, executors, personal representatives, predecessors and successors in interest, and assigns, as well as any benefit plans sponsored or administered by any of the proceeding individuals and entities.

3.57 "San Francisco Clubs" means those Clubs listed on ***Exhibit A*** that are located in San Francisco, California; those being Chowder House, Inc., d/b/a Hungry I; Deja Vu – San Francisco, LLC, d/b/a Centerfolds; San Francisco Roaring 20's, LLC, d/b/a Roaring 20's; San Francisco Garden of Eden, LLC, d/b/a Garden of Eden; S.A.W. Entertainment, Ltd., d/b/a Larry Flynt's Hustler Club; S.A.W. Entertainment, Ltd., d/b/a the Condor Club; Deja Vu Showgirls of San Francisco, LLC, d/b/a Little Darlings of San Francisco; Gold Club - SF, LLC, d/b/a Gold Club; Bijou-Century LLC, d/b/a New Century Theatre; and BT California, LLC, d/b/a The Penthouse Club & Steakhouse (f/k/a Showgirls).

3.58 "Secondary Pool Remuneration" shall have the same meaning as that phrase is defined in Section 3.88 of the Limited National Settlement attached as ***Exhibit C***.

3.59 "Settlement" means the compromise and settlement of the Action embodied in this Agreement.

3.60 "Settlement Administrator" means an independent settlement administrator mutually agreed upon by the Parties and to be appointed by the Court.

3.61 "Settlement Check" means any check issued by the Settlement Administrator to a Settlement Class Member for her Settlement Payment, her Supplemental Settlement Payment, and/or her Settlement Class Member's PAGA Payment.

3.62 "Settlement Check Filing Date" means the date upon which a Participating Class Member's last Negotiated Settlement Check is filed with the Court in accordance with Section 7.11.

3.63 "Settlement Class" means all Class Members who, during the Class Periods, have Performed as an Entertainer at one or more of the Clubs pursuant to a Dancer Contract, and who have not timely and properly excluded themselves from the Settlement as provided for in Sections 10.3 – 10.5 of this Agreement.

3.64 "Settlement Class Member" means any Class Member who has not timely and properly excluded herself from the Settlement (by submission of an Opt Out Form) as provided for in Sections 10.3 – 10.5 of this Agreement.

3.65 "Settlement Class Members' PAGA Payments" means that portion of the PAGA Payments that is to be distributed, pursuant to and as part of the Plan of Allocation, among Settlement Class Members.

3.66 "Settlement Class Members' Released Claims" means, for a Settlement Class Member, any and all Claims from the beginning of her applicable Class Period(s) up to and including the Preliminary Approval Date, that are asserted in the Action or that are to be asserted in the Action by way of the amendments contemplated in this Agreement, and any and all Claims of any conceivable kind or nature whatsoever that are based on such pleadings or that are reasonably related thereto (except only for FLSA Claims), whether known or unknown, whether fixed or contingent, whether asserted or unasserted, and whether filed or unfiled, at law, in equity or otherwise, and specifically including:

(a) Claims for unpaid wages (including, without limitation, claims for minimum wage, regular wages, overtime, final wages, calculation of the correct overtime or regular rate, and meal period and rest period payments/premiums), uniform/costume costs and associated cleaning expenses, expense reimbursements, interest, and penalties;

(b) Claims to recover any alleged tip or other payment;

(c) Claims for expense reimbursement;

(d) Any and all Claims pursuant to the California Labor Code, including but not limited to Claims under or pursuant to California Labor Code sections 200-204, 206.5, 207, 208, 210-214, 216, 218, 218.5, 218.6, 221, 222.5, 223, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353, 432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2698 et seq. (PAGA), 2753, 2802, and 2804;

(e) Claims pursuant to California Code of Civil Procedure section 1021.5;

(f) Claims pursuant to California Code of Regulations, Title 8, sections 11010 and 11040;

(g) Claims pursuant to California Industrial Welfare Commission Wage Orders;

(h) Claims under California Business and Professions Code sections 17200, *et seq*. and 17500;

(i) Claims asserting unfair business practices or violations of similar laws;

(j) Claims under the Nation Labor Relations Act, 29 U.S.C. § 151 *et seq*.;

(k) Claims asserting any form of retaliation predicated upon a Class Member's assertion that any of the Release Defendants wrongfully terminated her Dancer Contract or right to Perform, or otherwise retaliated against her, after she or any other Person asserted a Claim that she was, or that other Entertainers were, misclassified as an independent contractor and/or as a non-employee and were entitled to any form of compensation thereby;

(l) Claims for liquidated, punitive, and/or exemplary damages based upon Defendants' wage policies and/or their employment classification of Entertainers;

(m) Any other employment, wage, or labor-related Claims that could be brought under any statute, regulation, or otherwise against the Released Defendants, or against any one or group of them, that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, any act or omission as pled in the First Amended Complaint for Settlement that occurred during the Class Periods, including but not limited to any Claims under any legal or equitable theory as a result of the alleged violation of any state or federal law or regulation, Claims brought pursuant to breach of contract, Claims brought pursuant to common law, Claims of unjust enrichment and/or *quantum meruit*, and any and all Claims pursuant to, or derived from, ERISA that arise, or may arise, from any alleged failure to pay wages, including any Claims for benefits under any benefit plans subject to ERISA;

(n) Claims for attorneys' fees and costs;

(o) All Claims, including common law claims, arising out of or related to the statutory causes of action described in this Section 3.67; and

(p) Any Claims asserting breach of contract, violation of injunctive relief, contempt, rescission, or otherwise with regard to the terms of the Dancer Contracts, the Limited National Settlement or the San Francisco Settlement,

arising out of the required conversion of the Entertainers Performing at the Clubs to employees as mandated by Section 8.1 of this Agreement.

3.67 "Settlement Consideration" means the total and aggregate financial benefit conferred on the Settlement Class Members through the Settlement Payments, Enhancement Payments, the Settlement Class Members' PAGA Payments, and changes to the Defendants' business practices, all which confer a direct financial benefit on Settlement Class Members; a portion of the PAGA Payments conferred on the LWDA; together with the Attorney Fee and Expense Award and the Administrative Costs.

3.68 "Settlement Payment(s)" means the amount of money to be paid to Settlement Class Members pursuant to the terms of Section 7.3 – 7.5.

3.69 "Settlement Pool" means the amount of one million five hundred thousand dollars ($1,500,000.00) to be made available by the Defendants pursuant to the terms of this Agreement to pay: a) Settlement Class Members their Settlement Payments; b) the Enhancement Payments; c) the PAGA Payments; d) the Administrative Costs; and e) the Attorney Fee and Expense Award.

3.70 "Supplemental Settlement Payment" means an additional payment to a Participating Class Member made pursuant to Section 7.6 in order to extinguish the Net Settlement Fund as a result of undeliverable or non-Negotiated Settlement Checks.

## IV. SUBMISSION OF THE SETTLEMENT AND THIS AGREEMENT TO THE COURT FOR REVIEW AND APPROVAL, CONDITIONAL CERTIFICATION OF PROPOSED CLASS FOR SETTLEMENT PURPOSES, AND STIPULATION REGARDING AMENDMENT OF THE COMPLAINT

4.1 Submission of Settlement for Court Approval. Promptly upon completing drafting and signing this Agreement, and before October 11, 2018, the Parties shall submit it to the Court for review. This Agreement shall be considered to be sufficiently signed for purposes of filing with the Court when all anticipated Class Counsels and Defenses Counsel have executed the

document. Contemporaneously with the filing of this Agreement with the Court, the Plaintiffs shall, in accordance with Cal. Labor Code § 2699(l)(2), submit this Agreement to the LWDA.

4.2 Provisional Certification of the Class. For purposes of settlement only, the Plaintiffs will seek provisional certification of the Class as a collective action pursuant to 29 U.S.C. § 216(b) and as a Rule 3.760 Class. Each Party agrees that this stipulation shall not be used by any Person for any purpose whatsoever in any legal, administrative, or arbitral proceeding. Such matters may only be submitted in a proceeding to enforce the terms of this Agreement.

4.3 Limitations of Provisional Certification. Defendants do not consent to certification of the Class for any purpose other than to effectuate the Settlement of this Action. The Parties acknowledge and agree that Defendants' consent to provisional certification, for purposes of this Settlement only, does not constitute an admission of wrongdoing, fault, liability, or damage of any kind to the Named Plaintiffs or to any of the Class Members, or an acknowledgement or concession of the propriety of such Class/collective certification.

4.4 Cooperation of the Parties. The Parties shall act in good faith to effectuate each and every term of this Agreement to obtain Final Approval of this Agreement (including providing Class Notice under the FLSA and Rule 3.760), to take all acts so that the Judgment becomes Final, and to secure a prompt, complete, and final resolution of the Settlement of this Action.

4.5 Actions to Accomplish Settlement. Solely for purposes of implementing this Agreement and effectuating the proposed Settlement, the Parties agree and stipulate that:

(a) Named Plaintiffs shall be permitted to, as applicable, file, or to seek permission of the Court in order to be able to submit, a First Amended Complaint for Settlement pursuant to Federal Rule of Civil Procedure Rule 15(a)(2) in a form acceptable to Defendants. The Parties agree that the filing

of the First Amended Complaint for Settlement will streamline the settlement process and ensure that more money can be paid to Settlement Class Members by saving the costs of multiple notice and approval processes. The Parties further agree and stipulate that Defendants may seek an order from the Court establishing that the allegations in the First Amended Complaint for Settlement are deemed fully controverted by Defendants, and by each and every one of them, such that no further responsive pleading from Defendants is required. If, for any reason, the Settlement and Judgment do not become Final or the Effective Date does not occur, the First Amended Complaint for Settlement shall be stricken from the record and the operative complaint in the Action shall revert to the originally filed Complaint, and no prejudice shall occur to any motion to arbitrate that may be filed by the Defendants.

(b) The Parties shall request a Preliminary Approval Order preliminarily approving the Settlement. The Parties shall seek entry of a preliminary Approval Order that, among other things: Grants leave, if necessary, to file the First Amended Complaint for Settlement and to preliminarily certify the Class for settlement purposes only; approves the Named Plaintiffs as class representatives; appoints Class Counsel to represent the Settlement Class, and appoints the Settlement Administrator; approves the Class Notice, the Posted Notice, and the Class Notice plan embodied in the Agreement, and approves them as consistent with 29 U.S.C. § 201, *et seq*., Rule 3.760, and due process; sets out the requirements for Class Members to be able to

exclude themselves from the Settlement and for Settlement Class Members to object to the terms of the Settlement, all as provided for in this Agreement; provides that certification and all actions associated with certification are undertaken on the condition that the certification and other related actions shall be automatically vacated if this Agreement is terminated or if the Settlement does not become Final, all as provided in this Agreement; preliminarily enjoins all Class Members and their Legally Authorized Representatives, unless and until they submit a timely request for exclusion from the Settlement pursuant to this Agreement, from filing, participating in, or proceeding with, any other suit or non-administrative proceeding based on the Released Claims, or from attempting to effect an Opt Out from the Settlement as a group, class, or subclass of individuals; and schedules the Fairness Hearing.

4.6 Court Submissions. Any of the Parties, Class Counsel, Defense Counsel, and any person objecting to this Agreement, may file with the Court, as directed by the Court in its Preliminary Approval Order, a written brief setting forth their respective positions regarding the fairness of the Settlement. All submissions to the Court shall comply with the provisions set forth in the applicable rules of the Court, as well as the dates established by the Court in its Preliminary Approval Order.

4.7 The Fairness Hearing. At the Fairness Hearing, the Class Representatives shall request entry of the Final Approval Order and the Judgment; the terms of which shall be agreed upon by the Parties. The entry of the Final Approval Order and the Judgment by the Court is a

material condition of the Settlement and of this Agreement, and shall order, among other things, that the Court:

(a) finally approves the Settlement as fair, reasonable, and adequate, within the meaning of Rule 3.760 and due process, and directs its consummation pursuant to the terms of this Agreement;

(b) finds that Class Counsel and the Class Representatives adequately represent the Settlement Class for the purpose of entering into and implementing this Agreement;

(c) confirms the appointment of the Settlement Administrator and finds that the Settlement Administrator has fulfilled its duties under the Settlement;

(d) finds that the Class Notice: (i) constituted the best practicable notice; (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action and their right to exclude themselves from, or object to, the proposed Settlement and to appear at the Fairness Hearing; (iii) was reasonable and constituted due, adequate, and sufficient notice to all Persons entitled to receive notice; and (iv) met all applicable requirements of Rule 3.760, due process, and any other applicable rules or law;

(e) approves the Opt Out List and determines that the Opt Out List is a complete list of all Class Members who have timely requested exclusion from the Settlement and who, accordingly, shall neither share in nor be bound by the Final Approval Order and Judgment;

(f) dismisses the Action on the merits with prejudice and without fees or costs, except as provided in this Agreement;

(g) directs that the Final Approval Order and Judgment shall be final and entered forthwith;

(h) without affecting the finality of the Final Approval Order and the Judgment, reserves and retains jurisdiction over the Class Representatives, the Settlement Class, and Defendants as to all matters concerning the administration, consummation, and enforcement of this Agreement, including but not limited to those provisions relating to the extension of injunctive relief into the future as provided for herein;

(i) adjudges that the Class Representatives, the Settlement Class Members, and the Participating Class Members, as well as their Legally Authorized Representatives, together with anyone claiming through them or acting or purporting to act for them, in their interest, on their behalf, or for their benefit, regardless of whether they received actual notice of the proposed Settlement or not, have conclusively compromised, settled, discharged, and released the General Released Claims (in the case of the Class Representatives), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the Participating Class Members' Released Claims (in the case of the Participating Class Members) against the Released Defendants, and are bound by the provisions of this Agreement;

(j) declares this Agreement and the Final Approval Order and Judgment to be binding on, and have *res judicata* and preclusive effect in regard to, all pending and future lawsuits or other proceedings: (i) that encompass the General Released Claims and that are maintained by or on behalf of a Class Representative or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act for her, in her interest, on her behalf, or for her benefit; (ii) that encompass the Settlement Class Members' Released Claims and that are maintained by or on behalf of any Settlement Class Member or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act for her, in her interest, on her behalf, or for her benefit, regardless of whether the Settlement Class Member or other such Person previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the Settlement Class Members' Released Claims and even if such Settlement Class Member never received actual notice of the Action or this proposed Settlement; and iii) that encompass the Participating Class Members' Released Claims and that are maintained by or on behalf of any Participating Class Member or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act for her, in her interest, on her behalf, or for her benefit, regardless of whether the Participating Class Member previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the Participating Class Members' Released Claims;

(k) permanently bars and enjoins the Class Representatives and all other Settlement Class Members from: (i) filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in any other lawsuit or administrative, regulatory, arbitration, or other proceeding in any jurisdiction based on the General Released Claims (in the case of the Class Representatives, the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the Participating Class Members' Released Claims (in the case of the Participating Class Members); and (ii) organizing Settlement Class Members or Participating Class Members into a separate group, class, or subclass for purposes of pursuing, as a purported class action, any lawsuit or administrative, regulatory, arbitration, or other proceeding (including by seeking to amend a pending complaint to include class allegations), based on the Settlement Class Members' Released Claims or the Participating Class Members' Released Claims;

(l) determines that the Agreement and the Settlement provided for herein, and any proceedings taken pursuant thereto, are not and should not, in any event, be offered, received, or construed as evidence, or a presumption, concession, or an admission by any Party, of liability or non-liability, the certifiability or non-certifiability of a litigation class, or any misrepresentation or omission in any statement or written document approved or made by any Party; provided, however, that reference may be made to this Agreement and the Settlement provided for herein in such

proceedings as may be necessary to effectuate the provisions of this Agreement;

(m) certifies the Class and orders Final Approval of the proposed Settlement, and provides that all actions associated with them are undertaken on the condition that such certification and Final Approval shall be vacated if this Agreement is terminated or disapproved in whole or in part by the Court, or by any appellate court and/or other court of review, or if Defendants invoke the right to terminate the Settlement as provided herein, in which event this Agreement and the fact that it was entered into shall not be offered, received, or construed as an admission or as evidence for any purpose, including but not limited to an admission by any Party of liability or non-liability, of any misrepresentation or omission in any statement or written document approved or made by any Party, or of the certifiability of a litigation class;

(n) authorizes the Parties, without further approval from the Court, to agree to and adopt such amendments, modifications, and expansions of this Agreement, including all Exhibits hereto, as: (i) shall be consistent in all material respects with the Final Approval Order, and (ii) do not limit the rights of Settlement Class Members; and

(o) includes such other and further provisions to which the Parties expressly consent in writing that are consistent with the terms of this Agreement.

4.8 Request to Approve Plan of Allocation. At the Fairness Hearing and as a part of the Final Approval of this Settlement, Class Counsel will also request approval of the Plan of Allocation set forth in Article VII.

4.9 Request to Approve Attorney Fee and Expense Award. At the Fairness Hearing, Class Counsel may also request entry of an order approving Class Counsels' application for the Attorney Fee and Expense Award and for Enhancement Payments to the Class Representatives. In no event shall Defendants otherwise be obligated to pay for any attorneys' fees or expenses or Enhancement Payments. The disposition of Class Counsels' application for an Attorney Fee and Expense Award, and for Enhancement Payments, is within the sound discretion of the Court. Any disapproval or modification of such applications by the Court shall not: (a) affect the enforceability of the Settlement or this Agreement, (b) provide any of the Parties with the right to terminate the Settlement or this Agreement, or (c) impose any obligation on the Defendants to increase the consideration extended in connection with the Settlement.

4.10 Statutory Compliance with Notification. Within ten (10) days of entry of the Judgment and the Final Approval Order, Plaintiffs shall, in accordance with Cal. Labor Code § 2699(l)(3), submit such documents to the LWDA.

## V. CLASS NOTICE

5.1 Information to be Supplied by each Club as Identified in Exhibit A. Within thirty (30) days of the entry of the Preliminary Approval Order by the Court, Defendants will provide the Settlement Administrator, to the extent available in Defendants' records, the following information:

5.2.1 Each Class Member's legal name;

5.2.2 Each Class Member's last known address from the Class Member's Designated Club's last (most recent) Dancer Contract; and

5.2.3 To the extent available, each Class Member's last known email address.

5.2 Confidentiality of Information. The Parties agree that the information to be disclosed pursuant to Section 5.1 shall be deemed CONFIDENTIAL INFORMATION in accordance with Section 14.1. The Settlement Administrator shall be required to enter into an agreement to keep such information confidential.

5.3 Contents of the Class Notice and Posted Notice. The Class Notice and Posted Notice shall be in forms attached as Exhibits D and E respectively; shall contain all information required by law; shall specifically inform the Class Members of the requirement of the Settlement that, under Article VIII of this Agreement, the Class Members and Entertainers Performing at the Clubs will be converted to employees for all purposes; and shall also inform the Class Members of their legal obligation as regularly tipped employees to report all of their tip income to the Club or Clubs at which they Perform.

5.4 The Settlement Administrator's Obligations and Duties. The Settlement Administrator shall, in accordance with the Section immediately below, be responsible for the effectuation of the Class Notice; remitting the PAGA Payments, the Enhancement Payments, and the Attorney Fee and Expense Award from the Settlement Pool; remitting Settlement Payments from the Net Settlement Fund; remitting copies of all Settlement Checks to the Defendants in order to permit the Defendants to issue proper IRS Forms 1099-MISC; and remitting copies of all cancelled Settlement Checks to the Defendants to permit the Defendants to maintain appropriate records of all Participating Class Members.

5.5 Effectuation of Class Notice. Within twenty (20) days of receipt of the Class Member information identified in Section 5.1, the Settlement Administrator shall mail, and email where available, the Class Notice to each Class Member. The envelope containing the Class Notice will identify the Settlement Administrator's return address only, and shall not contain *any* Club-related information from which a reader of the envelope could glean that it relates to the adult nightclub industry. The envelope shall include the Class Notice.

5.6 Return of Class Notice. If the Class Notice mailed to a Class Member is returned within twenty-one (21) days of the initial mailing, with a forwarding address provided by the Postal Service, the Class Notice will be re-sent by the Settlement Administrator to the forwarding address within seven (7) days of return. If no forwarding address is provided by the Postal Service, the Settlement Administrator shall perform a skip trace on the Class Member and, if an alternative address is found, the Class Notice will be re-sent by the Settlement Administrator to the alternative address within seven (7) days of discovery of the additional address. Irrespective of these matters, a timely (in accordance with Section 10.3) Opt Out Form must have been submitted in order for a Class Member to have properly Opted Out.

5.7 Posted Notice. In addition to the mailed and emailed notice identified in Section 5.5, Defendants shall post the details of the Settlement Pool ("Posted Notice"). Each Club shall prominently display the Posted Notice in the Club's Entertainer dressing room. The Posted Notice shall remain posted until the Opt Out Period expires.

5.8 Class Notice Verification. No later than thirty (30) days after the Settlement Administrator has completed the effectuation of the Class Notice as set forth in Sections 5.5 and 5.6, and before the Fairness Hearing, the Parties shall file with the Court a notice of compliance stating that the Class Notice has been mailed and emailed (when available) to the Class Members.

## VI. SETTLEMENT CONSIDERATION

6.1 The Value of the Settlement Consideration. The Settlement Pool shall be in an amount of one million five hundred thousand dollars ($1,500,000.00), consisting of Settlement Payments, Enhancement Payments, the PAGA Payments, the Attorney Fee and Expense Award, and Administrative Costs. Under no circumstances shall Defendants be responsible for making payments or other remunerations of any kind, or for extending credits in a manner, that confers an aggregate financial benefit on the Settlement Class Members, on Class Counsel, on the LWDA, and on the Settlement Administrator, in excess of the amount of the Settlement Pool.

6.2 Payment of the Settlement Pool. The Settlement Pool shall be paid by the Defendants as follows:

a) Defendants shall pay an amount specified by the Settlement Administrator as an estimate to cover the cost of mailing the Class Notice, Opt Out administration, and preparing the Opt Out List, within fifteen (15) days of the Preliminary Approval Date, and shall pay, up until the full remittance of the Settlement Pool, any further bills from the Settlement Administrator as they become due. Once Defendants have, as set forth in this Section, either fully paid the Settlement Pool to the Settlement Administrator or have commenced monthly payments of the Settlement Pool, any bills from the Settlement Administrator shall be paid out of the Settlement Pool as funded by the Defendants to the Settlement Administrator; and

b) If none of the Defendants are remitting payments under the Limited National Settlement at time this Settlement becomes Final, Defendants shall pay the remaining portion of the one million five hundred thousand dollars

($1,500,000.00) within ninety (90) days of the Settlement becoming Final; or

c) In the event that any of the Defendants are remitting payments under the Limited National Settlement at the time this Settlement becomes Final, the Defendants shall pay the remaining portion of the one million five hundred thousand dollars ($1,500,000.00) in monthly installments of one hundred fifty thousand dollars ($150,000.00) each until fully paid, with no interest accruing, beginning sixty (60) days after the Settlement becomes Final.

The payment of the Settlement Pool shall be inclusive of all payments, costs, and fees required to be remitted by the Defendants pursuant to the Settlement and this Agreement; all to be paid without reversion to Defendants.

6.3 Timing of Payments from the Settlement Pool. The timing of payments from the Settlement Pool shall be as follows:

6.3.1 In the event that the Defendants fund the Settlement Pool in accordance with the terms of Section 6.2(b), distributions shall be made by the Settlement Administrator for the Enhancement Payments, the portion of the PAGA Payments to be remitted to the LWDA, and the Attorney Fee and Expense Award, within seven (7) days of the Settlement Pool payment by the Defendants being received by the Settlement Administrator; and for the Settlement Payments and the Settlement Class Members' PAGA Payments within thirty (30) days of the Settlement Pool payment by the Defendants being received by the Settlement Administrator.

6.3.2 In the event that the Defendants fund the Settlement Pool in accordance with the terms of Section 6.2(c), distributions shall be made by the Settlement Administrator for the PAGA Payments to be remitted to the LWDA out of the first monthly payment made by the Defendants. The Settlement Payments, the Settlement Class Members' PAGA Payments, the Enhancement Payments, and the Attorney Fee and Expense Award, shall be distributed by the Settlement Administrator in two payments; the first to be paid within thirty (30) days after receipt by the Settlement Administrator of the first five (5) monthly installment payments from the Defendants, and the second to be paid within thirty (30) days after receipt by the Settlement Administrator of the last of the monthly installment payments from the Defendants.

## VII. PLAN OF ALLOCATION AND DISBURSEMENTS OF SETTLEMENT PAYMENTS AND PAGA PAYMENTS

7.1 Information to be Supplied by each Club as Identified in Exhibit A to Permit Calculation of Settlement Payments. Within thirty (30) days of the Final Approval Order, Services shall provide to the Settlement Administrator the total number of the Dates of Performance that each Settlement Class Member Performed at any Affiliated Entity during the Class Periods (for each Class Member, her number of "Performance Dates"). Services shall maintain the applicable records related to the data furnished to the Settlement Administrator.

7.2 Confidentiality of Information. The Parties agree that the information to be disclosed pursuant to Section 7.1 shall be deemed CONFIDENTIAL INFORMATION in accordance with Section 14.1. Notwithstanding these restrictions, the Settlement Administrator may use the information provided by Services to determine the amount of each Class Member's

Settlement Payment. The Settlement Administrator shall be required to enter into an agreement to keep such information confidential pursuant to the terms of this Section.

7.3 The PAGA Payments. Defendants shall pay, out of and as part of the Settlement Pool, the sum of twenty thousand dollars ($20,000.00) to resolve all PAGA Claims. From the PAGA Payments, seventy-five percent (75%), or fifteen thousand dollars ($15,000.00), shall be paid to the LWDA as civil penalties pursuant to PAGA, and twenty-five percent (25%), or five thousand dollars ($5,000.00), shall be distributed out of the Net Settlement Fund to the Settlement Class Members in accordance with Sections 7.4 – 7.6 immediately below.

7.4 Determination of the Value of Settlement Payments. Settlement Class Members shall be paid a pro-rata share of the Net Settlement Fund based on the number of their Performance Dates relative to all other Settlement Class Members. The Defendants' records and the information provided by the Defendants pursuant to Section 7.1 shall be deemed to be conclusive for purposes of the calculations to be made pursuant to this Section. The pro rata share of the Net Settlement Fund will be determined by the Settlement Administrator based on a formulaic points system, designed by the Parties for ease of administration and in recognition of the limits of Class Members' and Defendants' records and Class Members' memories, in the following manner:

7.4.1 Individual Points Allocation. For each Settlement Class Member, she will receive one (1) point for each of her Performance Dates in order to determine her Individual Points Allocation. The Individual Points Allocation is intended to award higher values to Class Members who Performed on more occasions at the Affiliated Entities during the Class Periods. The maximum Individual Points Allocation a Settlement Class Member can receive is six hundred thirty-four (634) points.

7.4.2 Settlement Payments Formula. The formula for determining the Settlement Payments is based on the Individual Points Allocation, the aggregate of each Settlement Class Member's Individual Points Allocation (the Aggregate Points Allocation), and the available Net Settlement Fund. Once each Settlement Class Member's Individual Points Allocation is determined, the Aggregate Points Allocation will be determined by adding together the Individual Points Allocation for all Settlement Class Members. The total available Net Settlement Fund will then be divided by the Aggregate Points Allocation to determine a per-point dollar value, which is then multiplied by each Settlement Class Member's Individual Points Allocation to determine her pro rata share of the available Net Settlement Fund. For example, someone whose Individual Points Allocation equates to 1% of the Aggregate Points Allocation will receive 1% of the Net Settlement Fund. However, if a Settlement Class Member's pro rata share would result in a payment of less than twenty-five dollars ($25.00) under this formula, her Settlement Payment will be increased to equal twenty-five dollars ($25.00). The Settlement Administrator is authorized to reduce all other Settlement Class Member's Settlement Payments on a pro rata basis under this formula to account for the increases needed to comply with the twenty-five dollar ($25.00) minimum Settlement Payment threshold to avoid aggregate Settlement Payments that exceed the available Net Settlement Fund amount.

7.5 Distribution of the Net Settlement Fund. The Settlement Administrator shall be directed to allocate, and make payments from, the Net Settlement Fund. Upon the determination by the Settlement Administrator of the amount remaining from the Settlement Pool to constitute the Net Settlement Fund, the specific amount of each Settlement Payment as determined by Section 7.4, and upon the Judgment becoming Final, the Settlement Administrator shall make all

Settlement Payments, or portions thereof, in accordance with the provisions of Section 6.3. All Settlement Checks shall contain the following endorsement: "By cashing this check, I Consent to Join (opt in to) the underlying Action and to release any and all Claims that I may have under the Fair Labor Standards Act."

7.6 Returned or Uncashed Settlement Checks. In the event that any Settlement Checks are returned to the Settlement Administrator that cannot be resent with a valid address, the Settlement Administrator shall retain such funds in the account for the Settlement Pool for a period of sixty (60) days months following return of the check. If, after the expiration of that sixty (60) day period, the Settlement Class Member has not requested the Settlement Check, those funds shall be considered to be part of the remaining Net Settlement Fund. Any funds remaining in the Net Settlement Fund one hundred twenty (120) days after the last Settlement Payments are remitted by the Settlement Administrator to Settlement Class Members, shall be distributed by the Settlement Administrator to those Settlement Class Members whose Settlement Checks had not been returned, using the Individual Points Allocation formula set forth in Section 7.4 (the Supplemental Settlement Payments). If, after ninety (90) days of such additional mailings, there remains in the Net Settlement Fund (either as a result of Settlement Checks and/or Supplemental Settlement Payments that are sent out but returned as undeliverable, or Settlement Checks or Supplemental Settlement Checks that are not Negotiated within sixty (60) days of the mailing of the check, then the Settlement Administration shall remit all such remaining funds to the charity identified in Section 7.8.

7.7 Tax Considerations of Settlement Payment Distributions. The Class Representatives and each Settlement Class Member acknowledge and agree that the Settlement Payments and Supplemental Settlement Payments made to them pursuant to Sections 7.3 – 7.6 do

not constitute "wages" within the meaning of § 3111(a) of the Internal Revenue Code, any other applicable provisions therein, or any applicable state tax or revenue code. A Form (or Forms, as applicable) 1099-MISC shall be issued, as required by law, by the Defendants, at their sole cost, to each Settlement Class Member reflecting the payments made in accordance with this Agreement, and copies of said forms shall be duly filed with the United States Internal Revenue Service and with the California taxing authorities. Class Counsel represent that they are providing no tax advice to Settlement Class Members in regard to the tax reporting and remittance obligations that they may have in regard to the Settlement Payments conveyed to them pursuant to the terms of this Agreement.

7.8 Uncollected Settlement Pool Funds. If any uncashed or non-Negotiated Settlement Checks or unpaid funds remain in the Settlement Pool, then the remaining amount contained in the Settlement Pool bank account shall be paid to a charitable organization. The organization selected by Class Counsel is Impact Fund, a California-based non-profit organization providing funds for impact litigation to achieve economic and social justice, including through selected class action litigation and involving matters concerning gender discrimination in employment.

7.9 Excess Claims. There can be no excess Settlement Payments under the scoring system because Settlement Class Members shall share 100% of the available Net Settlement Fund on a pro-rata basis following payment of the Enhancement Payments, the PAGA Payments to the LWDA, the Attorney Fee and Expense Award, and the Administrative Costs therefrom.

7.10 Distribution of Settlement Checks. Within thirty (30) days of issuing Settlement Checks, the Settlement Administration shall provide the Defendants with copies of all Settlement Checks remitted in order to permit the Defendants to issue appropriate IRS Forms 1099-MISC. Within ninety (90) days of the mailing of Settlement Checks, including Supplemental Settlement

Payments, the Settlement Administration shall provide Class Counsel and Defense Counsel with copies of all Negotiated Settlement Checks, and shall thereafter remit to the Class Counsel and Defense Counsel, within thirty (30) days of the receipt of any further Negotiated Settlement Checks, copies of such other Negotiated Settlement Checks. The Negotiated Settlement Checks shall be designated as CONFIDENTIAL INFORMATION in accordance with Section 14.1.

7.11 Filing of Negotiated Settlement Checks. In order to document those Class Members who have submitted a Consent to Join this Action, within thirty (30) days of their receipt of the Negotiated Settlement Checks as set forth in Section 7.10, Class Counsel shall submit such Negotiated Settlement Checks to the Court UNDER SEAL in order to protect the information contained thereon as well as the confidentiality of the Participating Class Members.

## VIII. DEFENDANTS' CHANGES OF BUSINESS PRACTICES, WHICH WILL CONFER A DIRECT AND SUBSTANTIAL FINANCIAL BENEFIT TO THE SETTLEMENT CLASS

8.1 Conversion of Class Members and Entertainers to Employees. No later than the Preliminary Approval Date, the Clubs shall convert all Class Members who are at that time a party to a Dancer Contract with one or more of the Clubs to, and shall treat all Entertainers who will be Performing in their facilities in the future as, employees in accordance with applicable law. For Settlement Class Members, and for other Entertainers who commence Performing at a Club after the end of the Class Periods, their employment shall be on monetary terms that are at least as favorable as specified for employee-Entertainers in the Limited National Settlement (§ 8.20 thereof) for the Greater California Clubs and in the San Francisco Settlement (§139 thereof) for the San Francisco Clubs (with the enhanced benefits of employment set forth in those settlements being available to those qualified individuals for a period of at least one (1) year from the date that the applicable Club converts the Entertainers who Perform on its premises to employees).

Irrespective of anything contained in this Agreement to the contrary, the enhanced employment terms set forth in this Agreement, in the Limited National Settlement and in the San Francisco Settlement, shall not be binding upon any legitimate third-party successor of any of the Defendants.

8.2 Employing Clubs. The Defendants may permit a Class Member to be an employee of more than one Club or may limit her to employment only at her Designated Club. Similarly, the Defendants may permit any Entertainer in the future to be an employee of more than one Club or may limit her to employment only at a single Club of the Defendants' choosing. Nothing contained in this Agreement, or in the Limited National Settlement or in the San Francisco Settlement, shall require the Defendants to permit any Entertainer to work at more than one Club following conversion of the Entertainers who perform at the Clubs to employees in accordance with Section 8.1 above.

8.3 No Contract of Employment/"At Will" Employment Only. Nothing in this Agreement shall constitute or require any contract of employment between any Class Member or Entertainer and any Defendant. The employment terms set forth herein, in the Limited National Settlement and in the San Francisco Settlement, shall be "AT WILL," and shall permit the Clubs to terminate the employment of any Class Member or Entertainer for any reason not precluded by law (including for no specific reason). Just by way of example only, the Clubs shall be permitted to terminate the employment of any Class Member or Entertainer in the future if she fails to appear as scheduled, does not abide by directives of management, or does not generate sufficient income for the Defendant-employer to justify retaining her as an employee.

8.4 Rights of Class Members and Entertainers. Following the conversion to employees as set forth in Section 8.1, Class Members and other subsequent Entertainers will be eligible, as

employees and as may be legally applicable, for Social Security, Medicare, Worker's Compensation and unemployment insurance, as well as to protection under all federal, state and local laws applying to or affecting employees, including but not limited to, as may be legally applicable, the National Labor Relations Act, Title VII of Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), the Older Workers Benefits Protection Act, the Americans with Disabilities Act, the Family Medical Leave Act and the Fair Labor Standards Act, for claims arising out of, or related in any way to, their employment or separation of employment save only for the limitations provided for in this Agreement.

8.5 Rights of Defendant-Employers. Nothing contained in this Agreement, in the Limited National Settlement or in the San Francisco Settlement, shall be construed in any way to restrict the rights of the Defendants as employers that they can exercise over their current employees. Just by way of example only and in no way restricting the rights of the Defendants, the Clubs may impose training; set performance goals; establish appearance standards; regulate clothing and costuming; determine work schedules and hours of work; establish and modify job responsibilities; select the music to which Entertainers Perform; mandate Performing for certain customers; determine the nature, content, character, manner and means of Performances; require the participation in advertising; require attendance at meetings; set meal and rest breaks; require the execution of arbitration agreements with class and collective action waivers; and the like.

8.6 Prerequisites to Employment. Prior to conversion to employees as set forth in Section 8.1, all Class Members shall be required to remit to the Club or Clubs at which they are to be employed, all information, documents and materials that are legally required as a condition for employment (including but not limited valid identification, valid Social Security Card or other documentation permitting the Class Member to work in the United States, I-9, and W-4). Nothing contained in this Agreement shall require a Club to hire a Class Member as an employee who does

not possess, has not produced, or has not remitted, as applicable, all such required information, documents and materials, and nothing contained in this Agreement permits a Class Member to continue to Perform at a Club as an IPE following the date on which Defendants convert Entertainers Performing in the Clubs to employees as set forth in Section 8.1.

8.7 Financial Viability of the Clubs. Nothing in this Agreement shall require any Club to remain open for business following the conversion of Entertainers and Class Members to employees; the Parties acknowledging that some of the Clubs may not be able to operate in a financially profitable manner following the conversion of the Entertainers and Class Members to employee status.

8.8 Verification of Conversion. Commencing at the time the Clubs begin to convert the Class Members to employees as set forth in Section 8.1 until the date of the Final Approval Order, Class Counsel will be permitted, and shall undertake steps, to verify that the conversion to employees of the Class Members (and other Entertainers who may start Performing at the Clubs after the Preliminary Approval Date) has in fact taken place. Verification will consist of, at a minimum, Defendants providing Class Counsel with a schedule of conversion dates and a representative sample of paychecks and other documents demonstrating conversion; accompanied (by Defense Counsel or their designees) site visits by Class Counsel to any of the Clubs identified on ***Exhibit A***; and interviews by Class Counsel with any Entertainers of their choosing who are then Performing in one or more of the Clubs. All fees and costs associated with the obligations of Class Counsel pursuant to this Section 8.8 shall be exclusively borne by Class Counsel, but may be included as part of their request for the Attorney Fee and Expense Award.

8.9 No Violations of Prior Settlements. The Parties acknowledge and agree that nothing contained in this Agreement, and in particular the terms of Section 8.1 that require

conversion of the Entertainers and Class Members still Performing in the Clubs to be employees, shall be considered to constitute a violation or breach of the terms of the Limited National Settlement or the San Francisco Settlement, and more specifically of the terms set forth in Article VIII of the Limited National Settlement and Article VII of the San Francisco Settlement.

8.10 Changes of Law. Only in the event that there is a change of law in the State of California in the future concerning the distinction between employees and independent contractors that modifies or invalidates, in whole or in part, the "ABC" test adopted in *Dynamex*, and/or that modifies, clarifies or specifies those workers who may be subject to the "ABC" test adopted in *Dynamex* or exempted therefrom, including changes by legislation, regulation, wage order adoption or the judiciary, the Clubs shall then be permitted to alter their relationship with the Entertainers who perform in their facilities back to the way it existed prior to the execution of this Agreement, or to any other structure or relationship that they believe complies with the then-existing law.

8.11 Interpretation and Construction of the Limited National Settlement. The Parties agree that the Limited National Settlement, as has already been acknowledged in the San Francisco Settlement, shall be interpreted and construed to permit California Entertainers who are entitled to claim Secondary Pool Remuneration thereunder to obtain Dance Fee Payments from that settlement (the Limited National Settlement) even though they may be employees of a Club under the terms of this Settlement. Accordingly, Class Members who are entitled to obtain Secondary Pool Remuneration from the Limited National Settlement shall be entitled to both, at the same time, the enhanced terms of employment as set forth in Section 8.1 hereof and Section 8.20 of the Limited National Settlement (including but not limited to Dance Fee commissions) and their

Secondary Pool Remuneration when such becomes available pursuant to the terms of the Limited National Settlement.

8.12 Right to Modify the Terms of this Article. The Clubs maintain the right, during the time periods established for the enhanced benefits of employment set forth in the Limited National Settlement and the San Francisco Settlement, to make further changes to their business practices so long as such changes do not materially and adversely undermine the monetary terms set forth in this Article as incorporating those settlements or run afoul of any valid laws covering the Entertainers as employees.

8.13 Injunctive Relief. In the Final Approval Order, the Court shall grant injunctive relief to compel the Defendants to comply with all terms of this Article.

## IX. ATTORNEY FEE AND EXPENSE AWARD, CLASS REPRESENTATIVE ENHANCEMENT PAYMENTS, AND ADMINISTRATIVE COSTS

9.1 Attorney Fee and Expense Award. Defendants shall pay, out of and as part of the Settlement Pool, to Class Counsel, in order to compensate them for their work in obtaining the Settlement Consideration as set forth herein, an amount as ordered by the Court in the Final Approval Order, which shall include attorneys' fees and Litigation Expenses. Class Counsel has indicated that they will submit a request for an Attorney Fee and Expense Award that does not exceed the sum of five hundred thousand dollars ($500,000.00).

9.2 Allocation of Attorney Fee and Expense Award, and Court Approval of the Same. Subject to Court approval, Class Counsel shall, within their sole discretion, allocate the Attorney Fee and Expense Award amongst the various firms that constitute Class Counsel. As directed by the Court's Preliminary Approval Order, Class Counsel shall apply to the Court for an award of attorneys' fees and costs as set forth in this Agreement. In no event shall the Defendants be requested or required to pay any attorneys' fees, costs, or expenses in excess of those set forth in

this Agreement. No attorney shall be entitled to any award or allocation of attorneys' fees or costs prior to satisfying the following two conditions:

(a) Filing a petition for attorneys' fees and/or costs with the Court as set forth in this Section 9.1.

(b) Obtaining their clients' consent to be bound by the terms and conditions of this Agreement without objection.

9.3 Payment of the Attorney Fee and Expense Award. Defendants shall pay to Class Counsel, by way of remittance from the Settlement Administrator out of the Settlement Pool, the Attorney Fee and Expense Award as determined and ordered by the Court, through checks issued to Class Counsel in allocated amounts as determined by the Class Counsel. The Attorney Fee and Expense Award shall be paid according to the terms of Section 6.3.

9.4 Litigation Expenses. With the exception of the payments for the Attorney Fee and Expense Award made pursuant to Section 9.1, all other Litigation Expenses incurred in connection with prosecuting this Action shall be borne exclusively by Class Counsel. Under no circumstances shall Defendants be responsible for Litigation Expenses that exceed the amount of the maximum Attorney Fee and Expense Award provided for herein; that being five hundred thousand dollars ($500,000.00).

9.5 Enhancement Payments. Class Counsel may apply to the Court for an incentive award for each of the Class Representatives (to be in addition to compensating them for their portion of the overall Settlement proceeds available to the Settlement Class, including the Settlement Class Member's PAGA Payment). Subject to Court approval, the Enhancement Payments for each of the Class Representatives will have two monetary components. The first, in the amount of one thousand five hundred dollars ($1,500.00), will be in recognition of each of the

Class Representatives' time, efforts, and expenses incurred in coming forward as a Class Representative, assisting in the prosecution of this Action, and securing the Settlement as embodied in this Agreement. The second, in the amount of eight thousand-five hundred dollars ($8,500.00), will act as consideration for a full, general, and comprehensive release of that individual's General Released Claims, including unknown Claims. Enhancement Payments as ordered by the Court shall not exceed, in the aggregate, twenty thousand dollars ($20,000.00). Enhancement Payments shall be considered non-wage income for which an IRS Form 1099 will be issued by the Defendants, as required by law, to each Class Representative receiving such a payment.

9.6 Administrative Costs. Defendants shall pay to the Claims Administrator, out of and as part of the Settlement Pool, the Administrative Costs in accordance with the terms herein.

## X. OBJECTIONS AND OPT OUTS

10.1 Objections to Settlement. All objections to the Settlement must be in writing and must be filed with the Court in accordance with the Court's Preliminary Approval Order. All objections must be mailed to both Class Counsel and Defense Counsel.

10.2 Procedures for Objections. The procedures of objection shall be as set forth in the Preliminary Approval Order.

10.3 Opting Out of the Settlement. Any Class Member who wishes to be excluded from the Settlement must mail to the Settlement Administrator, at the address that is set forth in the Class Notice, a request for exclusion from the Settlement, personally signed by the Class Member or her Legally Authorized Representative and postmarked no later than sixty (60) days from the Notice Date (the Opt Out Form). The Settlement Administrator shall date-stamp the original of any Opt Out Form and serve copies on both Class Counsel and Defense Counsel via electronic

mail and United States Mail within five (5) business days of receipt of any such statement. Class Counsel shall, prior to the Fairness Hearing, file copies of all timely submitted Opt Out Forms, not timely rescinded (*i.e.*, before the sixty (60) day period provided in this Section), with the Court UNDER SEAL in order to protect the confidentiality of those Class Members who have Opted Out.

10.4 Failure to Properly Opt Out, and Opt Out Limitations. Any Class Member who does not fully complete, personally sign, and timely mail (by postmark), pursuant to Section 10.3, notice of her intention to Opt Out of the Settlement will be deemed included as a Settlement Class Member in accordance with this Agreement. All Class Representatives waive any right to Opt Out of the Settlement.

10.5 Notification to Counsel of Opt Outs. Within ten (10) days following the conclusion of the Opt Out Period, the Settlement Administrator shall provide Class Counsel and Defense Counsel with information, in the form of the Opt Out List, setting forth the total number of Opt Outs and the identities (which shall include the information required by the terms of this Agreement) of such individuals who have decided to Opt Out. The contents of the Opt Out List shall be designated as CONFIDENTIAL INFORMATION in accordance with Section 14.1, and shall be submitted by Class Counsel to the Court, before the Fairness Hearing, UNDER SEAL in order to protect the confidentiality of those Class Members who have Opted Out.

## XI. RELEASES AND COVENANTS

11.1 Scope of Releases. The Released Claims against each and all of the Released Defendants shall be fully and finally released and dismissed with prejudice and on the merits (without an award of fees or costs to any Party other than as provided for in this Agreement) upon entry of the Final Approval Order and the Judgment becoming Final, provided that a Participating

Class Member's Released Claims shall be fully and finally released as of her Settlement Check Filing Date.

11.2 Release of Released Defendants. The Class Representatives, the Settlement Class Members, and the Participating Class Members, individually and on behalf of their heirs, estates, trustees, executors, administrators, representatives, agents, successors, and assigns, and anyone claiming through them, or acting or purporting to act on their behalf or for their benefit, hereby knowingly and voluntarily, forever release, relinquish, acquit, discharge, and hold harmless, each and every one of the Released Defendants from, and covenant not to sue each and every one of the Released Defendants regarding, each and every one of the General Released Claims (in the case of the Class Representatives), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the Participating Class Members' Released Claims (in the case of the Participating Class Members); and they further agree that they shall not now or hereafter initiate, maintain, or assert any General Released Claims (in the case of the Class Representatives), any Settlement Class Members' Released Claims (in the case of the Settlement Class Members), or any Participating Class Members' Released Claims (in the case of the Participating Class Members) against the Released Defendants, or against any one or group of them, in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicating body. Without in any way limiting the scope of the releases described in this Section and in this Article XI, these releases cover, without limitation, any and all Claims for attorneys' fees, costs, or disbursements incurred by Class Counsel, any other counsel representing the Class Members or Settlement Class Members, the Class Representatives or Settlement Class Members themselves, or by any one or group of them, in connection with or related in any manner to the Action, the Settlement of the Action, any other action or proceeding predicated upon the Release Claims, the

administration of the Settlement, and/or the Released Claims, except to the extent otherwise specified in this Agreement. Notwithstanding the foregoing, Settlement Class Members retain the right to bring Claims based upon future violations of the terms of this Agreement.

11.3 Waiver of Released Claims. For and in return of the complete and full considerations, terms, covenants and conditions as set forth in this Agreement, the Settlement Class Members, the Participating Class Members, and the Class Representatives, and each and every one of them, further specifically agree to waive each and all of their rights to bring any Claims against the Released Defendants, or against any one or group of them, at any time in the future arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims (for Settlement Class Members), the Participating Class Members' Released Claims (for Participating Class Members), and the General Released Claims (for Class Representatives).

11.4 Release of FLSA Claims. With respect to those Claims that could be asserted under the FLSA, a Class Member's Negotiation of any Settlement Check or Supplemental Settlement Check shall be deemed as that Class Member's Consent to Join. The Negotiation by a Class Member of any Settlement Check or Supplemental Settlement Check shall fully, finally, and forever settle and release any and all FLSA Claims that she may have up to and including her Settlement Check Filing Date (her Participating Class Member's Released Claims).

11.5 Claims Barred and Enjoined. The Class Representatives, all Settlement Class Members and all Participating Class Members, shall be permanently barred and enjoined from initiating, asserting, or prosecuting against the Released Defendants, or against any one or group of them, in any federal or state court or before any administrative body, tribunal, arbitration panel, or other adjudicating body, any and all of the General Released Claims (in the case of the Class

Representatives, any Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and any Participating Class Members' Released Claims (in the case of the Participating Class Members). The Court shall retain jurisdiction to enforce the provisions of this Section.

11.6 Waiver of Additional Compensation. Irrespective of the releases, waivers, and satisfactions set forth herein, if any court, tribunal, firm, third person or persons, business entity, or governmental entity, organization or agency brings, asserts, or assumes jurisdiction over any form of investigation, proceeding, lawsuit, Claim, charge or cause of action by, for or on behalf of any Settlement Class Member, Participating Class Member, or Class Representative, and/or in her interest or for her benefit, either in whole or in part, against the Released Defendants, or against any one or group of them, arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims, the Participating Class Members' Released Claims, or the General Released Claims, such Settlement Class Member, Participating Class Member, or Class Representative, as applicable, shall not seek to enforce, recover or collect upon any damages, awards, remunerations, sanctions, penalties, costs and/or attorney fees assessed against the Released Defendants, or against any one or group of them, and shall reasonably cooperate with any request from the Released Defendants, at the Released Defendants' cost, to demand the dismissal, with prejudice, of any such investigation, proceeding, lawsuit, Claim, charge, or cause of action, and/or, as may be appropriate, her withdrawal therefrom (by way of example and without limitation, "withdrawal" includes, where applicable, a formal written request for withdrawal of, or non-participation in, an administrative proceeding, formally "opting"-out of an opt out class action lawsuit, and refraining from formally "opting"-in to an opt-in class or collective action matter). In the event, however, that any court, tribunal, or governmental entity,

organization or agency should assess any damages, awards, remunerations, sanctions, penalties, costs, and/or attorney fees of any kind whatsoever against any Released Defendant beyond the relief provide for in this Agreement (in this Section, sometimes generally hereinafter simply referred to as "Award") arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims, the Participating Class Members' Released Claims, or the General Released Claims, the Settlement Class Members, Participating Class Members, and Class Representatives, as applicable, and each and every one of them, agree to specifically waive entitlement to, and refrain from collecting upon, any such Award.

11.7 Sufficiency of Consideration. The Class Representatives specifically represent that sufficient and adequate consideration is being conveyed to them through this Agreement and the Settlement to support the General Released Claims.

11.8 Satisfaction of Class Member Claims. The Class Representatives specifically acknowledge that the payments made, and other considerations conveyed, by the Defendants as set forth herein, represent valid compromises, settlements, resolutions, accords, satisfactions, waivers, and releases of, as applicable, any and all Claims for FLSA or state wage/labor law coverage; minimum wage; overtime; liquidated, punitive, and/or exemplary damage payments; penalties; costs; attorney fees; and/or any other benefits allegedly due the Class Representatives in regard to any matters or conduct arising from, relating to, associated with, based upon, or concerning, in any way, matter, regard, or fashion whatsoever, the General Released Claims.

11.9 Acknowledgement of Other Claims. The Class Representatives, and each and every one of them, specifically represent that to their own personal knowledge: A) There are no other lawsuits, Claims, charges, actions, proceedings, investigations, cause, and/or causes of actions of any kind whatsoever, other than those that are set forth in Plaintiffs' Complaint and in any amendment to

be filed as part of this Settlement, or as otherwise previously disclosed in writing to the Defendants, pending or anticipated against the Released Defendants, or against any one or group of them, whether filed or unfiled, and whether civil or criminal, arising from, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the General Released Claims; B) that none of them have filed, been served with, or have any personal knowledge of any such matters; and C) that they have not participated in, or have provided assistance or cooperation to, such matters.

11.10 Release of Participating Class Members. Subject to any Claims that they may have for libel, slander, business disparagement, damage or destruction of property, assault and/or battery, or the like, each and every Released Defendant hereby, knowingly and voluntarily, releases, acquits, and forever discharges, each and every Participating Class Member and Class Counsel from any and all Claims of every conceivable kind or nature whatsoever that they have, had, or may have, against the Participating Class Members, or against any one or group of them, whether known or unknown, whether fixed or contingent, whether asserted or unasserted, and whether filed or unfiled, at law, in equity, or otherwise, that arise out of, relate to, are associated with, are based upon, or concern in any way, manner, regard, or fashion whatsoever, the business arrangement that the Clubs had or have with the Participating Class Members and which occurred during the Class Periods and/or up until the Preliminary Approval Date of this Settlement, including but not limited to any Claim for breach of contract, any Claim purportedly arising out of a Dancer Contract, or any Claim that could exist as a result of the Participating Class Member's election to declare herself an "employee" under the terms of a Dancer Contract. Notwithstanding the foregoing, Defendants retain the right to bring Claims based upon future violations of the terms of this Agreement.

11.11 Waiver of California Civil Code Section 1542. Each Class Representative

expressly acknowledges that she is familiar with principles of law such as Section 1542 of the Civil Code of the State of California ("Section 1542"), which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the DEBTOR**.

Consequently, each Class Representative shall be deemed to have expressly, knowingly, and voluntarily waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits she may otherwise have or have had pursuant to Section 1542 and to all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein. In connection with the General Released Claims, the Class Representatives acknowledge that they are aware that they may hereafter discover Claims presently unknown and unsuspected or facts in addition to or different from those which they now know or believe to be true with respect to matters released herein. Nevertheless, the Class Representatives acknowledge that a portion of the consideration received herein for the General Released Claims is for a release with respect to unknown damages and complaints, whether resulting from known injuries and consequences or from unknown injuries or unknown consequences of known or unknown injuries, and state that it is the intention of the Class Representatives in agreeing to this release to fully, finally, and forever settle and release all matters and all Claims that exist, may exist (currently or hereafter), or might have existed (whether or not previously or currently asserted in any action or proceeding), constituting the General Released Claims.

11.12 Performing in the Future at the Clubs. The Parties acknowledge that some of the Class Members are no longer Performing at any one of the Clubs. Nothing in this Agreement shall require any Club to hire any Class Member not under contract at the time of execution of this Agreement in order to be able to Perform on its premises at any time in the future, and each and

every Settlement Class Member not a party to a current Dancer Contract with one or more of the Clubs at the time of the Preliminary Approval Order releases the Released Defendants from, and waives any right to assert at any time in the future, any Claims of any conceivable kind or nature whatsoever that she may have that arises out of, relates to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, the refusal of any Club to hire her in order to permit her to Perform on its premises at any time in the future.

11.13 Knowing Execution. Each Class Representative further acknowledges, agrees, and understands that: (a) she has read and understands the terms of this Agreement; (b) she has been advised in writing to consult with an attorney before executing this Agreement; (c) she has obtained and considered such legal counsel as she deems necessary; and (d) she has been given twenty-one (21) days to consider whether or not to enter into this Agreement (although she may elect not to use the full 21 day period at his/her option). The signature page(s) of this Agreement for the Class Representatives shall be considered to be CONFIDENTIAL INFORMATION in accordance with Section 14.1, shall be kept confidential, attorneys' eyes only, among Class Counsel and Defense Counsel, and shall not be attached to the public filing of this Agreement for approval by the Court.

11.14 Non-Assignment of Claims. Each Class Representative represents and agrees that she has not and will not assign any of her General Released Claims to any other person or entity. These representations shall survive the execution of this Agreement and the approval by the Court of the Settlement contemplated herein.

11.15 Dismissals. Subject to Court approval, the Class Representatives and all Settlement Class Members shall be bound by this Agreement, and all of their Released Claims shall be dismissed with prejudice and fully and forever released and discharged, even if such Person(s)

never received actual notice of the Action or this Settlement.

## XII. TERMINATION OF SETTLEMENT

12.1 Events Permitting Termination. This Agreement and the Settlement shall terminate and be canceled within ten (10) business days of the mailing of notification if one of the Parties provides such written notification of an election to terminate this Agreement and the Settlement based upon the occurrence of any of the following circumstances:

(a) The Court denies or rescinds preliminary approval of this Agreement, or declines to enter, or materially modifies, the contents of the Preliminary Approval Order;

(b) Any of the signatories hereto have not signed this Agreement at least fifteen (15) days prior to Final Approval;

(c) One or more of the Class Representatives has not signed the General Release Form within seven (7) days of the entry of the Final Approval Order as required by Section 3.30;

(d) The Court declines to provide Final Approval of this Agreement, or declines to enter the Judgment that fully adopts the terms of this Agreement, or enters a Judgment that material modifies, or that is at material variance from, the terms of this Agreement;

(e) The Court's Judgment is vacated, reversed, or modified in any material respect in any appeal or other review, or in any collateral proceeding occurring prior to the Effective Date;

(f) The Effective Date does not occur for some other reason; or

(g) Any federal or state authorities object to, or request material modifications of, the Settlement and the Court adopts such objections and/or modifications.

12.2 Consequences of Termination. In the event this Agreement does not receive Final Approval by the Court, or in the event the Court's Final Approval is overturned, reversed, vacated, or modified in any material way on appeal or review, or by or through any collateral proceeding, or in the event the Settlement is terminated or fails to become effective in accordance with the terms of this Agreement, the Parties shall request the Court to restore them to their respective positions in the Action as of August 1, 2018. In such event: a) the terms and provisions of this Agreement shall have no further force or effect with respect to the Parties; b) neither this Agreement nor any discussions or documents regarding it, or the Settlement prior to the termination/cancellation of this Agreement, shall be used in the Action or in any other proceeding for any purpose except with regard to matters set forth in this Section; c) any order or judgment entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*; d) no prejudice shall attach to any motion by Defendants, either filed or unfiled, to compel the Named Plaintiffs into individualized arbitration and to dismiss and/or stay the Action.

12.3 Costs of Termination. If any Party terminates this Agreement, both Plaintiffs and Defendants shall bear their own costs incurred.

12.4 Effects of Termination. In the event this Agreement is terminated:

(a) The Defendants shall have no obligations to make any payments to any Party, Class Representative, Class Member, attorney, fund (including but not limited to the LWDA), or account (including but not limited to that set up for the Settlement Pool), or to the Settlement Administrator;

(b) Any Preliminary Approval Order, Final Approval Order and the Judgment, including any order of class certification pursuant to the Agreement (provisional or otherwise), shall be vacated and the First Amended Complaint for Settlement and any answer/counterclaim thereto shall be deemed withdrawn; and

(c) Any monies paid or remitted by Defendants to the Settlement Administrator pursuant to Section 6.2(a), except mailing costs to the extent actually spent on mailing of the Class Notice and costs for administration and preparation of the Opt Out List, shall be immediately returned to Defendants.

## XIII. LIMITATIONS UPON THE TERMS OF SETTLEMENT

13.1 No Admission of Wrongdoing. Neither this Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance thereof, is, or may be deemed to be, or may be used as: (a) an admission or evidence of the truth of any allegations in the Action, either as presently pending or as to be amended as provided for herein; b) an admission or evidence of the validity of any of the Released Claims, or any alleged wrongdoing or liability of any of the Released Defendants; (c) an admission or evidence of any fault or omission of any of the Released Defendants in any civil, criminal, or administrative proceeding in any court, administrative agency or other tribunal (including any arbitral forum), other than such proceedings as may be necessary to consummate or enforce this Agreement, the Settlement memorialized herein, or the Judgment; (d) an admission that Services, Mohney SFBSC, or any other Affiliated Entity is, or could be held to be, a "joint employer" of the Plaintiffs or of any one or group of them; (e) an admission that each of the Clubs' separate corporate identity is or can be disregarded; or (f) an admission as to, or evidence of, the certifiability of any Claims contemplated herein or in the Action, either as

presently pending or as to be amended as provided for herein. Notwithstanding the preceding, however, this Agreement and/or the Judgment may be filed and used in any action or proceeding in any court, administrative agency, or other tribunal to support a defense of *res judicata*, collateral estoppel, payment, release, good faith settlement, accord and satisfaction, claim preclusion, issue preclusion, or any similar defense or counterclaim.

## XIV. PROTECTIVE ORDER

14.1 Terms of Protective Order. The Parties shall agree upon, and shall submit to the Court for entry, a stipulated protective order in the Action in order to protect the confidentiality of certain identities, information, documents, and materials deemed to be confidential pursuant to the terms of this Agreement or as otherwise designated by the Parties (collectively, "CONFIDENTIAL INFORMATION"). Such CONFIDENTIAL INFORMATION shall be held in confidence by the Parties and/or by their attorneys pursuant to the terms of that order, and shall not be submitted in any public filing or other public disclosures except as may be permitted herein.

14.2 Return of Confidential Information. All documents and/or things produced or generated through discovery by any Party in the Action (including by way of informal discovery provided for by the Parties) shall be destroyed within thirty (30) days of the Effective Date. Each Party shall promptly certify to the other that all documents and/or things produced or generated through discovery have been destroyed. No Party shall be required, however, to destroy their own documents and things or any other document that the Protective Order entitles the Party or its Counsel to retain following the termination of litigation.

## XV. NOTIFICATIONS

15.1 Process of Notification. Unless otherwise specifically provided herein, all notices, demand, or other communications given hereunder shall be in writing and shall be deemed to have

been duly given as of the third business day after mailing by United States registered or certified mail, return receipt requested, addressed as follows:

To Plaintiffs and the Settlement Class:

Jason Thompson
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, MI 48076

To Defendants:

Bradley J. Shafer
Shafer & Associates, P.C.
3800 Capital City Boulevard, Suite 2
Lansing, MI 48906

## XVI. MISCELLANEOUS PROVISIONS

16.1 This Agreement may be amended or modified only by a written instrument signed by or on behalf of all of the signatories hereto or their successors-in-interest. No oral amendment or modification shall be permitted or effective.

16.2 This Agreement and the Settlement were entered into after substantial good faith, arms-length, negotiations between the Parties, Class Counsel and Defense Counsel. As such, no Party shall be deemed to have relied upon the representations of any other Party or opposing counsel in relation to the negotiation or execution of this Agreement.

16.3 Each counsel or other person executing this Agreement on behalf of any of the Parties hereto represents that such person has the authority to so execute this Agreement.

16.4 This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same Agreement. This Agreement may be executed by signature delivered by facsimile or PDF, and need not be the original "ink" signature. A complete set of executed counterparts shall be filed with the Court prior to the

Fairness Hearing, with the exception of the true identities of the Class Representatives, which are to be kept as CONFIDENTIAL INFORMATION in accordance with Section 14.1. This Agreement shall become binding upon its execution by the Class Representatives, the Defendants, all counsels of record, and upon Final Approval by the Court.

16.5 This Agreement and the exhibits hereto constitute the entire fully integrated agreement among the Parties. No representations, warranties, or inducements have been made to any Party concerning the Settlement, this Agreement, or its exhibits, other than the representations, warranties, and covenants contained in such documents.

16.6 The failure of any of the Parties to perform any of their obligations hereunder shall not subject such Party to any liability or remedy for damages, or otherwise, where such failure is occasioned, in whole or in part, by acts of God, fires, accidents, earthquakes, other natural disasters, explosions, floods, wars, interruptions or delays in transportation, power outages, labor disputes or shortages, shortages of material or supplies, governmental laws, restrictions, rules or regulations, sabotage, terrorist acts, acts or failures to act of any third parties, or any other similar or different circumstances or causes beyond the reasonable control of such Party.

16.7 This Agreement shall be governed by the laws of the State of California. All actions or proceedings relating to this Agreement may only be brought in the Superior Court of the State of California, County of San Diego.

16.8 Upon the occurrence of the Effective Date, the Settlement shall be fully enforceable by the Court, and the Court shall retain exclusive and continuous jurisdiction over the Parties and the Settlement Class Members to interpret and enforce the terms and conditions of, and rights under, the Settlement until the terms of this Agreement are fully performed.

16.9 Unless otherwise indicated herein, where any Party's exercise of any right under this Agreement requires written notice, the Party shall serve such written notice on the counsel of record for the other Parties by First Class U.S. Mail or any method that is at least as reliable and timely as First Class U.S. Mail.

16.10 Each of the Parties acknowledges and represents that he/she/it has fully and carefully read this Agreement prior to execution; that he/she/it has been fully apprised by his/her/its counsel of the legal effect and meaning of this Agreement and all terms and conditions hereof; that he/she/it has had the opportunity to make whatever investigation or inquiry he/she/it deemed necessary or appropriate in connection with the subject matter of the Action; that he/she/it has been afforded the opportunity to negotiate any and all terms of this Agreement; and that he/she/it is executing this Agreement voluntarily and free from any undue influence, coercion, duress, or menace of any kind. This Agreement reflects the conclusion of each of the Parties that this Agreement, the Settlement, the Judgment to be entered hereunder, and the releases, waivers, and covenants provided for herein, are in the best interest of said Parties, the general public, and the Settlement Class. Except as expressly provided herein, this Agreement is not intended to confer upon any other person or entity any rights or remedies.

16.11 In the event that any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall in no way affect any other provisions if Defense Counsel and Class Counsel, on behalf of the Parties and the Settlement Class, mutually elect in writing to proceed as if such invalid, illegal, or unenforceable provision had never been included in this Agreement. However, if any funds have been remitted, or other consideration conveyed, to a Class

Representative or a Settlement Class Member, then the releases and discharges granted, waivers conferred, and satisfactions conveyed by this Agreement may not be terminated.

16.12 The headings and captions inserted in this Agreement are for convenience only and in no way define, limit, or otherwise describe the scope or intent of this Agreement, or any provision hereof, or in any way affect the interpretation of this Agreement.

16.13 Except as otherwise provided in this Agreement, the Parties shall bear their own respective costs and fees.

16.14 None of the Parties, or their respective counsel, shall be deemed to be the drafter of this Agreement or its exhibits for purposes of construing their provisions. The language in all parts of this Agreement and its exhibits shall be interpreted according to its fair meaning, and shall not be interpreted for or against any of the Parties as the drafter of the language.

16.15 All time computations under this Agreement shall be done in accordance with the provisions of the rules of court applicable to the Superior Court of the State of California, County of San Diego, which govern the calculation of time.

16.16 The waiver by any of the Parties to this Agreement of any provision thereof shall not be deemed a waiver by that Party of any other provision of this Agreement.

16.17 Each and every one of the Parties hereto acknowledges and agrees that he/she/it will and shall, at all times subsequent to the execution of this Agreement and upon reasonable request, make, do, and execute, or cause to be made, done, or executed, all such further documents and instruments to effectuate the full intent, purpose, covenants and conditions as set forth herein as any Party may require.

16.18 This Agreement shall be binding upon and inure to the benefit of the Parties, the Settlement Class Members, the Participating Class Members, Class Counsel, and Defense

Counsel, as well as their assigns, successors-in-interest of any kind whatsoever, purchasers of any of their assets and/or liabilities, heirs, executors, and administrators.

[THIS SPACE INTENTIONALLY LEFT BLANK]

# EXHIBIT A
# FILED UNDER SEAL PURSUANT TO 6-1-18 ORDER

**REDACTED**

FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
Joshua C. Anaya, Esq. (265444)
jca@classactionlaw.com
Trenton R. Kashima, Esq. (SBN 291405)
trk@classactionlaw.com
550 West C St., Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

Attorneys for Plaintiffs
and the Putative Classes

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

**JANE ROE NO. 1 and 2, individually and on behalf of all others similarly situated,**

**Plaintiffs,**

**vs.**

**DÉJÀ VU SERVICES, INC., HARRY MOHNEY, THE DÉJÀ VU AFFILIATED NIGHTCLUBS, and DOES 1-200, jointly and severally,**

**Defendants.**

Case No: 37-2018-00028044-CU-OE-CTL

**FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT FOR VIOLATION OF THE FLSA AND STATE LAW**

**DEMAND FOR JURY TRIAL**

*** * * REDACTED * * ***

## INTRODUCTION

1. This is a class action brought by Plaintiffs Jane Roe No. 1 and 2 ("Plaintiffs") against Defendants Déjà Vu Services, Inc., Harry Mohney, and the Déjà Vu Affiliated Nightclubs identified in **Exhibit A** and attached hereto (hereinafter collectively referred to as "Defendants").

2. The Class which Plaintiffs seek to represent is composed of people who, during the relevant time period, worked as exotic dancers at Déjà Vu Affiliated Nightclubs in California.

3. Plaintiffs contend that all class members were denied their fundamental rights under applicable federal and state wage and hour laws, causing financial loss and injury. Specifically, Plaintiffs complain that Defendants misclassified Plaintiffs and all other members of the Class as independent contractors, as opposed to employees, at all times in which they worked as dancers at Defendants' adult nightclubs located throughout California. Plaintiffs contend that Defendants failed to pay Plaintiffs and all other members of the Class the minimum and overtime wages and other benefits to which they were entitled under applicable federal and California state laws. Additionally, Defendants engaged in unlawful tip-sharing by requiring dancers in the Class to share gratuities given to them by patrons with Defendants and their employees, such as doormen and DJs. Plaintiffs, therefore, bring this class action seeking damages, back pay, restitution, liquidated damages, injunctive and declaratory relief, civil penalties, prejudgment interest, reasonable attorneys' fees and costs, and any and all other relief the Court deems just, reasonable and equitable under the circumstances.

## I. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to Article 6, § 10 of the California Constitution, California Business and Professions Code § 17203 and Code of Civil Procedure §§ 382 and 410.10. This Court has jurisdiction over Defendants because they are registered to conduct, and do conduct, substantial business within California and San Diego County.

5. This Court has jurisdiction over Plaintiffs' Fair Labor Standards Act ("FLSA") claims as 29 U.S.C. § 216(b) authorizes private rights of action to recover damages for violations of the FLSA's wage and hour provisions on any court, which means state or federal.

6. Venue is proper in this Court pursuant to Code of Civil Procedure § 395 because

Defendants operate their business and employ the class members within this County, and a substantial or significant portion of the conduct complained of herein occurred and continues to occur within this County.

## II. PARTIES AND STANDING

7. Plaintiff Jane Roe No. 1 ("[redacted]"), is a resident of San Bernardino County, California. Jane Roe No. 1 worked as an exotic dancer for Defendants at Déjà Vu Showgirls in Bakersfield, California during the class period and is a member of the proposed class. Like other class members, when Jane Roe No. 1 worked in that capacity, she was: (1) misclassified as an independent contractor, and as a result was not paid any wages (or provided other benefits and rights) to which she was entitled as an employee; and (2) required to split tip income as described more fully below. Jane Roe No. 1 sues on her own behalf and as a proposed class representative on behalf of similarly situated individuals. She sues under a fictitious name, Jane Roe No. 1, due to the highly sensitive and personal nature of the details about Plaintiffs in this action, and for additional reasons described below.

8. Plaintiff Jane Roe No. 2 ("[redacted]") is a resident of San Diego County, California. Jane Roe No. 2 worked as an exotic dancer for Defendants at Déjà Vu Showgirls in San Diego, California and Torrance, California during the class period and is a member of the proposed class. Like other class members, when Jane Roe No. 2 worked in that capacity, she was: (1) misclassified as an independent contractor, and as a result was not paid any wages (or provided other benefits and rights) to which she was entitled as an employee; and (2) required to split tip income as described more fully below. Jane Roe No. 2 sues on her own behalf and as a proposed class representative on behalf of similarly situated individuals. She sues under a fictitious name, Jane Roe No. 2, due to the highly sensitive and personal nature of the details about Plaintiffs in this action, and for additional reasons described below.

9. Plaintiffs sue under fictitious names due to the highly sensitive and personal nature of the details about Plaintiffs in this action and because (1) there is a significant social stigma associated with the nude and semi-nude "dancing" that exotic dancers, also known as "strippers," perform; (2) there are risks inherent in working as an exotic dancer, including risk of injury by

current or former customers of Defendants if an exotic dancer's name or address is disclosed; (3) Plaintiffs would be hesitant to maintain this action enforcing fundamental employee rights if their names were to be forever associated with Defendants' Nightclubs, which could affect their prospects for future employment by others; and (4) Plaintiffs wish to protect their rights to privacy. Plaintiffs' concerns are reasonable and justified. At the Nightclubs, it is customary for the exotic dancers to use pseudonyms or stage names for privacy and personal safety reasons. *See generally Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-1068 (9th Cir. Cal. 2000) *accord Starbucks Corp. v. Superior Court* (2008) 168 Cal.App.4th 1436, n.7 ("[W]e allow parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment.' . . . We join our sister circuits and hold that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity.").

10. Plaintiffs intend to file additional Consents to Become Party Plaintiff executed by similarly situated individuals as they are secured. Many similarly situated individuals, however, will be afraid to join the lawsuit as party plaintiffs because of reasonable fears relating to privacy, personal safety, and/or the potential for retaliation. In order to allow them to pursue their rights under the FLSA without jeopardizing their privacy, personal safety, or income, Plaintiffs pray that the Court permit party plaintiffs to keep their names and addresses concealed. *See generally Does I thru XXIII*, 214 F.3d at 1071 ("complaining employees are more effectively protected from retaliation by concealing their identities than by relying on the deterrent effect of *post hoc* remedies under FLSA's anti-retaliation provision").

11. Defendants are business entities and/or individuals that jointly employ and control the work of members of the Class that work or have worked at Déjà Vu Affiliated Nightclubs throughout California.

12. The Déjà Vu Affiliated Nightclubs are businesses that, within the state of California, currently are, or that at any time during the Class Period were, either: A) parties to an agreement or contract with Déjà Vu Services, Inc. whereby they receive(d) either consulting or management

services, or licensing rights, from Déjà Vu Services, Inc.; B) parties to an agreement or contract with Global Licensing, Inc., whereby they receive(d) licensing rights from Global Licensing, Inc.; C) owned, either wholly or in part, and directly or indirectly, by either Harry Mohney or Jason "Cash" Mohney; or D) tenants of Harry Mohney or Jason "Cash" Mohney, either directly or indirectly.

13. The senior management of all Déjà Vu Affiliated Nightclubs throughout California is delegated to Déjà Vu Services, Inc., Harry Mohney and/or their agents. In turn, the employment policies affecting class members at the Déjà Vu Affiliated Nightclubs in California are dictated, determined, controlled and perpetuated in material part by Déjà Vu Services, Inc. and Harry Mohney. As such, Déjà Vu Services, Inc. and Harry Mohney are joint employers of all dancers under applicable federal and state wage and hour laws, including the FLSA.

14. Defendant Déjà Vu Services, Inc. (hereinafter "Déjà Vu Services" or "DVS") is a Michigan Corporation maintaining offices in North Hollywood, California, San Diego, California and Lansing, Michigan. The registered office for Déjà Vu Services is 8252 E. Lansing Road, Durand, Michigan, 48429. Déjà Vu Services also maintains corporate offices in North Hollywood and San Diego, California. From those offices DVS manages, operates and/or controls the business operations and employment and wage policies at the numerous Déjà Vu Affiliated Nightclubs doing business under "Déjà Vu," "Déjà Vu Showgirls," "Déjà Vu Dream Girls," "Déjà Vu Centerfolds," and/or other trade names nationwide, including the Déjà Vu Affiliated Nightclubs where Plaintiffs and all Class members worked.

15. Defendant Harry Mohney ("Mohney") is an individual residing in California, Nevada and/or other foreign addresses. Upon information and belief, Mohney owns, manages and/or controls Déjà Vu Services and each of the Déjà Vu Affiliated Nightclubs, directly or indirectly. Together with DVS, Mohney perpetuates the employment policies affecting Class members that are challenged in this lawsuit. Mohney maintains offices in California where he conducts this work and makes these decisions that affect Class members in California. Mohney manages, operates and/or controls the business operations and employment policies at the numerous nightclubs doing business under "Déjà vu," "Déjà Vu Showgirls," "Déjà Vu DreamGirls," "Déjà Vu Centerfolds," and/or other trade names nationwide, including the Déjà Vu Affiliated Nightclubs where Plaintiffs and all Class

members worked.

16. Déjà Vu Services and Mohney are joint employers of all Class members and as such are jointly and severally liable for any violations of the wage and hour laws set forth below. Plaintiffs seek to certify a class of all exotic dancers who worked at Déjà Vu Affiliated Nightclubs in California that were directly or indirectly owned, operated, controlled and/or managed by Déjà Vu Services and/or Mohney. Déjà Vu Services and Mohney manage, operate and control the significant business operations in each Déjà Vu Affiliated Nightclub, and dictate the common employment policies applicable to each nightclub, including but not limited to the decisions: (1) to classify dancers as independent contractors, as opposed to employees, and; (2) to require that dancers share their tips. Those policies, which affected and harmed Class members in California, were established and implemented, in significant and material part, at Déjà Vu Services' and Mohney's offices and places of business in California.

17. DVS, its officers and consultants, including Mohney, have been involved in the decisions to classify exotic dancers working at the Déjà Vu Affiliated Nightclubs as independent contractors, as opposed to employees, and to perpetuate and maintain that classification system. As part of those discussions, DVS, its officers and consultants, including Mohney, have discussed compliance with the labor codes relating to the dancer classification issue and made the decision to try to have dancers "elect" to be independent contractors and waive their statutory rights under the wage and hour laws.

18. Each Déjà Vu Affiliated Nightclub has a common structure where it is held by a nominal corporation, but substantial senior management, financial, legal and other critical operational functions are delegated to affiliated companies which all come under the common control of DVS, its officers and consultants, including Mohney; all or significant senior management functions of each nightclub corporation are delegated to Déjà Vu Services, a company indirectly owned by Mohney. Other key business functions are delegated to and performed by other affiliated companies controlled by Mohney.

19. DVS currently makes its services available to each of the Déjà Vu Affiliated Nightclubs and licenses various "Déjà Vu" trademarks to the clubs. DVS establishes policies that

confirm that it controls the workplace at all of the Déjà Vu Affiliated Nightclubs, including those pertaining to the work and classification of exotic dancers in the Class. Upon information and belief, Déjà Vu Services performs the same business functions with respect to all Déjà Vu Affiliated Nightclubs, including management and consultation functions regarding the employment classification of dancers and tip sharing practices.

20. Mohney, directly or indirectly, holds a significant ownership share in all or certain Déjà Vu Affiliated Nightclubs. DVS, its officers and consultants, including Mohney, make decisions regarding the Déjà Vu Affiliated Nightclubs (including employment policies) from their offices in California. Specifically, a senior DVS consultant lives in California and, in conjunction with others, implements, directs, and creates DVS policies on behalf of the Déjà Vu Affiliated Nightclubs.

21. DVS employs a number of "consultants" including Mohney. These individuals make decisions regarding DVS and the Déjà Vu Affiliated Nightclubs (including employment policies) from their offices in California.

22. Certain DVS officers and "consultants" also manage the Déjà Vu Affiliated Nightclubs. For instance, one DVS consultant - who resides and works in California - is also the President of a holding company that maintains ownership interests in numerous Déjà Vu Affiliated Nightclubs. Other managers of Déjà Vu Affiliated Nightclubs report to, are controlled by, and answer to, DVS's officers and consultants. Through this, *inter alia*, DVS and Mohney control the operations of the Déjà Vu Affiliated Nightclubs and the people who work there, including dancers in the class.

23. Upon information and belief, at all relevant times, Mohney has played a significant role in managing, directing and controlling the day-to-day business operations of Déjà Vu Services, all of the Déjà Vu Affiliated Nightclubs, and Modern Bookkeeping.

24. Upon information and belief, at all relevant times Mohney was employed by Déjà Vu Services and conducted his work, supervision, and direction of the Déjà Vu Affiliated Nightclubs' operations from his offices in California, Nevada, and/or Michigan.

25. Upon information and belief, Mohney, Déjà Vu Services and the Déjà Vu Affiliated Nightclubs employ "consulting" agreements to allow Mohney and Déjà Vu Services to control,

operate, direct, and manage the business affairs of the Déjà Vu Affiliated Nightclubs, including those that affect dancer classification and tip sharing policies.

26. At all relevant times, Mohney has been the *de facto* chief corporate officer of Déjà Vu Services and the Déjà Vu Affiliated Nightclubs; has had a significant ownership interest in Déjà Vu Services and the Déjà Vu Affiliated Nightclubs; and has had operational control over significant aspects of the business functions of Déjà Vu Services and the Déjà Vu Affiliated Nightclubs, including those relating to the employment classification of dancers; the determination of dancers' wages (or more accurately, the lack thereof); and tip-sharing requirements applicable to dancers working at the nightclubs. Mohney played a significant role in creating and maintaining the business model where dancers working at the Déjà Vu Affiliated Nightclubs were to be classified as independent contractors and required to share their tips. As such, Mohney is jointly and severally liable to Plaintiffs and the Class, along with the other Defendants, for damages stemming from Déjà Vu Services and the other Déjà Vu Affiliated Nightclubs' failure to comply with applicable wage and hour laws.

27. At all relevant times, DVS and Mohney jointly employed all exotic dancers working in the Déjà Vu Affiliated Nightclubs, managed, directed and controlled the operations in each Déjà Vu Affiliated Nightclub, and dictated the common employment policies applicable in each nightclub, including but not limited to the decisions: (1) to misclassify dancers as independent contractors, as opposed to employees; (2) to require that dancers share their tips with Defendants; (3) to require that dancers further share their tips with Defendants' managers, doormen, floor walkers, DJs and other employees who do not usually receive tips, by paying "tip-outs;" (4) to not pay any dancers any wages; (5) to demand improper and unlawful payments from class members; (6) to adopt and implement employment policies which violate the FLSA and/or California wage and hour laws, and; (7) to threaten retaliation against any dancer attempting to assert her statutory rights to be recognized as an employee. DVS and Mohney created the common business model employed at each Déjà Vu Affiliated Nightclub regarding dancer classification and tip-sharing and require that the practices continue.

28. All named Defendants agreed and conspired among themselves, along with any third

party owners of certain of the Déjà Vu Affiliated Nightclubs throughout California to unlawfully: (1) misclassify dancers as independent contractors, as opposed to employees; (2) require that dancers share their tips with Defendants; (3) require that dancers further share their tips with Defendants' managers, doormen, floor walkers, DJs and other employees who do not usually receive tips, by paying "tip-outs;" (4) not pay any dancers any wages; (5) demand improper and unlawful payments from Class members; (6) adopt and implement employment policies which violate the FLSA and California wage and hour laws, and; (7) threaten retaliation against any dancer attempting to assert her statutory rights to be recognized as an employee. The unlawful agreements and conspiracies between Defendants and third parties in the enterprise were entered into as part of a strategy to maximize revenues and profits and to violate Class members' statutory rights.

29. Defendants knew or should have known that the business model employed was unlawful as applicable laws confirm that all money given to dancers by patrons was defined as a gratuity and the sole property of the dancer. Despite this, Defendants continued to willfully engage in the acts described below misclassifying dancers and sharing tip income in violation of their legal duties.

30. At all relevant times, Defendants owned and operated a nightclub business engaged in interstate commerce and which utilized goods moving in interstate commerce. For example, goods sold at the Déjà Vu Affiliated Nightclubs moved in interstate commerce. DVS and Mohney own, manage, and control the business operations at numerous nightclubs in California doing business under "Déjà Vu" and other tradenames. On information and belief, during the relevant time period, the annual gross revenues of each Defendant exceeded $500,000 per year.

31. By reason of the foregoing, Defendants, along with the Déjà Vu Affiliated Nightclubs, were at all relevant times enterprises engaged in commerce as defined in 29 U.S.C. §203(r) and §203(s). Defendants and the Déjà Vu Affiliated Nightclubs constitute an "enterprise" within the meaning of 29 U.S.C. §203(r)(1), because they perform related activities through common control for a common business purpose. At all relevant times, Defendants were enterprises engaged in commerce within the meaning of 29 U.S.C. §206(a) and §207(a).

32. The true names and capacities, whether individual, corporate, associate or otherwise,

of each of the Defendants designated herein as DOES are unknown to Plaintiffs at this time and therefore said Defendants are sued by such fictitious names. Plaintiffs will amend this Complaint to show their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each Defendant designated herein as a DOE defendant is legally responsible in some manner for the events and happenings herein alleged and in such manner proximately caused damages to Plaintiffs as hereinafter further alleged.

33. Plaintiffs are informed and believe and thereon allege that each of the Defendants was acting as the agent, employee, partner, or servant of each of the remaining Defendants and was acting within the course and scope of that relationship, and gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.

34. On information and belief, Plaintiffs anticipate naming, and possibly substituting, additional business entities or individuals because Defendant owns, operates, and/or controls local nightclubs while maintaining shell corporations and/or sham agreements to create the appearance that it does not have ownership and/or control of the nightclubs.

## III. GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

35. The FLSA and California Labor Code and Industrial Welfare Commission (“IWC”) Wage Orders applied to Plaintiffs and the Class at all times in which they worked at the Déjà Vu Affiliated Nightclubs.

36. No exceptions to the application of the FLSA or California wage and hour laws apply to Plaintiffs and the Class. For example, no Class member has ever been a professional or artist exempt from the provisions of those statutes. The exotic dancing performed by Class members while working at the Déjà Vu Affiliated Nightclubs does not require invention, imagination, or talent in a recognized field of artistic endeavor, and Class members have never been compensated by Defendants on a set salary, wage, or fee basis. Rather, Class members’ sole source of income while working at the Déjà Vu Affiliated Nightclubs were tips given to them by patrons.

37. At all relevant times, Plaintiffs and each member of the Class, defined below, were employees of Defendants under the FLSA and applicable California wage and hour laws.

38. At all relevant times, Defendants were the employers of Plaintiffs and each member

of the Class, defined below, under the FLSA and other applicable law. Defendants suffered or permitted Class members to work. Defendants, directly or indirectly, employed and exercised significant control over the Class members' wages, hours, and working conditions.

39. At all relevant times, all Defendants were the joint employers of Plaintiffs and members of the Class. Under the FLSA and/or California laws, Plaintiffs' and Class members' employment for one Defendant is not completely disassociated from their employment by the other Defendant(s). DVS, Mohney, and the Déjà Vu Affiliated Nightclubs do not act entirely independent of each other and are not completely dissociated with respect to the employment of Plaintiffs and the Class. DVS and Mohney maintain significant control over Plaintiffs and other Class members while working at the Déjà Vu Affiliated Nightclubs. DVS and Mohney play significant roles in establishing, maintaining and directing the working and employment policies that are to be applied to Class members while working at the Déjà Vu Affiliated Nightclubs. DVS and Mohney benefit financially from the work Class members perform while working at the Déjà Vu Affiliated Nightclubs. As joint employers of Plaintiffs and members of the Class, DVS and Mohney are responsible both individually and jointly for compliance with all of the applicable provisions of the FLSA and other applicable wage and hour laws. 29 C.F.R. § 791.2(a) and (b).

40. During the relevant time period, the employment terms, conditions, and policies that applied to Plaintiffs were the same as those applied to the other Class members who worked as exotic dancers at all Déjà Vu Affiliated Nightclubs in all material respects.

41. Throughout the relevant time period, Defendants' policies and procedures regarding the classification of all exotic dancers (including Plaintiffs) at the Déjà Vu Affiliated Nightclubs and treatment of dance tips were the same.

42. As a matter of common business policy, Defendants systematically misclassified Plaintiffs and all Class members as independent contractors, as opposed to employees. Defendants' classification of Plaintiffs as independent contractors was not due to any unique factor related to their employment or relationship with Defendants. Rather, as a matter of common business policy, Defendants routinely misclassified all exotic dancers as independent contractors as opposed to employees. As a result of this uniform misclassification, Plaintiffs and the members of the Class

were not paid the minimum and overtime wages required, were deprived of other statutory rights and benefits, and therefore, suffered harm, injury and incurred financial loss.

43. Plaintiffs and members of the Class incurred financial loss, injury, and damage as a result of Defendants' common practices misclassifying them as independent contractors and failing to pay them minimum and overtime wages in addition to the tips that they were given by patrons. Plaintiffs' injuries and financial loss were caused by Defendants' application of those common policies in the same manner as they were applied to absent Class members.

44. During the relevant time period, no Class member received any wages or other compensation from Defendants. Members of the Class generated their income solely through the tips received from patrons when they performed exotic table, chair, couch, lap and/or VIP room dances (collectively referred to herein as "dance tips").

45. All monies Class members like Plaintiffs received from patrons when they performed exotic dances were tips, not wages or service fees. Tips belong to the person they are given to. Dance tips were given by patrons directly to dancers in the Class and therefore, belong to dancers in the Class, not Defendants.

46. The full amount dancers in the Class are given by patrons in relation to exotic dances they perform are not taken into Defendants' gross receipts, with a portion then paid out to the dancers. Neither Defendants nor any of their affiliated companies issue W-2 forms, 1099 forms or any other documents to Class members indicating any amounts being paid from their gross receipts to Class members as wages.

47. Plaintiffs and members of the Class are tipped employees as they are engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips. No tip credits offsetting any minimum wages due, however, are permitted. Therefore, as employees of Defendants, Class members are entitled to: (a) receive the full minimum wages due, without any tip credit, reduction or other offset; and (b) to retain the full amount of any dance tips and monies given to them by patrons when they perform exotic dances.

48. Defendants' misclassification of Plaintiffs and other Class members as independent contractors was designed to deny Class members their fundamental rights as employees to receive

minimum wages, to demand and retain portions of tips given to Class members by patrons, and done to enhance Defendants' profits at the expense of the Class.

49. Defendants' misclassification of exotic dancers like Plaintiffs was willful. Defendants knew or should have known that Plaintiffs and the other dancers performing the same job functions were improperly misclassified as independent contractors.

50. Employment is defined with "striking breadth" in the wage and hour laws. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 325-26, 112 S.Ct. 1344, 1349-50 (1992). The determining factor as to whether dancers like Plaintiffs are employees or independent contractors under the FLSA is not the dancer's election, subjective intent or any contract. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 727 (1947). Rather, the test for determining whether an individual is an "employee" under the FLSA is the economic reality test. Under the economic reality test, employee status turns on whether the individual is, as a matter of economic reality, in business for herself and truly independent, or rather is economically dependent upon finding employment in others.

51. Any contract which attempts to have workers in the Class waive, limit or abridge their statutory rights to be treated as an employee under the FLSA or other applicable wage and hour laws is void, unenforceable, unconscionable and contrary to public policy. Workers in the Class cannot validly "elect" to be treated as employees or independent contractors under threat of adverse treatment. Nor can workers in the Class agree to be paid less than the minimum wage.

52. Despite this, Defendants unfairly, unlawfully, fraudulently and unconscionably attempt to coerce dancers in the Class to waive their statutory rights and elect to be treated as independent contractors. Defendants threaten to penalize and discriminate against dancers in the Class if they assert their statutory rights such as through termination and the confiscation of all dance tips, among other adverse conditions and retaliations. Any such retaliation based on the assertion of statutory rights under the wage and hour laws is unlawful. 29 U.S.C. § 215(a)(3). Further, it is unlawful for an employer to even threaten to discharge, demote, terminate or discriminate in the terms and conditions of employment because an employee has made a bona fide complaint against an employer for a violation of wage and hour laws. This protection encompasses the exercise of

statutory rights on the employees own behalf and on behalf of others. Any actual or threatened retaliation against an employee for the assertion of wage and hour law claims violates the state's fundamental public policy to protect the payment of wages and employee's rights.

53. Under the applicable FLSA test, courts utilize several factors to determine economic dependence and employment status. They are: (i) the degree of control exercised by the alleged employer; (ii) the relative investments of the alleged employer and employee; (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer; (iv) the skill and initiative required in performing the job; (v) the permanency of the relationship; and (vi) the degree to which the alleged employee's tasks are integral to the employer's business.

54. By contrast, California has opted for the "ABC Test." On April 30, 2018, the California Supreme Court issued its long-awaited opinion in *Dynamex Operations W., Inc. v. Super. Ct.*, 416 P.3d 1, 5 (Cal. 2018), clarifying the standard for determining whether workers in California should be classified as employees or as independent contractors for purposes of the wage orders adopted by California's Industrial Welfare Commission. In so doing, the Court narrowed the definition of independent contractor, holding that there is a presumption that individuals are employees and that an entity classifying an individual as an independent contractor bears the burden of establishing that such a classification is proper.

55. To meet this burden, the **hiring** entity must establish *each* of the following three factors, commonly known as the "ABC test":

a. that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and*

b. that the worker performs work that is outside the usual course of the hiring entity's business; *and*

c. that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

56. The totality of circumstances surrounding the employment relationship between Defendants and the dancers in the Class working at the Déjà Vu Affiliated Nightclubs establishes economic dependence by the dancers on Defendants and employee status. Here, as a matter of economic reality, Plaintiffs and all other Class members are not in business for themselves and truly independent, but rather are economically dependent upon finding employment in others, namely

Defendants. The dancers are not engaged in occupations or businesses distinct from that of Defendants. Rather, their work is the basis for Defendants' business. Defendants obtain the patrons who desire exotic dance entertainment and provide the workers who conduct the exotic dance services on behalf of Defendants. Defendants retain pervasive control over the nightclub operation as a whole, and the dancers' duties are an integral part of the operation.

57. Thus, whether analyzed according to the FLSA's economic reality test or California's more rigorous "ABC test," it is clear that Defendants miscast Plaintiffs and the Class as independent contractors.

***A. Degree Of Control – Plaintiffs And The Other Dancers Exercise No Control Over Their "Own" Or Their Employers' Business'***

58. Plaintiffs and the other members of the Class do not exert control over a meaningful part of the nightclub business and do not stand as separate economic entities from Defendants. Defendants exercise control over all aspects of the working relationship with Plaintiffs and the other dancers in the nightclubs.

59. Class members' economic status is inextricably linked to those conditions over which Defendants have complete control. Plaintiffs and the other dancers are completely dependent on the Déjà Vu Affiliated Nightclubs for their earnings. The club controls all of the advertising and promotion without which dancers like Plaintiffs could not survive economically. Moreover, Defendants create and control the atmosphere and surroundings at the Déjà Vu Affiliated Nightclubs, the existence of which dictates the flow of patrons into the club. The dancers have no control over the customer volume or the atmosphere at each of the nightclubs.

60. Defendants employ guidelines and rules dictating the way in which dancers like Plaintiffs must conduct themselves while working at the Déjà Vu Affiliated Nightclubs. Defendants dictate: the hours of operation; length of shifts dancers must work; the show times during which a dancer may perform; minimum dance tips; determine the sequence in which a dancer may perform on stage during her stage rotation; the format and themes of dancers' performances (including their costuming and appearances); theme nights; conduct while at work (*i.e.*, that they be on the floor as much as possible when not on stage and mingle with patrons in a manner which supports

Defendants' general business plan); tip sharing; paying "tipouts" to employees who do not normally receive tips from patrons; requirements that dancers help sell drinks or "Déjà Vu " branded novelties to patrons; and all other terms and conditions of employment.

61. Defendants require Plaintiffs and the other dancers in the Class to schedule work shifts. Defendants require that each shift worked by a dancer be of a minimum number of hours. Further, Defendants require dancers like Plaintiffs to clock-in and clock-out (or otherwise check in or report) at the beginning and end of each shift. If late or absent for a shift, a dancer is subject to fine, penalty, or reprimand by Defendants. Once a shift starts, a dancer, like Plaintiffs, are required to complete the shift and cannot leave early without penalty or reprimand.

62. Defendants impose other rules on dancers such as those restricting smoking breaks, the length of breaks, and how many dancers can take such breaks at a time.

63. While working at the Déjà Vu Affiliated Nightclubs, dancers like Plaintiffs perform exotic table, chair, couch, lap and/or VIP room dances for patrons offering them "dance tips." Defendants, not the dancers, set the minimum tip amount that dancers must collect from patrons when performing exotic dances. Defendants announce the minimum tip amounts to patrons in the nightclub wishing to view dances.

64. Defendants dictate the manner and procedure in which dance tips are collected from patrons and tracked. Each time a dancer performs an exotic dance for a patron and receives a dance tip, the dancer is required to immediately account to Defendants for their time and any dance tip given to them by the patron. Additionally, Defendants employ other employees called "checkers," doormen and/or floor walkers to watch dancers work, count private dances they perform, and record the amount of any dance tips received. At the end of a work shift, dancers like Plaintiffs are required to clock out and account to Defendants for all dances performed for the patrons of the nightclub. Then, in addition to any base "rent" payment, the dancer is required to pay a portion of each dance tip given to them by patrons over to Defendants as "rent." The rent payment typically exceeds 30% of each dance tip. Alternatively, in clubs where rent is not collected on a per-dance basis, the base "rent" the dancer must pay the nightclub at the end of a shift is higher and ultimately funded through tip-sharing.

65. The entire sum a dancer receives from a patron in relation to a dance is not given to Defendants (and/or the nightclubs) and taken into their gross receipts. Rather, the dancers keep their share of the payment under the tip-sharing policy and only pay over to Defendants and the nightclub the portion demanded as "rent" (e.g., $7 from each $20 dance tip received). As a result, there is no pay out by Defendants to the dancer of any wages. Defendants (and/or the nightclubs) issue no 1099 forms, W-2 forms, or other documents to any dancers showing any sums being paid to dancers as wages.

66. Defendants establish the share or percentage which each dancer is required to pay them for each type of dance they receive dance tips for during the work shift. In addition, per-dance amounts or "tip-outs" must be paid by dancers (e.g. approx. $1 for each dance) to the nightclub manager, dance checkers, disk-jockey, bouncers/door staff and/or other employees as part of Defendants' tip-sharing policy. Dancers are also required to help sell goods (such as t-shirts, videos or hats) bearing the Déjà Vu logo to patrons as part of their job duties performing table dances. As part of these "special" dances, goods are sold as a package with a table dance. The foregoing establishes that Defendants control and set the terms and conditions of all dancers' work. This is the hallmark of economic dependence and control.

***B. Skill and Initiative of a Person in Business for Themselves***

67. Plaintiffs, like all other dancers, do not exercise the skill and initiative of a person in business for themselves.

68. Plaintiffs, like all other dancers, are not required to have any specialized or unusual skills to work at the Déjà Vu Affiliated Nightclubs. Prior dance experience is not required to perform at the Déjà Vu Affiliated Nightclubs. Dancers are not required to attain a certain level of skill in order to work at the Déjà vu Affiliated Nightclubs. There are no dance seminars, no specialized training, no instruction booklets, and no choreography provided or required in order to work at any of the Déjà Vu Affiliated Nightclubs. The dance skills utilized are commensurate with those exercised by ordinary people who choose to dance at a disco or at a wedding.

69. Plaintiffs, like all other dancers, do not have the opportunity to exercise the business skills and initiative necessary to elevate their status to that of independent contractors. Dancers, like

Plaintiffs, own no enterprise. Dancers, like Plaintiffs, exercise no business management skills. Dancers maintain no separate business structures or facilities. Dancers exercise no control over customer volume or atmosphere at the Déjà Vu Affiliated Nightclubs. Dancers do not actively participate in any effort to increase the nightclub's client base, enhance goodwill, or establish contracting possibilities. The scope of a dancer's initiative is restricted to decisions involving what clothes to wear (within Defendants' guidelines) or how provocatively to dance which is consistent with the status of an employee opposed to an independent contractor.

70. Plaintiffs, like all other dancers, are not permitted to hire or subcontract other qualified individuals to provide additional dances to patrons, and increase their revenues, as an independent contractor in business for themselves would.

***C. Relative Investment***

71. Plaintiffs' relative investment is minor when compared to the investment made by Defendants.

72. Plaintiffs, like all other dancers, make no capital investment in the facilities, advertising, maintenance, sound system and lights, food, beverage and other inventory, or staffing of the Déjà Vu Affiliated Nightclubs. Defendants provide all investment and risk capital. Dancers' investments are limited to expenditures on costumes and make-up which they may choose to wear while working, and their own labor. But for Defendants' provision of the lavish nightclub work environment the dancers would earn nothing.

***D. Opportunity for Profit and Loss***

73. Defendants, not dancers like Plaintiffs, manage all aspects of the business operation including attracting investors, establishing the hours of operation, setting the atmosphere, coordinating advertising, hiring and controlling the staff (managers, waitresses, bartenders, bouncers/doormen, etc.). Defendants, not the dancers, take the true business risks for the Déjà Vu Affiliated Nightclubs. Defendants, not the dancers, are responsible for providing the capital necessary to open, operate and expand the nightclub business.

74. Dancers like Plaintiffs do not control the key determinants of profit and loss of a successful enterprise. Specifically, Plaintiffs are not responsible for any aspect of the enterprises' on-

going business risk. For example, Defendants, not the dancers, are responsible for all financing, the acquisition and/or lease of the physical facilities and equipment, inventory, the payment of wages (for managers, bartenders, doormen, and waitresses), and obtaining all appropriate business' insurance and licenses. Defendants, not the dancers, establish the minimum dance tip amounts that should be collected from patrons when dancing. Even with respect to any "rent" payments, the dancers do not truly pay the Club's "rent" for the exclusive use of space. Rather, the term "rent" is a misnomer or subterfuge for tip sharing as in reality, Defendants simply demand a set portion (approx. 35%) of each dance tip given to a dancer.

75. The extent of the risk that dancers like Plaintiffs are confronted with is the loss of any "base rent" fee due to Defendants when the employee clocks out after each shift. Defendants, not the dancers, shoulder the risk of loss. The dance tips the dancers receive are not a return for risk on capital investment. They are a gratitude for services rendered. From this perspective, it is clear that a dancer’s “return on investment” (i.e. dance tips) is no different from that of a waiter who serves food during a customer's meal at a restaurant.

***E. Permanency***

76. Certain dancers in the Class have worked at the Déjà Vu Affiliated Nightclubs for significant periods of time.

***F. Integral Part of Employer’s Business***

77. Dancers like Plaintiffs are essential to the success of the Déjà vu Affiliated Nightclubs. The continued success of the Déjà Vu Affiliated Nightclubs depends to an appreciable degree upon the provision of exotic dances by dancers for patrons. In fact, the primary reason the nightclubs exist is to showcase the dancers' physical attributes for patrons. The primary "product" or "good" Defendants are in business to sell patrons that come to their nightclubs are lap dances performed by the exotic dancers in the Class that Defendants recruit to work in their clubs and instruct to work in a specific way.

78. Many of the Déjà Vu Affiliated Nightclubs do not serve alcohol and therefore, are not truly in direct competition with other enterprises in the nightclub, tavern, or bar business. Absent the provision of exotic dances by dancers for patrons, a nightclub serving only non-alcoholic beverages

would have difficulty remaining in business. Moreover, Defendants are able to charge admission prices and a much higher price for their drinks (e.g., $10 for soft drinks) than establishments without exotic dancers because the dancers are the main attraction of the Déjà Vu Affiliated Nightclubs. Moreover, dancers in the Class must help sell Defendants' drink products to patrons. As a result, the dancers are an integral part of the Déjà vu Affiliated Nightclubs' business.

79. The foregoing demonstrates that dancers in the Class like Plaintiffs are economically dependent on Defendants and subject to significant control by Defendants. Therefore, Plaintiffs were misclassified as independent contractors and should have been paid minimum wages at all times they worked at any Déjà vu Affiliated Nightclub and otherwise been afforded all rights and benefits of an employee under federal and state wage and hour laws.

## IV. DEFENDANTS' INTENT

80. All actions and agreements by Defendants described herein were willful, intentional, and not the result of mistake or inadvertence.

81. Defendants were aware that the FLSA and state wage and hour laws applied to their operation of the Déjà Vu Affiliated Nightclubs at all relevant times and that under the economic realities test applicable to determining employment status under those laws the dancers were misclassified as independent contractors. Defendants and their affiliated companies, were aware of and/or the subject of previous litigation and enforcement actions relating to wage and hour law violations where the misclassification of exotic dancers as independent contractors was challenged. In the vast majority of those prior cases, exotic dancers working under conditions similar to those employed at the Déjà Vu Affiliated Nightclubs were determined to be employees under the wage and hour laws, not independent contractors. *See e.g., Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343 (M.D. Fla. 1997). Further, Defendants were aware, and on actual or constructive notice, that applicable law rendered all dance tips given to class members by patrons when working in the Déjà Vu Affiliated Nightclubs the dancer/Class member's sole property, rendering Defendants' tip-share, rent, and tip-out polices unlawful. Despite being on notice of their violations, Defendants intentionally chose to continue to misclassify dancers like Plaintiffs, withhold payment of minimum wages, and require dancers to share their tips with Defendants and their employees in an effort to

enhance their profits. Such conduct and agreements were intentional, unlawful, fraudulent, deceptive, unfair and contrary to public policy.

## V. INJURY AND DAMAGE

82. Plaintiffs and all Class members suffered injury, were harmed, and incurred damage and financial loss as a result of Defendants' conduct complained of herein. Among other things, Plaintiffs and the Class were entitled to minimum wages and to retain all of the dance tips and other tips they were given by patrons. By failing to pay Plaintiffs and the Class minimum wages and interfering with their right to retain all of the dance tips and other tips they were given by patrons, Defendants injured Plaintiffs and the members of the Class and caused them financial loss, harm, injury, and damage. Defendants' conduct causing those injuries was committed in California, emanated to, and affected Class members across the state and nationwide.

## VI. COLLECTIVE AND CLASS ACTION ALLEGATIONS

83. Plaintiffs bring the First Cause of Action (for violations of the FLSA) as an "opt-in" collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b) on behalf of themselves and a proposed collection of similarly situated individuals defined as follows, and hereinafter referred to as the "FLSA Collective":

> All individuals who have worked for Defendant(s) as an exotic dancer at any Déjà Vu Affiliated Nightclub identified on **Exhibit A** at any time during the relevant class period.

84. The names and addresses of the individuals who comprise the FLSA Collective are available from Defendants. Accordingly, Plaintiffs herein pray for an Order requiring Defendants to provide the names and all available locating information for all members of the FLSA Collective, so that notice can be provided regarding the pendency of this action, and of such individuals' right to opt-in to this action as party plaintiffs.

85. Plaintiffs bring the Second through Eighth Causes of Action (the California state law claims) as an "opt-out" class action pursuant to California Code of Civil § 382, defined initially as follows, and hereinafter referred to as the "California Class":

> All individuals who have worked for Defendant(s) as an exotic dancer at any Déjà Vu Affiliated Nightclub identified on **Exhibit A** at at any time during the relevant class period.

Excluded from the California Class is anyone employed by counsel for Plaintiffs in this action, and any Judge to whom this action is assigned and his or her immediate family members.

86. Numerosity. Defendants have employed hundreds of individuals as exotic dancers during the relevant time periods.

87. Existence and Predominance of Common Questions. Common questions of law and/or fact exist as to the members of the proposed classes and, in addition, common questions of law and/or fact predominate over questions affecting only individual members of the proposed classes. The common questions include the following:

a. Whether Defendants' policy and practice of not paying exotic dancers the minimum wage and/or at one-and-a-half (1.5) times the regular rate of pay (*i.e.*, time-and-a-half) for all hours worked in excess of forty hours in a week or eight hours in a day violates the FLSA and/or California labor laws;

b. Whether Defendants violated the FLSA and/or California wage and hour laws by classifying all exotic dancers at the Déjà Vu Affiliated Nightclubs as "independent contractors," as opposed to employees, and not paying them overtime and minimum wages;

c. Whether the monies given to dancers by patrons when they perform table dances are gratuities;

d. Whether the dancers own the money given to them by patrons when they perform exotic dances;

e. Whether Defendants unlawfully required Class members to share their tips with Defendants and Defendants' employees;

f. Whether Defendants are joint employers of the dancers in the Class;

g. Whether Defendants and certain third parties agreed and conspired to deny Class members their rights under federal and state wage and hour laws;

h. Whether Defendants failed to keep required employment records;

i. Whether Defendants' payroll policies and practices violated the California Labor Code and/or the Unfair Competition Law ("UCL");

j. Whether the Class members are entitled to unpaid wages, waiting time penalties, and other relief;

k. Whether Defendants' affirmative defenses, if any, raise common issues of fact or law as to Plaintiffs and the Class members; and

l. Whether Plaintiffs and the proposed classes are entitled to damages and equitable relief, including, but not limited to, restitution and a preliminary and/or permanent injunction, and if so, the proper measure and formulation of such relief.

88. Typicality. Plaintiffs' claims are typical of the claims of the proposed classes. Defendants' common course of conduct in violation of law as alleged herein has caused Plaintiffs and the proposed classes to sustain the same or similar injuries and damages. Plaintiffs' claims are therefore representative of and co-extensive with the claims of the proposed classes.

89. Adequacy. Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the proposed classes.

90. Superiority. The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each member of the proposed classes, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

91. In the alternative, the proposed classes may be certified because the prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent or varying adjudication with respect to individual members of the proposed classes that would establish incompatible standards of conduct for Defendants; and Defendants have acted and/or refused to act on grounds generally applicable to the proposed classes, thereby making appropriate final and injunctive relief with respect to members of the proposed classes as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE FLSA**
**(Failure to Pay Statutory Minimum Wages and Overtime)**
**(By the FLSA Collective)**

92. Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein, unless inconsistent.

93. At all relevant times, Defendants jointly employed Plaintiffs and all Class members

within the meaning of the FLSA.

94. 29 U.S.C. § 206 requires that Defendants pay all employees minimum wages for all hours worked. 29 U.S.C. § 206(a) provides in pertinent part:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
>
> (1) except as otherwise provided in this section, not less than--
>
> (A) $5.85 an hour, beginning on the 60th day after May 25, 2007;
>
> (B) $6.55 an hour, beginning 12 months after that 60th day; and
>
> (C) $7.25 an hour, beginning 24 months after that 60th day;

95. 29 U.S.C. § 207 requires that Defendants pay all employees overtime wages for all overtime hours worked. 29 U.S.C. § 207(a) provides in pertinent part:

> ... no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed.

96. Like other dancers working at the Déjà Vu Affiliated Nightclubs, Defendants failed to pay Plaintiffs the minimum and overtime wages set forth in 29 U.S.C. §§ 206-207, or any wages whatsoever. In fact, Defendants required that dancers like Plaintiffs actually pay them in order to work.

97. Defendants failed to pay dancers like Plaintiffs a minimum or overtime wage throughout the relevant time period because Defendants misclassified them as independent contractors.

98. The amounts paid to exotic dancers, like Plaintiffs, by patrons in relation to dances performed were tips, not wages. Those monies were not the property of Defendants. The entire amount collected from patrons in relation to dances performed by exotic dancers was not made part of any of Defendants' gross receipts at any point.

99. As a result, the amounts paid to dancers like Plaintiffs by patrons in relation to exotic

dances were tips, not wages or service fees, and no part of those amounts can be used to offset Defendants' obligation to pay dancers, like Plaintiff, minimum wages due. *See e.g., Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 934 (S.D.N.Y. 2013) (granting summary judgment to exotic dancers on the issue of whether dance fees offset a nightclub's wage obligations under the FLSA).

100. Further, no tip credit applies to reduce or offset any minimum wages due. The FLSA only permits an employer to allocate an employee's tips to satisfy a portion of the statutory minimum wage requirement provided that the following conditions are satisfied: (1) the employer must inform the tipped employees of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and (2) tipped employees must retain *all the tips* received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m).

101. Neither of these conditions was satisfied. Defendants did not inform dancers like Plaintiffs of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and Plaintiffs did not retain all the tips received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m). Defendants never notified any dancers that their dance tips were being used to reduce the minimum wages otherwise due under FLSA's tip-credit provisions and that they were still due the reduced minimum wage for tipped employees. Rather, Defendants maintained that no dancers were ever due any minimum wages due to their classification as independent contractors and were paid none.

102. Further, Defendants' requirement that dancers like Plaintiffs share their tips and: (i) pay Defendants a portion of all dance tips as "rent"; and (ii) also pay a percentage of their tips as "tip-outs" to other employees who do not customarily receive tips, such as managers, checkers, DJs and bouncers/doormen/floor walkers, was not part of a valid tip-sharing arrangement.

103. Based on the foregoing, Plaintiffs are entitled to the full statutory minimum wages set forth in 29 U.S.C. §§ 206 and 207 for all periods in which they worked at the Déjà Vu Affiliated Nightclubs, along with all applicable penalties, liquidated damages, and other relief.

104. Defendants' conduct in misclassifying dancers like Plaintiffs as independent contractors was intentional, willful, and done to avoid paying minimum and overtime wages and the other benefits that they were legally entitled to.

105. The FLSA provides that a private civil action may be brought for the payment of federal minimum and overtime wages and for an equal amount in liquidated damages in any court of competent jurisdiction by an employee pursuant to 29 U.S.C. § 216(b) ("Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."). Moreover, Plaintiffs may recover attorneys' fees and costs incurred in enforcing their rights pursuant to 29 U.S.C. § 216(b).

106. 12 U.S.C. § 21 l(c) provides in pertinent part:

(c) Records

> Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

107. 29 C.F.R.§ 516.2 and 29 C.F.R. § 825.500 further require that every employer shall maintain and preserve payroll or other records containing, without limitation, the total hours worked by each employee each workday and total hours worked by each employee each workweek.

108. To the extent Defendants failed to maintain all records required by the aforementioned statutes and regulations, and failed to furnish Plaintiffs comprehensive statements showing the hours that they worked during the relevant time period, it also violated the aforementioned laws causing Plaintiffs damage.

109. When the employer fails to keep accurate records of the hours worked by its employees, the rule in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-688 (1946) is controlling. That rule states:

> ...where the employer's records are inaccurate or inadequate ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce

such evidence, the court may then award damages to the employee, even though the result be only approximate.

110. The Supreme Court set forth this test to avoid placing a premium on an employer's failure to keep proper records in conformity with its statutory duty, thereby allowing the employer to reap the benefits of the employees' labors without proper compensation as required by the FLSA. Where damages are awarded pursuant to this test, "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with ... the Act." *Id.*

111. Based on the foregoing, Plaintiffs seek unpaid minimum wages at the required legal rate for all working hours during the relevant time period, back pay, restitution, damages, reimbursement of any base rent and tip-sharing, liquidated damages, prejudgment interest calculated at the highest legal rate, attorneys' fees and costs, and all other costs, penalties, and other relief allowed by law.

**SECOND CAUSE OF ACTION**
**Violation of Calif. Labor Code §§ 1194, 1197, 1198, and 1199**
**Failure to Pay Minimum Wage as Required by State Law**
**(By the California Class)**

112. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

113. Defendants' conduct, as set forth above, in failing to pay their dancers minimum wage for all hours worked as required by California law, violates Cal. Lab. Code §§ 1197 and 1194.

114. California Labor Code § 1194(a) provides for a private right of action for nonpayment of wages, and further provides that a plaintiff may recover the unpaid balance of the full amount of such wages, together with costs of suit, as well as liquidated damages, interest thereon, and the attorneys' fees and costs incurred. California Labor Code § 1194.5 further grants courts the authority to enjoin violations of this statute.

115. At all relevant times, Defendants have willfully failed to pay Plaintiffs and class members any wages whatsoever. Defendants have required that Plaintiffs and Class members actually pay Defendants in order to be able to work at Déjà Vu Affiliated Nightclubs.

116. Therefore, Plaintiffs seek, on behalf of themselves and all others similarly situated, unpaid wages at the required legal rate, reimbursement of stage fees, liquidated damages, interest,

attorneys' fees and costs, and all other costs and penalties allowed by law. Plaintiffs further seek injunctive relief to compel Defendants to recognize exotic dancers' employee status, to provide all payment guaranteed by law, and for this Court's continuing jurisdiction to enforce compliance.

**THIRD CAUSE OF ACTION**
**Violation of Calif. Labor Code §§ 1194, 1198, 510, and 558**
**Failure to Pay Overtime as Required by State Law**
**(By the California Class)**

117. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

118. At all times relevant to the Complaint, Wage Order No. 4 has required the payment of an overtime premium for hours worked in excess of 8 hours in a workday, 40 hours in a workweek, or on the seventh day worked in a single workweek.

119. During the relevant time period, Plaintiffs and the class members were employed by Defendants within California but were not paid overtime wages for overtime hours worked.

120. Plaintiffs request that Defendants be required to pay them, and all those similarly situated, all overtime wages illegally withheld, penalties as provided under the California Labor Code including §§ 201-203, 510 and 1194.1(a) *et seq.*, punitive/exemplary damages, and attorneys' fees and costs under California Labor Code § 218.5 and 1194(a).

**FOURTH CAUSE OF ACTION**
**Violation of Calif. Labor Code § 226 and IWC Wage Order 4-2001**
**Failure to Provide Itemized Wage Statements in Violation of Cal. Labor Code**
**(By the California Class)**

121. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

122. Defendants have failed, and continue to fail, to provide timely, accurate itemized wage statements to Plaintiffs and California Class members in accordance with California Labor Code § 226 and Wage Order No. 4. The wage statements that Defendants have provided to their exotic dancers, including Plaintiffs and the proposed California Class members, do not accurately reflect the actual hours worked and wages earned.

123. Defendants' failure to provide timely, accurate, itemized wage statements to Plaintiffs and members of the proposed California Class in accordance with the California Labor Code and the California Wage Order has been knowing and intentional. Accordingly, Defendants are liable for damages and penalties under California Labor Code § 226.

**FIFTH CAUSE OF ACTION**
**Violation of Calif. Labor Code §§ 201-203**
**Waiting Time Penalties**
**(By the California Class)**

124. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

125. California Labor Code § 201(a) requires an employer who discharges an employee to pay compensation due and owing to said employee upon discharge. California Labor Code § 202(a) requires an employer to pay compensation due and owing within seventy-two (72) hours of an employee's termination of employment by resignation. California Labor Code § 203 provides that if an employer willfully fails to pay compensation promptly upon discharge or resignation, as required under §§ 201 and 202, then the employer is liable for waiting time penalties in the form of continued compensation for up to thirty (30) work days.

126. Certain members of the proposed California Class are no longer employed by Defendants but have not been paid full compensation for all hours worked, as alleged above. They are entitled to unpaid compensation for all hours worked, and overtime, for which to date they have not received compensation, and any applicable overtime.

127. Defendants have failed and refused, and continue to willfully fail and refuse, to timely pay compensation and wages and compensation to Plaintiffs and members of the proposed California Class whose employment with Defendants have terminated, as required by California Labor Code §§ 201 and 202. As a direct and proximate result, Defendants are liable to all such California Class members for up to thirty (30) days of waiting time penalties pursuant to California Labor Code § 203, together with interest thereon.

128. WHEREFORE, pursuant to Labor Code §§ 218, 218.5, and 218.6, Plaintiffs and Class members are entitled to recover the full amount of their unpaid wages, continuation wages under § 203, interest thereon, reasonable attorneys' fees, and costs of suit.

**SIXTH CAUSE OF ACTION**
**Violation of Calif. Labor Code § 204**
**Failure to Pay all Wages Owed Every Pay Period**
**(By the California Class)**

129. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

130. During the relevant time period, Plaintiffs and Class members have been employees of Defendants covered by Labor Code § 204 but have been misclassified and not treated as employees.

131. Pursuant to Labor Code § 204, Plaintiffs and Class members were entitled to receive on regular paydays all wages earned for the pay period corresponding to the payday.

132. Defendants have failed to pay Plaintiffs and Class members all wages earned each pay period. On information and belief, at all times during the proposed class period, Defendants have maintained a policy or practice of not paying Plaintiffs and Class members minimum wages for all hours worked and overtime wages for all overtime hours worked.

133. As a result of Defendants' unlawful conduct, Plaintiffs and Class members have suffered damages in an amount, subject to proof, to the extent they were not paid all wages and/or compensation and/or penalties each pay period. The precise amounts of unpaid wages, compensation, and/or penalties are not presently known to Plaintiffs but can be determined directly from Defendants' records or indirectly based on information from Defendants' records and/or information known by class members.

134. WHEREFORE, pursuant to Labor Code §§ 218, 218.5 and 218.6, Plaintiffs and class members are entitled to recover the full amount of their unpaid wages, interest thereon, reasonable attorneys' fees, and costs of suit.

## SEVENTH CAUSE OF ACTION
**Violation of Calif. Labor Code § 226.7 and IWC Wage Orders**
**Rest Break Violations**
**(By the California Class)**

135. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

136. Labor Code §§ 226.7 and paragraph 12 of the applicable IWC Wage Orders provide that employers must authorize and permit all employees to take rest periods at the rate of ten minutes net rest time per four work hours.

137. Plaintiffs and Class members consistently worked consecutive four hour periods during their work shifts. Pursuant to the Labor Code and the applicable IWC Wage Orders, Plaintiffs were entitled to paid rest breaks of not less than ten minutes for each consecutive four hour shift, or

major fraction thereof.

138. Labor Code §§ 226.7 and paragraph 12 of the applicable IWC Wage Orders provide that if an employer fails to provide an employee rest periods in accordance with this section, the employer shall pay the employee one hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

139. Defendants failed to provide Plaintiffs with timely rest breaks of not less than ten minutes for each consecutive four hour shift. Defendants failed to implement policies and practices which accounted for and authorized and permitted Plaintiffs and the Class members to timely take all required rest periods under California law. Defendants have therefore intentionally and improperly denied rest periods to Plaintiffs and the Class members in violation of Labor Code § 226.7 and paragraph 12 of the applicable IWC Wage Orders. Consequently, Defendants must pay rest period wages and penalty premium wages as required under Labor Code § 226.7.

140. Defendants' practice of not providing rest breaks or requiring employees to perform work during their legally mandated rest periods without premium compensation is a violation of Labor Code § 226.7 and the applicable IWC Wage Orders.

141. Additionally, Defendants failed to authorize and permit Plaintiffs and the Class members to take paid rest periods, as required by the Labor Code, because Defendants failed to pay an additional piece of compensation to account for the rest breaks. Instead, the only compensation the Class received was in the form of tips that they earned. As such, no *paid* rest break was ever provided under Defendants' compensation structure. Defendants also did not compensate the Class with an additional hour of pay at each Class member's effective hourly rate for each day that Defendants failed to provide them with adequate rest breaks, as required under Labor Code § 226.7.

142. Therefore, pursuant to Labor Code § 226.7 and paragraph 12 of the applicable IWC Wage Orders, Plaintiffs and Class members are entitled to damages in an amount equal to one hour of wages at their effective hourly rates of pay for each day worked without the required rest breaks, a sum to be proven at trial, as well as the assessment of any statutory penalties against Defendants, and each of them, in a sum as provided by the Labor Code and/or other statutes.

**<u>EIGHTH CAUSE OF ACTION</u>**
**Violation of Calif. Labor Code §§ 226.7 and 512**
**Meal Break Violations**
**(By the California Class)**

143. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

144. Plaintiffs and the Class regularly worked shifts greater than five hours and greater than ten hours. Pursuant to Labor Code § 512 an employer may not employ an employee for a shift of more than five hours without providing him or her with a meal period of not less than 30 minutes or for a shift of more than ten hours without providing him or her with a second meal period of not less than 30 minutes.

145. Defendants failed to provide Plaintiffs and the Class members with meal periods as required by the Labor Code, including by not providing them with the opportunity to take meal breaks, by providing them late or for less than 30 minutes, or by requiring them to perform work during breaks.

146. Defendants' practice of not providing meal breaks or requiring employees to perform work during their legally mandated meal periods without premium compensation is a violation of Labor Code §§ 226.7 and 512, and the applicable IWC Wage Orders.

147. Labor Code § 226.7 and paragraph 11 of the applicable IWC Wage Orders also provide that, if an employer fails to provide an employee a meal period in accordance with this section, the employer shall pay the employee one hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided. Defendants failed to compensate Plaintiffs for each meal period not provided or inadequately provided, as required under Labor Code § 226.7.

148. Therefore, pursuant to Labor Code § 226.7 and paragraph 11 of the applicable IWC Wage Orders, Plaintiffs are entitled to damages in an amount equal to one hour of wages at their effective hourly rates of pay for each meal period not provided or deficiently provided, a sum to be proven at trial, as well as the assessment of any statutory penalties against the Defendants, and each of them, in a sum as provided by the Labor Code and other statutes.

**NINTH CAUSE OF ACTION**
**Violation of Calif. Labor Code § 221, 223 and 351**
**Collecting and Receiving Earned Tips from the Class**
**(By the California Class)**

149. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

150. Labor Code § 221 provides, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

151. Labor Code § 351 prohibits employers and their agents from sharing in or keeping any portion of gratuity left for or given to one or more employees by a patron.

152. Defendants unlawfully received and/or collected wages from Plaintiffs by making unlawful deductions from the wages paid to Plaintiffs and the Class by requiring them to "tip out" the house at the end of their shifts.

153. Labor Code § 223 provides that where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract. Labor Code § 225 further provides that the violation of any provision of Labor Code §§ 221 and 223 is a misdemeanor.

154. Additionally, Defendants otherwise withheld and/or failed to pay all wages due and owing to Plaintiffs and the Class. This includes requiring Plaintiffs and the Class to "tip out" the house at the end of their shifts, or to otherwise turn their tips over to Defendants.

155. As a direct and proximate cause of the unauthorized deductions from wages, Plaintiffs have been damaged, in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**Common Law Conversion**
**(By the California Class)**

156. laintiffs incorporate by reference all paragraphs above as if fully set forth herein.

157. Defendants' failure to give class members gratuities from customers that were given and/or left for class members, as alleged above, constitutes common law conversion.

158. Defendants have assumed control and ownership over the above-referenced gratuities, and applied them to its own use.

159. Plaintiffs and class members had a right of ownership and possession over the above-referenced gratuities.

160. Defendants' theft and retention of the above-referenced gratuities, without consent, have caused Plaintiffs and class members significant financial harm.

161. In failing to pay said monies to Plaintiffs and class members and retaining that money for its own use, Defendants have acted with malice, oppression, and/or conscious disregard for the statutory rights of Plaintiffs and class members. Such wrongful and intentional acts, given the number of victims and the number of acts and previous claims and/or lawsuits relative to similar acts, justify awarding Plaintiffs and class members punitive damages pursuant to California Civil Code § 3294 *et seq.* in an amount sufficient to deter future similar conduct by Defendants.

**ELEVENTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.***
**(By the California Class)**

162. Plaintiffs incorporate the allegations of all the foregoing paragraphs by reference, as if fully set forth herein.

163. Plaintiffs bring this action individually, on behalf of the Class, and on behalf of the general public pursuant to § 17200 *et seq.* of the California Business and Professions Code (the "Cal. Bus. & Prof. Code"), and the Unfair Competition Laws ("UCL").

164. California Business and Professions Code § 17204 prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice." On behalf of the Class, Plaintiffs seek compensation for the loss of their property and the personal financial impacts they have suffered as a result of Defendants' unfair business practices. Defendants' conduct, as described above, has been and continues to be deleterious to the Class, and Plaintiffs are seeking to enforce important rights affecting the public interest within the meaning of California Code of Civil Procedure § 1021.5.

165. The conduct of Defendants, as described above, constitutes unlawful, unfair, unconscionable and/or fraudulent business acts or practices which injured the Class members and caused them loss of money.

166. The unlawful, unfair, unconscionable and/or fraudulent business acts or practices

adopted by Defendants, which injured the Class members and caused them loss of money, were conducted by DVS and Mohney in material part in the state of California and emanated to their business operations in California. Class members, therefore, were harmed and injured as a result of DVS's and Mohney's conduct in California. As such, the UCL applies to the entire Class.

167. Defendants adopted unlawful business and employment policies, entered into agreements and conspired amongst themselves (and with certain third parties in the enterprise who own part of other Déjà Vu Affiliated Nightclubs) to engage in the above-described unlawful, unfair, unconscionable and/or fraudulent business acts and practices in California and that conduct harmed Class members and caused them injury and financial loss. As such, the UCL applies to all such transactions and dealings. All members of the Class have standing to assert UCL claims against DVS and Mohney.

168. By failing to pay its employees minimum and overtime wages in violation of the FLSA and California wage and hour laws, Defendants violated the UCL.

169. Violations of the FLSA are unlawful acts which are independently actionable under the UCL. *Wang v. Chinese Daily News* (9th Cir. 08-56740 9/27 /1 O); *In re Wells Fargo Home Mortgage Litig.*, 527 F.Supp.2d 1053, 1066-69 (N.D. Cal. 2007). Such cases are certifiable as class actions under Fed. R. Civ. P. 23 where the unlawful, unfair, unconscionable and/or fraudulent business acts or practices, which injured the Class, were conducted by DVS and Mohney in material part in the state of California and emanated to their business operations in this state.

170. Unpaid wages constitute restitution of property earned by the employee.

171. By requiring Class members to share their tips (e.g., dance tips) with Defendants and/or their employees (tip-outs) in violation of the FLSA and/or any other state or federal law or regulation, as described above, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

172. By attempting to have Class members waive, abridge or limit their rights under the FLSA and/or other applicable wage and hour laws in order to work as exotic dancers at the Déjà Vu Affiliated Nightclubs, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

173. By threatening to retaliate against and penalize Class members for asserting their rights under the FLSA and/or other applicable wage and hour laws (such as by terminating them, confiscating their tips, and/or imposing other penalties and discrimination), Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

174. By failing to maintain employment records under the FLSA and/or other applicable wage and hour laws, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

175. The acts complained of herein, and each of them, constitute unfair, unlawful, unconscionable and/or fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq*. Defendants' acts and practices described herein offend established public policies including, but not limited to, those set forth in the FLSA and/or other applicable wage and hour laws (including Cal. Labor Code § 356), and involve business practices that are immoral, unethical, oppressive, and/or unscrupulous.

176. The unfair business practices set forth above have and continue to injure the Class and the general public and cause injury and the loss of money, as described further within. These violations have unjustly enriched Defendants at the expense of the Class. As a result, Plaintiffs, the Class and the general public are entitled to restitution and an injunction.

177. Defendants' conduct, as set forth above, violates the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. Defendants' conduct constitutes unlawful business acts or practices, in that Defendants have violated California Labor Codes §§ 210, 226, 1194, 1197, and 2802, among other laws. As a result of Defendants' unlawful conduct, Plaintiffs and class members suffered injury in fact and lost money and property, including, but not limited to unpaid wages, unpaid minimum wages, and business expenses that dancers were required to pay. Pursuant to California Business and Professions Code § 17203, Plaintiffs and class members seek to recover restitution. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs and class members who worked for Defendants in California are entitled to recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

178. Defendants' conduct, as set forth above, in failing to permit dancers to retain all gratuities, including dance fees paid by customers, constitutes a violation of California Labor Code § 351. This violation is enforceable pursuant to the UCL, Cal. Bus. & Prof. Code § 17200 *et seq*. Defendants' conduct constitutes unlawful, unfair, or fraudulent acts or practices, in that Defendants have violated California Labor Code § 351 in not permitting dancers to retain all gratuities, including dance fees, paid by customers. As a result of Defendants' conduct, Plaintiffs and class members suffered injury in fact and lost money and property, including the loss of gratuities to which they were entitled. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and class members seek declaratory and injunctive relief for Defendants' unlawful, unfair, and fraudulent conduct and to recover restitution.

**<u>TWELVETH CAUSE OF ACTION</u>**
**Private Attorneys General Act ("PAGA"**
**Violation of Calif. Labor Code § 2698, *et seq.***
**(By Plaintiffs as Aggrieved Employees)**

179. Plaintiffs incorporate the allegations of all the foregoing paragraphs by reference, as if fully set forth herein.

180. Under The Labor Code Private Attorneys General Act ("PAGA"), an aggrieved employee, on behalf of himself or herself and other current or former employees as well as the general public, may bring a representative action as a private attorney general to recover penalties for an employer's violations of the California Labor Code and IWC Wage Orders. These civil penalties are in addition to any other relief available under the Cal. Labor Code, and must be allocated 75% to California's Labor and Workforce Development Agency ("LWDA") and 25% to the aggrieved employee, pursuant to Cal. Labor Code § 2699.

181. Pursuant to Cal. Labor Code § 1198, Defendants' failure to pay proper compensation to Plaintiffs and the California Class, and failure to provide the California Class with accurate wage statements, constitute violations of the Cal. Labor Code, each actionable under PAGA.

182. Plaintiffs allege, on behalf of themselves and the California Class, as well as the general public, that Defendants have violated the following provisions of the Cal. Labor Code that are actionable through the Cal. Labor Code and PAGA, as previously alleged herein: Cal. Labor

Code §§ 201, 202, 203, 221, 223, 226, 226.7, 510, 512, 1174, 1194, 1197, 1197.1, and 1198. Each of these violations entitles Plaintiffs, as private attorneys general, to recover the applicable statutory civil penalties on their own behalf, on behalf of all aggrieved employees, and on behalf of the general public.

Cal. Labor Code § 2699(a), which is part of PAGA, provides in pertinent part:

> Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in § 2699.3.

Cal. Labor Code § 2699(f), which is part of PAGA, provides in pertinent part:

> For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows: … (2) If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

183. Plaintiffs are entitled to civil penalties, to be paid by Defendants and allocated as PAGA requires, pursuant to Cal. Labor Code § 2699(a) for Defendants' violations of the Cal. Labor Code and IWC Wage Orders for which violations a civil penalty is already specifically provided by law. Further, Plaintiffs are entitled to civil penalties, to be paid by Defendants and allocated as PAGA requires, pursuant to Cal. Labor Code § 2699(f) for Defendants' violations of the Cal. Labor Code and IWC Wage Orders for which violations a civil penalty is not already specifically provided.

184. Plaintiffs provided notice pursuant to California Labor Code § 2699.3. On June 4, 2018, they informed the LWDA of their intention to file a class action lawsuit for violations of the California Labor Code, including civil penalties recoverable under PAGA, as set forth in their notice letter, attached hereto as **Exhibit B** ("PAGA Notice").

185. Sixty-five days have passed since the postmark date of Plaintiffs' PAGA Notice, and the LWDA has not provided notice to Plaintiffs regarding its intention to investigate the alleged violations. As such, pursuant to California Labor Code § 2699.3(a)(2)(A), Plaintiffs have exhausted the PAGA notice requirement and seek civil penalties under California Labor Code § 2698, *et seq.*

186. Under PAGA, Plaintiffs and the State of California are entitled to recover the

maximum civil penalties permitted by law for the violations of the Cal. Labor Code that are alleged in this Complaint, including but not limited to penalties pursuant to Labor Code §§ 210, 225.5, 226.3, 558, 1174.5, 1197.1, and 2699(f).

187. Plaintiffs, on behalf of themselves and all California Class members, also request further relief set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

a) For an order certifying that the First Cause of Action of this Complaint may be maintained as a collective action pursuant to 29 U.S.C. § 216(b) and requiring that Defendants identify all members of the FLSA Collective and provide all locating information for members of the FLSA Collective, and that notice be provided to all members of the FLSA Collective apprising them of the pendency of this action and the opportunity to file Consents to Become Party Plaintiffs thereto;

b) For an order certifying that the Second through Eleventh Causes of Action of this Complaint may be maintained as a class action pursuant to California Code of Civil Procedure § 382 on behalf of the classes as defined herein and that notice of the pendency of this action be provided to members of the proposed classes;

c) For an order designating Plaintiffs as class representatives for both the FLSA and California state law claims and Plaintiffs' attorneys as counsel for the FLSA Collective and the proposed classes;

d) For an order awarding Plaintiffs, the FLSA Collective, and the proposed classes compensatory damages and statutory damages (including liquidated damages on the FLSA claims), including unpaid wages, overtime compensation, and all other sums of money owed, together with interest on these amounts;

e) For preliminary, permanent, and mandatory injunctive relief prohibiting Defendants and its officers and agents from committing the violations of law herein alleged in the future;

f) For a declaratory judgment that Defendants have violated the FLSA, California labor law, and public policy as alleged herein;

g) For an order imposing all statutory and/or civil penalties provided by law, including without limitation penalties under the California Labor Code and PAGA;

h) For exemplary and punitive damages, as appropriate and available under each cause of action, pursuant to California Civil Code § 3294;

i) For all unpaid minimum and overtime wages due to Plaintiffs and each class member;

j) For an order enjoining Defendants from further unfair and unlawful business practices in violation of the UCL;

k) Disgorgement of profits;

l) For an order awarding restitution of the unpaid minimum, regular, overtime, and premium wages due to Plaintiffs and class members;

m) For pre- and post-judgment interest;

n) For an award of reasonable attorneys' fees, expenses and costs as provided by the FLSA, 29 U.S.C. § 216(b); California Labor Code §§ 218.5, 226(e) and (h), 1194, and 2699; California Code of Civil Procedure § 1021.5; and/or other applicable law;

o) For all costs of suit; and

p) For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury for all of the claims asserted in this Complaint so triable.

DATED: October 11, 2018

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

By: ______________________________

Jeffrey R. Krinsk, Esq.
Joshua C. Anaya, Esq.
Trenton R. Kashima, Esq.
550 West C St., Suite 1760
San Diego, CA 92101-3593
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

Attorneys for Plaintiffs
and the Putative Classes

# EXHIBIT A

## LIST OF CLUBS INVOLVED IN THIS SETTLEMENT

| | DOING BUSINESS AS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| B.T. CALIFORNIA, LLC | THE PENTHOUSE CLUB & STEAKHOUSE | 412 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| BIJOU - CENTURY, LLC | NEW CENTURY THEATRE | 816 LARKING ST | SAN FRANCISCO | CALIFORNIA | 94109 |
| CHOWDER HOUSE, INC. | HUNGRY I | 546 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| DEJA VU - SAN FRANCISCO, LLC | DEJA VU CENTERFOLDS | 391 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC | LITTLE DARLINGS OF SAN FRANCISCO | 312 COLUMBUS AVE | SAN FRANCISCO | CALIFORNIA | 94133 |
| GOLD CLUB - SF, LLC | GOLD CLUB | 650 HOWARD ST | SAN FRANCISCO | CALIFORNIA | 94105 |
| S.A.W. ENTERTAINMENT, LTD. | LARRY FLYNT'S HUSTLER CLUB | 1031 KEARNY ST | SAN FRANCISCO | CALIFORNIA | 94133 |
| S.A.W. ENTERTAINMENT, LTD. -- CONDOR CLUB | CONDOR CLUB | 300 COLUMBUS AVE. | SAN FRANCISCO | CALIFORNIA | 94133 |
| SAN FRANCISCO - GARDEN OF EDEN, LLC | GARDEN OF EDEN | 529 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| SAN FRANCISCO - ROARING 20'S, LLC | ROARING 20'S | 552 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| 3610 BARNETT AVE., LLC | ADULT SUPERSTORE | 3610 BARNETT AVE. | SAN DIEGO | CALIFORNIA | 92110 |
| CATHAY ENTERTAINMENT, INC. | DÉJÀ VU SHOWGIRLS | 16025 GALE AVE, STE A11-A12 | CITY OF INDUSTRY | CALIFORNIA | 91745 |
| COLDWATER, LLC | DÉJÀ VU SHOWGIRLS | 7350 COLDWATER CANYON | N. HOLLYWOOD | CALIFORNIA | 91605 |
| DEJA VU SHOWGIRLS - SACRAMENTO, LLC | DEJA VU SHOWGIRLS | 11252 TRADE CENTER DR | RANCHO CORDOVA | CALIFORNIA | 95742 |
| DV OF LA, LLC | DÉJÀ VU LA - MAIN ST. | 1800 S. MAIN ST | LOS ANGELES | CALIFORNIA | 90015 |
| EF5 ACQUISITIONS GROUP, LLC | DEJA VU SHOWGIRLS | 20320 HAMILTON AVE | TORRANCE | CALIFORNIA | 90502 |
| EYEFULL, INC. | DEJA VU SHOWGIRLS | C/O P.O. BOX 408 | DURAND | MICHIGAN | 48429 |
| GRAPEVINE ENTERTAINMENT, INC. | DÉJÀ VU SHOWGIRLS | 1524 GOLDEN STATE HWY | BAKERSFIELD | CALIFORNIA | 93301 |
| HOLLYWOOD & VINE CLUB, LLC | DEJA VU SHOWGIRLS | 6315 HOLLYWOOD BLVD | LOS ANGELES | CALIFORNIA | 90028 |
| JGMA, ANAHEIM HOSPITALITY, INC. | SAM'S AFTER DARK | 1501 E WASHINGTON BLVD | LOS ANGELES | CALIFORNIA | 90021 |
| JOLAR CINEMA OF SAN DIEGO, LTD | JOLAR CINEMA | 6321 UNIVERSITY AVE | SAN DIEGO | CALIFORNIA | 92115 |
| NITE LIFE EAST, LLC | LITTLE DARLINGS | 8290 BROADWAY | LEMON GROVE | CALIFORNIA | 91945 |
| SHOWGIRLS OF SAN DIEGO INC | DÉJÀ VU SHOWGIRLS | 2720 MIDWAY DR | SAN DIEGO | CALIFORNIA | 92110 |
| SP STAR ENTERPRISE, INC. | DÉJÀ VU LA - UNION STATION | 710 E. COMMERCIAL ST | LOS ANGELES | CALIFORNIA | 90012 |
| STOCKTON ENTERPRISES, LLC | DÉJÀ VU SHOWGIRLS | 4206 WEST LANE | STOCKTON | CALIFORNIA | 95204 |

# EXHIBIT B

Douglas J. Melton, Bar No. 161353
Shane M. Cahill, Bar. No. 227972
LONG & LEVIT LLP
465 California Street, 5th Floor
San Francisco, California 94104
Telephone: (415) 397-2222
E-mail: dmelton@longlevit.com
scahill@longlevit.com

Attorneys for Defendant
SFBSC Management, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROES 1-2, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SFBSC MANAGEMENT, LLC; and DOES 1-200,<br><br>Defendants. | Case No. 3:14-cv-03616-LB<br><br>**CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE** |

# CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE

This Class Action Settlement Agreement and Release, including Exhibits A through E hereto (collectively "Settlement Agreement" or "Agreement"), is made and entered into by, between, and among Plaintiffs Jane Roe 1 and Jane Roe 3 ("Named Plaintiffs"),[1] on behalf of themselves and the Settlement Class as defined below, on the one hand, and Defendant SFBSC Management, LLC ("SFBSC"), and the entities set forth in Exhibit A (the "Nightclub Entities," with SFBSC and the Nightclub Entities being collectively the "Defendants"), on the other hand. Named Plaintiffs and Defendants (individually, a "Party" and collectively, the "Parties") enter into this Agreement to effect a full and final settlement, resolution, and dismissal with prejudice of all claims in the action of *Jane Roes 1-2, et al. v. SFBSC Management, LLC, et al.*, Case No. 3:13-cv-03616-LB (N.D. Cal.), as amended pursuant to this Agreement (the "Action"), and all claims based on or reasonably related thereto. This Agreement is intended to fully and finally compromise, resolve, discharge, and settle the Released Claims, as defined herein, and on the terms set forth below, and to the fullest extent reflected herein, subject to the approval of the Court.

## I. RECITALS

1. This Agreement is made in consideration of the following:

2. WHEREAS, on August 8, 2014, Plaintiff Jane Roe 1 filed a class action complaint in the United States District Court for the Northern District of California asserting various wage- and expense-related claims against Defendant SFBSC as an alleged joint employer, on behalf of herself and a proposed class of "all individuals who, during the class period, have worked as exotic dancers at nightclubs in California that Defendant has operated, controlled, and where Defendant has dictated employment policies,"[2] thereby initiating the Action (*see Roe* Dkt. 1);

---

[1] On January 12, 2015, the Court issued an order granting Plaintiffs' motion to proceed pseudonymously (*see Roe* Dkt. 32). Jane Roe 2 is not a signatory to this agreement.

[2] The Nightclubs identified in the initial complaint filed in this Action are: Hungry I, Centerfolds, Roaring 20's, Garden of Eden, Larry Flynt's Hustler Club, Little Darlings, Gold Club, Market Street Cinema, New Century, Showgirls (now known as The Penthouse Club) and Condor

3. WHEREAS, on November 28, 2014, Plaintiffs Jane Roe 1 and Jane Roe 2 filed an amended class action complaint asserting similar wage- and expense-related claims on behalf of themselves and the same proposed class (*see Roe* Dkt. 11);

4. WHEREAS, on December 3, 2014, Jane Roe 3 filed a Notice of Consent to Become Party Plaintiff in FLSA Action (*see Roe* Dkt. 14), and, on March 11, 2015, a motion to be added to the action as a proposed class representative (*see Roe* Dkt. 59);

5. WHEREAS, on March 2, 2015, the Court issued an order denying SFBSC's motions to compel arbitration (*see Roe* Dkt. 53), and SFBSC appealed that decision pursuant to 9 U.S.C. § 16;

6. WHEREAS, on April 17, 2015, the Court issued an order denying, without prejudice, Jane Roe 3's motion to be added to the action as a proposed class representative and granting SFBSC's motion to stay as to all current and potential plaintiffs' claims pending the Ninth Circuit's decision on SFBSC's appeal (*see Roe* Dkt. 80);

7. WHEREAS, on July 18, 2016, the Ninth Circuit issued a Memorandum Disposition affirming the Court's order denying SFBSC's motions to compel arbitration (*see* Roe Dkt. 90; Ninth Circuit Case No. 15-15437 [the "Appeal"] Dkt. 45-1);

8. WHEREAS, the Ninth Circuit continued SFBSC's deadline to petition for reconsideration or *en banc* review of its Memorandum Disposition until December 27, 2016 (*see* Appeal Dkt. 50).

9. WHEREAS, on December 21, 2016, the Ninth Circuit granted the Parties' stipulation to dismiss the Appeal without prejudice to its reinstatement in the event the Court denies approval of the Settlement (*see* Appeal Dkt. 52);

10. WHEREAS, the Named Plaintiffs have not filed a motion for class certification, and no litigation class has been certified;

11. WHEREAS, the Named Plaintiffs allege generally that Defendants improperly classified them, and all putative Class Members, as independent contractors rather than

---

Gentleman's Club (*see Roe* Dkt. 1).

Case 3:14-cv-03616-LB Document 126 Filed 03/09/17 Page 4 of 135

employees, and assert derivative claims related thereto;

12. WHEREAS, Defendants deny the allegations in the Action; deny that they have engaged in any wrongdoing; deny that any Class Member is, or ever was, an employee of Defendants; deny that they took tips or gratuities from any Class Member; deny that they took improper or unlawful payments from any Class Member; deny that they were required and/or failed to pay any Class Member a minimum wage to the extent required by applicable law; deny that they were required and/or failed to pay any Class Member overtime wages to the extent required by applicable law; deny that they were required and/or failed to reimburse any Class Member for business expenses to the extent required by applicable law; deny that they were required and/or failed to provide any Class Member with wage statements to the extent required by applicable law; deny that they engaged in unfair competition; deny that they threatened, or engaged in, unlawful retaliation against any Class Member; deny that they are liable for any penalties under California law; deny that the Named Plaintiffs' allegations state valid claims; deny that the arbitration agreements in issue were unenforceable; and state that they are entering into this Settlement Agreement solely to eliminate the uncertainties, burden, expense, and delay of further protracted litigation;

13. WHEREAS, a *bona fide* dispute exists as to whether any amount of wages are due from Defendants to any putative Class Member, and as to whether and penalties are due under California law;

14. WHEREAS, the Parties have engaged in three in-person mediation sessions and multiple telephone conferences with Ninth Circuit Mediator Peter Sherwood during which the Parties exchanged significant facts, documents, and information regarding Class Members' working conditions, performance hours, compensation, and the relative control exercised respectively by the Class Members and Defendants over the manner and means under which Class Members performed at the Nightclubs, before agreeing to the terms of this arm's-length Settlement;

15. WHEREAS, this Settlement Agreement is intended to fully and finally compromise, resolve, discharge, and settle the Released Claims, as defined herein, and on the

terms set forth below, and to the fullest extent reflected in this Agreement, subject to the approval of the Court;

16. WHEREAS, this Settlement Agreement shall cover all labor law and related "employment" claims and litigation now pending, asserted by amended pleadings to be filed pursuant to the terms of this Agreement, or that could be brought against Defendants (including but not limited to claims related to or arising from alleged employment misclassification; reimbursement claims; tip confiscation claims; overtime claims; minimum wage claims; inaccurate wage statement claims; reporting time claims; payroll recordkeeping claims; claims for timely payment of wages upon discharge; claims for waiting time penalties; claims for payment for all hours worked; claims for working more than six days in seven; claims for improper deduction of wages; claims in court related to payment of workers' compensation; claims related to the provision of paid sick leave, meal and rest breaks; claims under the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") for all Class Members who have consented to join in this Action pursuant to 29 U.S.C. § 216(b) as provided for in this Agreement; and claims brought under the California Labor Code Private Attorneys General Act of 2004 codified at Labor Code § 2699 *et seq*. ("PAGA") and/or the California Unfair Competition Law codified at Business & Professions Code § 17200 *et seq.* ("UCL") predicated on or related to any alleged labor law violations, and in particular shall cover the labor law and related claims now pending in the action known as *Nicole Hughes, Angelynn Hermes and Penny Nunez, et al. v. S.A.W. Entertainment, Ltd., et al.,* Case No. 3:16-cv-03371-LB (N.D. Cal.) (the "*Hughes* Action") and *Elana Pera and Sarah Murphy et al. v. S.A.W. Entertainment LTD., d/b/a Condor Gentlemen's Club*, Case No. 3:17-cv-00138-LB (N.D. Cal.) (the "*Pera* Action");

17. WHEREAS, upon execution of this Settlement Agreement, Class Counsel will promptly submit to the Court in concurrence with a motion for preliminary approval of the Settlement an Amended Complaint for Settlement in the Action, without material variation from Exhibit B (the "Amended Complaint for Settlement"), understanding that, in the event that the Court approves the Settlement and the Settlement becomes Final, said Amended Complaint for Settlement shall be deemed timely filed and the operative complaint in the Action. In the event

Case 3:14-cv-03616-LB Document 126 Filed 03/09/17 Page 6 of 135

the Court does not grant Final Approval of the Settlement or the Settlement does not become Final, the Amended Complaint for Settlement shall be null and void *ab initio*;

18. WHEREAS, the Parties agree that this Settlement Agreement, the fact of the anticipated Settlement, any of the terms in the Agreement, and any documents filed in support of the Settlement or approval thereof, shall not constitute, or be offered, received, claimed, construed, or deemed as, an admission, finding, or evidence of: (i) any wrongdoing on the part of any Party; (ii) any violation of any statute, regulation, ordinance or other law; (iii) any liability on the claims or allegations in the Action, or in any other proceeding—legal, administrative, or arbitral—including but not limited to the *Hughes* Action and *Pera* Action; (iv) the propriety of litigating as opposed to arbitrating the claims in these actions; (v) whether any entertainer at any of the Nightclubs is, should be, or should have been, classified or treated as an employee for any purpose; or (vi) the propriety of certifying a litigation class in the Action, or in any other proceeding, and shall not be used by any Person for any purpose whatsoever in any legal, administrative, or arbitral proceeding. Such matters may only be submitted in a proceeding to enforce the terms of the Settlement Agreement;

19. WHEREAS, there has been no final determination by any court as to the merits of the claims asserted by the Named Plaintiffs or any Class Members against Defendants;

20. WHEREAS, the Named Plaintiffs and Class Counsel believe that the Settlement provides a just, fair, and favorable recovery for the Settlement Class, based on the claims asserted, the evidence developed, and the damages that might be proven against Defendants in the Action, and recognize and acknowledge the significant expense, length, difficulty, and uncertainty of continued proceedings necessary to prosecute the Action against Defendants through trial and appeals. The Named Plaintiffs and Class Counsel have also considered the uncertain outcome and the risk of any litigation, especially in complex litigation such as the Action, as well as the difficulties and delays inherent in any such litigation, are mindful of the inherent challenges of proof and the strength of the defenses to the alleged claims, and therefore believe that it is desirable that the Released Claims be fully and finally compromised, settled, and resolved with prejudice and enjoined as set forth herein;

21. WHEREAS, the Named Plaintiffs and Class Counsel, based on their own independent investigations and evaluations, have examined the benefits to be obtained under the terms of this Settlement Agreement, have considered the claims of the Named Plaintiffs, the claims of the average Class Member, the risks associated with the continued prosecution of the Action, and the likelihood of success on the merits of the Action, and believe that, after considering all the circumstances, including the uncertainties surrounding the risk of further litigation and the defenses that Defendants have asserted and could assert, the proposed Settlement set forth in this Agreement is just, fair, reasonable, adequate, is in the best interests of the Named Plaintiffs and the Class Members, and confers substantial benefits upon the Class Members;

22. WHEREAS, the Named Plaintiffs warrant and represent that they are effectuating this Settlement and executing this Agreement after having received full legal advice as to their respective rights and have had the opportunity to obtain independent counsel to review this Agreement;

23. WHEREAS, Defendants dispute that any certification is proper for the purposes of litigating the claims proposed in or flowing from the operative complaint in the Action;

24. WHEREAS, however, for settlement purposes only, Defendants will stipulate to the certification of all class claims in the Action that are subject to the certification requirements of Rule 23 of the Federal Rules of Civil Procedure, with the understanding that in the event the Court does not grant Final Approval of the Settlement or the Settlement does not become Final, such stipulation and certification shall be null and void *ab initio*;

25. And, WHEREAS, also for settlement purposes only, Defendants will stipulate to the certification, for the purpose of transmitting notice, of all claims in the Action that are subject to the collective action requirements of 29 U.S.C. § 216(b), with the understanding that in the event the Court does not grant Final Approval of the Settlement or the Settlement does not become Final, such stipulation and certification shall be null and void *ab initio.*

26. NOW, THEREFORE, IT IS HEREBY STIPULATED, CONSENTED TO, AND AGREED, by the Named Plaintiffs, for themselves and on behalf of the Settlement Class, and by

Defendants that, subject to the approval of the Court, the Action shall be settled, resolved, compromised, and dismissed, on the merits and with prejudice, and the Released Claims shall be finally and fully compromised, settled, resolved and dismissed as to the Released Parties, in the manner and upon the terms and conditions hereafter set forth in this Agreement.

## II. DEFINITIONS

27. In addition to the terms defined elsewhere in this Agreement, the following terms, when used in this Agreement, shall have the meanings specified in this Section. Capitalized words and phrases in such definitions, not previously explained, are further defined herein.

28. "Administrative Costs" means the administrative costs of settlement charged by the Settlement Administrator, including but not limited to preparation and copying of Class Notice, mailing of Class Notice, website maintenance, tracking of Class Members who have requested exclusion from the Settlement and the consequent preparation of the Opt-Out List, preparation and submission of the Due Diligence Declaration specified in this Agreement, tracking of Settlement Class Members who have objected to the Settlement, Cash Payment and Dance Fee Payment Claims administration, and any other reasonable fees and costs incurred or charged by the Court-approved Settlement Administrator in connection with the execution of its duties under this Agreement. The Notice and Administration Fund as defined herein is part of the Administrative Costs.

29. "Attorneys' Fees and Expenses" or "Fee and Expense Award" means such funds as may be awarded by the Court to Class Counsel to compensate Class Counsel for their fees, costs, and expenses in connection with the Action and the Settlement.

30. "Bar Date" means the final time and date by which an FLSA Claim Form must be postmarked to the Settlement Administrator in order for a Class Member to be eligible to receive a Cash Payment or Dance Fee Payment. The Bar Date shall be specifically identified and set forth in the Preliminary Approval Order and the Class Notice.

31. "CAFA Notice" means notice sent by Defendants that complies with the requirements of the Class Action Fairness Act of 2005, 28 U.S.C. § 1711 *et seq.*

32. "Cash Payment" means the amount of money to be paid pursuant to the terms of

this Agreement to a Settlement Class Member who elects to receive her monetary compensation of this Settlement in the form of a one-time cash payment. Although the term "cash" is used, Cash Payments will be paid via check.

33. "Cash Payment Claim" means the submission made by a Class Member using the FLSA Claim Form on which she elects to receive a Cash Payment, which shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in this Action pursuant to 29 U.S.C. § 216(b).

34. "Cash Payment Claimant" means any Class Member who consents to join as a party plaintiff in the FLSA Claims in this Action by submitting a Properly Completed, valid, and timely FLSA Claim Form that qualifies for a Cash Payment under the terms of this Settlement Agreement.

35. "Claim(s)" means, when used alone herein and not as a part of another specifically defined phrase, any and all past, present and future claims, actions, demands, causes of action, suits, debts, obligations, damages, and rights or other assertions of liability, of any conceivable kind, nature and description whatsoever, whether known or unknown, whether existing or potential, whether fixed or contingent, whether asserted or not, recognized now or hereafter and whether expected or unexpected, pursuant to any theory of recovery and whether at law, in equity or otherwise, including, but not limited to, those based in contract or tort, common law or equity, federal, state, or local law, statute, ordinance, or regulation, and whether for compensatory, consequential, punitive or exemplary damages, statutory damages, penalties, interest, attorneys' fees, costs, or disbursements (including, but not limited to, those incurred by Class Counsel or any other counsel representing the Named Plaintiffs or any Settlement Class Members, other than those expressly awarded by the Court in the Attorneys' Fee and Expense Award authorized by this Agreement), that a Person may have up to the Effective Date.

36. "Claim Period" means the time period from the Notice Date through the Bar Date, which is the time period that Settlement Class Members will have to submit an FLSA Claim Form pursuant to this Agreement. The Claim Period shall run for a period of time ordered by the Court, and last until at least sixty (60) days from the Notice Date.

37. "Class" means the group of Entertainers who, during the Class Period, performed at one or more of the Nightclubs, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Nightclub during the Class Period.

38. "Class Counsel" means The Tidrick Law Firm.

39. "Class Member" means any individual who, during the Class Period, has performed as an Entertainer at one or more of the Nightclubs, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Nightclub during the Class Period.

40. "Class Notice," or "Notice of Settlement of Class Action," means a notice of settlement of class action to be submitted for review and approval by the Court as part of the motion for preliminary approval.

41. "Class Period" means the period from August 8, 2010, through the Preliminary Approval Date.

42. "Consent to Join" means a Class Member's consent to join as a party plaintiff to the FLSA claims asserted in this Action pursuant to 29 U.S.C. § 216(b). A Settlement Class Member's signed FLSA Claim Form that is timely and validly submitted to the Settlement Administrator shall serve as that Class Member's Consent to Join.

43. "Court" means the United States District Court for the Northern District of California, and the Magistrate Judge assigned to the Action, the Honorable Laurel Beeler.

44. "Dance Fee" means the mandatory, established, and published cost of personal entertainment performances engaged in by Entertainers at the Nightclubs for, and paid by, customers; the division of which between a Nightclub and an Entertainer is established in the Dancer Contract.

45. "Dance Fee Payment" means certain Dance Fees that would otherwise be owned exclusively by a Nightclub pursuant to the terms of a Dancer Contract that the Dance Fee Payment Claimant may retain as her monetary compensation under this Agreement following her

submission of a Valid Claim electing a Dance Fee Payment. Subject to the Plan of Allocation for the Dance Fee Payment Pool set forth herein, a Dance Fee Payment Claimant may receive a total Dance Fee Payment of up to $8,000.00 by retaining up to $5,000.00 in Dance Fees that would otherwise be owned exclusively by the Nightclub she designates on the FLSA Claim Form as her Primary Nightclub and up to $3,000.00 in Dance Fees that would otherwise be owned exclusively by the Nightclub she designates on the FLSA Claim Form as her Secondary Nightclub. After the Dance Fee Payment Pool is allocated among Dance Fee Payment Claimants in the manner set forth herein, Dance Fee Payment Claimants will receive their Dance Fee Payments in future installments by performing during the Dance Fee Payment Redemption Period at the Nightclubs identified on their FLSA Claim Forms and retaining the Dance Fees generated during those performances that would otherwise be owned exclusively by the specified Nightclub(s), pursuant to the terms of the relevant Dancer Contract(s), in the manner described above.

46. "Dance Fee Payment Claimant" means any Class Member who consents to join as a party plaintiff in the FLSA Claims in this Action by submitting a Properly Completed, valid, and timely FLSA Claim Form that specifies an election to receive, and qualifies for, a Dance Fee Payment under the terms of this Settlement Agreement.

47. "Dance Fee Payment Pool" means the total sum of $1,000,000.00 in future Dance Fees that would otherwise be owned exclusively by the Nightclubs pursuant to the terms of Dancer Contracts with Dance Fee Payment Claimants, which will be paid as Dance Fee Payments to Dance Fee Payment Claimants by the Nightclub(s) designated on the Dance Fee Payment Claimants' valid FLSA Claim Forms as monetary compensation under this Agreement. The Dance Fee Payment Pool will be divided evenly among ten of the eleven Nightclubs (specifically, all of the Nightclubs excluding Market Street Cinema), meaning that up to $100,000.00 in future Dance Fees that would otherwise be owned exclusively by a particular Nightclub will be available for allocation to Dance Fee Payment Claimants, pursuant to the Plan of Allocation, who designate that particular Nightclub as either her Primary Nightclub or Secondary Nightclub. No Nightclub will be required to pay total Dance Fee Payments in excess of $100,000.00.

48. "Dance Fee Payment Redemption Period" means a period of two years

immediately following the last occurrence of the following events: 1) the determination by the Settlement Administrator of the identity of Settlement Class Members who have filed Valid Cash Pool Claims or Dance Fee Payment Claims; 2) the expiration of the Opt-Out Period; 3) the Judgment becoming Final.

49. "Dancer Contract" means a contract entered into between a Settlement Class Member and a Nightclub, which permits the Settlement Class Member to engage in personal dance sales for remuneration at the Nightclub's premises.

50. "Date of Performance" means the date(s) any Settlement Class Member Performs pursuant to a Dancer Contract at a Nightclub in order to obtain a Dance Fee Payment or a Residual Dance Fee Payment. For purposes of this definition, one Date of Performance shall include any connected block of time that a Settlement Class Member is on the premises of a Nightclub in order to Perform, regardless of the fact that the Date of Performance extends over more than one calendar day. By way of illustration only, if a Settlement Class Member commences Performing on a Tuesday night at 9:00 p.m., and completes her Performances at 2:00 a.m. on Wednesday morning and then leaves the Nightclub, that period will be considered for purposes of this Agreement to constitute one Date of Performance. If the same Settlement Class Member then returns to the same Nightclub, or a different Nightclub, on Wednesday evening and again commences Performances (which may carry over to Thursday morning), that will constitute a second Date of Performance.

51. "Defense Counsel" means the law firm of Long & Levit LLP.

52. "Effective Date" means seven (7) days after which both of the following events have occurred: (i) the Final Approval Order has been entered, and (ii) the Final Approval Order and Judgment have become Final.

53. "Enhancement Payment" means the amount approved by the Court to be paid to a Named Plaintiff or other Settlement Class Member identified herein in addition to their respective payments under the Plan of Allocation, in recognition of her/their efforts in coming forward as a Named Plaintiff or in another capacity.

54. "Entertainer(s)" means persons who dance, Perform, and/or entertain, or who have

danced, Performed, or entertained, as exotic dance entertainers on the premises of a Nightclub and who sell personal entertainment performances or services to customers.

55. "Exclusion/Objection Deadline" means the final date, established by and set forth in the Preliminary Approval Order, by which a Class Member may either (i) object to any aspect of the Settlement (pursuant to Section XIV), or (ii) request to be excluded from the Settlement (pursuant to Section XIII).

56. "Fairness Hearing" means the hearing that is to take place after the entry of the Preliminary Approval Order and after the Notice Date for purposes of: (i) entering the Final Approval Order and Judgment and dismissing the Action with prejudice; (ii) determining whether the Settlement should be approved as fair, reasonable, and adequate; (iii) ruling upon an application for Enhancement Payments by the Named Plaintiffs and other individuals; (iv) ruling upon an application by Class Counsel for Attorneys' Fees and Expenses; and (v) entering any orders awarding Attorneys' Fees and Expenses and Enhancement Payments. The Parties shall request that the Court schedule the Fairness Hearing for a date that is in compliance with the provisions of 28 U.S.C. § 1715(d).

57. "Final," when referring to the Judgment or to the Settlement, means that (i) the Judgment is a final, appealable judgment; and (ii) either (a) no appeal has been taken from the Judgment as of the date on which all times to appeal therefrom have expired, or (b) an appeal or other review proceeding of the Judgment having been commenced, such appeal or other review is finally concluded and no longer is subject to review by any court, whether by way of appeal, petitions for rehearing or re-argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been finally resolved in such manner that affirms the Judgment in its entirety.

58. "Final Approval" means entry by the Court of the Final Approval Order agreed upon by the Parties, in a form that is approved by and acceptable to all Parties.

59. "Final Approval Order" means the order that the Named Plaintiffs and Defendants will seek from the Court, to be agreed upon by the Parties, memorializing the Court's approval of the Settlement. Entry of the Final Approval Order shall constitute the Court's ultimate and

conclusive approval of this Settlement Agreement.

60. "First Tier Cash Pool" means the amount of $2,000,000.00 made available in accordance with the terms of this Agreement that will be used to pay Settlement Class Members who elect to receive their monetary Settlement benefit in the form of a Cash Payment, to pay Attorney's Fees and Expenses, to pay the PAGA Payment, to pay Enhancement Payments, and to pay Administrative Costs.

61. "FLSA Claim Form" means the claim form, as reflected without material variation in Exhibit C, on which Class Members may elect to receive a Cash Payment or Dance Fee Payment. The FLSA Claim Form, if signed by a Settlement Class Member and timely and validly submitted to the Settlement Administrator as set forth herein, shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Action pursuant to 29 U.S.C. § 216(b); shall authorize Class Counsel to file the Consent to Join with the Court in a manner that is consistent with the privacy protections of the Court's order of January 12, 2015; and shall effect a full and complete release of any and all Claims under the FLSA asserted in the Action or that are reasonably related thereto and could have been brought in the Action. In the event that the Court does not grant Final Approval of the Settlement, or the Settlement does not become Final, any Consent to Join and release of the FLSA Claims filed on behalf of any Class Member shall be null and void *ab initio*.

62. "FLSA Claimants' Released Claims" means all Settlement Class Members' Released Claims as well as any and all Claims against the Released Parties, or against any one or group of them, based on putative violations of, or related to the Claims asserted in this Action, or that could have been asserted in this Action, under the FLSA.

63. "General Released Claims" means any and all Claims against the Released Parties, or against any one or group of them, including unknown Claims covered by California Civil Code § 1542 (as quoted herein), by a General Releasor, arising at any time prior to the Effective Date, for any type of relief that can be released as a matter of law, including, without limitation, Claims for wages, damages, unpaid costs, penalties (including civil and waiting time penalties), liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or

equitable relief, with the exception of any Claims which cannot be released as a matter of law. Each General Releasor will generally release all known and unknown Claims against the Released Parties conditioned upon Court approval of a General Release Enhancement Payment for her, and waive the application of section 1542 of the California Civil Code by executing the General Release Form, which is attached hereto as Exhibit E, within seven (7) days of the date on which the Court enters the Final Approval Order. The Settlement Administrator will pay the Court approved General Release Enhancement Payment(s) within eight (8) days of the date on which the General Releasor executes the General Release Form if she has not by then revoked her signature. The Claims released pursuant to this paragraph and described in the General Release Form include but are not limited to the Settlement Class Members' Released Claims, as well as any other Claims under any provision of the FLSA, the California Labor Code (including sections 132a, 4553 *et seq*.) or any applicable California Industrial Welfare Commission Wage Orders, and Claims under all state or federal discrimination statutes, including, without limitation, the California Fair Employment and Housing Act, California Government Code section 12940 *et seq*.; the Unruh Civil Rights Act, California Civil Code section 51 *et seq*.; the California Constitution; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*.; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.; the Age Discrimination in Employment Act of 1967, as amended; the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.; and all of their implementing regulations and interpretive guidelines.

64. "General Releasor" means Jane Roe 2, if the Court approves payment to her of a General Release Enhancement Payment and she also signs a General Release Form, and/or Jane Roe 1, if the Court approves payment to her of a General Release Enhancement Payment and she signs a General Release Form.

65. "General Release Enhancement Payment" means the amount approved by the Court, if any, to be paid to Jane Roe 1, Jane Roe 2, or both of them, in addition to their respective payments under the Plan of Allocation and in addition to their respective Enhancement Payments, as consideration for their execution of a General Release Form.

66. "Gross Settlement Value," and also referred to herein as "Settlement

Consideration," shall mean the value of the aggregate financial benefits that Defendants shall make available pursuant to this Agreement. The Gross Settlement Value shall equal (and shall not exceed) $5,000,000.00. That amount includes the value of the First Tier Cash Pool ($2,000,000.00), the Second Tier Cash Pool (up to $1,000,000.00), the Dance Fee Payments and Residual Dance Fee Payments ($1,000,000.00), and the changes to the Defendants' business practices (estimated to confer benefits to class members in excess of $1,000,000.00).[3]

67. "Judgment" means the final judgment to be entered in the Action upon Final Approval of this Settlement, in a form that is approved by and acceptable to all Parties.

68. "Legally Authorized Representative" means an administrator/administratrix, personal representative, or executor/executrix of a deceased Class Member's estate; guardian, conservator, or designated agent of an incapacitated Class Member; or any other legally appointed Person responsible for handling the business affairs of a Class Member.

69. "Net Cash Payment Settlement Fund" means the First Tier Cash Pool and, as applicable, the Second Tier Cash Pool, less the Attorneys' Fees and Expenses, the PAGA Payment, Enhancement Payments, and Administrative Costs approved by the Court and as further provided in this Agreement.

70. "Nightclubs" means the following San Francisco adult entertainment nightclubs, which are owned by the various Nightclub Entities identified in Exhibit A: 1) Hungry I; 2) Centerfolds; 3) Roaring 20's; 4) Garden of Eden; 5) Larry Flynt's Hustler Club; 6) Little Darlings; 7) Gold Club; 8) New Century; 9) The Penthouse Club (formerly known as Showgirls); 10) Condor Gentleman's Club; and 11) Market Street Cinema.

71. "Notice and Administration Fund" means a fund consisting of $50,000.00 advanced by Defendants (which will be considered to be part of the Settlement Consideration in the event that the Settlement becomes Final) to be used by the Settlement Administrator to pay

---

[3] Defendants will be required to implement all the changed business practices identified in this Agreement, and confer upon Class Members the corresponding benefits associated with those changed business practices, even if the total monetary value of the corresponding benefits exceeds the Parties' estimates.

the costs of preparing and providing Class Notice to Class Members, tracking Class Members who have requested exclusion from the Settlement and the consequent preparation of the Opt-Out List, preparation and submission of the Due Diligence Declaration specified this Agreement, tracking of Settlement Class Members who have objected to the Settlement, soliciting the filing of Cash Payment Claims or Dance Fee Payment Claims by Class Members, and assisting Class Members in making the Cash Payment Claims or Dance Fee Payment Claims. The monies paid into the Notice and Administration Fund is part of the monetary Settlement to be paid by Defendants from the First Tier Cash Pool as part of the Administrative Costs.

72. "Notice Date" means the date of the initial distribution of the Notice of Settlement of Class Action to Settlement Class Members.

73. "Opt-Out List" means the Court-approved list of all Class Members who timely and properly requested exclusion from the Settlement. The contents of the Opt-Out List shall be designated as Confidential Information subject to the terms of the Stipulated Protective Order in the Action (*Roe* Dkt. 14), and shall be held in confidence by the Parties pursuant to the terms of that Order. The Opt-Out List shall not be disclosed through any manner of public filing or other disclosure.

74. "PAGA Claims" mean all penalties sought against the Defendants pursuant to PAGA. The Named Plaintiffs assert PAGA Claims in a representative capacity in their Amended Complaint for Settlement.

75. "PAGA Payment" means the payments made pursuant this Agreement to resolve all PAGA Claims.

76. "Perform(s)," "Performed," "Performing," and "Performances" mean(s) all acts of entertaining, dancing, and/or engaging in entertainment services, and all activities related thereto, at the Nightclubs or at any of them.

77. "Performance Month" means any month during the Settlement Class Period in which a Settlement Class Member had at least one Date of Performance at a Nightclub.

78. "Person" means any individual, corporation, partnership, association, affiliate, joint stock company, estate, trust, unincorporated association, entity, government and any

political subdivision thereof, or any other type of business or legal entity.

79. "Plaintiffs" means collectively the Named Plaintiffs and all Settlement Class Members.

80. "Plan of Allocation" means the plan for allocating the Cash Payment settlement fund, and the Dance Fee Payment Pool, the Residual Dance Fee Payment Pool, between and among Cash Payment Claimants, Dance Fee Payment Claimants, and Residual Dance Fee Payment Claimants as approved by the Court.

81. "Preliminary Approval Date" means the date on which the Court enters the Preliminary Approval Order and thus: (i) preliminarily approves the Settlement, including the Exhibits thereto, and (ii) enters an order providing for distribution of the Notice of Settlement of Class Action to the Class Members, an opportunity to be excluded, or to "opt out," from the Settlement, an opportunity to submit timely objections to the Settlement, establishing procedures for submitting Cash Payment Claims and Dance Fee Payment Claims, and setting the Fairness Hearing.

82. "Preliminary Approval Order" means the order that the Named Plaintiffs and Defendants will seek from the Court, which shall constitute preliminary approval by the Court of this Settlement Agreement.

83. "Primary Nightclub" means a Nightclub where a Dance Fee Payment Claimant has a valid Dancer Contract and which she designates on the FLSA Claim Form as the Nightclub where she primarily performs for purposes of redeeming Dance Fee Payments.

84. "Properly Complete(d)" means a document dated and personally signed by the Settlement Class Member under penalty of perjury, which provides accurate, to the best of the Class Member's knowledge, answers/responses to all of the information requested in the document.

85. "Released Claims" shall be construed as broadly as possible to effect complete finality over the Action and the Claims asserted therein. "Released Claims" include, as applicable, "General Released Claims," "Settlement Class Members' Released Claims," and "FLSA Claimants' Released Claims." Notwithstanding any other provision of this Agreement,

"Released Claims" do not include claims for personal injuries. Plaintiffs are not releasing any Claims relating to personal injuries. Furthermore, the release of any Claims under the FLSA contemplated by this Settlement shall be effectuated only if and after a Class Member has submitted a Valid Claim before the Bar Date and thereby has consented to join as a party to the FLSA claims asserted in the Action pursuant to 29 U.S.C. § 216(b).

86. "Released Parties" means SFBSC, and each and every one of the Nightclubs and Nightclub Entities identified in Exhibit A, together with each and every one of their respective current, former and future owners (either direct or indirect, including but not limited to partners, shareholders, members, parent companies, holding companies, trusts and/or trustees), officers, directors, managers, employees, agents, representatives, contractors (not including Plaintiffs or Class Members), insurers, reinsurers, attorneys, auditors, accountants, bookkeepers, experts, subsidiaries, affiliates, divisions, licensees, licensors, consultants, heirs, executors, personal representatives, predecessors and successors in interest, and assigns, and any benefit plans sponsored or administered by SFBSC or any of the Nightclubs or Nightclub Entities identified in Exhibit A.

87. "Releasing Parties" means Plaintiffs, and each and every one of their heirs, guardians, executors, administrators, representatives, agents, attorneys, and assigns.

88. "Residual Dance Fee Payment" means a payment of Dance Fees made from the Residual Dance Fee Payment Pool to a Residual Dance Fee Payment Claimant.

89. "Residual Dance Fee Payment Claim" means the submission made by a Class Member using the Residual Dance Fee Payment Claim Form electing to receive Residual Dance Fee Payments as monetary compensation under this Agreement.

90. "Residual Dance Fee Payment Claimant" means a Class Member who has timely submitted a Valid Residual Dance Fee Claim.

91. "Residual Dance Fee Payment Claim Form" means a form in all material respects identical to Exhibit D, which is to be provided to Settlement Class Members at, and which must be returned Properly Completed and within the Dance Fee Payment Redemption Period to, a Nightclub in order for a Settlement Class Member to be entitled to obtain a Residual Dance Fee

Payment.

92. "Residual Dance Fee Payment Pool" means the amount of the Dance Fee Payment Pool remaining at any given Nightclub, if any, that Dance Fee Payment Claimants do not claim during the Claim Period.

93. "Second Tier Cash Pool" means a monetary amount equal to the amount by which the collective sum of the Attorney's Fees and Expenses, Enhancement Payments, the PAGA Payment, the Administrative Costs, and the total amount of Cash Payment Claimants' Cash Payment Claims exceed the First Tier Cash Pool of $2,000,000.00. By way of illustration only, if the sum of Attorney's Fees and Expenses, Enhancement Payments, the PAGA Payment, Administrative Costs, and the total amount of Cash Payment Claimants' Cash Payment Claims equals $2,900,000.00, the Second Tier Cash Pool will consist of $900,000.00. In no event shall the Second Tier Cash Pool exceed the sum of $1,000,000.00.

94. "Secondary Nightclub" means a Nightclub where a Dance Fee Payment Claimant has a valid Dancer Contract which she designates on the FLSA Claim Form as the secondary Nightclub where she performs for purposes of redeeming Dance Fee Payments.

95. "Settlement" means the settlement of the Action between and among the Plaintiffs and Defendants, as set forth in this Agreement, including all attached Exhibits (which are an integral part of this Settlement Agreement and that are incorporated herein in their entirety by reference).

96. "Settlement Administrator" means one of the following neutral, third-party professional settlement administrators to be recommended by Class Counsel and appointed by the Court:

a. Simpluris, Inc.

b. Rust Consulting, Inc.

c. Settlement Services, Inc.

d. CPT Group, Inc.

97. "Settlement Class" means all Persons who, during the Class Period, have Performed as exotic dancers at one or more of the Nightclubs pursuant to a Dancer Contract, and

who have not timely and properly excluded themselves from the Settlement as provided in Section XIII of this Agreement.

98. "Settlement Class Member" means any Class Member who has not timely and properly excluded herself from the Settlement as provided in Section XIII of this Agreement.

99. "Settlement Class Members' Released Claims" means any and all Claims that are based on or reasonably related to the Claims asserted in the Action, with the exception of claims under the FLSA, including as is set forth in the Amended Complaint for Settlement, and specifically including:

a) Claims for unpaid wages (including without limitation claims for minimum wage, regular wages, overtime, final wages, calculation of the correct overtime or regular rate, and meal period and rest period premiums), expense reimbursements, interest, and penalties (including waiting time penalties pursuant to California Labor Code section 203, wage statement penalties pursuant to California Labor Code section 226, and civil penalties pursuant to PAGA (California Labor Code section 2698 *et seq.*));

b) Claims pursuant to California Labor Code sections 200-204, 206.5, 207, 208, 210-214, 216, 218, 218.5, 218.6, 221, 222.5, 223, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353, 432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2698 *et seq.*, 2753, 2802, and 2804;

c) Claims pursuant to California Code of Civil Procedure section 1021.5;

d) Claims pursuant to California Code of Regulations, Title 8, sections 11010 and 11040;

e) Claims pursuant to Industrial Welfare Commission Wage Orders;

f) Claims under California Business and Professions Code sections 17200, et seq. and 17500;

g) Claims under California common law to recover any alleged tip or expense;

h) Claims pursuant to the San Francisco Minimum Wage Ordinance (Chapter 12R of the SF Admin. Code);

i) Claims for attorneys' fees and costs;

j) Claims of unfair business practices; and

k) All Claims, including common law claims, arising out of or related to the statutory causes of action described herein.

100. "Stage Name" means the name or pseudonym utilized by a Settlement Class Member while Performing at one or more of the Nightclubs.

101. "Valid Claim(s)" means an FLSA Claim Form Properly Completed and timely submitted (with postmark) by a Class Member to the Settlement Administrator within the Claim Period, demonstrating the Settlement Class Member's election to receive her monetary Settlement benefit in the form of a Cash Payment or Dance Fee Payment.

102. "Valid Residual Dance Fee Claim(s)" means a Residual Dance Fee Payment Claim Form Properly Completed and timely submitted by a Class Member to a Nightclub within the Dance Fee Payment Redemption Period, demonstrating the Settlement Class Member's election to receive her monetary Settlement benefit in the form of a Residual Dance Fee Payment.

## III. SUBMISSION OF THE SETTLEMENT AGREEMENT TO THE COURT FOR REVIEW AND APPROVAL

103. Promptly following execution of this Settlement Agreement, the Named Plaintiffs shall submit to the Court a motion for preliminary approval of the Settlement, and shall concurrently submit the Amended Complaint for Settlement (as reflected without material variation from Exhibit B), which Named Plaintiffs shall seek to enter pursuant to the agreement of the Parties. The motion for preliminary approval shall include a proposed plan for the sending of the Notice of Settlement of Class Action to Class Members within twenty-one (21) days after the Preliminary Approval Date, and establishing the Exclusion/Objection Deadline. The Exclusion/Objection Deadline requested shall be sixty (60) days after the Notice Date, and shall be specifically identified and set forth in the Preliminary Approval Order and the Class Notice. The motion for preliminary approval shall also request that the Fairness Hearing for Final Approval of the Settlement and any determination on the request for Attorneys' Fees and Expenses and the Enhancement Payments, be set for a date no earlier than thirty-five (35) days after the Exclusion/Objection Deadline; that Class Counsel shall file a petition for awards of

Attorneys' Fees and Expenses and Enhancement Payments at least twenty-one (21) days before the Exclusion/Objection Deadline; that the motion for Final Approval be filed at least thirty-five (35) days before the Fairness Hearing; that any oppositions to such motions and petitions be filed at least twenty-one (21) days before the Fairness Hearing; and that any reply briefs on such motions and petitions be filed no later than fourteen (14) days before the Fairness Hearing.

104. No later than 10 days after the Settlement Agreement is filed with the Court for preliminary approval, Defendants participating in the proposed Settlement shall serve upon the appropriate state official of each State in which a Class Member resides and the appropriate Federal official a CAFA Notice as required by 28 U.S.C. § 1715(b).

105. For purposes of settlement only, the Parties agree to seek provisional certification of the Class as a collective action pursuant to 29 U.S.C. § 216(b) and as a Federal Rules of Civil Procedure Rule 23 Class. Each Party agrees that this stipulation shall not be used by any Person for any purpose whatsoever in any other legal, administrative, or arbitral proceeding. Such matters may only be submitted in a proceeding to enforce the terms of this Settlement Agreement.

106. Defendants do not consent to certification of any Class for any purpose other than to effectuate the Settlement of this Action. The Parties acknowledge and agree that Defendants' consent to provisional certification for purposes of settlement only does not constitute an admission of wrongdoing, fault, liability, or damage of any kind to Plaintiffs or to any of the Class Members.

107. The Parties agree to submit to the Court for its consideration this Settlement Agreement, including all Exhibits.

108. Solely for purposes of implementing this Agreement and effectuating the proposed Settlement, the Parties agree and stipulate that:

a) Named Plaintiffs shall seek the Court's permission to file the Amended Complaint for Settlement, without material variation from Exhibit B, and Defendants shall consent to such amendment pursuant to Federal Rule of Civil Procedure 15(a)(2). The Amended Complaint for Settlement shall be submitted concurrently with the submission of the motion for preliminary approval of the Settlement so that such complaint may be filed promptly upon approval of the

Court. Obtaining the Court's approval to file the Amended Complaint for Settlement, and the subsequent prompt entry of the Amended Complaint for Settlement, are material conditions of this Settlement Agreement. The Parties agree that the filing of the Amended Complaint for Settlement will streamline the settlement process and ensure that more money can be paid to Settlement Class Members by saving the costs of multiple notice and approval processes. The Parties further agree and stipulate that Defendants may seek an order from the Court establishing that the allegations in the Amended Complaint for Settlement are deemed fully controverted by the answer previously filed in response to the currently operative complaint in the Action, such that no further responsive pleading from any Defendant is required. If for any reason the Settlement does not become Final or the Effective Date does not occur, the Amended Complaint for Settlement shall be stricken from the record and the operative complaint in the Action shall revert to the filed complaint that preceded the Amended Complaint for Settlement.

b) They jointly request the Court to enter a Preliminary Approval Order preliminarily approving the Settlement and this Agreement. Among other things, the Preliminary Approval Order shall grant leave to preliminarily certify the Class for settlement purposes only; approve the Named Plaintiffs as class representatives; appoint Class Counsel to represent the Settlement Class and appoint the Settlement Administrator; approve the Notice of Settlement of Class Action and the Class Notice plan embodied in the Settlement Agreement, and approve them as consistent with 29 U.S.C. § 201 *et seq*., Federal Rule of Civil Procedure Rule 23, and due process; set out the requirements for Class Members to be able to exclude themselves from the Settlement and for Settlement Class Members to object to the terms of the Settlement, all as provided for in this Agreement; provide that certification and all actions associated with certification are undertaken on the condition that the certification and other related actions shall be automatically vacated if this Agreement is terminated or if the Settlement does not become Final, all as provided in this Agreement; preliminarily enjoin all Class Members and their Legally Authorized Representatives, unless and until they submit a timely request for exclusion from the Settlement pursuant to this Agreement, from filing or otherwise participating in any other suit or non-administrative proceeding based on the Released Claims, or from attempting to effect an opt-out from the

Settlement as a group, class, or subclass of individuals; and schedule the Fairness Hearing.

109. At the Fairness Hearing, the Named Plaintiffs shall request entry of the Final Approval Order and the Judgment, the terms of which shall be agreed upon by the Parties. The entry of the Final Approval Order and the Judgment by the Court is a material condition of this Settlement Agreement, and shall order, among other things, that the Court:

a) finally approves the Settlement as fair, reasonable, and adequate, within the meaning of Federal Rule of Civil Procedure 23 and due process, and directs its consummation pursuant to the terms of the Settlement Agreement;

b) finds that Class Counsel and the Named Plaintiffs adequately represent the Settlement Class for the purpose of entering into and implementing the Agreement;

c) re-confirms the appointment of the Settlement Administrator and finds that the Settlement Administrator has fulfilled its duties under the Settlement;

d) finds that the Class Notice (i) constituted the best practicable notice; (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action and their right to exclude themselves from, or object to, the proposed Settlement and to appear at the Fairness Hearing; (iii) was reasonable and constituted due, adequate, and sufficient notice to all Persons entitled to receive notice; and (iv) met all applicable requirements of Federal Rule of Civil Procedure Rule 23, due process, and any other applicable rules or law;

e) finds that the CAFA Notice sent by Defendants complied with 28 U.S.C. § 1715 and all other provisions of the Class Action Fairness Act of 2005;

f) approves the Opt-Out List and determines that the Opt-Out List is a complete list of all Class Members who have timely requested exclusion from the Settlement and, accordingly, shall neither share in nor be bound by the Final Approval Order and Judgment;

g) dismisses the Action on the merits and with prejudice, and without fees or costs except as provided in this Agreement;

h) directs that the Final Approval Order and Judgment shall be final and entered forthwith;

i) without affecting the finality of the Final Approval Order and Final Judgment, reserves jurisdiction over the Named Plaintiffs, the Settlement Class, and Defendants as to all matters concerning the administration, consummation, and enforcement of this Settlement Agreement;

j) adjudges that, as of the Effective Date, the Named Plaintiffs, and all Class Members who have not been excluded from the Settlement as provided in the Opt-Out List approved by the Court, and their heirs, estates, trustees, executors, administrators, principals, beneficiaries, representatives, agents, assigns, and successors, and/or anyone claiming through them or acting or purporting to act for them, on their behalf, or for their benefit, regardless of whether they have received actual notice of the proposed Settlement, have conclusively compromised, settled, discharged, and released the General Released Claims (in the case of each General Releasor), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the FLSA Claimants' Released Claims (in the case of the Settlement Class Members receiving Enhancement Payments or who opted in to the Action as FLSA Claimants, Cash Payment Claimants, and Dance Fee Payment Claimants) against Defendants and the Released Parties, and are bound by the provisions of this Agreement;

k) declares this Agreement and the Final Approval Order and Judgment to be binding on, and have *res judicata* and preclusive effect in, all pending and future lawsuits or other proceedings: (i) that encompass the General Released Claims, as applicable to any General Releasor, and that are maintained by or on behalf of any General Releasor and/or their heirs, estates, trustees, executors, administrators, beneficiaries, representatives, agents, and assigns, as well as anyone claiming through them or acting or purporting to act for them, on their behalf, or for their benefit; (ii) that encompass the Settlement Class Members' Released Claims and that are maintained by or on behalf of any Settlement Class Member and/or by her heirs, estates, trustees, executors, administrators, beneficiaries, representatives, agents, or assigns, as well as anyone claiming through them or acting or purporting to act for them, on their behalf, or for their benefit, regardless of whether the Settlement Class Member previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the Settlement Class Members'

Released Claims and even if such Settlement Class Member never received actual notice of the Action or this proposed Settlement; and iii) that encompass the FLSA Claimants' Released Claims and that are maintained by or on behalf of any Cash Payment Claimant, Dance Fee Payment Claimant, or any other Settlement Class Member receiving an Enhancement Payment or who opted in to the Action as an FLSA Claimant and/or by their heirs, estates, trustees, executors, administrators, beneficiaries, representatives, agents, or assigns, as well as anyone claiming through them or acting or purporting to act for them, on their behalf, or for their benefit, regardless of whether the Cash Payment Claimant or Dance Fee Payment Claimant previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the FLSA Claimants' Released Claims;

1) permanently bars and enjoins the Named Plaintiffs and all other Settlement Class Members from: (i) filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in any other lawsuit or administrative, regulatory, arbitration, or other proceeding in any jurisdiction based on the General Released Claims (in the case of any General Releasor), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the FLSA Claimants' Released Claims (in the case of the Settlement Class Members' receiving Enhancement Payments or who opted in to the Action as FLSA Claimants, Cash Payment Claimants, and/or Dance Fee Payment Claimants); and (ii) organizing Settlement Class Members or Cash Payment Claimants/Dance Fee Payment Claimants into separate groups, classes, or subclasses for purposes of pursuing as a purported class action any lawsuit or administrative, regulatory, arbitration, or other proceeding (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) based on the Settlement Class Members' Released Claims or the FLSA Claimants' Released Claims;

m) determines that the Agreement and the Settlement provided for herein, and any proceedings taken pursuant thereto, are not, and should not in any event be offered, received, or construed as evidence of, a presumption, concession, or an admission by any Party of liability or non-liability or of the certifiability or non-certifiability of a litigation class, or of any

misrepresentation or omission in any statement or written document approved or made by any Party; provided, however, that reference may be made to this Agreement and the Settlement provided for herein in such proceedings as may be necessary to effectuate the provisions of this Settlement Agreement;

n) orders that the certification of the Class and Final Approval of the proposed Settlement, and all actions associated with them, are undertaken on the condition that they shall be vacated if this Settlement Agreement is terminated or disapproved in whole or in part by the Court, or by any appellate court and/or other court of review, or if Defendants invoke the right to withdraw from the Settlement as provided herein, in which event this Agreement and the fact that it was entered into shall not be offered, received, or construed as an admission or as evidence for any purpose, including, but not limited to, an admission by any Party of liability or non-liability or of any misrepresentation or omission in any statement or written document approved or made by any Party, or of the certifiability of a litigation class;

o) authorizes the Parties, without further approval from the Court, to agree to and adopt such amendments, modifications, and expansions of this Agreement, including all Exhibits hereto, as (i) shall be consistent in all material respects with the Final Approval Order and (ii) do not limit the rights of Settlement Class Members; and

p) authorizes such other and further provisions consistent with the terms of this Settlement Agreement to which the Parties expressly consent in writing.

110. At the Fairness Hearing, Class Counsel may also request entry of an order approving Class Counsel's application for an award of Attorneys' Fees and Expenses and for Enhancement Payments to the Named Plaintiffs or other Settlement Class Members identified in Paragraph 112(e). In no event shall Defendants otherwise be obligated to pay for any Attorneys' Fees and Expenses or Enhancement Payments. The disposition of Class Counsel's application for a Fee and Expense Award, and for Enhancement Payments, is within the sound discretion of the Court and is not a material term of this Settlement Agreement, and it is not a condition of this Settlement Agreement that such applications be granted. Any disapproval or modification of such applications by the Court shall not (i) affect the enforceability of the Settlement Agreement,

(ii) provide any of the Parties with the right to terminate the Settlement Agreement, or (iii) impose any obligation on the Defendants to increase the consideration paid in connection with the Settlement.

## IV. SETTLEMENT CONSIDERATION

111. The settlement consideration consists of Cash Payments, Dance Fee Payments, Residual Dance Fee Payments, and changes to Defendants' business practices that will confer a direct financial benefit on Settlement Class Members as detailed below. Under no circumstances shall Defendants be responsible for making payments or other remunerations of any kind in a manner that confers an aggregate financial benefit in excess of $5,000,000.00 on the Settlement Class Members, on Class Counsel, on the LWDA, and on the Settlement Administrator.

112. The Cash Payments, Dance Fee Payments, Residual Dance Fee Payments, Enhancement Payments, PAGA Payment, Attorneys' Fees and Expenses Award, and Administrative Costs components of the Settlement Consideration shall be funded as follows:

a) First Tier Cash Pool: The sum of $2,000,000.00 will initially be made available by Defendants to provide cash compensation to those Settlement Class Members who elect to receive their Settlement in the form of a monetary payment, and to pay the Attorneys' Fees and Expenses, the Enhancement Payments, the PAGA Payment, and the Administrative Costs (including the Notice and Administration Fund) as provided for herein. Defendants shall deposit $750,000.00 of the First Tier Cash Pool in an escrow account administered by the Settlement Administrator ("Escrow Account") within 30 days of Preliminary Approval; Defendants shall deposit a second payment of $750,000.00 of the First Tier Cash Pool in the Escrow Account within 60 days after Final Approval; Defendants shall deposit the remainder of the funds comprising the First Tier Cash Pool in the Escrow Account within 180 days after the second payment. In the event the Court does not grant Final Approval, the Settlement Administrator shall promptly refund to Defendants the balance of the Escrow Account. The sum of the First Tier Cash Pool remaining after subtracting the amount of Enhancement Payments, the PAGA Payment, and Administrative Costs shall be distributed as set forth in more detail in Section V below, to Settlement Class Members who have timely submitted Valid Claims for Cash

Payments. After payment of all Valid Claims for Cash Payments, Enhancement Payments, the PAGA Payment, and Administrative Costs, any monies that remain in the First Tier Cash Pool shall be allocated to the payment of Attorneys' Fees and Expenses. If, after payment of all Valid Claims for Cash Payments, and the payment of all Attorneys' Fees and Expenses, Enhancement Payments, the PAGA Payment, and Administrative Costs, any moneys remain in the First Tier Cash Pool, all such remaining sums shall be paid on a *pro rata* basis to the Cash Payment Claimants who submitted Valid Claims for Cash Payments in proportion to the amount they received pursuant to the Plan of Allocation set forth in Paragraph 116. By way of example and for illustration purposes only, if 1,000 Cash Payment Claimants were to each submit a Valid Claim for Cash Payment in the amount of $800.00 and 200 Cash Payment Claimants were to each submit a Valid Claim for Cash Payment in the amount of $500.00, and if $100,000.00 were to remain in the First Tier Cash Pool after payment of all Valid Claims for Cash Payments, and the payment of all Attorneys' Fees and Expenses, Enhancement Payments, the PAGA Payment, and Administrative Costs, each Cash Payment Claimant who received a Cash Payment in the amount of $800.00 would receive an additional Cash Payment of $88.88 and each Cash Payment Claimant who received a Cash Payment of $500.00 would receive an additional Cash Payment of $55.55. Should any amounts from the First Tier Cash Pool remain in the Escrow Account after sixty (60) days following the distribution of the balance of the Cash Payments for the benefit of the Settlement Class as described above (e.g., should any Cash Payment checks go uncashed), all such unclaimed funds shall be paid to the St. James Infirmary[4], or if that entity is not approved by the Court, The Impact Fund (a public interest law non-profit organization) or another appropriate recipient as approved by the Court.

b) Second Tier Cash Pool: If the sum of the Valid Claims for Cash Payments, Attorneys' Fees and Expenses, Enhancement Payments, the PAGA Payment, and Administrative

[4] The St. James Infirmary is a non-profit organization located at 234 Eddy Street in San Francisco that provides free, compassionate and nonjudgmental healthcare and social services for sex workers (current or former) of all genders and sexual orientations while preventing occupational illnesses and injuries through a comprehensive continuum of services.

Costs in combination exceed the amount of the First Tier Cash Pool, Defendants will fund a Second Tier Cash Pool in an amount equal to the amount that the sum of the Valid Claims for Cash Payments, Attorneys' Fees and Expenses, Enhancement Payments, the PAGA Payment, and Administrative Costs exceed the First Tier Cash Pool, up to a maximum of $1,000,000.00 ("the Second Tier Cash Pool Amount"). By way of illustration only, if the sum of the Valid Claims for Cash Payments, Attorneys' Fees and Expenses, Enhancement Payments, the PAGA Payment, and Administrative Costs equals $2,900,000.00, the Second Tier Cash Pool Amount would be $900,000.00. If the Second Tier Cash Pool amount is $500,000.00 or less, Defendants shall deposit the full Second Tier Cash Pool Amount in the Escrow Account within 90 days after payment of the final First Tier Cash Pool Payment. If the Second Tier Cash Pool amount exceeds $500,000.00, Defendants shall deposit $500,000.00 of the Second Tier Cash Pool Amount in the Escrow Account within 90 days after payment of the final First Tier Cash Pool Payment and the balance of the Second Tier Cash Pool amount within 90 days of the initial Second Tier Cash Pool Payment. The Second Tier Cash Pool shall be used to first pay any remaining unpaid Valid Claims for Cash Payments with the balance thereafter used to pay any remaining unpaid Attorneys' Fees and Expenses.

c) <u>Dance Fee Payment Pool</u>: As an alternative to a Cash Payment Claim, Settlement Class Members may elect to receive a Dance Fee Payment as set forth below. The Dance Fee Payment Pool shall consist of a total of $1,000,000.00 with each of the ten Nightclubs (*i.e.*, each of the Nightclubs excluding Market Street Cinema) making $100,000.00 available to fund Dance Fee Payments to Dance Fee Payment Claimants who elect to receive a Dance Fee Payment and who designate that particular Nightclub on their FLSA Claim Form as either their Primary Nightclub or Secondary Nightclub. The Dance Fee Payment Pool will be divided by each Nightclub equally on a *pro rata* basis to Dance Fee Payment Claimants who submit a Valid Claim indicating their election to receive a Dance Fee Payment; provided, however, that the Dance Fee Payment may not exceed $5,000.00 per Dance Fee Claimant at the Nightclub she designates as her Primary Nightclub and may not exceed $3,000.00 per Dance Fee Claimant at the Nightclub she designates as her Secondary Nightclub. By way of illustration only, if 20

Dance Fee Payment Claimants were to designate the Garden of Eden as their Primary Nightclub and 0 Dance Fee Payment Claimants were to designate the Garden of Eden as their Secondary Nightclub, the total Dance Fee Payment Claims at the Garden of Eden would be $100,000.00 (20 x $5,000.00 = $100,000.00) and each such Dance Fee Payment Claimant would be entitled to a Dance Fee Payment of $5,000.00. By way of illustration only, if 20 Dance Fee Payment Claimants were to designate the Garden of Eden as their Primary Nightclub and 20 Dance Fee Payment Claimants were to designate the Garden of Eden as their Secondary Nightclub, the total Dance Fee Payment Claims at the Garden of Eden would be $160,000.00 (20 x $5,000.00 = $100,000.00; 20 x $3,000.00 = $60,000.00) and each such Dance Fee Payment Claimant's claim would be reduced on a *pro rata* basis such that Dance Fee Payment Claimants who designated Garden of Eden as their Primary Nightclub would each be entitled to a Dance Fee Payment of $3,125.00 and Dance Fee Payment Claimants who designated the Garden of Eden as their Secondary Nightclub would be entitled to a Dance Fee Payment of $1,875.00. By way of illustration only, if 10 Dance Fee Payment Claimants were to designate the Garden of Eden as their Primary Nightclub and 0 Dance Fee Payment Claimants were to designate the Garden of Eden as their Secondary Nightclub, the total Dance Fee Payment Claims at the Garden of Eden would be $50,000.00 (10 x $5,000.00 = $50,000.00) and each such Dance Fee Payment Claimant would be entitled to a Dance Fee Payment of $5,000.00. Under this scenario, the sum of $50,000.00 would remain and be available to pay Residual Dance Fee Payment Claims to Residual Dance Fee Payment Claimants who Perform at the Garden of Eden.

d) Residual Dance Fee Payment Pool: In the event that the sum of Dance Fee Payment Claims as described above equals a sum less than $100,000.00 at any Nightclub(s), such Nightclub(s) shall create a Residual Dance Fee Payment Pool that will consist of the difference between the sum of Dance Fee Payment Claims made to that Nightclub and $100,000.00. By way of example and for illustration purposes only, if at The Condor Club the sum of Valid Dance Fee Payment Claims was $75,000.00, the Condor Club would create a Residual Dance Fee Payment Pool of $25,000.00, which would be available to Settlement Class Members who did not submit an FLSA Claim Form as described below. Claims for the Residual Dance Fee Payment

Pool may be made on a claims-made basis during the Dance Fee Payment Redemption Period or until the Residual Dance Fee Payment Pool is exhausted, whichever occurs first. Settlement Class Members who do not submit an FLSA Claim Form may redeem a Residual Dance Fee Pool Payment in accordance with the provisions set forth in Paragraphs 128-132 below.

e) Enhancement Payments: Defendants shall pay, out of the First Tier Cash Pool, the Enhancement Payments as ordered by the Court in the Final Approval Order. The Enhancement Payments requested by Plaintiffs are to the following Named Plaintiffs and other Settlement Class Members: To Jane Roe 1 and Jane Roe 2 in an amount of $5,000.00 each; and to Jane Roe 3, Jane Roe 10, Jane Roe 11, Jane Roe 12, Jane Roe 13 and Jane Roe 22 in an amount of $3,500.00 each; for a total sum of no more than $31,000.00. Enhancement Payments shall be paid by the Settlement Administrator at the same time the Settlement Administrator pays Cash Payments to Cash Payment Claimants. Enhancement Payments shall be considered non-wage income for which an IRS Form 1099 will be issued to each of the Named Plaintiffs and other Settlement Class Members identified in this Paragraph.

f) General Release Enhancement Payments: Defendants shall pay to Jane Roe 1, Jane Roe 2, or both of them, out of the First Tier Cash Pool, the General Release Enhancement Payments as ordered by the Court in the Final Approval Order contingent upon their execution of the General Release Form as further described herein. The General Release Enhancement Payments requested are to Jane Roe 1 and Jane Roe 2 each in an amount not to exceed $20,000 for a total sum of $40,000.

g) The PAGA Payment: Named Plaintiffs' PAGA Claims include an allegation that Defendants violated California Labor Code §558, which Named Plaintiffs contend entitles them to recover, as a penalty under PAGA, unpaid wages on behalf of Class Members. The Parties understand and agree that Defendants' payment of the Cash Payments, Dance Fee Payments and Residual Dance Fee Payments resolve the PAGA Claims premised on California Labor Code §558.[5] In addition, the sum of $100,000.00 will be paid out of the First Tier Cash Pool to resolve

---

[5] "[A]n aggrieved employee acting as the LWDA's proxy or agent by bringing a PAGA action

all PAGA Claims premised on other alleged Labor Code violations. From the PAGA Payment, seventy-five percent (75%), or $75,000.00, shall be paid to the LWDA as civil penalties pursuant to PAGA and twenty-five percent (25%), or $25,000.00, shall be distributed to Cash Payment Claimants and Dance Fee Payment Claimants in an equal amount to each Claimant.

h) Fee and Expense Award: Defendants agree not to object to a request of a Fee and Expense Award that does not exceed twenty-five percent (25%) of the Gross Settlement Value. Defendants shall pay to Class Counsel, out of the First Tier Cash Pool and/or, as appropriate, out of the Second Tier Cash Pool, the amount, not to exceed $1,000,000.00, as ordered by the Court in the Final Approval Order to compensate Class Counsel for its fees, costs, and expenses incurred in connection with the Action and the Settlement.

i) Administrative Costs: Defendants shall pay, out of the First Tier Cash Pool, the sum of fifty thousand dollars ($50,000.00) to the Settlement Administrator for the administrative costs of settlement, including but not limited to the preparation and copying of Class Notice, mailing of the Class Notice, tracking Class Members who have requested exclusion from the Settlement and the consequent preparation of the Opt-Out List, preparation and submission of the Due Diligence Declaration specified in this Agreement, tracking of Settlement Class Members who have objected to the Settlement, website maintenance, and Cash Payment Claims administration, and any other reasonable fees and costs incurred or charged by a jointly approved Settlement Administrator in connection with the execution of its duties under this Agreement. In the event that the Administrative Costs exceed $50,000.00, any additional monies for Administrative Costs shall be paid solely from the First Tier Cash Pool, and/or, as appropriate, out of the Second Tier Cash Pool, and nothing in this Agreement requires that Defendants pay any amount over and above the amounts established for the Settlement Consideration as set forth

---

may likewise recover underpaid wages as a civil penalty under section 558." (*Thurman v. Bayshore Transit Mgmt., Inc.*, 203 Cal. App. 4th 1112, 1148 (2012).) Such underpaid wages "go[] entirely to the affected employee or employees as an express exception to the general rule that civil penalties recovered in a PAGA action are distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees (§ 2699, subd. (i))." (*Id.* at 1145 (2012).)

in this Agreement. In the event that the Administrative Costs do not reach $50,000.00, the remaining amount of the Notice and Administration Fund shall revert to the Net Cash Payment Settlement Fund. If for any reason the Settlement does not become Final or the Effective Date does not occur, the remaining money deposited into the Notice and Administration Fund shall be expeditiously returned to Defendants.

113. Class Member Election: Members of the Class will be mailed the Notice of Settlement of Class Action to their last known address as reflected on the most recent Dancer Contract they executed at the last Nightclub at which they Performed prior to the entry of the Preliminary Approval Order, except that before the first mailing to the Class, the Settlement Administrator shall run a National Change of Address (NCOA) database search on all addresses, and if the Settlement Administrator determines that the NCOA database shows that a Class Member's address has changed, the Settlement Administrator shall use the Class Member's current address as reflected in the NCOA database. Settlement Class Members who elect to receive a Cash Payment or Dance Fee Payment are required to opt-in pursuant to the provisions of § 216(b) of the FLSA by completing and timely submitting the FLSA Claim Form attached hereto as Exhibit C. Those Class Members who do not elect to receive a Cash Payment or Dance Fee Payment during the Claim Period and who are nevertheless Settlement Class Members, are eligible to participate in the Residual Dance Fee Payment Pool and to receive Residual Dance Fee Payments as set forth below. In no event may a Settlement Class Member elect more than one of the following forms of monetary compensation under this Agreement: a Cash Payment, a Dance Fee Payment, or a Residual Dance Fee Payment.

## V. PLAN OF ALLOCATION AND DISBURSEMENT OF CASH PAYMENTS

114. To receive a Cash Payment, a Settlement Class Member or her Legally Authorized Representative must Properly Complete and timely submit an FLSA Claim Form on which she indicates an election to receive a Cash Payment. The FLSA Claim Form shall require the Class Member who elects a Cash Payment, to attest, to the best of her knowledge, to the total number of her Performance Months, and to provide all other information requested on the Claim Form. Each Settlement Class Member who satisfies these criteria is a Cash Payment Claimant.

115. An FLSA Claim Form for a Cash Payment is timely if it is postmarked by the Bar Date and mailed to the Settlement Administrator at the address in the Notice of Settlement of Class Action.

116. Cash Payments shall be calculated in accordance with the following Plan of Allocation, which shall be reduced on a *pro rata* basis if the First Tier Cash Pool and Second Tier Cash Pool are depleted:

a. $800.00 for Cash Payment Claimants who accrued 24 or more Performance Months during the Class Period;

b. $700.00 for Cash Payment Claimants who accrued between 12 and 23 Performance Months during the Class Period;

c. $500.00 for Cash Payment Claimants who accrued between 6 and 11 Performance Months during the Class Period; and

d. $350.00 for Cash Payment Claimants who accrued fewer than 6 Performance Months during the Class Period.

117. If, after payment of all Valid Claims for Cash Payments, and the payment of all Attorneys' Fees and Expenses, Enhancement Payments, the PAGA Payment, and Administrative Costs, any moneys remain in the First Tier Cash Pool, all such remaining sums shall be paid to the Cash Payment Claimants who submitted Valid Claims for Cash Payments in proportion to the amount they received under the total amounts received in the Plan of Allocation set forth in Paragraph 116 and as further described in Paragraph 112(a).

118. Settlement checks shall be delivered to the mailing address that the Cash Payment Claimant provides on the FLSA Claim Form. It shall be the Cash Payment Claimant's responsibility to ensure that the mailing address information provided is current and accurate at the time the Cash Payment is issued. A Cash Payment Claimant may update her mailing information after submitting a Claim Form by informing the Settlement Administrator of any changes in writing via email or mail.

119. In the event that the Settlement Administrator receives, prior to the expiration of the Claim Period, an FLSA Claim Form for a Cash Payment from a Class Member that is not

Properly Completed, the Settlement Administrator shall immediately email a copy of that FLSA Claim Form to both Class Counsel and to Defense Counsel, who shall be required to cooperate in order to determine whether enough information has been provided, or can be provided, to render the Claim Form a Valid Claim for a Cash Payment. If additional information is needed, the Settlement Administrator shall immediately request the same from the Class Member. Nevertheless, unless Class Counsel and Defense Counsel jointly conclude, before the expiration of the Claim Period, that the Class Member has provided sufficient information to have the document constitute a Properly Completed FLSA Claim Form, or the Settlement Administrator receives additional information so as to permit the document to constitute a Valid Claim for a Cash Payment, the FLSA Claim Form shall be deemed invalid for all purposes hereunder and such Class Member shall not be entitled to a Cash Payment.

120. At the end of the Claim Period, the Settlement Administrator shall furnish to Class Counsel a list of all Cash Payment Claimants who filed a Valid Claim for a Cash Payment and the number of their Performance Months claimed. Defendants, if they choose to contest the number of Performance Months claimed by a particular Cash Payment Claimant, shall request from the applicable Nightclub(s) a statement of the number of Performance Months reflected in the Nightclub's records to enable a determination to be made of the amount of the Net Cash Payment Settlement Fund to which the Cash Payment Claimant may be entitled, along with a print out of the supporting data upon which the Nightclub(s) rely. The Nightclub(s) shall furnish its (their) records to the Settlement Administrator within a maximum thirty (30) days of receiving the Class Member's claim information from the Settlement Administrator. The Settlement Administrator will thereafter be empowered to make a determination based on the record of the total number of disputed Performance Months.

121. The Settlement Administrator shall disburse Cash Payments for Valid Claims for Cash Payments by direct payment by check via first-class mail. For those Cash Payments for which the Settlement Administrator attempts payment by check but such check is returned as undeliverable, the Settlement Administrator shall make a diligent effort to obtain updated mailing addresses and attempt a second disbursement if the Cash Payment is greater than two hundred

dollars ($200.00). Likewise, the Settlement Administrator shall engage in reasonable follow-up for any Cash Payment Claimants who have submitted Claim Forms that are not Properly Completed.

122. Cash Payment Claimants and Dance Fee Payment Claimants acknowledge and agree that neither Cash Payments nor Dance Fee Payments constitute "wages" within the meaning of § 3111(a) of the Internal Revenue Code, any other applicable provisions therein, or any applicable state tax or revenue code. Cash Payment Claimants and Dance Fee Payment Claimants shall be solely responsible for the timely payment in full of all federal, state, and municipal income taxes owed on the Cash Payments or Dance Fee Payments. The FLSA Claim Form shall require Cash Payment Claimants and Dance Fee Payment Claimants to acknowledge: (i) that she understands that obtaining a Cash Payment or Dance Fee Payment may constitute a taxable event and that if the Settlement Administrator or Consolidated Bookkeeping, Inc., as appropriate, deems it required under the Internal Revenue Code, it will issue Form 1099-MISC's to such Cash Payment Claimant or Dance Fee Payment Claimant; and (ii) she is not receiving any tax advice from Class Counsel, Defense Counsel or Defendants. Neither Party has made any representation to the other Party as to the taxability or tax implications of any Cash Payments, Dance Fee Payments, or other payments pursuant to this Agreement.

123. Any checks issued to Cash Payment Claimants shall remain valid and negotiable for sixty (60) days from the date of their mailing. Within seven (7) business days of the conclusion of the 60-day check cashing period, the Settlement Administrator shall inform the Parties regarding the status of any uncashed checks, including the amount, and the identity of the corresponding Cash Payment Claimant with an uncashed check.

## VI. <u>PLAN OF ALLOCATION AND DISBURSEMENT OF DANCE FEE PAYMENTS</u>

124. <u>Dance Fee Payment Pool</u>: Dance Fee Payments may be obtained by a Dance Fee Payment Claimant only at a Nightclub where she has a current Dancer Contract.

125. Dance Fee Payment Claimants shall be entitled to retain 100% of the Dance Fees generated by their sales of entertainment services, rather than the stated contract division set forth in the applicable Dancer Contract, on Dates of Performance during the Dance Fee Payment

Redemption Period selected by the Dance Fee Payment Claimant, until the Dance Fee Claimant's Dance Fee Payment amount, as determined by the Settlement Administrator, is satisfied. The Dance Fee Payment Pool will be made available to Dance Fee Payment Claimants on a *pro rata* basis based on the number of Dance Fee Payment Claimants at each Nightclub, but will not exceed $5,000.00 per Dance Fee Payment Claimant at the Nightclub where the Dance Fee Payment Claimant primarily performs and will not exceed $3,000.00 per Dance Fee Payment Claimant at one secondary Nightclub where the Dance Fee Payment Claimant also performs.

126. To redeem Dance Fee Payments, a Dance Fee Payment Claimant must schedule a Date of Performance during the Dance Fee Redemption Period at either her Primary or Secondary Nightclub and notify the Nightclub of her intent to retain her Dance Fee Payment at least three (3) business days before she desires to Perform and retain 100% of her Dance Fees in order to allow the Nightclub time to confirm the Dance Fee Payment Claimant's entitlement to such Dance Fee Payment, that she has Dance Fee Payments remaining, and the existence of a valid Dancer Contract between the Dance Fee Payment Claimant and the Nightclub. The Dance Fee Payment Claimant may continue to schedule Dates of Performance during which she retains 100% of her Dance Fees pursuant to the procedure described above until she has retained in the aggregate all the Dance Fee Payments to which the Settlement Administrator has determined she is entitled, or until the expiration of the Dance Fee Payment Redemption Period, whichever occurs first.

127. Regardless of whether a Dance Fee Payment Claimant has fully obtained and exhausted the Dance Fee Payments to which she was entitled under this Agreement, her ability to redeem Dance Fee Payments shall terminate at the expiration of the Dance Fee Redemption Period.

128. <u>Residual Dance Fee Payment Pool</u>: To make a claim to the Residual Dance Fee Payment Pool, the Settlement Class Member must submit to the Nightclub a Properly Completed Residual Dance Fee Payment Claim Form, which shall require the Settlement Class Member to acknowledge that during the Claim Period she did not submit an FLSA Claim Form for a Cash Payment or Dance Fee Payment pursuant to the Settlement Agreement.

129. A Settlement Class Member electing to obtain a Residual Dance Fee Payment is

required to schedule a Date of Performance at a Nightclub where she has a current Dancer Contract and notify the Nightclub of her intent to retain her Dance Fees at least three (3) business days before she desires to Perform and obtain 100% of her Dance Fees in order to allow the Nightclub time to confirm the Settlement Class Member's entitlement to such Residual Dance Fee Payment, that the Residual Dance Fee Payment Pool has not been exhausted, and the existence of a valid Dancer Contract between the Settlement Class Member and the Nightclub.

130. Residual Dance Fee Payment Claimants shall be entitled to retain 100% of the Dance Fees generated by their sales of entertainment services, rather than the stated contract division set forth in the applicable Dancer Contract, on two Dates of Performance selected by the Residual Dance Fee Payment Claimant.

131. Regardless of whether the Settlement Class Members have fully obtained and exhausted the Residual Dance Fee Payment Pool(s), if any, under this Agreement, the ability of Settlement Class Members to obtain Residual Dance Fee Payments shall terminate at the expiration of the Dance Fee Payment Redemption Period.

132. Each Nightclub's obligation to provide Residual Dance Fee Payments shall be satisfied if the Residual Dance Fee Payment Pool at that Nightclub is exhausted.

133. A Settlement Class Member who desires to Perform at a Nightclub in order to obtain a Residual Dance Fee Payment must either be a party to a current Dancer Contract or execute a Dancer Contract prior to Performing and receiving a Residual Dance Fee Payment.

134. Throughout the Dance Fee Payment Redemption Period, Class Counsel shall be provided reasonable access to data and records used to determine any Settlement Class Member's eligibility to obtain Dance Fee Payments or Residual Dance Fee Payments, the amount of individual Dance Fee Payments or Residual Dance Fee Payments obtained and remaining, and the total amount of the Dance Fee Payment Pool or Residual Dance Fee Payment Pool used and remaining.

135. The accounting for, and administration of, the Dance Fee Payment Pool and Residual Dance Fee Payment Pool shall be performed by Consolidated Bookkeeping and Management Services, Inc., a full service payroll and tax service accounting firm located at 2341

Eastlake Avenue East in Seattle, Washington. Defendants shall pay Consolidated Bookkeeping and Management Services, Inc. for charges for work relating to the Dance Fee Payment Pool and Residual Dance Fee Payment Pool. The Settlement Administrator shall determine the proper allocation of the Dance Fee Payment Pool among Dance Fee Payment Claimants. Thereafter, the Settlement Administrator shall have no further obligations or duties related to the accounting for, administration of, allocation of, or payment through, the Dance Fee Payment Pool or Residual Dance Fee Payment Pool.

## VII. DEFENDANTS' CHANGED BUSINESS PRACTICES

136. Enhanced Offer of Employee Status. Following the Judgment becoming Final, each Entertainer who continues to perform at a Nightclub, and each Person who applies to be able to Perform as an Entertainer at a Nightclub ("Entertainer Applicant"), shall be offered the opportunity to Perform either as an employee of the Nightclub or as an Independent Professional Entertainer ("IPE") under the terms set forth in this Agreement.

137. The Plaintiffs, Class Counsel, and Defense Counsel all acknowledge that employees may not waive or contract away their rights under applicable labor laws (except as may be specifically permitted therein), including but not limited to those set forth in the FLSA, the California Labor Code, or other applicable law, and that workers who meet the legal standard for employment status may not contract to work under a business arrangement or structure that does not provide for the legal protections and benefits to which employees are otherwise entitled. The purpose of offering Entertainers the opportunity to perform at the Nightclubs either as employees or as IPEs is not to circumvent or negate those legal principles, but rather to: 1) delineate parameters, as recognized by Class Counsel, Defense Counsel, and the Court, under which Entertainers may lawfully perform in the Nightclubs as other than employees if they so desire; 2) establish legally enforceable rights, as granted through this Agreement and specifically by way of the injunctive relief afforded hereunder, for the protection of such Entertainers who desire to lawfully perform as IPE's so that the Nightclubs do not in the future compromise or impinge upon the independence and control to which such IPEs are entitled under applicable law; and; 3) provide for certain employment benefits -- beyond those as are afforded under statutory

Case 3:14-cv-03616-LB Document 126 Filed 03/09/17 Page 42 of 135

law -- for Entertainers who choose to perform at the Nightclubs as employees.

138. Management staff at the Nightclubs shall take no position as to, and shall not in any manner attempt to influence, the choice that an Entertainer or Entertainer Applicant should make.

139. The Nightclubs shall provide to the Entertainers and Entertainer Applicants an enhanced employment offer, which shall be as follows:

a) The Nightclub will place Entertainers who decide to become employees on its payroll, and pay them an hourly rate of $15.00.

b) Such Entertainers shall be entitled to a commission of 20% on Entertainer's sales of private dances for all sales that exceed $150.00 per Date of Performance.

c) The Nightclub will provide such Entertainers one logo costume per month to wear while Performing.

d) Such Entertainers shall be entitled to all of the rights, benefits and privileges of, and subject to all of the obligations and policies that apply to, all other non-managerial Nightclub employees.

140. Following the Judgment becoming Final, each Nightclub shall provide a document summarizing the terms of the employment offer and the differences between performing at the Nightclub as an employee versus an IPE ("the Selection Document"). The contents of the Selection Document shall be agreed upon by Class Counsel and Defense Counsel, and may be modified by the Defendants without approval from Class Counsel in order to comply with changes of the applicable laws.

141. No Entertainer or Entertainer Applicant shall be required to make a selection before she has had an opportunity to fully review the Selection Document, and before she has been afforded an opportunity to have the Selection Document reviewed by professionals (accountants, attorneys, etc.) of her choice.

142. Nightclub personnel shall not permit an Entertainer or Entertainer Applicant to make a choice on the Selection Document while she is intoxicated, otherwise impaired or in a state of nudity or semi-nudity.

143. Any Entertainer performing as an IPE at any Nightclub shall be entitled, at any time, to notify Nightclub management, in writing, of her desire to terminate her IPE contract and to be hired as an employee. The Nightclub shall, within three business days thereafter, terminate such Entertainer's IPE contract and hire the Entertainer as an employee in accordance with the terms as set forth above.

144. Employee Entertainers shall be at-will employees. Nothing in this Agreement shall preclude any Nightclub from terminating the employment of any Entertainer for any reason not prohibited by law.

145. For Entertainers or Entertainer Applicants who select to perform as IPE's at a Nightclub:

a) The Nightclub shall not control the manner, means, or details of the IPE Entertainers' entertainment services except to ensure: a) compliance with all applicable laws and regulations; b) that no damage to the Nightclub's property occurs; and c) the premises are used in a safe fashion for all those present.

b) The Nightclub shall not be permitted to impose any work schedule upon IPEs in regard to the Dates of Performance during which they appear to Perform (although the Nightclub may require an IPE to provide the Nightclub with the schedule she selects to perform).

c) The Nightclub shall not require IPEs to share tips or pool tips with any employee of the Nightclub.

d) The Nightclub shall not exert control over the clothing and costumes worn by IPEs while performing other than to require that such wearing apparel complies with applicable law.

146. Prior to the Fairness Hearing, Defense Counsel shall create a training video that explains the employee and IPE option for Entertainers and Entertainer Applicants set forth above (the "Training Video"). Prior to use in the Nightclubs, the Training Video shall be reviewed and approved by Class Counsel, and shall be submitted to the Court for review prior to the Fairness Hearing. Each manager employed by a Nightclub, and each Nightclub personnel tasked to engage in Entertainer Applicant onboarding, shall be required to fully review the Training Video. Any person hired as a manager by a Nightclub after the Effective Date, and each person hired by

a Nightclub after the Effective Date whose job responsibilities shall include Entertainer Applicant onboarding, shall be required to review the Training Video prior to engaging in his or her employment duties. Each Nightclub manager and each person hired by a Nightclub whose job responsibilities shall include Entertainer Applicant onboarding shall comply at all times with the provisions of this section and with the contents of the Training Video. The Training Video may be modified from time to time for legal compliance purposes. Prior to use in the Nightclubs, such a revised Training Video shall be reviewed and approved for use by Class Counsel.

147. IPE Guaranteed Average Earnings. The Nightclubs shall also provide to the Entertainers and Entertainer Applicants certain guaranteed average earnings for those Entertainers who select to Perform, or who select to continue to Perform, as IPE's, which shall be as follows:

a) For a period of two years from the Effective Date, Defendants agree to guarantee that such IPE Entertainers earn in Dance Fee payments from the Nightclub(s) at which they are Performing, a minimum of $14.00 per performance hour, such amounts being averaged over each preceding 30 day period (the "Pay Guarantee").

b) To effectuate such Pay Guarantee, the Nightclubs will process "Minimum Pay Guarantee Claim Forms," which shall be submitted by a claiming IPE Entertainer at the end of any month for which she claims payment of any shortfall in the Pay Guarantee.

c) Minimum Pay Guarantee Claim Forms are to be accompanied by the Entertainer's contract pay receipts for the month she is claiming entitlement to a Pay Guarantee.

d) Each Minimum Pay Guarantee Claim Form shall be evaluated by Defendants for accuracy, and on confirmation that the IPE Entertainer did not earn, on average, the amount of the Pay Guarantee during the past calendar month (30 day period), the applicable Nightclub shall pay her for such shortfall within 10 days of her claim.

e) Minimum Pay Guarantee Claim Forms not accompanied by the Entertainer's receipts shall be reimbursed within 30 days of the submission of her Minimum Pay Guarantee Claim Form.

f) By signing a Minimum Pay Guarantee Claim Form, the Entertainer shall acknowledge that she understands that: (i) such payments do not constitute wages paid to her; (ii)

such Pay Guarantee payments constitute a taxable event and that she will be issued a Form 1099-MISC that includes such payments; and (iii) she is not receiving any tax advice from Class Counsel, Defense Counsel or Defendants.

148. In recognition of the fact that the business and regulatory landscape may significantly change over time, the Parties agree that the provisions of the Agreement set forth at Paragraphs 136-147, including all subparagraphs thereof, shall expire upon the earliest of the following two dates: (i) two years after Final Approval; or (ii) the date upon which there are changes to any applicable statute, regulation, or other law that Defendants reasonably believe would require a modification to any of the provisions of the agreement set forth at Paragraphs 134-145, including all subparagraphs thereof, in order to comply with the applicable statute, regulation, or law.

149. Defendants maintain the right to make further changes to their business practices so long as such changes do not materially and adversely undermine the non-monetary terms set forth in Paragraphs 136-147. In addition, Defendants maintain the right to make changes to any of the non-monetary terms set forth in Paragraphs 136-147 if changes to those terms are warranted by a significant change in statutory or common law that is material to the classification of independent contractors or employees.

## VIII. SETTLEMENT NEGOTIATIONS

150. The terms of this Agreement relating to the Fee and Expense Award and Enhancement Payments were not negotiated by the Parties before full agreement was reached as to all other material terms of the proposed Settlement, including, but not limited to, any terms relating to the relief to the Settlement Class. The Parties agree that Plaintiffs may apply to the Court for Enhancement Payments to the Named Plaintiffs and other Settlement Class Members who contributed meaningfully to the litigation of this Action and the Parties further agree that the combined sum of all Enhancement Payments should not exceed $71,000.00 as set forth in Paragraph 112(e) herein. Named Plaintiffs acknowledge and understand that they may receive no Enhancement Payments, and their agreement to the Settlement is not conditioned on the possibility of receiving Enhancement Payments.

151. Class Counsel agrees not to seek a Fee and Expense Award from the Court in excess of twenty-five percent (25%) of the Gross Settlement Value. Defendants agree to pay the amount of Fee and Expense Award (if any) determined by the Court up to a maximum of $1,000,000.00 so long as it is within the limitations as set forth in this Agreement. Subject to approval by the Court, that amount shall be the only compensation paid by Defendants or the Released Parties for attorneys' fees and costs associated with the prosecution and administration of this Action and the consummation of the Settlement. Neither Class Counsel, nor Named Plaintiffs, nor any Settlement Class Member, shall apply to the Court for any payment of attorneys' fees or costs that are in addition to the foregoing. The Parties agree that, over and above the Court-approved Fee and Expense Award, each of the Parties, including all Settlement Class Members, shall bear their own fees and costs, including, but not limited to, those relative to the investigation, filing, prosecution or settlement of this Action; the negotiation, execution, or implementation of this Settlement Agreement; and/or the process of obtaining, administering or challenging a certification order and/or Final Approval of Settlement. If Class Counsel appeals the Court's ruling on their application for a Fee and Expense Award, the ruling of the appellate court (regardless of its substance) shall not constitute a material alteration of a term of this Settlement Agreement. All claims for attorneys' fees and costs or expenses that Class Counsel, Named Plaintiffs, and the Settlement Class Members may possess against Defendants or the Released Parties have been compromised and resolved in this Settlement Agreement and shall not be affected by any appeal that Class Counsel may file.

## IX. DISSEMINATION OF CLASS NOTICE

152. Within five (5) days after the entry of the Preliminary Approval Order, the Defendants shall deposit with the Settlement Administrator the full sum of the Notice and Administration Fund.

153. Within fourteen (14) days after entry of the Preliminary Approval Order, but subject to the Settlement Administrator providing adequate and contractual assurances with respect to confidentiality and data security, Defendants will provide the Settlement Administrator the names and last-known mailing addresses of Class Members that they are able to identify

following a good-faith search. The data provided to the Settlement Administrator will remain confidential and will not be disclosed to anyone, except as required by applicable tax authorities, pursuant to the express written consent of Defendants, or by order of the Court. The data provided under this Section shall be used only for the purpose of administering this Settlement.

154. All Class Members' names and postal mail addresses shall be protected as confidential and not used for purposes other than the providing of the Notice of Settlement of Class Action and administration of this Settlement.

155. The Settlement Administrator shall send a copy of the Notice of Settlement of Class Action by mail to each Class Member, as well as to Class Counsel and Defense Counsel.

156. If any Notice of Settlement of Class Action sent to any Class Member is undeliverable, the Settlement Administrator shall promptly log each such Notice of Settlement of Class Action and provide copies of the log to Class Counsel and Defense Counsel, as requested. If the postal mailing is returned with a forwarding address, the Settlement Administrator shall forward the postal mailing to that address. For any remaining returned postal mailings, the Settlement Administrator shall make a further search of the NCOA database, and postal mailings shall be forwarded to any new postal mailing address obtained through such a search. In the event that any Notice of Settlement of Class Action is returned as undeliverable after completing the steps specified herein, no further postal mailings shall be required.

157. The Parties agree that the procedures set forth in this Section constitute reasonable and the best practicable notice under the circumstances and an appropriate and sufficient effort to locate current addresses for Class Members such that no additional efforts to do so shall be required.

158. The Settlement Administrator will provide Class Notice by first-class mail (where available) and maintain and manage a content-neutral settlement website, approved by counsel for the Parties, which will contain further information about the Settlement and Cash Payment Claims and Dance Fee Payment Claims processes, including relevant pleadings. The Class Notice shall comply with Federal Rule of Civil Procedure Rule 23 and due process.

159. The Class Notice shall inform Class Members that Cash Payments will be made by

check via first-class mail. The Settlement Administrator shall provide an opportunity for Class Members to submit updated postal mailing addresses.

160. At least twenty-one (21) days before the Fairness Hearing, the Settlement Administrator shall prepare, and shall serve upon Class Counsel and Defense Counsel, a declaration of due diligence and proof of dissemination with regard to the mailing of the Class Notice, its attempts to locate Class Members, its receipt of valid FLSA Claim Forms (indicated by number of Cash Payment Claimants and Dance Fee Payment Claimants), its receipt of valid requests for exclusion from Settlement, and its inability to deliver the Class Notice to certain Class Members due to invalid addresses ("Due Diligence Declaration"). Class Counsel shall be responsible for filing the Due Diligence Declaration with the Court.

161. If the Final Approval Order and Judgment are not entered by the Court, or if they are overturned or modified on appeal or as a result of further proceedings on remand of any appeal with respect to the Settlement, or if the Effective Date otherwise does not occur, the balance of the Notice and Administration Fund which has not been expended pursuant to this Agreement, and the balance of the Escrow Account, including all earned or accrued interest, shall be returned to Defendants within five (5) days after such circumstances become known.

162. If any individual whose name does not appear on the list of Class Members that Defendants provide to the Settlement Administrator (and who has not previously opted out of the Settlement), believes that she is a Settlement Class Member, she shall have the opportunity to dispute her exclusion from the Settlement Class. If an individual believes she is a Settlement Class Member, she must notify the Settlement Administrator within a reasonable amount of time after the first mailing of the Notice of Settlement of Class Action. The Parties shall then meet and confer regarding any such individuals in an attempt to reach an agreement as to whether any such individual should be regarded as a Settlement Class Member. If the Parties so agree, the Settlement Administrator shall mail a Notice of Settlement of Class Action and an FLSA Claim Form to the individual, and treat the individual as a Settlement Class Member for all other purposes. Such an individual will have all of the same rights as any other Settlement Class Member under this Agreement. In the event that the initial disbursement of Cash Payments has

begun (in accordance with this Settlement Agreement) at the time that the Parties agree that such individual should be regarded as a Settlement Class Member and if such individual submits a Valid Claim for a Cash Payment, the Cash Payment to such individual shall be disbursed from the First Tier Cash Pool or, as appropriate, the Second Tier Cash Pool.

## X. RELEASES

163. The Released Claims against each and all of the Released Parties shall be released and dismissed with prejudice and on the merits (without an award of fees or costs to any Party other than as provided in this Agreement) upon entry of the Final Approval Order and Judgment becoming Final, provided that a Dance Fee Payment Claimant's and Cash Payment Claimant's FLSA claims shall be released and dismissed with prejudice on the merits (without an award of fees or costs to any party other than as provided in this Agreement) only if that Dance Fee Payment Claimant's or Cash Payment Claimant's Consent to Join has been filed with the Court (which shall be filed in a manner that is consistent with the privacy protections of the Court's order of January 12, 2015).

164. As of the Effective Date, the Named Plaintiffs, and all Settlement Class Members, individually and on behalf of their heirs, estates, trustees, executors, administrators, representatives, agents, successors, and assigns, and anyone claiming through them, or acting or purporting to act on their behalf or for their benefit, agree to forever release, relinquish, acquit, discharge, hold harmless, and covenant not to sue, each and all of the Released Parties from each and all of the General Released Claims (in the case of General Releasor(s)), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the FLSA Claimants' Released Claims (in the case of the Settlement Class Members receiving Enhancement Payments or who opted in to the Action as FLSA Claimants, Cash Payment Claimants, and Dance Fee Payment Claimants), and by operation of the Judgment becoming Final shall have fully and finally released, relinquished, acquitted and discharged all such Claims against each and all of the Released Parties; and they further agree that they shall not now or hereafter initiate, maintain, or assert any General Released Claims (in the case of General Releasor(s)), any Settlement Class Members' Released Claims (in the case of the Settlement

Class Members), and any FLSA Claimants' Released Claims (in the case of the Settlement Class Members receiving Enhancement Payments or who opted in to the Action as FLSA Claimants, Cash Payment Claimants, and Dance Fee Payment Claimants) against the Released Parties or against any one or group of them in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicating body. Without in any way limiting the scope of the releases described in Paragraphs 62, 63, and 99 (and subparts), or in the remainder of this Section, this release covers, without limitation, any and all claims for attorneys' fees, costs, or disbursements incurred by Class Counsel or any other counsel representing the Named Plaintiffs or Settlement Class Members, or by the Named Plaintiffs or Settlement Class Members, or any of them, in connection with or related in any manner to the Action, the Settlement of the Action, any other action or proceeding, the administration of the Settlement, and/or the Released Claims, except to the extent otherwise specified in the Agreement.

165. As of the Effective Date, the Named Plaintiffs, all Settlement Class Members and all Cash Payment Claimants and Dance Fee Payment Claimants, shall be permanently barred and enjoined from initiating, asserting, or prosecuting against the Released Parties or against any one or group of them, in any federal or state court or before any administrative body, tribunal, arbitration panel, or other adjudicating body, any and all of the General Released Claims (in the case of General Releasor(s)), any Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and any FLSA Claimants' Released Claims (in the case of the Settlement Class Members receiving Enhancement Payments or who opted in to the Action as FLSA Claimants, Cash Payment Claimants, and Dance Fee Payment Claimants), as further provided in Paragraphs 62, 63, and 99 (and subparts).

166. With respect to those Claims that could be asserted under the FLSA, a Dance Fee Payment Claimant's or Cash Payment Claimant's submission of a Valid Claim shall be deemed as that Dance Fee Payment Claimant's or Cash Payment Claimant's Consent to Join. The filing of the FLSA Claim Form with the Court (which shall be filed in a manner that is consistent with the privacy protections of the Court's order of January 12, 2015) shall fully, finally and forever settle and release all such FLSA Claims and matters as of the Effective Date for Dance Fee

Payment Claimants and Cash Payment Claimants.

167. Each General Releasor expressly acknowledges that she is familiar with principles of law such as Section 1542 of the California Civil Code, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

168. Each General Releaseor shall be deemed to have expressly, knowingly, and voluntarily waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits she may otherwise have or have had pursuant to Section 1542 of the California Civil Code and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein. Each General Releasor further acknowledges that she is aware that she may hereafter discover claims presently unknown and unsuspected or facts in addition to or different from those which she now know or believe to be true with respect to matters released herein. Nevertheless, each General Releasor acknowledges that a portion of the General Release Enhancement Payment is for a release with respect to unknown damages and complaints, whether resulting from known injuries and consequences or from unknown injuries or unknown consequences of known or unknown injuries, and states that it is her intention in agreeing to this release to fully, finally, and forever to settle and release all matters and all Claims that exist, may exist (currently or hereafter), or might have existed (whether or not previously or currently asserted in any action or proceeding), constituting the General Released Claims.

169. Each General Releaseor further acknowledges, agrees, and understands that: (i) she has read and understands the terms of this Agreement; (ii) she has been advised in writing to consult with an attorney before executing this Agreement; (iii) she has obtained and considered such legal counsel as he deems necessary; (iv) she has been given twenty-one (21) days to consider whether or not to enter into this Agreement (although she may elect not to use the full 21 day period at his/her option).

170. Each General Releasor further acknowledges, agrees, and understands that she is expressly, knowingly, and voluntarily waiving and relinquishing, to the fullest extent permitted

by law, all rights or claims arising under the Age Discrimination in Employment Act of 1967. Each General Releasor may each revoke her acceptance of the General Release Enhancement Payment in consideration for the General Released Claims within seven (7) days after the date she signs the General Release Form. Any revocation must be in writing and sent to, and received by, Defense Counsel.

171. Subject to Court approval, the Named Plaintiffs and all Settlement Class Members shall be bound by this Settlement Agreement, and all of their Claims, except for those specifically preserved herein, shall be dismissed with prejudice and fully and forever released, even if such Persons never received actual notice of the Action or this Settlement.

## XI. ADMINISTRATION OF THE NOTICE AND ADMINISTRATION FUND AND ESCROW ACCOUNT

172. The Settlement Administrator or its authorized agents, in consultation with the Parties and subject to the supervision, direction, and approval of the Court, shall administer and identify Cash Payment Claims submitted by Settlement Class Members, and shall calculate the allocation, and oversee the distribution, of such Cash Payment Claims to Cash Payment Claimants.

173. The Notice and Administration Fund and funds deposited in the Escrow Account shall be applied as follows:

a) to pay the Settlement Administrator for all costs and expenses incurred in connection with the preparation of and the providing of Class Notice to Class Members, processing FLSA Claim Forms and any objections, challenges, and requests for exclusion, administering and distributing the Cash Payments to the Cash Payment Claimants;

b) to pay Cash Payment Claims;

c) subject to the approval and further order(s) of the Court, and according to the terms provided in Paragraph 112(e), to pay Enhancement Payments;

d) subject to the approval and further order(s) of the Court, and according to the terms provided in Paragraph 112(f), to pay the PAGA Payment;

e) subject to the approval and further order(s) of the Court, and according to the

terms of Paragraph 112(g), to pay the Fee and Expense Award as ordered by the Court.

174. Should any amounts from the First Tier Cash Pool remain in the Escrow Account after sixty (60) days following the distribution of the balance of the Cash Payments for the benefit of the Settlement Class, the Settlement Administrator shall direct all such unclaimed funds to be paid to the St. James Infirmary, or if that entity is not approved by the Court, The Impact Fund (a public interest law non-profit organization) or another appropriate recipient as approved by the Court.

175. Class Members who are not on the Opt-Out List approved by the Court shall be subject to and bound by the provisions of the Settlement Agreement, the releases contained herein, and the Judgment with respect to all Settlement Class Members' Released Claims, regardless of whether they seek or obtain any distribution from the First or Second Tier Cash Pools, the Dance Fee Payment Pool, or the Residual Dance Fee Payment Pool.

176. Defendants shall bear no responsibility for the costs, fees, or expenses related to the administration and distribution of the First and Second Tier Cash Pools beyond the funding of the Administrative Costs as set forth in this Agreement. Neither Defendants nor their counsel shall have any responsibility for, interest in, or liability whatsoever with respect to the providing of any notice, the receipt of any FLSA Claim Forms or requests for exclusion from the Settlement, or the processing or administration of Cash Payment Claims, the calculations or disbursements of Cash Payments, or for any losses incurred in connection with any such matters.

177. The Settlement Administrator shall be responsible for issuing copies of IRS Form 1099 for the Named Plaintiffs and for all Settlement Class Members who receive Enhancement Payments or Cash Payments and for whom such form is required.

178. The Settlement Administrator shall be responsible for reporting payment of Enhancement Payments and Cash Payments to all required taxing and other authorities.

179. Neither Defendants nor Plaintiffs nor their respective counsel shall have any liability concerning the appointment of the Settlement Administrator or for any of its actions.

180. Payments from the First and Second Tier Cash Pools, the Dance Fee Payment Pool or the Residual Dance Fee Payment Pool made pursuant to and in the manner set forth herein

shall be deemed conclusive of compliance with this Settlement Agreement as to all Settlement Class Members.

181. No Settlement Class Member shall have any claim or cause of action against the Named Plaintiffs, Class Counsel, or the Settlement Administrator based on distributions made substantially in accordance with this Settlement Agreement and/or orders of the Court. No Settlement Class Member shall have any claim or cause of action against Defendants, or any one or group of them, or their counsel relating to distributions made under this Settlement.

## XII. EFFECT OF DISAPPROVAL, CANCELLATION, OR TERMINATION OF SETTLEMENT AGREEMENT

182. If the Court does not approve the Settlement as set forth in this Agreement, or does not enter the Final Approval Order and Judgment in forms that will be agreed upon by the Parties, or if the Court enters the Judgment and appellate review is sought, and on such review the entry of Judgment is vacated, modified in any way, or reversed, or if the Final Approval Order does not otherwise become Final, then this Settlement Agreement shall be cancelled and terminated and the Parties are released from their obligations under the Agreement, unless all Parties, in their sole discretion within thirty (30) days from the date of such ruling, provide written notice to all other Parties hereto of their intent to proceed with the Settlement under the terms of the Judgment as it may be modified by the Court or any appellate or reviewing court.

183. Defendants shall have the right to withdraw from the Settlement if leave to file the Amended Complaint for Settlement is not granted on the Preliminary Approval Date or if the Amended Complaint for Settlement does not become the operative complaint in the Action promptly thereafter. If Defendants choose, pursuant to their sole and absolute discretion, to exercise this right, they must do so within thirty (30) days of the Preliminary Approval Date, by providing written notice to Class Counsel.

184. Defendants shall also have the right to withdraw from the Settlement if the number of Class Members who attempt to exclude themselves from the Settlement Class equals or exceeds 5% of Class Members. If Defendants choose, in their sole and absolute discretion, to exercise this right, they must do so within fourteen (14) days of receipt of the Settlement

Case 3:14-cv-03616-LB Document 126 Filed 03/09/17 Page 55 of 135

Administrator's Opt-Out List by providing written notice to Class Counsel.

185. In the event that (i) this Settlement does not obtain Final Approval, or (ii) if the terms of Settlement as set forth in this Agreement are materially modified by the Court, or (iii) if The Final Approval of this Settlement and/or the Judgment is overturned, or is materially modified on appeal or by any other reviewing court, or (iv) if the Judgment does not become Final, or (v) if this Settlement Agreement is terminated, cancelled, or fails to become effective for any reason, the following apply:

a) Within five (5) business days after written notice is sent by Class Counsel or Defense Counsel to all Parties hereto and the Settlement Administrator, the Notice and Administration Fund, less any funds paid or expenses incurred but not yet paid, the Settlement Fund, and any other cash deposited by Defendants pursuant to this Agreement shall be refunded to Defendants, including all interest earned or accrued;

b) The Settlement shall be without force and effect upon the rights of the Parties hereto, and none of its terms shall be effective or enforceable, with the exception of this Paragraph 185 and all of its subparagraphs, which shall remain effective and enforceable;

c) The Parties shall be deemed to have reverted *nunc pro tunc* to their respective status as of the date of the filing of this Agreement in the District Court, including with respect to any Court-imposed deadlines;

d) All orders entered in connection with the Settlement, including the approval for filing of the Amended Complaint for Settlement, shall be vacated without prejudice to any Party's position on the issue of class certification, the issue of amending the complaint, or any other issue, in this Action or in any other action, and the Parties shall be restored to their litigation positions existing on the date of execution of this Agreement;

e) All orders certifying the Class for purposes of effecting this Settlement Agreement, and all preliminary and/or final findings regarding the Class certification order, shall be automatically vacated upon notice to the Court, and the Action shall proceed as though the Class had never been certified pursuant to this Agreement and as though such findings had never been made. The Action shall then revert *nunc pro tunc* to the procedural status quo as of the date

of the filing of this Agreement in the District Court. Moreover, Class Counsel shall not refer to or invoke the vacated findings and/or order relating to Class certification in the event the Action continues to be litigated and Defendants contest class certification under Rule 23 of the Federal Rules of Civil Procedure or certification under 29 U.S.C. § 216(b) of the FLSA. Defendants do not agree or consent to certification of any Class for any purpose other than to effectuate the Settlement of the Action; and

f) The Parties shall proceed in all respects as if the Settlement Agreement and related documentation and orders had not been executed, and without prejudice in any way from the negotiation or fact of the Settlement or the terms of the Settlement Agreement. The Settlement Agreement, the Settlement, all documents, orders, and other evidence relating to the Settlement, the fact of their existence, any of their terms, any press release or other statement or report by the Parties or by others concerning the Settlement Agreement or the Settlement, their existence, or their terms, any negotiations, proceedings, acts performed, or documents executed pursuant to or in furtherance of the Settlement Agreement or the Settlement, shall not be offered, received, or construed as evidence of a presumption, concession, or an admission of liability, of the certifiability of a litigation class, or of any misrepresentation or omission in any statement or written document approved or made, or otherwise used by any Person for any purpose whatsoever, in any trial of this Action or in any other action or proceedings. This subparagraph shall be liberally construed to effectuate the broad purpose of exclusion intended;

g) For the purposes of this Paragraph 185 and all of its subparagraphs, “material modifications” to the Settlement include any changes that any Party deems to be unacceptable. However, decisions by the Court to award an Enhancement Payment to an eligible Person below the maximum amount set forth in this Settlement, or to decline to award an Enhancement Payment to an eligible Person entirely, or to award Class Counsel fees and costs below the requested amounts for the same, shall not be considered to be “material modifications.”

## XIII. PROCEDURES FOR REQUESTS FOR EXCLUSION FROM THE SETTLEMENT

186. Class Members (with the exception of the Named Plaintiffs) may exclude themselves from the Settlement. Those who wish to do so (or to “opt-out” of the Settlement)

must submit timely, written requests for exclusion. To be effective, such a request must include the Class Member's name, address, and telephone number; a clear and unequivocal statement that the Class Member wishes to be excluded from the Settlement and that the Class Member understands that he or she is still bound by the release of PAGA Claims upon the issuance of the Final Approval Order and Final Judgment; and the signature of the Class Member or the Legally Authorized Representative of the Class Member. The request must be mailed to the Settlement Administrator at the address provided in the Notice of Settlement of Class Action and must be postmarked no later than the Exclusion/Objection Deadline. The date of the postmark shall be the exclusive means used to determine whether a request for exclusion has been timely submitted. Requests for exclusion must be exercised individually by the Class Member, not as or on behalf of a group, class, or subclass, except that such individual exclusion requests may be submitted by a Class Member's Legally Authorized Representative. All requests for exclusion must be submitted by the requesting Class Member (or her Legally Authorized Representative) even if the Class Member is represented by counsel.

187. The Settlement Administrator shall promptly log each request for exclusion from Settlement that it receives and provide copies of the log and all such requests for exclusion to Class Counsel and Defense Counsel, as requested.

188. The Settlement Administrator shall prepare the Opt-Out List of all Persons who timely and properly requested exclusion from the Settlement and shall, before the Fairness Hearing, submit a declaration to the Court attesting to the accuracy of the Opt-Out List.

189. All Class Members who are not included in the Opt-Out List approved by the Court shall be bound by this Agreement, and all their state law claims (including but not limited to PAGA Claims) shall be dismissed with prejudice and released as provided for herein, even if they never received actual notice of the Action or this proposed Settlement.

190. The Settlement Administrator, in its sole discretion, shall determine whether a request for exclusion from Settlement was timely submitted. The Settlement Administrator's decision shall be final, binding, and non-appealable.

191. The Named Plaintiffs agree not to request exclusion from the Settlement.

192. Class Members may object to or opt out of the Settlement, but may not do both. Any Class Member who submits a timely request for exclusion from Settlement may not file an objection to the Settlement, may not submit a Cash Payment Claim or a Dance Fee Payment Claim, or receive a Cash Payment, Dance Fee Payment, or Residual Dance Fee Payment, and shall be deemed to have waived any and all rights or benefits under this Settlement Agreement.

193. Notwithstanding the submission of a timely request for exclusion from Settlement, Class Members will still be bound by the settlement and release of all PAGA Claims or remedies under the Judgment pursuant to *Arias v. Superior Court*, 46 Cal.4th 969 (2009). Requests for exclusion from Settlement do not apply to PAGA Claims.

194. No later than five (5) business days after the Exclusion/Objection Deadline, the Settlement Administrator shall provide to Class Counsel and Defense Counsel a complete Opt-Out List together with copies of the opt-out requests.

## XIV. PROCEDURES FOR OBJECTIONS

195. Any Class Member who wishes to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement must file with the Court a timely statement of the objection as set forth below.

196. To be timely, the objection must be postmarked and mailed to the Settlement Administrator, and filed with the Court, no later than by the Exclusion/Objection Deadline. The date of the postmark on the return-mailing envelope shall be the exclusive means used to determine whether an objection has been timely submitted.

197. The objection must contain at least the following: (i) the objector's full name, address, telephone, and signature; (ii) a clear reference to the Action; (iii) a statement of the specific legal and factual basis for each objection; and (iv) a statement whether the objecting Person intends to appear at the Fairness Hearing, either in person or through counsel and, if through counsel, a statement identifying that counsel by name, bar number, address, and telephone number. All objections shall be signed by the objecting Settlement Class Member (or her Legally Authorized Representative), even if the Settlement Class Member is represented by counsel.

198. Any Settlement Class Member, any attorney who is representing or assisting a Settlement Class Member in connection with any objection to the Settlement (including, but not limited to, by drafting or preparing papers for an objection on behalf of a Settlement Class Member), or any attorney working for a governmental entity, who wishes to appear in the Action to object to the Settlement must provide to the Settlement Administrator (who shall forward it to Class Counsel and Defense Counsel) and file with the Clerk of the Court a notice of appearance no later than by the Exclusion/Objection Deadline.

199. The right to object to the proposed Settlement must be exercised individually by a Settlement Class Member or his attorney, and not as a member of a group, class, or subclass, except that such individual objections may be submitted by a Settlement Class Member's Legally Authorized Representative.

200. Any Settlement Class Member who does not file a timely notice of intent to object in accordance with this Section XIV shall waive the right to object or to be heard at the Fairness Hearing, and shall be forever barred from making any objection to the proposed Settlement, the Plan of Allocation, the PAGA Payment, the Fee and Expense Award, the Administrative Costs, and the Enhancement Payments. Settlement Class Members who object to the proposed Settlement shall remain Settlement Class Members, and shall be deemed to have voluntarily waived their right to pursue an independent remedy against Defendants and the Released Parties. To the extent any Settlement Class Member objects to the proposed Settlement, and such objection is overruled in whole or in part, such Settlement Class Member will be forever bound by the Final Approval Order and Judgment.

201. In the event that any Person objects to or opposes the Settlement, or attempts to intervene in or otherwise enter the Action, the Parties agree to use their best efforts to cooperate in the defense of the Settlement. Notwithstanding the foregoing, it shall be Class Counsel's sole responsibility to respond to any objections made with respect to any application for the Fee and Expense Award and the Enhancement Payments.

## XV. <u>MISCELLANEOUS PROVISIONS</u>

202. Each Settlement Class Member shall be obligated to obtain her own independent

tax advice concerning the proper income reporting and tax obligations regarding any and all payments and/or other remuneration she receives or obtains pursuant to this Agreement, and shall further assume the responsibility of remitting to the Internal Revenue Service and any other relevant taxing authorities any and all amounts required by law to be paid out of any monies received, or other remuneration obtained, under this Agreement, without any contribution whatsoever from any of the Released Defendants for Class Counsel. Nothing in this Agreement shall be construed as Class Counsel, Defense Counsel, or Defendants providing any advice regarding the payment of taxes for the tax consequences of a Settlement Class Member's participation in any portion of this Agreement.

203. In the event that one or more of the Parties to this Settlement Agreement institutes any legal action, arbitration, or other proceeding against any other Party to enforce the provisions of this Settlement Agreement or to declare rights and/or obligations under this Settlement Agreement, the successful Party or Parties shall be entitled to recover from the unsuccessful Party or Parties reasonable attorneys' fees and costs, including expert witness fees incurred in connection with any enforcement actions.

204. Unless otherwise specifically provided herein, all notices, demands, or other communications given hereunder shall be in writing and shall be deemed to have been duly given as of the third business day after mailing by United States registered or certified mail, return receipt requested, addressed as follows:

To Plaintiffs and the Settlement Class:
Steven G. Tidrick, Esq.
The Tidrick Law Firm
2039 Shattuck Ave., Suite 308
Berkeley, CA 94704

To Defendants:
Douglas J. Melton
Long & Levit, LLP
465 California Street, 5th Floor
San Francisco, CA 94104

205. All of the Exhibits to this Agreement are an integral part of the Settlement and are incorporated by reference as though fully set forth herein.

206. The Parties agree that the recitals herein are contractual in nature and form a material part of this Settlement Agreement.

207. This Settlement Agreement, including its accompanying Exhibits, set forth the entire understanding of the Parties. No change or modification of this Agreement shall be effective unless in writing and signed by Class Counsel and Defense Counsel. No extrinsic evidence or parole evidence shall be used to interpret this Agreement.

208. This Settlement Agreement supersedes all prior negotiations, understandings and agreements among the Parties, and may be amended or modified only by a written instrument signed by counsel for all Parties or the Parties' successors-in-interest.

209. Any and all previous agreements and understandings between or among the Parties regarding the subject matter of this Agreement, whether written or oral, are superseded and hereby revoked by this Settlement Agreement. The Parties expressly agree that the terms and conditions of this Settlement Agreement will control over any other written or oral agreements.

210. The Named Plaintiffs and Class Counsel acknowledge that an adequate factual record has been established that supports the Settlement and, apart from the limited discovery described in the next sentence, hereby waive any right to conduct further discovery to assess or confirm the Settlement. Notwithstanding the prior sentence, the Parties agree to reasonably cooperate with respect to limited confirmatory discovery to be agreed upon related to the last-known addresses of Class Members.

211. Unless otherwise noted, all references to "days" in this Agreement shall be to calendar days. In the event any date or deadline set forth in this Agreement falls on a weekend or federal legal holiday, such date or deadline shall be on the first business day thereafter.

212. The Parties reserve the right, subject to the Court's approval, to make any reasonable extensions of time that might be necessary to carry out any of the provisions of this Agreement. Such extensions must be in writing to be enforceable.

213. This Agreement, the Settlement, the fact of the Settlement's existence, the terms of this Settlement Agreement, any press release or other statement or report by the Parties or by others concerning the Settlement Agreement or the Settlement, and/or any negotiations,

proceedings, acts performed, or documents executed pursuant to or in furtherance of the Settlement Agreement or the Settlement: (i) may not be deemed to be, may not be used as, and do not constitute, an admission or evidence of the validity of any of the Released Claims or of any liability, culpability, negligence or wrongdoing on the part of the Released Parties or any one or group of them; and (ii) may not be deemed to be, may not be used as, and do not constitute, an admission or evidence of any fault, wrongdoing, or omission by the Released Parties, or by any one or group of them, in any trial of the Action or in any other action or proceedings in any court (civil, criminal or otherwise), administrative agency, arbitration forum, or other tribunal.

214. The Released Parties shall have the right to file this Settlement Agreement, the Final Approval Order and the Judgment, and any other documents or evidence relating to the Settlement, in any action or proceeding that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, payment, accord and satisfaction, release, good-faith settlement, judgment bar, reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

215. The Parties to the Agreement agree that the considerations to be paid hereby and the other terms of the Settlement were negotiated at arm's length and in good faith by the Parties, resulted from several in-person mediation sessions before Ninth Circuit Mediator Peter Sherwood, and reflect a settlement that was reached voluntarily based upon adequate information and after consultation with experienced legal counsel.

216. The Named Plaintiffs and Class Counsel have concluded that the Settlement set forth herein constitutes a fair, reasonable, and adequate resolution of the claims and causes of action that the Named Plaintiffs asserted, and will assert pursuant to the Amended Complaint for Settlement, against Defendants, including the claims and causes of action on behalf, and/or for the benefit, of the Settlement Class, and that it promotes the best interests of the Settlement Class.

217. To the extent permitted by law, all agreements made and orders entered during the course of the Action relating to the confidentiality of information shall survive the execution and Final Approval of this Settlement Agreement.

218. The Parties agree that the Plaintiffs and Class Counsel are not required to return

any documents produced by Defendants until the final resolution of the Action, by the Judgment becoming Final. Within sixty (60) days following the Effective Date, Class Counsel shall return to Defendants all documents produced in the Action and all copies thereof, or confirm in writing that all such documents have been destroyed, in a manner consistent with the terms of any applicable protective order in the Action.

219. The waiver by one Party of any breach of this Settlement Agreement by any other Party shall not be deemed a waiver of any other prior or subsequent breach of this Settlement Agreement.

220. This Settlement Agreement, including its Exhibits, constitutes the entire agreement among the Parties, and no representations, warranties, or inducements have been made to any Party concerning this Settlement Agreement or its Exhibits, other than the representations, warranties, and covenants contained and memorialized in this Agreement and its Exhibits.

221. This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. The date of execution shall be the latest date on which any Party signs this Agreement.

222. This Settlement Agreement may be signed with a facsimile or .PDF signature and in counterparts, each of which shall constitute a duplicate original.

223. The Parties hereto and their respective counsel agree that they will use their best efforts to obtain all necessary approvals of the Court required by this Agreement.

224. This Settlement Agreement shall be binding upon and shall inure to the benefit of the Parties, the Settlement Class Members, Class Counsel and Defense Counsel, as well as their respective heirs, executors, personal representatives, predecessors and successors in interest, and assigns, including any and all Released Parties and any corporation, partnership, or other entity into or with which any Party hereto may merge, consolidate, or reorganize, each of which is entitled to enforce this Agreement.

225. This Settlement Agreement has been negotiated and drafted by Class Counsel and Defense Counsel. Named Plaintiffs, Settlement Class Members, and Defendants shall not be

deemed to be the drafters of this Agreement or of any particular provision, nor shall they argue that any particular provision should be construed against its drafter or otherwise resort to the *contra proferentem* canon of construction. Accordingly, this Agreement should not be construed in favor of or against one Party as to the drafter, and the Parties agree that the provisions of California Civil Code § 1654 and common law principles of construing ambiguities against the drafter shall have no application. All Parties agree that counsel for the Parties jointly drafted this Settlement Agreement during extensive arm's-length negotiations. No parole or other evidence may be offered to explain, construe, contradict, or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which this Agreement was made or executed.

226. Except where this Agreement itself provides otherwise, all terms, conditions, and Exhibits are material and necessary to this Settlement Agreement and have been relied upon by the Parties in entering into this Agreement.

227. This Agreement shall be governed by federal law. To the extent that federal law does not apply, this Agreement shall be governed by and construed under the laws of the State of California, without regard to choice of law principles. Any action based on this Agreement, or to enforce any of its terms, shall be venued in the United States District Court for the Northern District of California, which shall retain jurisdiction over all such disputes. All Parties to and all Persons bound by this Agreement shall be subject to the jurisdiction of the United States District Court for the Northern District of California for all purposes related to this Agreement.

228. The Court shall retain continuing and exclusive jurisdiction over the Parties to this Agreement for the purpose of the administration and enforcement of its terms.

229. The headings used in this Agreement are inserted merely for the convenience of the reader, and shall not affect the meaning or interpretation of this Settlement Agreement.

230. In construing this Agreement, the use of the singular includes the plural (and vice-versa) and the use of the masculine includes the feminine (and vice-versa).

231. All of the Parties warrant and represent that they are agreeing to the terms of this Agreement based upon the legal advice of their respective attorneys, that they have been afforded the opportunity to discuss the contents of this Agreement with their attorneys, and that they fully

understand and voluntarily accept the terms and conditions of this document.

232. Any disagreement and/or action to enforce this Agreement shall be commenced and maintained only in the United States District Court for the Northern District of California.

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound hereby, have duly executed this Settlement Agreement as of the date set forth below.

Dated: March 8, 2017

JANE ROE 1

By: Roe 1

Dated: March _____, 2017

JANE ROE 3

By: ________________________________

Dated: March _____, 2017

SFBSC MANAGEMENT, LLC

By: ________________________________
Joseph Carouba

Dated: March _____, 2017

SAW ENTERTAINMENT, LTD
(HUSTLER AND CONDOR)

By: ________________________________
Francesco Fusco

Dated: March _____, 2017

BT CALIFORNIA, LLC
(PENTHOUSE)

By: ________________________________
Mark Calcagni

understand and voluntarily accept the terms and conditions of this document.

232. Any disagreement and/or action to enforce this Agreement shall be commenced and maintained only in the United States District Court for the Northern District of California.

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound hereby, have duly executed this Settlement Agreement as of the date set forth below.

Dated: March _____, 2017

JANE ROE 1

By: ______________________________

Dated: March 8, 2017

JANE ROE 3

By: Jane Roe 3

Dated: March _____, 2017

SFBSC MANAGEMENT, LLC

By: ______________________________
Joseph Carouba

Dated: March _____, 2017

SAW ENTERTAINMENT, LTD
(HUSTLER AND CONDOR)

By: ______________________________
Francesco Fusco

Dated: March _____, 2017

BT CALIFORNIA, LLC
(PENTHOUSE)

By: ______________________________
Mark Calcagni

understand and voluntarily accept the terms and conditions of this document.

232. Any disagreement and/or action to enforce this Agreement shall be commenced and maintained only in the United States District Court for the Northern District of California.

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound hereby, have duly executed this Settlement Agreement as of the date set forth below.

Dated: March _____, 2017

JANE ROE 1

By: ______________________________

Dated: March _____, 2017

JANE ROE 3

By: ______________________________

Dated: March 7, 2017

SFBSC MANAGEMENT, LLC

By: ______________________________
Joseph Carouba

Dated: March 7, 2017

SAW ENTERTAINMENT, LTD
(HUSTLER AND CONDOR)

By: ______________________________
Francesco Fusco

Dated: March 7, 2017

BT CALIFORNIA, LLC
(PENTHOUSE)

By: ______________________________
Mark Calcagni

Dated: March 7, 2017

GOLD CLUB-SF, LLC
(GOLD CLUB)

By: ______________________
Craig Bordeau

Dated: March 07, 2017

CHOWDER HOUSE, INC.
(HUNGRY I)

By: ______________________
Harley Hall

Dated: March 07, 2017

SF ROARING 20'S, LLC
(ROARING 20'S)

By: ______________________
Jonathan Morataya

Dated: March 7, 2017

DEJA VU-SAN FRANCISCO, LLC
(CENTERFOLDS)

By: ______________________
Sherry Cooper

Dated: March 7, 2017

DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC
(LITTLE DARLINGS)

By: ______________________
Delando Garrett

Dated: March 7, 2017

SF GARDEN OF EDEN, LLC
(GARDEN OF EDEN)

By: ______________________
George Britton

Dated: March 7, 2017

BIJOU-CENTURY, LLC
(NEW CENTURY)

By: ______________________
Ken Johnson

**APPROVED AS TO FORM AND CONTENT**

Dated: March _____, 2017

LONG & LEVIT LLP

By: /s/ *Douglas J. Melton*
DOUGLAS J. MELTON
Attorneys for Defendant
SFBSC MANAGEMENT, LLC

Dated: March ______, 2017

THE TIDRICK LAW FIRM

By: /s/ *Steven G. Tidrick*
STEVEN G. TIDRICK
Attorneys for Plaintiffs

DOCS\S0301-204\820117.12

# Exhibit A

Case 3:14-cv-03616-LB Document 126 Filed 03/09/17 Page 71 of 135

# Exhibit A

| Nightclubs | Nightclub Entities |
|---|---|
| Chowder House, Inc. | Owner of San Francisco nightclub known as "Hungry I" |
| Déjà Vu San Francisco, LLC | Owner of San Francisco nightclub known as "Centerfolds" |
| SF Roaring 20's, LLC | Owner of San Francisco nightclub known as "Roaring 20's" |
| SF Garden of Eden, LLC | Owner of San Francisco nightclub known as "Garden of Eden" |
| SAW Entertainment, Ltd. | Owner of San Francisco nightclubs known as "Larry Flynt's Hustler Club" and "The Condor Club" |
| Déjà Vu Showgirls of San Francisco, LLC | Owner of San Francisco nightclub known as "Little Darlings" |
| Gold Club-SF, LLC | Owner of San Francisco nightclub known as "Gold Club" |
| Bijou-Century, LLC | Owner of San Francisco nightclub known as "New Century Theater" |
| BT California, LLC | Owner of San Francisco nightclub known as "The Penthouse Club" (formerly known as "Showgirls") |

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOES 1-2, individually and on behalf of all others similarly situated,

Plaintiffs,

Case No. 1:16-cv-10877
Hon. STEPHEN J. MURPHY, III

v.

DÉJÀ VU SERVICES, INC., f/k/a DÉJÀ VU SERVICES, INC., DV SAGINAW, LLC, d/b/a DÉJÀ VU SHOWGIRLS, HARRY MOHNEY, and THE DÉJÀ VU AFFILIATED NIGHTCLUBS IDENTIFIED ON EXHIBIT "A" ATTACHED HERETO, jointly and severally,

Defendants.

---

**RELEASE AND SETTLEMENT AGREEMENT**

## I. INTRODUCTION

1.1 This Release and Settlement Agreement (which, together with all attached exhibits, is referred to collectively herein as the "Agreement") is entered into between Plaintiff Jane Doe 1 (sometimes "Named Plaintiff") and Jane Doe 2 who intends to be added as a party plaintiff and Class Representative[1] to this Action pursuant to the terms of this Agreement, on behalf of themselves and all others similarly situated (the Named Plaintiff, Jane Doe 2 and all others similarly situated are collectively referred to hereafter as the "Plaintiffs"), and Defendants DV Saginaw, LLC (sometimes hereafter "Deja Vu Saginaw"), Deja Vu Services, Inc. (formerly known as Deja Vu Consulting, Inc. and hereafter "Services"), and Harry Mohney ("Mohney"), along with

[1] Capitalized terms and phrases contained in this Introduction and in the Recitals portion of this Agreement are specifically defined in Article III herein or elsewhere in this Agreement.

all of the additional Affiliated Entities identified on Exhibit A attached hereto and incorporated by reference (Deja Vu Saginaw, Services, Mohney, and the Affiliated Entities are collectively referred to in the balance of this Agreement as the "Defendants"). This Agreement settles collective claims – except those specifically reserved herein – brought pursuant to the provisions of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq*. -- the "FLSA") and class action claims under various state labor laws pursuant to Federal Rule of Civil Procedure Rule 23 ("Rule 23"). Upon execution of this Agreement, Final Approval by the Court, and the Judgment becoming Final, it is the express intent of the Parties to resolve all Claims – those specifically reserved herein – which were brought (both initially and by way of the amendment permitted under this Agreement), or which could have been brought, by the Class Representatives, by all "opt in" Class Members who file a Consent to Join this Action, and by all Class Members who have declined to Opt Out of the Settlement as set forth in this Agreement and who therefore constitute the Rule 23 Settlement Class. The Settlement shall become operative upon the date that the Judgment becomes Final, and will then constitute a full, final, and binding settlement agreement.

## II. <u>RECITALS</u>

2.1 On June 25, 2008, an individual identified as Jane Doe 1 (the "Cin-Lan Plaintiff") filed suit in the United States District Court for the Eastern District of Michigan, Southern Division, Case No. 2:08-cv-12719, alleging that she and all Entertainers who Performed at Cin-Lan, Inc. ("Cin-Lan") and/or at eight (8) other identified adult entertainment establishments in Michigan were misclassified as non-employees or as "independent contractors" by their alleged employer, Cin-Lan, and also contending that Deja Vu Consulting, Inc. ("Consulting," now "Services") was their joint employer (the "Cin-Lan Action"). The Cin-Lan Plaintiff claimed that this alleged misclassification resulted in her sustaining certain losses, including not being paid

minimum wages, being subjected to impermissible tip sharing, and not being provided other employee benefits, all of which she contended was actionable under the FLSA and the Michigan Minimum Wage Act ("MWL"). That action was assigned to the Hon. Stephen J. Murphy, III of this Court.

2.2 Mohney was later added as a defendant to the Cin-Lan Action wherein the Cin-Lan Plaintiff alleged that he was her joint employer as well.

2.3 The defendants in the Cin-Lan Action, Cin-Lan, Consulting and Mohney (the "Cin-Lan Defendants"), vigorously contested the joint employer allegations as well as the misclassification claims asserted by the Cin-Lan Plaintiff, and filed Counterclaims against her and against the putative class for, among other things, offset, breach of contract, fraud and unjust enrichment.

2.4 Following comprehensive discovery and the undertaking of extensive motion practice, which resulted in, among other things, this Court refusing to dismiss the Cin-Lan Defendants' counterclaims against the Cin-Lan Plaintiff and the putative class, the parties to the Cin-Lan Action engaged in lengthy settlement negotiations that extended over more than a six (6) month period, in an effort to reach a resolution of the Cin-Lan Action. Such negotiations resulted in extending the scope and resolution of the Cin-Lan Action to include Entertainer Claims against all exotic dance establishments then-affiliated with Consulting (the "Consulting-Affiliated Clubs"), which included Deja Vu Saginaw. That resolution was ultimately approved by the Court (the "Cin-Lan Settlement") in 2011.

2.5 At the time of the settlement negotiations surrounding the Cin-Lan Action, seven (7) substantially similar lawsuits and three (3) state labor claims were pending that all alleged that

Entertainers Performing at certain Consulting-Affiliated Clubs were misclassified as non-employees or as "independent contractors." These comprised:

(1) *Arfat v Deja Vu North Hollywood* (Los Angeles Superior Court, Case No. BC367362), filed March 5, 2007;

(2) *Hills v Deja Vu City of Industry* (Los Angeles Superior Court, Case No. BC 385610), filed February 14, 2008;

(3) *Trauth v Deja Vu City of Industry* (Los Angeles Superior Court, Case No. BC 427315), filed December 4, 2009;

(4) *Doe v Pacers/Hustler San Diego* (San Diego Superior Court, Case No. 37-2009-00097991-CU-OE-CTL), filed September 24, 2009 (dismissed without prejudice);

(5) *Doe v CBDM* (Deja Vu Kearney Villa) (San Diego Superior Court, Case No. 37-2009-00097992-CU-OE-CTL), filed September 24, 2009;

(6) *Doe v Deja Vu Showgirls* (Déjà Vu Midway) (San Diego Superior Court, Case No. 37-2009-00097990-CU-OE-CTL), filed September 24, 2009;

(7) *Blunt v. Deja Vu Showgirls of Las Vegas, LLC*, Case No. A-09-603563-C Dept. 25 Clark County Nevada District Court), filed February 25, 2010;

(8) *Corbin v BT California LLC*, State Case No. 11-39860-CT, California Division of Labor Standards Enforcement ("DLSE"), filed August 9, 2010;

(9) *Corbin v. Gold Club SF, LLC*, State Case No. 11-39859-CT, California Dept. Industrial Relations, Division of Labor Standards Enforcement ("DLSE"), filed August 9, 2010; and

(10) *Handelman v. Gold Club SF, LLC*, State Case No. 11-39926-CT, California Dept. Industrial Relations, Division of Labor Standards Enforcement ("DLSE"), filed August 17, 2010.

These matters and proceedings were all, pursuant to this Court's granting of an All Writs Motion, eventually subsumed into, became a part of, and were resolved by, the Cin-Lan Settlement.

2.6 In seeking to obtain a satisfactory resolution of the Cin-Lan Action, class counsel, the firm of Sommers Schwartz, P.C., and in particular attorney Jason Thompson (sometimes hereafter collectively just "Sommers Schwartz") sought and obtained the input of numerous class

members in regard to the relief that they desired to obtain out of any possible settlement, and did not find at the time any significant desire of such individuals to require, as a condition of such settlement, conversion of Entertainers who Performed at the Consulting-Affiliated Clubs to employees. As a result, the Cin-Lan Settlement, as approved by the Court, did not mandate the conversion of Entertainers who Performed at Consulting-Affiliated Clubs into Club employees.

2.7 As part of the Cin-Lan Settlement, certain injunctive relief was provided therein for the protection of the class members to the Cin-Lan Action.

2.8 In approving the Cin-Lan Settlement, Judge Murphy retained jurisdiction over the administration of that settlement in the Rule 23 Final Approval Order and Judgment of Dismissal.

2.9 On March 10, 2016, the Named Plaintiff (who is *not* the same Jane Doe 1 who initiated the Cin-Lan Action) filed suit in the United States District Court for the Eastern District of Michigan, Southern Division, Case No. 1:16-cv-10877, alleging that she and all other Entertainers who performed at DV Saginaw, LLC, were misclassified as non-employees, or as "independent contractors," by their alleged employer, Deja Vu Saginaw, and asserting that Services and Mohney were joint employers of Entertainers (including the Named Plaintiff) who Performed or Perform at Deja Vu Saginaw (the "Action"). The Action was initially assigned to the Hon. Thomas L. Ludington.

2.10 On March 16, 2016, Plaintiff filed a First Amended Class Action and Collective Action Complaint and Demand for Jury, to purportedly identify the proper defendants.

2.11 Sommers Schwartz, the class counsel approved by the Court in the Cin-Lan Action, also requests to be appointed as co-Class Counsel in this Action, and since the Consulting-Affiliated Clubs in the Cin-Lan Action are, in most respects, the same Clubs subject to this Agreement, they therefore have extensive knowledge in regard to the Claims asserted herein, the

potential counterclaims that the Defendants can and could raise in this Action (or in any ordered arbitration proceeding), and the business operations of the Defendants in general and in specific as they relate to the Entertainers who perform in the Clubs.

2.12 On September 16, 2016, Deja Vu Saginaw, Services and Mohney filed a motion to compel the Named Plaintiff into individualized arbitration and to dismiss or stay the Action. That motion has been fully briefed and is awaiting consideration and resolution by the Court.

2.13 Since approximately August of 2016, Class Counsel and Defense Counsel have been discussing a potential resolution of the Action, and have ultimately negotiated, through extensive and prolonged efforts, the potential expansion of the Action and the ultimate Settlement thereof as contemplated by this Agreement.

2.14 On or about December 28, 2016, the Parties reached a preliminary resolution of the Action through the execution of a "term sheet" that broadly laid out the terms of settlement and that provided for a ninety (90) day period for the Parties to attempt to negotiate a full and complete settlement agreement (which is now memorialized by this Agreement).

2.15 Also on December 28, 2016, the Named Plaintiff filed a Motion to Transfer the Action, Intra-District, to the Hon. Steven J. Murphy, III, as a result of the continuing jurisdiction retained by him over the Cin-Lan Settlement. That motion was granted by order of the Court dated January 4, 2017.

2.16 To date, at least eight (8) substantially similar lawsuits and administrative labor law proceedings, all alleging that Entertainers Performing at one or more of the Clubs were misclassified as non-employees or as "independent contractors," have been filed and/or commenced naming as defendants thereto various entities – including one or more of the Clubs – and individuals (the "Pending Proceedings"). These include:

(a) *Campbell, et al v. Dean Martin Dr. – Las Vegas, LLC, et al*, Case No. A-14-709417-C (District Court Clark County, Nevada);

(b) *Garcia v. Deja Vu Showgirls of Tampa, LC*, et al, Case No. 8:16-cv-01193 (M.D. Fla.);

(c) *Wells v. Showgirls of San Diego* (California PAGA letter submitted);

(d) *Predmore v. Deja Vu Showgirls, et al* (California PAGA letter submitted);

(e) *Wilson v. 59th St LD Oklahoma City LLC*, Case No 5:16-cv-01124 (W.D. Okla.);

(f) *Campbell, et al v. Deja Vu Entertainment Enterprises of Minnesota, Inc.* (District Court Hennepin County, Minnesota);

(g) *Doe v. Deja Vu Consulting, Inc., et al*, Case No. 3:17-cv-00040 (M.D. Tenn.); and

(h) *Doe v. Las Vegas Bistro, LLC, et al*, Case No. 2:17-cv-00205 (D. Nev.).

As used herein, the phrase "Pending Proceedings" shall also refer to any similar labor/employment claims filed, initiated, served upon, or commenced against any of the Defendants prior to the Effective Date.

2.17 Plaintiffs intend to file, in accordance with this Settlement, a Second Amended Class and Collective Action Complaint ("Second Amended Complaint for Settlement") that more fully sets forth the alleged facts, specific legal bases, and nationwide character and scope of the Claims included in the Action and resolved by this Agreement if so approved by the Court.

2.18 Following the Cin-Lan Settlement, the Spearmint Rhino group of gentlemen's clubs (the "Spearmint Rhino Group") settled a national employment misclassification class action lawsuit brought by Entertainers wherein, following the settlement and pursuant to a provision demanded by the federal district court there as a condition of approval, those establishments were

required to convert the Entertainers who performed in the facilities to employees or to "co-owners" (the "Spearmint Rhino Settlement").

2.19 In accordance with the Spearmint Rhino Settlement, the Spearmint Rhino Group converted the Entertainers who performed in those establishments to employees consistent with applicable laws. Nevertheless, a large number of those Entertainers, across the country, ceased performing in those facilities because they did not desire to work as employees subject to the controls and constraints that such a relationship entails. This led to the Spearmint Rhino Clubs then converting the remaining Entertainers into "co-owners" of those establishments.

2.20 Class Counsel have reviewed the business structure created by the "co-owner" arrangement currently used by the Spearmint Rhino Group, and have determined that the Class Members here are better served by the terms negotiated in this Agreement.

2.21 Class Counsel have obtained, through their own investigation and extensive informal discovery provided through Defense Counsel, information regarding Defendants' policies and practices regarding the putative class' activities at the Clubs, the Dancer Contracts or other agreements executed between those establishments and Entertainers, and the number of Class Members who Performed during the Class Period, and currently Perform, at the Clubs.

2.22 In their investigation into the matters pertaining to the Action, Class Counsel have spoken to and otherwise communicated with numerous Entertainers who would be Class Members of this Settlement. Those Entertainers do not currently work at the Clubs under a relationship denominated by the Clubs as one of employment, but rather Perform under a number of different business structures (discussed below) where the Clubs describe them to be Independent Professional Entertainers ("IPE"). As a result of those discussions, Class Counsel have additionally become aware that many Entertainers who perform at the Clubs oppose, for a variety

of legitimate and justifiable reasons, working in the Clubs as employees (including but limited to the fact that they do not desire to be subject to the type of control that the Clubs could exercise over employee-Entertainers; they do not want to be required to meet the financial, time, and performance expectations that would come with working as employees; they prefer the tax benefits of performing as independent business persons; and they want the flexibility of performing as IPE's). Nevertheless, a number of such potential Class Members contend that the Clubs, or at least some of them, have – from time-to-time – infringed upon their contractual and/or legal rights and privileges of performing as IPE's. As a result, they seek from the resolution of this Action not conversion to employee status but, rather, to obtain legal redress, enforceable as injunctive relief through the Court, to preserve, protect and enhance their business arrangements with the Clubs under an appropriate, lawful, and legally binding IPE business structure.

2.23 In light of all of the above, Class Counsel have engaged in extensive arms-length negotiations with Defense Counsel with a view toward achieving substantial benefits for the Class Members and to comprehensively address their divergent interests, expectations and goals, while avoiding the cost, delay and uncertainty of further litigations, trials, and appellate review.

2.24 Since the resolution of the Cin-Lan Action, many Clubs have altered their business operations in regard to the Entertainers who Perform in those facilities beyond what was required by them as a result of the terms of the Cin-Lan Settlement. Whereas at the time of the resolution of the Cin-Lan Action almost all of the Clubs used a business model whereby the Entertainers entered into a Dancer Performance Lease with the Clubs and paid rent to the Clubs for the right to be able to utilize the Club premises for their business activities (the "Lease Model"), a significant number of Clubs now pay the Entertainers directly for their services by way of Form 1099-MISC

payments (the "Independent Contractor Model"), and some Clubs share and allocate certain entertainment revenues with the Entertainers (the "Joint Venture Model").

2.25 Class Counsel have investigated the operation of the Independent Contractor Model and have determined that even if the Entertainers operating thereunder were found to be employees in this Action, the payments made to Entertainers by the Clubs using the Independent Contractor Model may well be found by the Court to constitute wage payments, which could significantly reduce, if not totally abrogate, the minimum wage claims being asserted by Entertainers operating under the Independent Contractor Model. In their investigation of the Independent Contractor Model, Class Counsel have also determined that such method of operation does not appear to suffer from the operational problems noted in the decision of *Hart v. Rick's Cabaret International, Inc.*, 967 F.Supp.2d 901 (S.D. N.Y. 2013), whereby that court rejected the use of IRS Form 1099-MISC payments to offset minimum wage obligations under the FLSA because of the failure there of Rick's Cabaret to track, and issue IRS Form 1099-MISC's on, all mandatory entertainment charges collected by the Entertainers Performing at that establishment.

2.26 In the Cin-Lan Action, the Cin-Lan Defendants had asserted both legal and contractual counterclaims against the Cin-Lan Plaintiff and the putative class there contending, among other things, that the mandatory entertainment charges to customers but collected and retained by the Entertainers, were – in the event that the Entertainers were reclassified to have been employees – the lawful property and income of Cin-Lan, which would then have to be legally returned by the Entertainers to Cin-Lan upon a misclassification finding; with Cin-Lan then being able to use those sums to pay any minimum wages found to be due. These are, in part, the counterclaims that the Court refused to dismiss.

2.27 As part of the proceedings to approve the settlement in the Cin-Lan Action, the Cin-Lan Defendants brought to the attention of the Court a variety of formal rulings from the Internal Revenue Service ("IRS") and the United State Department of Labor ("DOL") that – the Cin-Lan Defendants asserted – supported their position that the mandatory entertainment charges collected from customers by Entertainers were, in fact, "service charges" and not tip income, which could be used, under applicable law, to satisfy any minimum wage obligations found to be due if the Entertainers there were ultimately found to have been the employees of the applicable establishments. Those rulings included FLSA 2005-31, 2005 WL 3308602 (DOL Wage-Hour); WH-305, 1975 WL 40930 (DOL Wage-Hour); WH-386, 1976 WL 41739 (DOL Wage-Hour); Rev. Ruling 77-290; Rev. Ruling 65-282; Rev. Ruling 59-252; Rev. Ruling 58-220; and Rev. Ruling 58-515.

2.28 None of the formal rulings identified in the Section immediately above have been abrogated by the IRS or the DOL since the Cin-Lan Settlement.

2.29 In fact, the Parties, Class Counsel, and Defense Counsel are also aware of the issuance by the IRS, subsequent to the Cin-Lan Settlement, of Rev. Ruling 2012-18 which, the Defendants contend, further supports such a conclusion.

2.30 Class Counsel are aware of a number of court rulings issued subsequent to the Cin-Lan Settlement finding exotic dancers to have been employees and/or finding that a wage "offset" was not available in those circumstances. Class Counsel have reviewed the decisions and, when available, the pleadings in those actions and have not found that any of the respective defendants therein raised, or that the courts decided, the applicability of the formal administrative rulings set forth in the two Sections immediately above or the Supremacy of federal law in this regard over certain state laws that could be construed to the contrary, to the types of Claims asserted by these

Plaintiffs or to the types of counterclaims and affirmative defenses that the Defendants could raise here. Accordingly, the Parties, Class Counsel, and Defense Counsel all acknowledge that there exists in this Action an unresolved legal issue as to whether Class Members operating under the Lease Model or the Joint Venture Model would be entitled to any wages, remuneration, damages or other compensation or penalties, even if they were found to have been employees of the Clubs; the outcome of which remains in significant doubt.

2.31 During the course of the negotiations, and since this Action was filed, Defendants have asserted, and continue to assert, both formally and in discussions with Class Counsel, that they have substantial defenses – predicated in part on the matters set forth above – to the Claims brought by the Plaintiffs. Plaintiffs, for their part, dispute the validity of these defenses. These defenses include, but are not limited, to the following:

2.31.1 The Plaintiffs and each and every one of them, have executed Dancer Contracts that contain legally valid and binding arbitration clauses, which include comprehensive waivers of class and collective action proceedings and that therefore preclude Plaintiffs from proceeding: a) in any forum other than in individualized arbitration; or b) as a Rule 23 class or as a collective under § 216(b) of the FLSA;

2.31.2 Entertainers are properly classified as non-employees because, among other things, they perform if, when, where and for whom they choose; they are not paid by the hour; they are not terminable at will; they control their profits and losses; they must exercise independent initiative in order to successfully engage in their professional occupation; they perform at other businesses; they intended to be independent contractors and/or non-employees; and they specifically rejected to become Club employees when that option was offered to them;

2.31.3 Entertainers specifically fall within the statutory exemptions for professionals;

2.31.4 Defendants' policies and practices with respect to permitting the Entertainers at the Clubs to classify themselves as independent contractors and/or as non-employees are fully lawful and legally enforceable, and comply with industry standards. Moreover, the applicable agreements signed by the Entertainers are clear and unambiguous, and are not unlawful, unfair, deceptive, fraudulent, misleading, wrongful or unenforceable in any way;

2.31.5 Entertainers earn more income as IPE's than they would as employees, and after offset of non-tip service charge monies paid, either directly or indirectly, to the Entertainers, the Entertainers would not be entitled to any compensation, damages or restitution of any kind;

2.31.6 Joint employer liability cannot be imposed upon the Defendants in the circumstances here;

2.31.7 There is substantial case law, federal regulations and formal administrative opinions supporting the legal argument that mandatory dance fees are not "tips," and it is likely that this defense would establish that all Class Members earned far more than minimum wage, exclusive of tips, while Performing at the Clubs; thereby negating any claims for monetary remuneration, damages or other penalties;

2.31.8 A significant number of the Clubs pay the Entertainers through IRS Form 1099-MISC payments, and such payments would fully satisfy any minimum wage obligations found to be due; and

2:16-cv-10877-SJM-PTM Doc # 41-2 Filed 04/28/17 Pg 15 of 98 Pg ID 1140

2.31.9 A finding of "willfulness," and therefore entitlement to liquidated damages or other penalties and an extended statute of limitations, cannot be sustained because, among other things, the Clubs have obtained rulings which hold: a) that classifying Entertainers as independent contractors or as non-employees was both appropriate and "reasonable" under the law; and/or b) that Entertainers were not in fact "employees" under the methods of operation at issue herein.

2.32 As such, Defendants deny each and every one of the Claims that are asserted, that will be asserted by way of the amendment permitted by this Agreement, or that could have been asserted, by the Plaintiffs in the Action, including but not limited to Claims alleging worker misclassification; entitlement to employment wages, benefits, penalties or other remuneration; and the imposition of joint employer liability. Defendants' decision to enter into this Agreement and to conditionally consent to class treatment of Plaintiffs' Claims shall not be construed as any form of admission of liability. Rather, all liability is expressly and specifically denied by each and every one of the Defendants.

2.33 Notwithstanding their differing view on the merits of the various Claims and potential counterclaims in this Action, and in measured consideration of the forgoing and as a consequence of the negotiations between the Parties and of Class Counsels' extensive investigations, analysis, and discovery, the Parties agree to settle the Actions under the terms and conditions memorialized in this Agreement; believing such Settlement to be fair, reasonable, adequate, and in the best interests of the Class and the general public.

**NOW THEREFORE,** in consideration of the foregoing and of the promises and mutual covenants contained herein, and other good and valuable consideration, the adequacy of which is acknowledged, it is hereby agreed by and among the undersigned Parties as follows:

## III. DEFINITIONS

As used in this Settlement Agreement and the attached exhibits, the following words and phrases shall have the meanings specified in this Article. Capitalized words and phrases in such definitions, not previously explained, are further defined herein.

3.1 "Actions" means, collectively, this Action and the Pending Proceedings.

3.2 "Administrative Costs" means the administrative costs of settlement, including but not limited to, preparation and copying of the Class Notice Documents, mailing of the Class Notice Documents, website maintenance, tracking Class Members who have requested exclusion from the Settlement and the consequent preparation of the Opt Out List, tracking of Settlement Class Members who have submitted Cash Pool Claims, Cash Pool Claims' administration, and any other reasonable fees and costs incurred or charged by a jointly approved Settlement Administrator in connection with the execution of its duties under this Agreement.

3.3 "Affiliated Entities" means those business entities that are identified on the attached ***Exhibit A***, which are businesses that currently are, or that at any time during the Class Period were, either: A) parties to an agreement or contract with Services whereby they receive(d) either consulting or management services, or licensing rights, from Services; B) parties to an agreement or contract with Global Licensing, Inc. ("Global"), whereby they receive(d) licensing rights from Global; C) owned, either wholly or in part, and directly or indirectly, by either Mohney or Jason Cash Mohney; or D) tenants of Mohney or Jason Mohney, either directly or indirectly.

3.4 **"**Aggregate Points Allocation" means the combined sum of the Individual Points Allocations.

3.5 "Assessment" means an evaluation by Club management, utilizing the Assessment Criteria as contained within the Entertainer Assessment Form, as defined immediately below, to

determine whether an Entertainer Applicant or an Entertainer qualifies to be able to Perform as a bona fide IPE.

3.6 "Assessment Criteria" means analyzing whether an Entertainer or an Entertainer Applicant qualifies to be able to Perform as a bona fide IPE. To determine whether an Entertainer or an Entertainer Applicant so qualifies, the Parties agree that the Club will conduct a critical analysis as to whether she: A) Has stated a belief in writing that she Performs, or desires to Perform, as an IPE instead of as an employee; B) has rejected an Enhanced Offer of Employment set forth in Section 8.16 herein; C) is self-incorporated or possesses a business license or permit, or other professional or occupational licensure; D) maintains a business address separate and distinct from the Club's address; E) possesses and utilizes business cards; F) advertises her business services through social media, handouts, or other means; G) Performs at exotic dance establishments other than the Club; H) selects the Persons for whom she chooses to Perform, and may freely decline to Perform for any Person; I) presents entertainment Performances requiring invention, imagination, originality or talent as opposed to consisting of routine mental, manual, mechanical or physical work; J) notwithstanding the exercise of control necessary to comply with statutory, regulatory, or contractual obligations, has control and discretion over the means and manner by which her Performances are produced and presented; K) has expended substantial (based upon the amount of income she generates from her Performances) investment of capital in her business; L) possesses the skill of an bona fide professional entertainer; M) possesses significant experience Performing as an IPE; N) does not have set hours of work; O) Performs if, when, and where she chooses -- subject to being required to provide to the Club a schedule at least one week in advance as to when she intends to Perform, to participating in stage promotional rotations, and to Performing a certain number of hours on any Dates of Performance she schedules

herself to Perform; P) does not require instruction for Performing as a professional entertainer; Q) files or intends to file a Schedule "C" in her tax returns and takes tax deductions for business expenses that she would not be lawfully entitled to take as an employee or files or intends to file a "corporate" or Subchapter "S" tax return in regard to the income she generates from the entertainment services she provides or provided at the Club; R) if she has previously Performed at the Club as an IPE and has been obligated to file tax returns after commencing such Performances, neither paid, in accordance with 26 C.F.R. 31.6652(c)-1, a 50% tax penalty for not reporting her tip income to the Club nor provided to the IRS a written statement in the form of a declaration filed under penalty of perjury providing facts establishing reasonable cause for her not having reported such tip income to the Club; and S) derives earnings from her Performances as an Entertainer that support non-employee status. No one of these elements is controlling. A determination must be made based upon the totality of the circumstances, and if a majority of these elements are found to apply, a presumption shall exist that the Entertainer qualifies as a bona fide IPE and may Perform at the Club as such.

3.7 "Assessment Review" means an additional Assessment conducted no later than the sixth month anniversary of when an Entertainer Applicant began to Perform in a Club as an employee in order to determine whether she then qualifies to be able to Perform as a bona fide IPE.

3.8 "Attorney Fee and Expense Award" means such funds that Class Counsel or any other attorney may receive either directly from Defendants, as a portion of the Secondary Pool Remuneration as described in this Agreement, or through an Order of the Court, to compensate them for their time and Litigation Expenses incurred in the Actions and in this Settlement.

3.9 "Bar Date" means the final time and date by which a Cash Election Form must be postmarked to the Settlement Administrator in order for a Class Member to be eligible to receive a Monetary Settlement Benefit in the form of a Cash Payment. The Bar Date shall be specifically identified and set forth in the Preliminary Approval Order and the Class Notice.

3.10 "CAFA Notice" means notice sent by Defendants that complies with the requirements of the Class Action Fairness Act of 2005, 28 U.S.C. § 1711, *et seq*.

3.11 "California Released Claims" means, for Participating Class Members who Performed at a Club located in the State of California during the Class Period:

(a) Any and all Claims pursuant to the California Labor Code, including but not limited to Claims under or pursuant to California Labor Code sections 200-204, 206.5, 207, 208, 210-214, 216, 218, 218.5, 218.6, 221, 222.5, 223, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353, 432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2698 et seq. (PAGA), 2753, 2802, and 2804;

(b) Claims pursuant to California Code of Civil Procedure section 1021.5;

(c) Claims pursuant to California Code of Regulations, Title 8, sections 11010 and 11040;

(d) Claims pursuant to Industrial Welfare Commission Wage Orders;

(e) Claims under California Business and Professions Code sections 17200, *et seq*. and 17500;

(f) All Claims, including common law Claims, arising out of or related to the statutory causes of actions described in this Section 3.11; and

(g) Claims under California common law to recover any alleged tip, expense, or other payment.

3.12 "Cash Election Form" means a form in all material respects identical to ***Exhibit C***, which is to be provided to Class Members and returned to the Settlement Administrator in order for them to become eligible to receive a Cash Payment under this Agreement.

3.13 "Cash Payment" means the amount of money to be paid pursuant to the terms of this Agreement to Participating Class Members who elect to receive their Monetary Settlement Benefit in the form of a one-time cash payment. Although the term "cash" is used, Cash Payments will be paid via check.

3.14 "Cash Pool" means the amount of two million dollars ($2,000,000.00) made available by the Defendants pursuant to the terms of this Agreement to pay: a)Participating Class Members who elect to receive their Monetary Settlement Benefit in the form of a Cash Payment; b) the Enhancement Payments; c) the PAGA Payment; d) 50% of the Administrative Costs; and e) the Direct Attorneys' Fees portion of the Attorney Fee and Expense Award.

3.15 "Cash Pool Claim" means the submission made by a Class Member using the Cash Election Form wherein she requests to receive her Monetary Settlement Benefit under this Agreement in the form of a one-time cash payment.

3.16 "Cash Pool Claimant" means a Class Member who has submitted a Valid Cash Pool Claim.

3.17 "Claim(s)" means, when used alone herein and not as a part of another specifically defined phrase, any and all past, present and future claims, actions, demands, causes of action, suits, debts, obligations, damages, and rights or other assertions of liability or wrongdoing, of any conceivable kind, nature and description whatsoever, whether known or unknown, whether existing or potential, whether fixed or contingent, whether asserted or not, recognized now or hereafter and whether expected or unexpected, pursuant to any theory of recovery and whether at

law, in equity or otherwise, including but not limited to those based in contract, tort, common law, federal, state or local law, statute, ordinance, or regulation, and whether for compensatory, consequential, punitive or exemplary damages, statutory damages, penalties, interest, attorneys' fees, costs, or disbursements (including but not limited to those incurred by Class Counsel or any other counsel representing the Class Representatives or any Settlement Class Members, other than those expressly awarded by the Court in the Attorney Fee and Expense Award authorized by this Agreement), that a Person may have.

3.18 "Class" means the group of Entertainers who, during the Class Period, Performed at one or more of the Clubs, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Nightclub during the Class Period. The Class includes all current and former Entertainers who Performed at any time during the Class Period and up until todays' date at any of the Affiliated Entities listed on ***Exhibit A*** to this Agreement.

3.19 "Class Counsel" means the law firms of Pitt McGehee Palmer & Rivers P.C. and Sommers Schwartz, P.C.

3.20 "Class Member" means any individual who, during the Class Period, has performed as an Entertainer at one or more of the Clubs, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Club during the Class Period.

3.21 "Class Notice" means the proposed notice to putative Class Members which shall conform in all material respects to the document attached as ***Exhibit D***.

3.22 "Class Notice Documents" means the Class Notice and the Cash Election Form.

3.23 "Class Period" means the period commencing (a) for Entertainers who Performed at Deja Vu Saginaw or at any of the Clubs located in the State of Michigan, March 10, 2013; (b) for Entertainers who performed at Clubs located outside of the State of Michigan and who are not a putative class member in any of the Pending Proceedings, the date upon which the statutes of limitations period under their applicable state labor laws began to run prior to March 10, 2016; or (c) for any Entertainers who are a putative class member in any of the Pending Proceedings, the earliest date of the applicable statute of limitations period as tolled by those Pending Proceedings, through the Effective Date of this Agreement.

3.24 "Class Representatives" means the Named Plaintiff, the other Entertainer identified through a pseudonym in the Second Amended Complaint for Settlement that is to be filed in accordance with this Agreement (Jane Doe 2), each of whom has been separately identified to Defense Counsel and whose identities will be filed under seal with the Court, or any other person(s) duly appointed as additional or successor representatives of the Settlement Class.

3.25 "Clubs" means Deja Vu Saginaw and those Affiliated Entities identified on the attached ***Exhibit A*** that present performance dance entertainment to the consenting adult public on their premises.

3.26 "Consent to Join" means a Class Member's consent to join as a party plaintiff to the FLSA Claims asserted in this Action pursuant to 29 U.S.C. § 216(b). A Class Member's signed Cash Election Form that is Properly Completed and Timely Submitted to the Settlement Administrator and a signed Secondary Pool Claim Form that is Properly Completed and Timely Submitted to a Participating Class Member's Qualifying Club shall serve as that Class Member's Consent to Join.

3.27 "Conversation Beverages" means those beverages for sale in a Club that an Entertainer may, if legally permitted, solicit a customer to purchase and consume either herself or together with such customer ("ladies drinks," "bottle service," and the like).

3.28 "Cost of Employment" means those costs and expenses that a Club is legally required to incur when hiring a Person as an employee, which are for such individual, as applicable: the wages paid (whether a full minimum wage or a "tip credited" minimum wage, and including overtime pay if due, but not including the tip credit portion of a tip credited wage or any tips reported or commissions earned by the employee), worker's compensation taxes/premiums, social security and Medicare taxes, unemployment compensation taxes (both federal and/or state), the premiums for any legally required health care coverage or insurance, and the costs of any legally mandated sick or vacation pay.

3.29 "Court" means the United States District Court for the Eastern District of Michigan, Southern Division.

3.30 "Dance Fee" means the mandatory, established, and published price and cost of personal entertainment performances engaged in by Entertainers at the Clubs for, and paid by, customers. "Dance Fee" shall not refer to any "room rental," "VIP Room" fee or other similar location use fee, which is assessed against a patron or customer by a Club and collected directly by club employees.

3.31 "Dance Fee Payment(s)" means the amount of money to be paid pursuant to the terms of this Agreement to Participating Class Members who elect to receive their Monetary Settlement Benefit in the form of the payment of Dance Fees.

3.32 "Dancer Contract" means a contract entered into between an Entertainer and a Club, which permits the Entertainer to Perform, and to engage in personal entertainment performances for remuneration, upon the Club's premises.

3.33 "Dance Fees" means the remuneration paid by customers as the purchase price for personal entertainment Performances engaged in by employee Entertainers (the payment of which is non-discretionary on the part of the customer, and the amounts of which are set by the Club in consultation with the Entertainers and are posted at various places in the Club). Consistent with applicable law, all Dance Fees for employee Entertainers are the lawful property and gross income of the Club. "Dance Fees" do not include any "door" or entrance fees or charges, private room fees/charges, or any tip income generated by the employee Entertainer.

3.34 "Dancer Performance Lease" means a Dancer Contract in the form of a lease agreement where the Entertainer pays a Club that utilizes the Lease Model for the right to be able to use those premises for her Performances.

3.35 "Date of Performance" means the date(s) an Entertainer Performed or Performs pursuant to a Dancer Contract at a Club. For purposes of this definition, one Date of Performance shall include any connected block of time that an Entertainer is on the premises of a Club in order to Perform, regardless of the fact that the Date of Performance extends over more than one calendar day. By way of illustration only, if an Entertainer commences Performing on a Tuesday night at 9:00 p.m., and completes her Performances at 2:00 a.m. on Wednesday morning and then leaves the Club, that period will be considered for purposes of this Agreement to constitute one Date of Performance. If the same Entertainer then returns to a Club on Wednesday evening and again commences Performing (which may carry over to Thursday morning), that will constitute a second Date of Performance.

3.36 "Defense Counsel" means Shafer & Associates, P.C., and Edith A. Thomas and Associates.

3.37 "Direct Attorneys' Fees" means attorneys' fees and Litigation Expenses paid directly by the Defendants to Class Counsel from the Cash Pool to compensate them for their work in obtaining a settlement for the Class pursuant to their Claims under Section 216(b) of the FLSA and Rule 23 state law claims.

3.38 "Effective Date" means seven (7) days after which both of the following events have occurred: (a) the Final Approval Order and Judgement have been entered, and (b) the Judgment has become Final.

3.39 "Election Period" means the time period from the Notice Date through the Bar Date, which is the time period that Class Members will have to submit a Cash Election Form in order to assert a Cash Pool Claim pursuant to this Agreement. The Election Period shall run for a period of time ordered by the Court, and last until at least ninety (90) days from the Notice Date. Any Cash Election Form that is not Properly Completed or is not Timely Submitted shall be deemed invalid.

3.40 "Enhancement Payment" means the amount approved by the Court to be paid to the Class Representatives identified in Section 9.5, in addition to their respective payments under the Plan of Allocation. The Enhancement Payment will have two monetary components. The first will be in recognition of the Class Representative's efforts in coming forward as a Class Representative and her efforts to secure the Settlement in this Action. The second will be as consideration for a full, general, and comprehensive release of that individual's General Released Claims.

3.41 "Entertainer(s)" means Persons who dance, Perform, and/or entertain, or who have danced, Performed or entertained, on the premises of an exotic dance nightclub or "gentlemen's club" (including but not limited to one of the Clubs), but excludes, for those individuals who Perform or who have Performed at a Club, Persons who provide or provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Club.

3.42 "Entertainer Assessment Form" means a questionnaire to be used in the Assessment, incorporating the Assessment Criteria, which shall be approved by Defense Counsel, Class Counsel, and the Court and which shall conform in all material respects to ***Exhibit B***.

3.43 "ERISA" means the Employee Retirement Income Securities Act of 1974, 29 U.S.C. § 1001, *et seq.*

3.44 "Exclusion/Objection Deadline" means the final date, established by and set forth in the Preliminary Approval Order, by which a Class Member may either: (a) object to any aspect of the Settlement pursuant to Section 11.1; or (b) request to be excluded from the Settlement pursuant to Section 11.3.

3.45 "Fairness Hearing" means the hearing that is to take place after the entry of the Preliminary Approval Order and after the Notice Date for purposes of: (a) determining whether the Settlement should be approved as fair, reasonable, and adequate; (b) entering the Final Approval Order and Judgment and dismissing the Action with prejudice; (c) ruling upon an application for Enhancement Payments by the Class Representatives and other individuals; (d) ruling upon an application by Class Counsel for an Attorney Fee and Expense Award; and (e) awarding Enhancement Payments. The Parties shall request that the Court schedule the Fairness Hearing for a date that is in compliance with the provisions of 28 U.S.C. § 1715(d).

3.46 “Final,” when referring to the Judgment or to the Settlement, means that: (a) the Judgment is a final, appealable judgment; and (b) either (i) no appeal has been taken from the Judgment as of the date on which all times to appeal therefrom have expired, or (ii) an appeal or other review proceeding of the Judgment having been commenced, such appeal or other review is finally concluded and no longer is subject to review by any court, whether by way of appeal, petitions for rehearing or re-argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been finally resolved in such manner that affirms the Judgment in its entirety.

3.47 “Final Approval” means formal and written approval of the Settlement by entry of the Final Approval Order and the Judgment by the Court.

3.48 “Final Approval Order” means the order that the Class Representatives and Defendants will seek from the Court, to be agreed upon by the Parties, memorializing the Court’s final approval of the Settlement.

3.49 “FLSA Claims” means any Claims under, or pursuant to, the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.

3.50 “General Released Claims” means any and all Claims by the Class Representative or other Settlement Class Members receiving Enhancement Payments, against the Released Parties, or against any one or group of them (including, for any Class Member who has performed in the State of California during the Class Period, the California Released Claims defined herein and unknown Claims covered by California Civil Code Section 1542 as quoted herein, arising during the period from the beginning of the Class Representatives’ (or other Settlement Class Members receiving Enhancement Payments) first interaction with Defendants to the Effective Date, for any type of relief that can be released as a matter of law, including, without limitation,

Claims for wages, damages, unpaid costs, penalties (including civil and waiting time penalties), retaliatory conduct, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief, with the exception of any Claims which cannot be released as a matter of law. The General Released Claims include, but are not limited to, the Settlement Class Members' Released Claims and the Participating Class Members' Released Claims.

3.51 "General Release Form" means the form the Parties will negotiate and execute, which outlines the Claims being released by the Named Plaintiff and Jane Doe 2. Within seven (7) days of the date on which the Court enters the Final Approval Order, the Class Representatives and other Participating Class Members receiving Enhancement Payments shall each sign and execute a copy of the General Release Form without any deletion or amendment to any language in said form.

3.52 "Gross Monetary Settlement Value" means the aggregate financial benefit conferred on the Settlement Class Members through the Cash Payments, Secondary Pool Remuneration, Enhancement Payments, a portion of the PAGA Payment, all which confer a direct financial benefit on Settlement Class Members, a portion of the PAGA Payment conferred on the California Labor and Workforce Development Agency, together with the Attorney Fee and Expense Award and the Administrative Costs. The Gross Monetary Settlement Value shall not exceed six million five hundred thousand dollars ($6,500,000.00).

3.53 "Indirect Attorneys' Fees" means the Attorneys' Fees Class Counsel shall receive in compensation for the benefit they have obtained on behalf of the Class in the form of the Secondary Pool Remuneration.

3.54 “Individual Points Allocation” means the number of points assigned to each Cash Pool Claimant pursuant to the formula described in Section 6.1.4(a) and used to determine the amount of each Cash Payment.

3.55 “Judgment” means the final judgment to be entered in the Action upon Final Approval of this Settlement and entry of the Final Approval Order, in a form that is approved by and acceptable to all Parties.

3.56 “Legally Authorized Representatives” means an administrator/administratrix, personal representative, or executor/executrix of a deceased Person’s estate; and a guardian, conservator, or next friend of an incapacitated Person; or any other legally appointed Person responsible for handling the business affairs of another Person. All rights and obligations of Class Members, Participating Class Members Settlement Class Members and Class Representatives as set forth in this Agreement extend to their Legally Authorized Representatives as well.

3.57 “Litigation Expenses” includes any expenses incurred by Class Counsel in connection with the prosecution and resolution of this Action and/or in the Pending Proceedings, including all Court-approved litigation costs.

3.58 “Monetary Settlement Benefit” means the amount of direct monetary consideration that a Participating Class Member will receive under this Agreement by way of one of the following: a) Cash Payments; b) Dance Fee Payments; or c) Rent Credits.

3.59 “Net Cash Payment Settlement Fund” means the Cash Pool, less the Direct Attorneys’ Fees portion of the Attorney Fee and Expense Award, and the PAGA Payment.

3.60 “Notice Date” means the date of the initial distribution of the Class Notice to Class Members.

3.61 "Opt Out" means the mechanism for a Class Member to opt out of the Settlement as set forth in Sections 11.3 – 11.5.

3.62 "Opt Out List" means the Court-approved list of all Class Members who timely and properly requested exclusion from the Settlement. The contents of the Opt Out List shall be designated as Confidential Information subject to the terms of a Stipulated Protective Order in the Action, and shall be held in confidence by the Parties pursuant to the terms of that order. The Opt Out List shall not be disclosed through any manner of public filing or other public disclosure.

3.63 "Opt Out Period" means a period of ninety-five (95) days from the entry of the Preliminary Approval Order, within which time a Class Member's request to be excluded from the settlement (the "Opt Out Form") must be signed by the Class Member, mailed to the Settlement Administration, and be postmarked.

3.64 "PAGA" means the California Labor Code Private Attorney General Act of 2004; Cal. Lab. Code § 2698, *et seq*.

3.65 "PAGA Claims" mean all civil penalties sought against the Defendants pursuant to PAGA.

3.66 "PAGA Payment" means the payments made pursuant to Section 5.2.4 of this Agreement to resolve all PAGA Claims.

3.67 "Participating Class Member(s)" means the Class Representatives and all Class Members who elect to receive a Monetary Settlement Benefit through the Cash Pool by submitting a Valid Cash Pool Claim or who elect to receive a Monetary Settlement Benefit through the Secondary Pool by submitting a Valid Secondary Pool Claim.

3.68 "Participating Class Member PAGA Payments" means that portion of the PAGA Payment that is to be distributed, pursuant to the Plan of Allocation, among Participating Class Members who Performed at a Club located in the State of California during the Class Period.

3.69 "Participating Class Members' Released Claims" means the Settlement Class Members' Released Claims together with any and all Claims of whatsoever kind or nature pursuant to the FLSA.

3.70 "Parties" means, collectively, the Class Representatives, Settlement Class Members and Defendants, and "Party" means any one of them.

3.71 "Perform(s)," "Performed," "Performing," and "Performances" means all acts of entertaining, dancing, and/or engaging in entertainment services, and all activities related thereto, at an exotic dance nightclub or "gentlemen's club" (including but not limited to at the Clubs or at any one or group of them).

3.72 "Performance Month" means any month during the Class Period in which a Settlement Class Member had at least one Date of Performance at a Club.

3.73 "Person" means any individual, corporation, partnership, association, affiliate, joint stock company, estate, trust, unincorporated association, entity, government and any political subdivision thereof, or any other type of business or legal entity.

3.74 "Plan of Allocation" means the plan for allocating the Net Cash Payment Settlement Fund, the Secondary Pool, and the Participating Class Member PAGA Payments, between and among Participating Class Members as approved by the Court.

3.75 "Posted Notice" means a notification which is to be posted in the Entertainer dressing room of each Club announcing the existence of the Cash Pool and the Secondary Pool and the ability of Entertainers to seek remuneration therefrom, attached as ***Exhibit E***.

3.76 "Preliminary Approval Date" means the date on which the Court enters the Preliminary Approval Order and thus: (a) preliminarily approves the Settlement, including the Exhibits hereto, and (b) enters an order providing for distribution of the Class Notice to the Class Members, an opportunity to be excluded, or to Opt Out, from the Settlement, and an opportunity to submit timely objections to the Settlement; establishing procedures for submitting Cash Pool Claims and Secondary Pool Claims, and setting the Fairness Hearing.

3.77 "Preliminary Approval Order" means the order that the Class Representatives and Defendants will seek from the Court. Entry of the Preliminary Approval Order shall constitute preliminary approval by the Court of the Settlement as embodied by this Agreement.

3.78 "Properly Complete(d)" in terms of a Cash Election Form and a Secondary Pool Claim Form means a document dated and personally signed by the Settlement Class Member, which provides accurate – to the best of the Participating Class Member's knowledge – answers/responses to all of the information requested in the document.

3.79 "Qualifying Club" means the Club at which the Participating Class Member last Performed prior to entry of the Preliminary Approval Order.

3.80 "Released Claims" shall be construed as broadly as possible to effect complete finality over the Actions and the Claims asserted therein. "Released Claims" include the General Released Claims, the Settlement Class Members' Released Claims, the California Released Claims, and the Participating Class Members' Released Claims. As provided for in this Agreement, the release of any Claims under the FLSA contemplated by this Settlement shall be effectuated only if and after a Class Member has submitted a Valid Cash Pool Claim or a Valid Secondary Pool Claim and thereby has consented to join this Action as party plaintiff to the FLSA Claims asserted therein pursuant to 29 U.S.C. § 216(b).

3.81 "Released Defendants" means Deja Vu Saginaw, Services, Mohney, and each and every one of the Affiliated Entities identified in Exhibit A, together with each and every one of their respective current, former, and future: Owners (either direct or indirect, including but not limited to partners, shareholders, members, parent companies, holding companies, trusts and/or trustees), officers, directors, managers, employees, agents, representatives, non-Entertainer contractors, insurers, reinsurers, attorneys, auditors, accountants, bookkeepers, experts, subsidiaries, affiliates, divisions, licensees, licensors, consultants, heirs, executors, personal representatives, predecessors and successors in interest, and assigns, as well as any benefit plans sponsored or administered by any of the proceeding individuals and entities.

3.82 "Rent" means any amount of money paid or to be paid by a Class Member to a Club under the terms of a Dancer Performance Lease, whether "flat" or payable on a per-dance basis, or a combination of both. The term "Rent," however, shall not refer to any "room rental" or other charge that is assessed against a patron or customer where the total amount, or a portion, of that charge is paid to, and/or retained by, the Clubs.

3.83 "Rent Credit(s)" means the amount of credit a Participating Class Member may obtain, in accordance with the Plan of Allocation, against the Rent to which her Qualifying Club would otherwise be entitled under the terms of her Dancer Performance Lease, as her Monetary Settlement Benefit under this Agreement.

3.84 "Secondary Pool" means the maximum of four million five hundred thousand dollars ($4,500,000.00) made available pursuant to the Plan of Allocation, in the form of Dance Fee Payments and/or Rent Credits to Participating Class Members who decide to receive their Monetary Settlement Benefit in the form of Dance Fee Payments or Rent Credits, as opposed to a Cash Payment.

3.85 "Secondary Pool Claimant" means a Class Member who has elected to receive her Monetary Settlement Benefit in the form of Secondary Pool Remuneration (that being either Dance Fee Payments or Rent Credits) during the Secondary Pool Redemption Period.

3.86 "Secondary Pool Claim" means the election made by a Class Member wherein she requests to receive her Monetary Settlement Benefit under this Agreement in the form of Secondary Pool Remuneration (that being either Dance Fee Payments or Rent Credits) instead of a Cash Payment.

3.87 "Secondary Pool Claim Form" means a form that is to be provided at the Clubs during the Secondary Pool Redemption Period through which Settlement Class Members may make a request to receive their Monetary Settlement Benefit in the form of Secondary Pool Remuneration. The Secondary Pool Claim Form must be returned by a Settlement Class Member to her Qualifying Club, Properly Completed and within the Secondary Pool Redemption Period, in order for that Settlement Class Member to be entitled to obtain Secondary Pool Remuneration.

3.88 "Secondary Pool Remuneration" means, as applicable depending upon whether the Qualifying Club uses the Independent Contractor Model, the Joint Venture Model, or the Lease Model, remuneration in the form of Dance Fee Payments and Rent Credits.

3.89 "Secondary Pool Redemption Period" means the period of one year after the last of: a) the determination by the Settlement Administrator of the identity of Settlement Class Members who have filed Valid Cash Pool Claims; b) the expiration of the Opt Out Period; and c) thirty-one (31) days after the Judgment becoming Final.

3.90 "Settlement" means the compromise and settlement of the Action and of the Pending Proceedings embodied in this Agreement.

3.91 "Settlement Administrator" means an independent settlement administrator mutually agreed upon by the Parties and to be appointed by the Court.

3.92 "Settlement Class" means all Persons who, during the Class Period, have Performed as an Entertainer at one or more of the Clubs pursuant to a Dancer Contract, and who have not timely and properly excluded themselves from the Settlement as provided for in Section 11.3 – 11.5 of this Agreement.

3.93 "Settlement Class Member" means any Class Member who has not timely and properly excluded herself from the Settlement as provided for in Sections 11.3 – 11.5 of this Agreement.

3.94 "Settlement Class Members' Released Claims" means any and all Claims asserted in the Action, or to be asserted in the Action by way of the amendment contemplated in this Agreement, and any and all Claims of any conceivable kind or nature whatsoever that are based on such pleadings or that are reasonably related thereto (except only for those under the FLSA), whether known or unknown, whether fixed or contingent, whether asserted or unasserted, and whether filed or unfiled, at law or in equity or otherwise, and specifically including:

(a) Claims for unpaid wages (including without limitation claims for minimum wage, regular wages, overtime, final wages, calculation of the correct overtime or regular rate, and meal period and rest period premiums), uniform/costume costs and associated cleaning expenses, expense reimbursements, interest, and penalties;

(b) Claims to recover any alleged tip, expense, or other payment;

(c) The California Released Claims;

(d) Claims asserting unfair business practices or violations of similar laws;

(e) Any Claims under the Nation Labor Relations Act, 29 U.S.C. 151 *et seq.*;

(f) Claims asserting any form of retaliation predicated upon a Class Member's assertion that any of the Release Defendants wrongfully terminated her Dancer Contract or right to Perform, or otherwise retaliated against her, after she or any other Person asserted a Claim that she was or that other Entertainers were misclassified as an independent contractor and/or as a non-employee;

(g) Claims for liquidated, punitive, and/or exemplary damages based upon defendants' wage policies and/or their employment classification of Entertainers;

(h) Any other employment, wage, or labor related Claims that could be brought under any statute, regulation, or otherwise against the Released Defendants, or against any one or group of them, that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, any act or omission that occurred during the Class Period and up to the Effective Date, including but not limited to any Claims under any legal or equitable theory as a result of the alleged violation of any state or federal law or regulation, Claims brought pursuant to breach of contract, Claims brought pursuant to common law, Claims of unjust enrichment and/or *quantum meruit*, and any and all Claims pursuant to, or derived from, ERISA that arise, or may arise, from any alleged failure to pay wages, including any Claims for benefits under any benefit plans subject to ERISA;

(i) Claims for attorneys' fees and costs;

(j) All Claims, including common law claims, arising out of or related to the statutory causes of action described herein.

3.95 "Settlement Consideration" means the total and aggregate financial benefit conferred on the Settlement Class Members through the Cash Payments, Secondary Pool

Remuneration, Enhancement Payments, a portion of the PAGA Payment, and changes to the Defendants' business practices, all which confer a direct financial benefit on Settlement Class Members, a portion of the PAGA Payment conferred on the California Labor and Workforce Development Agency, together with the Attorney Fee and Expense Award and the Administrative Costs.

3.96 "Timely Submit(ted)" means, when used in the context of a Cash Election Form, the mailing by a Class Member with a postmark prior to the expiration of the Election Period. In the context of a Secondary Pool Claim Form, "Timely Submitted" means the submission of a Secondary Pool Claim Form by a Class Member to her Qualifying Club within the Secondary Pool Redemption Period.

3.97 "Valid Cash Pool Claim(s)" means a Cash Election Form Properly Completed and Timely Submitted by a Class Member to the Settlement Administrator within the Election Period, demonstrating the Class Member's election to receive her Monetary Settlement Benefit in the form of a Cash Payment.

3.98 "Valid Secondary Pool Claim(s)" means a Secondary Pool Claim Form Properly Completed and Timely Submitted by a Settlement Class Member to her Qualifying Club during the Secondary Pool Redemption Period in order for that Settlement Class Member to be entitled to obtain Secondary Pool Remuneration at her Qualifying Club.

3.99 "Valid Claim(s)" means, collectively, Valid Cash Pool Claims and Valid Secondary Pool Claims.

## IV. SUBMISSION OF THE SETTLEMENT AND THIS AGREEMENT TO THE COURT FOR REVIEW AND APPROVAL, CONDITIONAL CERTIFICATION OF PROPOSED CLASS FOR SETTLEMENT PURPOSES, STAY OF PENDING PROCEEDINGS, AND STIPULATION REGARDING AMENDMENT OF COMPLAINT.

4.1 The Class subject to this Agreement is defined as all current and former Entertainers who Performed at any of the Affiliated Entities listed on Exhibit A to this Agreement from the beginning of the Class Period through the present.

4.2 Promptly upon completing drafting and signing this Release and Settlement Agreement, the Parties shall submit it to the Court for review.

4.3 For purposes of settlement only, the Parties sought and obtained provisional certification of the Class as a collective action pursuant to 29 U.S.C. § 216(b) and as a Rule 23 Class. Each Party agrees that this stipulation shall not be used by any Person for any purpose whatsoever in any legal, administrative, or arbitral proceeding. Such matters may only be submitted in a proceeding to enforce the terms of this Agreement.

4.4 Defendants do not consent to certification of the Class for any purpose other than to effectuate the Settlement of this Action. The Parties acknowledge and agree that Defendants' consent to provisional certification for purposes of this Settlement only does not constitute an admission of wrongdoing, fault, liability, or damage of any kind to the Named Plaintiff or to any of the Class Members, or of the propriety of such Class certification.

4.5 The Parties shall act in good faith to effectuate each and every term of this Agreement to obtain Final Approval of this Agreement (including providing Class Notice under the FLSA and Rule 23(c) and (e)), to take all acts so that the Judgment becomes Final, and to secure a prompt, complete, and final resolution of the Settlement of this Action.

4.6 The parties have obtained a Preliminary Injunction from this Court enjoining all of the Pending Proceedings as listed in Section 2.16 and any other similar types of actions that involve matters and claims subject to this Agreement, pending Final Approval of this Settlement and pending the Judgment becoming Final; enjoining in the future any Claim or action by any

Participating Class Member related to matters settled by this Agreement; and entering a permanent injunction prohibiting such actions in the future. The Court shall retain jurisdiction to enforce the terms of this Agreement, and specifically the provisions of this Section 4.6.

4.7 Class Counsel shall cooperate in moving to stay all Pending Proceedings.

4.8 To the Parties' knowledge, the Pending Proceedings identified in Section 2.16 represent all currently pending Entertainer class/collective action cases or Claims against any Defendant, any Club, any Affiliated Entity, and/or any of the Released Defendants, related to the matters and Claims at issue in the Action (and as may be amended by this Agreement), except for those individual Claims that have been commenced in arbitration or have already (by the time of full execution of this Agreement) been converted to an arbitration proceeding.

4.9 Solely for purposes of implementing this Agreement and effectuating the proposed Settlement, the Parties agree and stipulate that:

a) Named Plaintiff obtained the Court's permission to enter the Second Amended Complaint for Settlement pursuant to Federal Rule of Civil Procedure Rule 15(a)(2). The Parties agree that the filing of the Second Amended Complaint for Settlement will streamline the settlement process and ensure that more money can be paid to Participating Class Members by saving the costs of multiple notice and approval processes. The Parties further agree and stipulate that Defendants may seek an order from the Court establishing that the allegations in the Second Amended Complaint for Settlement are deemed fully controverted by Defendants, and by each and every one of them, such that no further responsive pleading from Defendants is required. If, for any reason, the Settlement and Judgment do not become Final or the Effective Date does not occur, the Second Amended Complaint for Settlement shall be stricken from the record and the operative

complaint in the Action shall revert to the filed First Amended Complaint that preceded the Second Amended Complaint for Settlement, and no prejudice shall occur to the motion to arbitrate previously filed by Deja Vu Saginaw, Services, and Mohney.

b) The Parties requested and obtained a Preliminary Approval Order preliminarily approving the Settlement. Among other things, the Preliminary Approval Order granted leave to file the Second Amended Complaint for Settlement and to preliminarily certify the Class for settlement purposes only; approved the Named Plaintiff and Jane Doe 2 as class representatives; appointed Class Counsel to represent the Settlement Class and appointed the Settlement Administrator; approved the Class Notice, the Posted Notice, and the Class Notice plan embodied in the Agreement, and approved them as consistent with 29 U.S.C. § 201, *et seq.*, Rule 23, and due process; set out the requirements for Class Members to be able to exclude themselves from the Settlement and for Settlement Class Members to object to the terms of the Settlement, all as provided for in this Agreement; provided that certification and all actions associated with certification are undertaken on the condition that the certification and other related actions shall be automatically vacated if this Agreement is terminated or if the Settlement does not become Final, all as provided in this Agreement; preliminarily enjoined all Class Members and their Legally Authorized Representatives, unless and until they submit a timely request for exclusion from the Settlement pursuant to this Agreement, from filing or otherwise participating in any other suit or non-administrative proceeding based on the Released Claims, or from attempting to effect an Opt Out from the Settlement as a group, class, or subclass of individuals; and schedule the Fairness Hearing.

4.10 Any of the Parties, Class Counsel, Defense Counsel, and any person objecting to this Agreement, may file with the Court, as directed by the Court in its Preliminary Approval Order, a written brief setting forth their respective positions regarding the fairness of the Settlement. All submissions to the Court shall comply with the provisions set forth in Federal Rules of Civil Procedure and Local Rules for the Eastern District of Michigan, as well as the dates established by the Court in its Preliminary Approval Order.

4.11 At the Fairness Hearing, the Class Representatives shall request entry of the Final Approval Order and the Judgment, the terms of which shall be agreed upon by the Parties. The entry of the Final Approval Order and the Judgment by the Court is a material condition of the Settlement and of this Agreement, and shall order, among other things, that the Court:

a) finally approves the Settlement as fair, reasonable, and adequate, within the meaning of Rule 23 and due process, and directs its consummation pursuant to the terms of this Agreement;

b) finds that Class Counsel and the Class Representatives adequately represent the Settlement Class for the purpose of entering into and implementing this Agreement;

c) confirms the appointment of the Settlement Administrator and finds that the Settlement Administrator has fulfilled its duties under the Settlement;

d) finds that the Class Notice: (i) constituted the best practicable notice; (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action and their right to exclude themselves from, or object to, the proposed Settlement and to appear at the Fairness Hearing; (iii) was reasonable and constituted due, adequate, and sufficient notice to all Persons entitled to

receive notice; and (iv) met all applicable requirements of Rule 23, due process, and any other applicable rules or law;

e) finds that the CAFA Notice sent by Defendants complied with 28 U.S.C. § 1715 and all other provisions of the Class Action Fairness Act of 2005;

f) approves the Opt-Out List and determines that the Opt-Out List is a complete list of all Class Members who have timely requested exclusion from the Settlement and who, accordingly, shall neither share in nor be bound by the Final Approval Order and Judgment;

g) dismisses the Action on the merits and with prejudice, and without fees or costs except as provided in this Agreement;

h) directs that the Final Approval Order and Judgment shall be final and entered forthwith;

i) without affecting the finality of the Final Approval Order and the Judgment, reserves jurisdiction over the Class Representatives, the Settlement Class, and Defendants as to all matters concerning the administration, consummation, and enforcement of this Agreement, including but not limited to those provisions relating to the extension of injunctive relief into the future as provided for herein;

j) adjudges that, as of the Effective Date, the Class Representatives and all Class Members who have not been excluded from the Settlement as provided in the Opt-Out List approved by the Court, as well as their Legally Authorized Representatives, together with anyone claiming through them or acting or purporting to act for them, in their interest, on their behalf, or for their benefit, regardless of whether they received actual notice of the proposed Settlement, have conclusively compromised, settled, discharged,

and released the General Released Claims (in the case of the Class Representatives and other designated Settlement Class Members who are to receive an Enhancement Payment), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the Participating Class Members' Released Claims (in the case of the Participating Class Members) against the Released Defendants, and are bound by the provisions of this Agreement;

k) declares this Agreement and the Final Approval Order and Judgment to be binding on, and have *res judicata* and preclusive effect in regard to, all pending and future lawsuits or other proceedings: (i) that encompass the General Released Claims and that are maintained by or on behalf of the a Class Representative or other designated Settlement Class Member who is to receive an Enhancement Payment pursuant to this Agreement, or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act for her, in her interest, on her behalf, or for her benefit; (ii) that encompass the Settlement Class Members' Released Claims and that are maintained by or on behalf of any Settlement Class Member, or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act for her, in her interest, on her behalf, or for her benefit, regardless of whether the Settlement Class Member or other such Person previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the Settlement Class Members' Released Claims and even if such Settlement Class Member never received actual notice of the Action or this proposed Settlement; and iii) that encompass the Participating Class Members' Released Claims and that are maintained by or on behalf of any Participating Class Member, or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act

for her, in her interest, on her behalf, or for her benefit, regardless of whether the Participating Class Member previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the Participating Class Members' Released Claims;

l) permanently bars and enjoins the Class Representatives and all other Settlement Class Members from: (i) filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in any other lawsuit or administrative, regulatory, arbitration, or other proceeding in any jurisdiction based on the General Released Claims (in the case of the Class Representatives or other Settlement Class Members who are to receive an Enhancement Payment pursuant to this Agreement), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the Participating Class Members' Released Claims (in the case of the Participating Class Members); and (ii) organizing Settlement Class Members or Participating Class Members into a separate group, class, or subclass for purposes of pursuing, as a purported class action, any lawsuit or administrative, regulatory, arbitration, or other proceeding (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a Pending Proceeding), based on the Settlement Class Members' Released Claims or the Participating Class Members' Released Claims;

m) determines that the Agreement and the Settlement provided for herein, and any proceedings taken pursuant thereto, are not, and should not in any event be offered, received, or construed as evidence of, a presumption, concession, or an admission by any Party of liability or non-liability or of the certifiability or non-certifiability of a litigation class, or of any misrepresentation or omission in any statement or written document

approved or made by any Party; provided, however, that reference may be made to this Agreement and the Settlement provided for herein in such proceedings as may be necessary to effectuate the provisions of this Agreement;

n) orders that the certification of the Class and Final Approval of the proposed Settlement, and all actions associated with them, are undertaken on the condition that they shall be vacated if this Agreement is terminated or disapproved in whole or in part by the Court, or by any appellate court and/or other court of review, or if Defendants invoke the right to withdraw from the Settlement as provided herein, in which event this Agreement and the fact that it was entered into shall not be offered, received, or construed as an admission or as evidence for any purpose, including, but not limited to, an admission by any Party of liability or non-liability or of any misrepresentation or omission in any statement or written document approved or made by any Party, or of the certifiability of a litigation class;

o) authorizes the Parties, without further approval from the Court, to agree to and adopt such amendments, modifications, and expansions of this Agreement, including all Exhibits hereto, as: (i) shall be consistent in all material respects with the Final Approval Order, and (ii) do not limit the rights of Settlement Class Members; and

p) contains such other and further provisions consistent with the terms of this Agreement to which the Parties expressly consent in writing.

4.12 At the Fairness Hearing and as a part of the Final Approval of this Settlement, Class Counsel will also request approval of the Plan of Allocation set forth in Articles VI and VII.

4.13 At the Fairness Hearing, Class Counsel may also request entry of an order approving Class Counsels' application for the Attorney Fee and Expense Award and for

Enhancement Payments to the Class Representatives. In no event shall Defendants otherwise be obligated to pay for any attorneys' fees or expenses or Enhancement Payments. The disposition of Class Counsels' application for an Attorney Fee and Expense Award, and for Enhancement Payments, is within the sound discretion of the Court and is not a material term of the Settlement or of this Agreement, and it is not a condition of this Agreement that such applications be granted or be granted under any particular terms. Any disapproval or modification of such applications by the Court shall not: (a) affect the enforceability of the Settlement Agreement, (b) provide any of the Parties with the right to terminate the Settlement or this Agreement, or (c) impose any obligation on the Defendants to increase the consideration extended in connection with the Settlement.

**V. SETLEMENT CONSIDERATION.**

5.1 Settlement Value. The Gross Monetary Settlement Value is an amount up to six million five hundred thousand dollars ($6,550,000.00) consisting of Cash Payments, Secondary Pool Remuneration, Enhancement Payments, the PAGA Payment, the Attorney Fee and Expense Award, and Administration Costs. Under no circumstances shall Defendants be responsible for making payments or other remunerations of any kind, for extending credits in a manner that confers an aggregate financial benefit on the Settlement Class Members, on Class Counsel, on the California Labor and Workforce Development Agency (the "LWDA"), and on the Settlement Administrator, in excess of the Gross Settlement Value. In addition, monetary settlement value is also conferred by the changes to Defendants' business practices set forth in Article VIII that will impart a direct financial benefit on Settlement Class Members. The value of such changes to Defendants' business practices is currently being evaluated by experts retained by both the Plaintiffs and the Defendants.

5.2 Monetary Settlement Consideration. The Cash Payment, Secondary Pool Remuneration, Enhancement Payments, PAGA Payments, Attorney Fee and Expense Award, and Administrative Costs components of the Settlement Consideration shall consist of the following:

5.2.1 Net Cash Payment Settlement Fund: The sum of one million dollars ($1,000,000.00) will be made available by Defendants to provide cash compensation to those Participating Class Members who elect to receive their Monetary Settlement Benefit in the form of a single monetary payment. The sums in the Net Cash Payment Settlement Fund shall be distributed as set forth in Article VI below, to Settlement Class Members who have submitted Valid Cash Pool Claims. The Net Cash Payment Settlement Fund shall also be used to pay the Enhancement Payments (thirty thousand dollars ($30,000.00)) set forth in subsection 5.2.3 below and the Defendants' portion of the Administrative Costs (fifty thousand dollars ($50,000)) set forth in subsection 5.2.6 below.

5.2.2 Secondary Pool Remuneration: Defendants agree to make available Secondary Pool Remuneration during the Secondary Pool Redemption Period to those Participating Class Members who do not participate in the Cash Pool but who appear to perform at, and claim – in accordance with the provisions of Article VII below – Secondary Pool Remuneration from, their Qualifying Club. The total Secondary Pool Remuneration to be made available is four million five hundred thousand dollars ($4,500,000.00). Participating Class Members may redeem Secondary Pool Remuneration in accordance with Article VII below.

5.2.3 Enhancement Payments: Defendants shall pay, out of the Net Cash Payment Settlement Fund, the Enhancement Payments as ordered by the Court in the Final Approval Order. One portion of the Enhancement Payment to each Class Representative

is contingent upon her execution of the General Release Form. Enhancement Payments are payable by the Settlement Administrator twenty-one (21) days after the Effective Date. Enhancement Payments shall be considered non-wage income for which an IRS Form 1099 will be issued by the Defendants as required by law to each of the Class Representatives receiving such a payment.

5.2.4 The PAGA Payment: Defendants shall pay the sum of one hundred thousand dollars ($100,000.00) to resolve all California PAGA Claims. From the PAGA Payment, seventy-five percent (75%), or seventy-five thousand dollars ($75,000.00), shall be paid to the State of California LWDA as civil penalties pursuant to PAGA, and twenty-five percent (25%), or twenty-five thousand dollars ($25,000.00), shall be distributed on a pro rata basis to Cash Pool Claimants who Performed in the State of California during the Class Period and submitted Valid Cash Pool Claims.

5.2.5 Attorney Fee and Expense Award: Defendants shall pay to Class Counsel, in order to compensate them for their work in obtaining the Settlement Consideration as set forth herein, an amount as ordered by the Court in the Final Approval Order, which shall include attorneys' fees, costs, and expenses incurred in connection with the Action, the Pending Proceedings, and this Settlement. Defendants agree not to object to a request for Direct Attorneys' Fees that does not exceed the sum of nine hundred thousand dollars ($900,000.00). Defendants also agree not to object to a request for Indirect Attorneys' Fees that does not exceed three hundred thousand dollars ($300,000.00). Indirect Attorneys' Fees will be paid out of the Secondary Pool, and shall be calculated based on 33.3% of redeemed Secondary Pool Remuneration.

5.2.6 Administrative Costs: Defendants shall pay to the Settlement Administrator 50% of the costs (estimated to be one hundred thousand dollars ($100,000.00)) for administering the Settlement, including, but not limited to, the preparation and copying of Class Notice and Cash Election Form, mailing of the Class Notice Documents, tracking Class Members who have requested exclusion from the Settlement and the consequent preparation of the Opt-Out List, website maintenance, Cash Pool Claims' calculation and administration, and any other reasonable fees and costs incurred or charged by a jointly approved Settlement Administrator in connection with the execution of its duties under this Agreement. In the event that those costs exceed one hundred thousand dollars ($100,000.00), such additional sums shall come out of the Net Cash Payment Settlement Fund.

5.3 Class Member Election: Class Members will be mailed the Class Notice Documents to their last known address as reflected on the most recent Dancer Contract they have executed at the last Club at which they Performed prior to the entry of the Preliminary Approval Order. Class Members who wish to participate in the Cash Pool are required to *opt-in* to the Cash Pool pursuant to the provisions of § 216(b) of the FLSA during the Election Period. Class Members making such an election must Properly Complete and Timely Submit (pursuant to Articles III and V) the Cash Election Form. Those Class Members who do not elect to participate in the Cash Pool and who are Participating Class Members by not having "opted-out" of this Action pursuant to the provisions of Article XI, are eligible to participate in Secondary Pool and to receive Secondary Pool Remuneration as set forth in Article VII below. In no event may a Participating Class Member elect both a Cash Payment and Secondary Pool Remuneration. The Cash Election Form, if Properly Completed and Timely Submitted to the Settlement Administrator as set forth in

Article VI, shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Action pursuant to 29 U.S.C. § 216(b), and shall effect a full and complete release of any and all FLSA Claims asserted in the Actions or that are reasonably related thereto and that could have been brought in the Actions. In the event that the Court does not grant Final Approval of the Settlement, or the Settlement does not become Final, any Consent to Join and release of the FLSA Claims filed on behalf of any Class Member shall be null and void *ab initio*.

**VI. DISBURSEMENT AND PLAN OF ALLOCATION OF CASH PAYMENT**

6.1 Cash Pool Claims: A Class Member who wishes to participate in the Cash Pool shall comply with the following procedures:

6.1.1 Cash Election Form: In order to receive a Cash Payment from the Cash Pool, a Class Member must Properly Complete the Cash Election Form to obtain their Monetary Settlement Benefit in the form of a Cash Payment, and must Timely Submit the Cash Election Form to the Settlement Administrator before the expiration of the Election Period. Class Members who do not Timely Submit a Properly Completed Cash Election Form to the Settlement Administrator (by having the same mailed and postmarked prior to the expiration of the Election Period) will not be entitled to receive a Cash Payment from the Cash Pool.

6.1.2 Cash Election Forms Not Properly Completed. In the event that the Settlement Administrator receives, prior to the expiration of the Election Period, a Cash Election Form from a Class Member that is not Properly Completed, the Settlement Administrator shall immediately e-mail a copy of that Cash Election Form to both Class Counsel and to Defense Counsel, who shall be required to cooperate in order to determine whether enough information has been provided, or can be provided, to render the Cash Election Form a Valid Cash Pool Claim. If additional information is needed, the Settlement Administrator shall immediately request the same from the

Class Member. Unless Class Counsel and Defense Counsel otherwise jointly conclude, before the expiration of the Election Period, that the Class Member provided sufficient information to have the document constitute a Properly Completed Cash Election Form, or the Settlement Administrator receives additional information so as to consider the document to constitute a Valid Cash Pool Claim, the Cash Election Form shall be deemed invalid for all purposes hereunder and such Class Member shall not be entitled to a Cash Payment.

6.1.3 Election Reporting of Cash Pool Claims. Within seven (7) calendar days of the end of the Election Period, the Settlement Administrator shall furnish to Class Counsel, Defense Counsel, and Services a copy of the Valid Cash Pool Claims. Within forty-five (45) calendar days of receiving the Valid Cash Pool Claims, Services shall provide to the Settlement Administrator the first date that the Cash Pool Claimant Performed at any Affiliated Entity within the Class Period, and the number of Performance Months that she Performed at any Affiliated Entity during the Class Period. Services shall maintain the applicable records related to the data furnished to the Settlement Administrator. .

6.1.4 Determination of the Value of Cash Pool Claims: Cash Pool Claimants shall be paid a pro-rata share of the available Cash Pool based on the length of time they Performed at any Affiliated Entity during the Class Period relative to all other Cash Pool Claimants. The pro rata share of the Cash Pool will be determined by the Settlement Administrator based on a formulaic points system, designed by the Parties for ease of administration and recognition of the limits of Defendants' records, in the following manner:

(a) Individual Points Allocation. For each Participating Class Member who has submitted a Valid Cash Pool Claim, the first Date of Performance will be used to determine how many points are allocated to each Cash Pool Claimant, as follows: (1) if the Cash Pool Claimant's

first Date of Performance occurred within six months of the Preliminary Approval Order, she will receive 2 points for each month Performed, up to a maximum of 12 points; (2) if the Cash Pool Claimant Performed more than six months but less than one year before the Preliminary Approval Order, the Cash Pool Claimant will receive an additional 1 point for each added month she Performed, up to 6 additional points; and (3) if the Cash Pool Claimant began to Perform more than one year before the Preliminary Approval Order, she will receive 8 points for each year regardless of the number of additional months she Performed in those years (the "Individual Points Allocation"). Partial months score the same as if full months. The Individual Points Allocation is intended to award higher values to more recently Performed months in consideration for the strength of those Claims, more recent evidence, witness memory, and a longer statute of limitations. The maximum Individual Points Allocation a Cash Pool Claimant can receive is 42 points.

(b) Cash Payments Formula. The formula for determining the Cash Payments is based on the Individual Points Allocation, the Aggregate Points Allocation, and the available Cash Pool. Once each Participating Class Members' Individual Points Allocation is determined, an Aggregate Points Allocation will be determined by adding together the Individual Points Allocation for all Cash Pool Claimants. The total available Cash Pool is then divided by the Aggregate Points Allocation to determine a per-point dollar value, which is then multiplied by each Cash Pool Claimant's Individual Points Allocation to determine her pro rata share of the available Cash Pool. For example, someone whose scored points equate to 1% of the total points scored will receive 1% of the Cash Pool. However, each Cash Pool Claimant will receive twenty-five dollars ($25.00) as a minimum amount, regardless of her actual calculated amount, to the extent the Cash Pool is not already exhausted.

6.1.5 Distribution of the Net Cash Payment Settlement Fund: The Settlement Administrator shall be directed to allocate, and make payments from, the Net Cash Payment Settlement Fund as follows: Upon the determination by the Settlement Administrator of the total amount of Cash Payments to be made pursuant to Section 5.2.1 above, and upon the Judgment becoming Final, the Defendants shall, within fifteen (15) days of the latter thereof, fully fund the Net Cash Payment Settlement Fund by depositing the amount of nine hundred twenty thousand dollars ($920,000.00) into a bank account established for this purpose. Within thirty (30) days after the deposit of that amount, the Settlement Administrator shall make all Cash Payments out of this account to the Cash Pool Claimants.

6.1.6 Tax Considerations of Cash Payment Distributions. The Class Representatives and each Participating Class Member who submits a Valid Cash Pool Claim acknowledge and agree that the Cash Payments made to them pursuant to Sections 5.2.1 do not constitute "wages" within the meaning of § 3111(a) of the Internal Revenue Code, any other applicable provisions therein, or any applicable state tax or revenue code. A Form 1099-MISC shall be issued as required by law, at their sole cost, to each Participating Class Member who selects to receive a Cash Payment reflecting the payments made in accordance with this Agreement, and copies of said forms shall be duly filed with the United States Internal Revenue Service and with the department of revenue and/or taxation of the state in which the Participating Class Member's Qualifying Club is located.

6.1.7 Uncollected Cash Payment Pool Funds: If any uncashed or unpaid funds remain in the Cash Pool, then the remaining amount contained in the Cash Pool bank account shall be paid to a charitable organization. The organization selected by Class Counsel is Girls, Inc., which is an organization dedicated to inspiring girls, through direct service and advocacy, to navigate gender, economic, and social barriers.

6.1.8 Excess Claims: There can be no excess Cash Pool Claims or Cash Payments under the scoring system because Cash Pool Claimants shall share 100% of the available Net Cash Payment Settlement Fund on a pro-rata basis following payment of the Enhancement Payments and the Administrative Costs therefrom.

## VII. DISBURSEMENT AND PLAN OF ALLOCATION OF SECONDARY POOL REMUNERATION

7.1 Plan of Allocation of the Secondary Pool: Secondary Pool Remuneration shall be administered as follows:

7.1.1 Secondary Pool: Defendants will make four million five hundred thousand dollars ($ 4,500,000.00) available for use as Secondary Pool Remuneration that can be obtained by any Settlement Class Member, subject to the terms herein, who does not opt into the Cash Pool. Secondary Pool Remuneration may only be redeemed by Settlement Class Members at their Qualifying Club. .

7.1.2 Application of Secondary Pool Remuneration: Secondary Pool Remuneration shall consist of Rent Credits from Qualifying Clubs using the Lease Model, and Dance Fee Payments from Qualifying Clubs using either the Independent Contractor Model or the Joint Venture Model. Each Class Member who does not Opt Out pursuant to Sections 11.3 - 11.5 below and who does not timely select on the Cash Election Form to receive her Monetary Settlement Benefit in the form of a Cash Payment will be eligible to receive Secondary Pool Remuneration.

7.1.3 Determination of a Participating Class Member's Maximum Secondary Pool Remuneration: Settlement Class Members who do not validly select to receive a Cash Payment shall be entitled to Secondary Pool Remuneration based on the number of months that the Class Member Performed at her Qualifying Club prior to the Effective Date. The

amount of Secondary Pool Remuneration to which a Participating Class Member shall be entitled shall be determined pursuant to the following 3-Tier schedule (the "Secondary Pool Tier"):

(a) TIER I. A maximum amount of two hundred dollars ($200.00) for any Class Member who Performed for a period of at least one (1) Performance Month at her Qualifying Club;

(b) TIER II. A maximum amount of one thousand dollars ($1,000.00) for any Class Member who Performed for a period of between six (6) and eighteen (18) Performance Months at her Qualifying Club; and

(c) TIER III. A maximum amount of two thousand dollars ($2,000.00) for any Class Member who Performed more than eighteen (18) Performance Months at her Qualifying Club.

7.2 Redemption of Secondary Pool Remuneration: Secondary Pool Remuneration may be obtained by a Participating Class Member only at her Qualifying Club. Participating Class Members electing to obtain Secondary Pool Remuneration are required to schedule a Date of Performance at her Qualifying Club and notify that Club of her intent to claim Secondary Pool Remuneration, both at least seven (7) business days before she desires to Perform and to obtain Secondary Pool Remuneration in order to allow Defendants time to confirm the Participating Class Member's entitlement to such Secondary Pool Remuneration (including the fact that she has not made a Cash Pool Claim), her applicable Secondary Pool Tier (if any disputes exist between the Secondary Pool Claimant's assertions and the Club documents, the Club documents shall control), and the existence of a valid Dancer Contract between the Participating Class Member and her Qualifying Club. Prior to obtaining Secondary Pool Remuneration, the Participating Class Member must submit to the Qualifying Club a Properly Completed Secondary Pool Claim Form, which shall, among other things, require the Participating Class Member to attest, to the best of her knowledge, the number of Performance Dates she Performed at that Club during the Class

Period and to acknowledge: (1) that she understands that obtaining Secondary Pool Remuneration may constitute a taxable event and that if Defendants deem it required under the Internal Revenue Code, they will issue Form 1099-MISC's to Participating Class Members receiving Secondary Pool Remuneration; (2) that she is not receiving any tax advice from Class Counsel, Defense Counsel or Defendants, and that she should obtain her own tax advice; (3) that she is releasing all FLSA Claims; and (4) that Class Counsel is receiving 33.3% of redeemed Secondary Pool Remuneration, not to exceed a total of three hundred thousand dollars ($300,000.00), as Indirect Attorneys' Fees. Participating Class Members must personally sign, date and submit the Secondary Pool Claim Form to her Qualifying Club before receiving any Secondary Pool Remuneration, and a copy shall be provided to Modern Bookkeeping, Inc. ("Modern") and Services, to assist it in the administration of the Secondary Pool Remuneration. After the Secondary Pool Redemption Period expires, copies of the Secondary Pool Claim Forms turned in shall be provided to Class Counsel. Secondary Pool Remuneration will be assigned as follows:

a. <u>Rent Credits</u>: Entitle the Participating Class Member to a sixty percent (60%) reduction of the established Rent for any Performance Date the Participating Class Member chooses to Perform at the Qualifying Club during the Secondary Pool Redemption Period, provided she has not exhausted the total amount of her Secondary Pool Remuneration as set forth in Section 7.1.3 and provided that the Secondary Pool has not been exhausted by Secondary Pool Claims. The remaining forty percent (40%) of the established Rent shall be remitted to the Qualifying Club.

b. Dance Fee Payments: Entitle the Participating Class Member to payment of 100% of the Dance Fees that she generates out of her entertainment services, with no allocation of those Dance Fees whatsoever going to the Qualifying Club, provided that the Secondary Pool has not been exhausted by Secondary Pool Claims.

Participating Class Members may only redeem a maximum of one hundred dollars ($100.00) in Secondary Pool Remuneration during any one Date of Performance, and no Qualifying Club shall be required to permit more than five (5) Participating Class Members to obtain Secondary Pool Remuneration on any given Date of Performance (first come/first served).

7.3 Payment of Indirect Attorneys' Fees: In order to obtain Secondary Pool Remuneration, the Participating Class Member shall, subject to the limitations as set forth in Section 7.5, pay to the Qualifying Club thirty-three and one-third percent (33.3%) of the Secondary Pool Remuneration to which she is entitled, which shall be held in trust by the Qualifying Club in order to compensate Class Counsel for their efforts in securing the common fund in the form of the Secondary Pool.

7.4 Exemplar of Application of Secondary Pool Remuneration: By way of example only, if the total Rent for a given Date of Performance is one hundred dollars ($100.00), the Participating Class Member would be entitled to a sixty dollar ($60.00) Rent Credit to be offset against her total Rent Credit (Secondary Pool Remuneration) set forth in Section 7.1.3. While the Participating Class Member is entitled to sixty dollars ($60.00) in Rent Credit, she will pay to the Qualifying Club thirty-three and one-third percent (33.3%; i.e., twenty dollars ($20.00)) of the sixty dollar ($60.00) Rent Credit as Indirect Attorneys' Fees for Class Counsel. The Qualifying Club shall, subject only the limitations as set forth in Section 7.5, collect the Indirect Attorneys'

Fees and forward the same to Modern, which shall accumulate such funds in an escrow account held for Class Counsel's benefit and remit the same to Class Counsel as directed in Section 9.1.3. The remaining forty dollars ($40.00) will be paid to the Qualifying Club as Rent. In other words, the Participating Class Member would pay the Qualifying Club a total of sixty dollar ($60.00), of which it would retain forty dollars ($40.00) as Rent and, subject to the limitations set forth in Section 7.5, deposit twenty dollars ($20.00) in the escrow account as Indirect Attorneys' Fees. Similarly for Dance Fee Payments, for the Dance Fees of which the Participating Class Member is entitled to 100% allocation, she will pay to the Qualifying Club thirty-three and one-third percent (33.3%) as Indirect Attorneys' Fees for Class Counsel. For example, if her entertainment services generate five hundred dollars ($500.00) in Dance Fees on that Date of Performance, she shall pay one hundred sixty-six dollars and sixty-six cents ($166.66) as Indirect Attorneys' Fees for Class Counsel. The Club shall remit the same in the same fashion as do the Clubs using the Lease Model.

7.5 Termination of Collection of Indirect Attorneys' Fees. In the event that the Qualifying Clubs collect, in the aggregate, a total of three hundred thousand dollars ($300,000.00) in Indirect Attorneys' Fees, the obligation of the Participating Class Members redeeming Secondary Pool Remuneration to pay Indirect Attorneys' Fees, and the obligation of the Qualifying Clubs to collect Indirect Attorneys' Fees, shall immediately cease. Thereafter, until the Secondary Pool is extinguished or terminated as provided for herein, Participating Class Members redeeming Secondary Pool Remuneration will receive the full amount of the Rent Credits or Dance Fee Payments to which they are entitled pursuant to this Article, and they will no longer be required to pay 1/3 of their Secondary Pool Remuneration to their Qualifying Club as Indirect Attorneys' Fee.

7.6 Redemption Period for Secondary Pool Remuneration: For those Settlement Class Members who did not select to receive their Monetary Settlement Benefit in the form of a Cash

Payment, they may seek to obtain Secondary Pool Remuneration within the Secondary Pool Redemption Period. The submission of a Secondary Pool Claim Form shall serve as that Settlement Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Action pursuant to 29 U.S.C. § 216(b); shall authorize Class Counsel to file the Consent to Join with the Court; and shall effect a full and complete release of any and all FLSA Claims asserted in the Actions or that are reasonably related thereto and that could have been brought in the Actions. Regardless of whether the Participating Class Members have fully exhausted the Secondary Pool, the Participating Class Members' entitlement to Secondary Pool Remuneration shall terminate at the expiration of the Secondary Pool Redemption Period. Expired Secondary Pool Remuneration shall have no value.

7.7 Exhaustion of Rent Credit Pool: Secondary Pool Remuneration is considered redeemed by a Participating Class Member only after she has Performed a Date of Performance to which she is entitled to Secondary Pool Remuneration. Defendants' obligation to provide Secondary Pool Remuneration shall be satisfied if the aggregate amount of the Secondary Pool is exhausted, regardless of whether all Participating Class Members have redeemed their total Secondary Pool Remuneration.

7.8 Performing at the Clubs: Nothing in this Agreement requires that any Club permit any particular Class Member the right to Perform on its premises. A Participating Class Member who desires to Perform at a Club in order to obtain Secondary Pool Remuneration (which must be at her Qualifying Club) must either be a party to a current Dancer Contract or execute a Dancer Contract prior to Performing and receiving Secondary Pool Remuneration.

7.9 Tax Considerations of Secondary Pool Remuneration: A Participating Class Member electing to obtain Secondary Pool Remuneration through this Agreement must complete

and submit to her Qualifying Club, prior to obtaining Secondary Pool Remuneration, a Secondary Pool Claim Form in which, among other things, she acknowledges and agrees that such Secondary Pool Remuneration does not constitute “wages” within the meaning of § 3111(a) of the Internal Revenue Code, any other applicable provisions therein, or any applicable state tax or revenue code. Defendants may seek advice from their accountants as to whether Forms 1099-MISC should be issued by them to each Participating Class Member who receives Secondary Pool Remuneration pursuant to this Agreement. Should it be determined that Forms 1099-MISC should issue in regard to the Secondary Pool Remuneration provided hereunder, Defendants, at their sole cost, shall issue such forms to each Participating Class Member who has elected to and has obtained Secondary Pool Remuneration. The Form 1099-MISC shall reflect the value of the Secondary Pool Remuneration received, and copies of said forms shall be duly filed with the United States Internal Revenue Service and the applicable department of revenue/taxation of the state in which the Qualifying Club is located.

7.10 Taxation and No Tax Advice: Each Participating Class Member shall be obligated to obtain her own independent tax advice concerning the proper income reporting and tax obligations regarding any and all payments and/or other remuneration she receives or obtains pursuant to this Agreement, and shall further assume the responsibility of remitting to the Internal Revenue Service and any other relevant taxing authorities any and all amounts required by law to be paid out of any monies received, or other remuneration obtained, under this Agreement, without any contribution whatsoever from any of the Released Defendants or Class Counsel. Nothing in this Agreement shall be construed as Class Counsel providing any advice regarding the payment of taxes or the tax consequences of a Participating Class Members’ participation in any portion of this Agreement.

7.11 Audit and Data Rights: Throughout the existence of the Secondary Pool, Class Counsel shall be provided reasonable access to data and records used to determine any Class Member's eligibility, position in the Secondary Pool Tier, amount of individual Secondary Pool Remuneration redeemed and remaining, and the total amount of the Secondary Pool redeemed and remaining.

7.12 Administration of Secondary Pool: The accounting for the Secondary Pool and collection of the one-third (1/3) Indirect Attorneys' Fees from redeemed Secondary Pool Remuneration shall be administered by Modern. Defendants shall pay all costs associated with Modern administering the Secondary Pool. The Settlement Administrator selected pursuant to the terms of this Agreement shall have no obligations or duties related to the administration or allocation of Secondary Pool Remuneration through the Secondary Pool.

## VIII. DEFENDANTS' CHANGES OF BUSINESS PRACTICES, WHICH WILL CONFER A DIRECT AND SUBSTANTIAL FINANCIAL BENEFIT TO THE SETTLEMENT CLASS

8.1 Rights of Employees: The Parties, Class Counsel, and Defense Counsel all acknowledge that employees are not permitted to waive or contract away their rights under applicable labor laws (except as may be specifically permitted therein), including but not limited to those set forth in the FLSA, and that workers who meet the legal standards of being employees may not contract to work under a business arrangement or structure that does not provide for the legal protections and benefits to which employees are otherwise entitled. The purpose of this Section is not to in any way circumvent, invade upon, or negate those legal principles, but to rather: a) delineate the parameters, as recognized by Class Counsel, Defense Counsel, and the Court, under which Entertainers may lawfully Perform in the Clubs as bona fide Independent Professional Entertainers, as opposed to as employees, if they meet the criteria for being able to do so as set

forth in this Agreement; b) establish legally enforceable rights, as granted through this Agreement and specifically by way of the injunctive relief afforded hereunder, for the protection of such Entertainers who desire to lawfully Perform as IPE's and meet the criteria for being able to do so as set forth in this Agreement, so that the Clubs do not in the future compromise or impinge in any way upon the privileges such Entertainers possess under such a business structure; and c) provide for certain employment benefits -- beyond those as are afforded under statutory law -- for Entertainers who choose or are required to work at the Clubs as employees in accordance with the terms of this Agreement.

8.2 Providing Entertainer Applicants the Choice of Performing as Bona Fide IPE's or Working as Employees: Following the Effective Date, upon application and satisfying an audition, the Clubs shall provide to Persons interested in Performing as an Entertainer at the Club ("Entertainer Applicant") an informed choice to Perform at the Club as an IPE or to work for the Club as an employee, under the respective terms for each as set forth in this Article (the "Selection Document"). The Selection Document shall contain the terms of the Enhanced Offer of Employment set forth in Sections 8.12 and 8.20 below.

8.3 Presentation of the Selection Document: Each Club shall provide the Selection Document to Entertainer Applicants in a "hard copy" writing or in an electronic format.

8.4 Consideration of Selection Document: No Entertainer Applicant shall be required to make her selection before she has had an opportunity to fully review the Selection Document and before she has been afforded an opportunity to have the Selection Document reviewed by professionals (accountants, attorneys, etc.) of her choice.

8.5 No Influence: Neither the Clubs nor anyone in Club management shall take any position as to, and shall not in any manner attempt to influence, the choice that an Entertainer

Applicant should make on the Selection Document.

8.6 Entertainer Applicant Attestations of Compliance: The applicable Club may require the Entertainer Applicant to attest in writing to the Club's compliance with the provisions herein.

8.7 Entertainer Applicant Selection: Each Entertainer Applicant who expresses her desire in the Selection Document to Perform at the Club as an IPE instead of working for the Club as an employee shall then undergo the Entertainer Assessment described below.

8.8 Providing of the Entertainer Assessment Form: The Entertainer Applicant shall be provided with an Entertainer Assessment Form (***Exhibit B***) in order to permit the Club to undertake the Assessment discussed in Section 8.9 immediately below. The Club shall be entitled to rely upon the answers provided by the Entertainer Applicant on the Entertainer Assessment Form as being truthful responses, and shall have no obligation hereunder to conduct its own investigation of such Entertainer Applicant prior to conducting the Assessment.

8.9 The Assessment: Following receipt of the Entertainer Assessment Form, Club management shall undertake the Assessment in order to determine whether the Entertainer Applicant meets the Assessment Criteria establishing her as being a bona fide Independent Professional Entertainer. If the Assessment determines that the Entertainer Applicant does not satisfy the Assessment Criteria, then the Club shall so inform the Entertainer Applicant that the Club will agree to hire her as an employee. If, however, the Entertainer Applicant nevertheless believes that she satisfies the Assessment Criteria, she may provide to the Club a letter from her attorney or Certified Public Accountant ("CPA") establishing that he or she has undertaken his or her own independent Assessment and finds that the Entertainer Applicant meets the Assessment Criteria of being a bona fide Independent Professional Entertainer (either constituting a

"Justification Letter"). The Justification Letter shall then be forwarded to the Club's CPAs. If the Club's CPAs concur in the Justification Letter, the Entertainer Applicantmay then begin to Perform as a bona fide IPE. If they do not concur with the Justification Letter, the Entertainer may only thereafter work at the Club as an employee. The decision of the Club's CPAs shall be final. Under no circumstances shall an Entertainer Applicant be permitted to Perform at the Club as an IPE unless the Assessment Criteria is satisfied either by way of a Club management Assessment or a Justification Letter in which the Club's CPAs concur.

8.10 Request for Assessment Review: If an Assessment determines that the Entertainer Applicant does not satisfy the Assessment Criteria but the Entertainer Applicant nevertheless believes that she satisfies the Assessment Criteria and desires to Perform at the Club as an IPE, and the Entertainer Applicant then proceeds to work at the Club as an employee, Club management shall undertake at the request of the Entertainer, but in no event earlier than the second month anniversary from the time the Entertainer first began to work at the Club as an employee, an additional Assessment utilizing the same Assessment Criteria that were applied in the initial Assessment, in order to determine whether the Entertainer then meets the Assessment Criteria to be able to Perform at the Club as a bona fide Independent Professional Entertainer (the "Assessment Review").

8.11 The Assessment Review: If the Assessment Review determines that the Entertainer does not satisfy the Assessment Criteria, then the Club shall so inform the Entertainer and she shall not be permitted to thereafter Perform at the Club as an IPE. She may, however, provide a Justification Letter in the form as set forth in Section 8.9 above, which will be subject to the same Club CPA review as established therein.

8.12 Presentation of the Enhanced Offer of Employment: Within thirty (30) days of the Effective Date, each Club shall provide to each Entertainer then Performing at that Club, either in a "hard copy" writing or in an electronic format, an offer to permit such individual to terminate her IPE Dancer Contract with the Club and to be hired as an employee consistent with the provisions of Section 8.20 (the "Enhanced Offer of Employment", a copy of which is attached as ***Exhibit F***). The contents of the Enhanced Offer of Employment are currently agreed upon by Class Counsel and Defense Counsel, and may be subsequently modified by the Defendants without approval from Class Counsel in order to comply with any changes in applicable laws.

8.13 Consideration of Enhanced Offer of Employment: No Entertainer shall be required to make her decision before she has had an opportunity to fully review the Enhanced Offer of Employment, and before she has been afforded an opportunity to have the Enhanced Offer of Employment reviewed by professionals (accountants, attorneys, etc.) of her choice.

8.14 No Influence: Neither the Clubs nor anyone in Club management shall take any position as to, and shall not in any manner attempt to influence, the choice that an Entertainer should make on the Enhanced Offer of Employment.

8.15 Entertainer Attestations of Compliance: The applicable Club may require the Entertainer Applicant to attest in writing to the Club's compliance with the provisions herein.

8.16 Requirement of Entertainers to Undergo Assessment: Each Entertainer who was Performing at a Club prior to the Effective Date and who declines the Enhanced Offer of Employment shall be required, no later than six (6) months after the Effective Date, to submit a fully completed and signed Entertainer Assessment Form in order to permit the Club to undertake an Assessment in the form generally discussed in Section 8.9 above. The Club shall be entitled to rely upon the answers provided by the Entertainer on the Entertainer Assessment Form as being

truthful responses, and shall have no obligation hereunder to conduct its own investigation of such Entertainer prior to conducting the Assessment.

8.17 Entertainer Assessment: Following receipt of the Entertainer Assessment Form, Club management shall undertake, no later than thirty (30) days thereafter, the Assessment generally described in Section 8.9 above in order to determine whether the Entertainer meets the Assessment Criteria to be able to continue to Perform at the Club as a bona fide Independent Professional Entertainer. If the Assessment determines that the Entertainer does not satisfy the Assessment Criteria, then the Club shall so inform the Entertainer and further inform her that the Club will, at the end of seven (7) days thereafter, terminate her Dancer Contract and hire her as an employee in accordance with the terms of Section 8.20 herein. If the Entertainer nevertheless desires to continue to Perform at the Club as an IPE, she may, within that seven (7) day period, provide to the Club a Justification Letter, subject to review by the Club's CPA as specified in Section 8.9 above. If she does (subject to Club CPA review), she will be permitted to continue to Perform at the Club as a bona fide Independent Professional Entertainer. If she does not and she declines to be hired by the Club as an employee, or if the Club's CPA does not concur with the Justification Letter, the Club will be permitted to immediately thereafter terminate her Dancer Contract regardless of any termination notice period that might otherwise be contained in such Dancer Contract.

8.18 Right of Bona Fide IPE to Change to Employee: Any Entertainer Performing as an IPE at any Club and who is not in breach of her Dancer Contract shall be entitled, at any time and regardless of whether she satisfies the Assessment Criteria, to notify Club management, in writing, of her desire to terminate her Dancer Contract and to be hired as an employee. Such Club shall, within three business days thereafter, terminate such Entertainer's Dancer Contract and if she is

deemed by the Club to be qualified to work as an employee Entertainer, hire the Entertainer as an employee in accordance with the terms as set forth in Section 8.20 below.

8.19 IPE's Who Select to Change to Employees: Once an Entertainer who is Performing as a bona fide IPE at a Club requests, in accordance with the terms of Sections 8.12 or 8.18, to terminate her IPE Dancer Contract and to be hired as an employee, and if she is so hired as an employee, then such Entertainer shall at all times thereafter Perform only as an employee at the Club and shall not be entitled to re-convert back to an IPE unless she undergoes a new Assessment and is found to meet the Assessment Criteria to be able to Perform at the Club as a bona fide IPE.

8.20 Enhanced Offer of Employment: For Entertainers or Entertainer Applicants who select to work as a Club employee, or who are otherwise required to work as a Club employee pursuant to the terms of this Agreement:

i) They shall be entitled to all of the rights, benefits and privileges of, and subject to all of the obligations and policies (including but not limited to the employee "at will" policy and all of those aspects of control exercised, or that could be exercised, by the Club over its non-managerial employees) that apply to all other non-managerial Club employees, without discrimination, except as may be specifically provided to the contrary in this Section 8.20;

ii) They shall be paid by the Club at the then-existing applicable minimum wage rate. For Clubs located in states where a tip credited wage is permitted, such Clubs may, at their option, retain Entertainers as employees pursuant to a tip credited wage in accordance with all laws that apply to the payment of such a tip credited wage;

iii) They shall be entitled to commissions of no less than 20% of the

amount that their Dance Fees exceed the Cost of Employment for such Entertainer on that Date of Performance (each particular Club being free to, in its absolute discretion, pay Dance Fee commissions of a higher amount either to Entertainer employees as a whole or to particular Entertainer employees);

iv) They shall be entitled, if permitted by applicable law, to commissions of no less than 20% of their sale of Conversation Beverages (each particular Club being free to, in its absolute discretion, pay Conversation Beverage commissions of a higher amount either to Entertainer employees as a whole or to particular Entertainer employees);

v) They shall be reimbursed by the Club for all application and license/permit fees that are incurred by the Entertainer after she has been hired as an employee for any and all licenses or permits that she is legally required to obtain and maintain in order to be able to continue to Perform at the Club (Entertainer Applicants who will Perform at a Club as an Employee, and Entertainers who either choose to Perform at a Club as an employee or who are required to Perform as an employee pursuant to the terms of this Agreement, will be required to possess, as a condition of being hired, all legally required licenses and permits, for which the Club shall have no obligation to reimburse such Entertainers);

vi) They shall not be required to pay any form of fee for the redemption, or receive anything below the actual "face" value, of the scrip certificates they may receive while working (for employee Entertainers, scrip redemption shall be made through payroll checks);

vii) They shall be provided by the Club two logo costumes per month

(which they will be required to wear while working) and, if required by law, laundering services for such costumes, as well as a $25.00 monthly allowance for footwear;

viii) They may be provided by the Club training in the methods to increase their sales, both in regard to their performance skills and their physical presentation (hair, make-up, etc.), and may also be provided dance lessons by the Club;

ix) They may be required to tip out to, or tip pool with, the Club's other regularly tipped employees (as designated by the Club) in the amount of 15% of all of their daily tip income (whether by way of "cash," credit card, scrip, or otherwise);

x) They shall be provided by the Club with any unemployment insurance coverage as mandated by law;

xi) They shall be provided by the Club with any workers' compensation coverage as mandated by law;

xii) They shall be provided by the Club with all social security contributions as mandated by law;

xiii) They shall be afforded all paid and unpaid breaks as required by law;

xiv) They shall be afforded all applicable statutory protections, rights and benefits of employees, including but not limited to those under the National Labor Relations Act, the Fair Labor Standards Act, the Equal Employment Opportunity Act, Title VII of Civil Rights Act of 1964, the Americans With Disabilities Act (ADA), the Family Medical Leave Act ("FMLA"), and the Age Discrimination in

Employment Act of 1967.

8.21 No Contractual Rights to Rejected Enhanced Offer of Employment: The provisions contained in the Enhanced Offer of Employment as set forth immediately above shall create no contractual rights, or causes of action predicated thereon, in the event that an Entertainer rejects the Enhanced Offer of Employment or in the event that an Entertainer Applicant chooses to Perform at the Club as an IPE instead of working at the Club as an employee and is permitted, pursuant to the terms of this Agreement, to Perform at the Club as a bona fide Independent Professional Entertainer.

8.22 Termination of Entertainer Employment: Nothing contained in this Article or in this Agreement shall in any way preclude any Club from terminating the employment of any Entertainer for any reason not prohibited by law (by way of example only, Clubs may, under this Agreement, freely terminate the employment of Entertainers who fail to appear as scheduled or whose entertainment services do not generate sufficient revenues to justify maintaining such individuals as employees). However, no Club may terminate the employment of an Entertainer for the reason that she chose to work at the Club, either initially or by changing from an IPE, as an employee.

8.23 Bona Fide IPE's: For Entertainers or Entertainer Applicants who select, and are permitted under the terms of this Agreement, to Perform as bona fide IPE's at a Club:

i) The Club shall not control the manner, means, or details of the Entertainers' entertainment services except to ensure: a) compliance with all applicable laws and regulations; b) that no damage to the Club's property occurs; and c) the premises are used in a safe fashion for all those thereon. Nevertheless, Independent Professional Entertainers shall be obligated to comply with all the terms of their Dancer Contract including the obligation to participate

in stage performance rotations in order to ensure a continuous entertainment performance in the Clubs;

ii) The Club shall not be permitted to impose any work schedule upon the bona fide IPE's in regard to the Dates of Performance during which they appear to Perform (although the Club may require a bona fide IPE to provide the Club with the schedule she selects to Perform at least one week in advance for any week during which she intends to Perform);

iii) They shall not be required to tip out to, or tip pool with, any Club employees;

iv) They shall not be subject to any controls by the Club over the costumes they wear while Performing, other than requiring that such costumes comply with all laws. The Club may also require that each bona fide IPE appear in a manner consistent with a professional entertainer Performing in an upscale entertainment facility;

v) They shall abide by all rules that the Club imposes upon all business invitees (for example, no weapons allowed on the premises, the right to bag search, no use of cell phones in the show-bar area in order to prohibit unconsented photography and video recording and thereby ensure privacy, etc.);

vi) They shall abide by all rules for bona fide IPE's voted upon by a majority of IPE's then under contract with the Club who attended the at-least-annual IPE meeting discussed in the subsection immediately below;

vii) At least once per year, each Club shall conduct a meeting open to all bona fide IPE's then under contract with that Club (the "IPE Meeting"). The purpose of the IPE Meeting shall be to provide a forum for the IPE's to collectively negotiate revisions to the Dancer Contracts (which the Clubs generally revised once per year); to decide whether the IPE's desire to form a committee in order to communicate to Club management on behalf of all

2:16-cv-10877-SJM-PTM Doc # 41-2 Filed 04/28/17 Pg 72 of 98 Pg ID 1197

bona fide IPE's; to obtain input from the bona fide IPE's concerning the general operations of the Club in order to potentially enhance IPE income, including advertising, as well as the rules, policies or directives that they desire all IPE's to follow (the adoption of such rules requiring the consent of a majority of IPE's attending the IPE Meeting); and to allow the IPE's to vote to revise, modify, or revoke, any rules they previously adopted or to revise or modify any Club policies or business operations that concern, affect, or impact upon the IPE's and/or the gross income they can generate from their independent business activities (the adoption of such revisions to previously adopted IPE rules or to previously adopted Club policies or business operations requiring the consent of a majority of bona fide IPE's then under contract with the Club), which shall include but not be limited to:

a) The prices to be charged for all personal entertainment performances (including changes to such prices when special events occur in the area);

b) The handling and administration of large scrip purchases to ensure a fair allocation of risk of customer chargebacks;

c) How often and under what circumstances the Club or the Disc Jockey should run promotional dances (such as 2 for 1's);

d) They type of promotional dances to be Performed at the Club;

e) How stage performances are to be structured and allocated (including but not limited to the length of time for each stage performance, the number of songs per each stage performance, factors to determine the rotation of stage performances, under what circumstances an IPE may decline to engage in a specific stage performance or stage performances in general during a Date of

Performance, and how stage performances are to be allocated between and among employee Entertainers and IPE's);

f) Whether there should be a minimum number of hours each IPE is expected to be available to Perform on the Club's premises during each Date of Performance she selects to Perform, and if so what that minimum number would be; and

g) Whether there should be a minimum number of days per week each IPE is expected to be available to Perform on the Club's premises during weeks that she decides to Perform, and if so what that minimum number would be.

8.24 Posting of Contract Damages List: Upon the Effective Date, each Club will post a list of all contract damages, if any, which a bona fide IPE may be charged while under contract with the Club. The notice of contract damages shall be posted in the IPE dressing room.

8.25 Limitation of Contract Damages: No Club may impose any contract damage or monetary penalty on an IPE that is not identified on the notice of contract damages.

8.26 Records of Contract Damages: Any Club that charges an IPE contract damages, or imposes a monetary penalty thereon, shall provide a written explanation of the contract damage to the IPE and for the Club's records. The Club shall maintain said record for at least one (1) year. IPE's shall be provided, within the notice of contract damages, an avenue of complaint above that of the club manager. The person or entity responsible for resolving such complaints shall be provided with the written explanation by the IPE should she assert that the contract damage was wrongly imposed.

8.27 Training Video: Prior to the Judgment becoming Final, legal counsel for the Clubs may create a training video that explains the options for Entertainer and Entertainer Applicants set

forth in this Article (the "Training Video"), the Assessment, and the Assessment Criteria. Prior to use in the Clubs, the Training Video may be reviewed and approved by Class Counsel. The Training Video may be modified from time to time for legal compliance purposes.

8.28 Expiration and Changes to This Article: In recognition of the fact that the business and regulatory landscape may significantly change over time, the Parties agree that the mandatory obligations upon the Clubs as set forth in this Article VIII, including all Sections and subsections thereof, shall expire upon the earliest of the following two dates: (i) five (5) years after the Effective Date; or (ii) the date upon which there are changes to any applicable statute, regulation, or other law that Defendants reasonably believe would require a modification to any of the provisions set forth in this Article, including all Sections and subsections thereof, in order to comply with such changes to the applicable statutes, regulations, or laws.

8.29 Right to Modify the Terms of this Article: Defendants maintain the right to make further changes to their business practices so long as such changes do not materially and adversely undermine the non-monetary terms set forth in this Article. In addition, Defendants maintain the right to make changes to any of the non-monetary terms set forth in this Article VIII if changes to those terms are warranted by a change in statutory, regulatory or common law that is material to the classification of independent contractors/non-employees and/or employees.

8.30 Injunctive Relief: In the Final Approval Order, the Court shall grant injunctive relief to compel the Defendants to comply with all terms of this Article VIII.

## IX. ATTORNEYS' FEES AND COSTS, AND CLASS REPRESENTATIVE INCENTIVE PAYMENTS.

9.1 Payment of the Attorney Fee and Expense Award: Defendants shall pay to Class Counsel the Attorney Fee and Expense Award as determined and ordered by the Court by depositing into an escrow account to be established by Modern on the following schedule:

9.1.1 Four hundred fifty thousand dollars ($450,000.00) as Direct Attorneys' Fees from the Cash Pool within thirty (30) days of the Effective Date of this Agreement;

9.1.2 Four hundred fifty thousand dollars ($450,000.00) as Direct Attorneys' Fees from the Cash Pool within ninety (90) days of the Effective Date of this Agreement;

9.1.3 33.3% of redeemed Secondary Pool Remuneration (the Indirect Attorneys' Fees), not to exceed a total of three hundred thousand dollars ($300,000.00) of the Secondary Pool Remuneration to which the Settlement Class Members are entitled, which Modern shall remit to Class Counsel on the first of each month.

9.2 Allocation of Attorneys' Fees and Costs, and Court Approval of the Same: Subject to Court approval, Class Counsel shall, within their sole discretion, allocate the Attorney Fee and Expense Award amongst the various firms that constitute Class Counsel. As directed by the Court's Preliminary Approval Order, Class Counsel shall apply to the Court for an award of attorneys' fees and costs as set forth in this Agreement. The petition for the Attorney Fee and Expense Award shall set forth the proposed allocation of attorneys' fees and costs endorsed by Class Counsel. Defendants shall not oppose Class Counsels' application so long as the application requests an aggregate Attorney Fee and Expense Award that complies with the terms of this Agreement, and in no event shall the Defendants be requested or required to pay any attorneys' fees, costs, or expenses in excess of those set forth in this Agreement. No attorney shall be entitled to any award or allocation of attorneys' fees or costs prior to satisfying the following two conditions:

(a) Filing a petition for attorneys' fees and/or costs with the Court as set forth in this Section 9.2.

(b) Obtaining their clients' consent to be bound by the terms and conditions of this Agreement without objection.

9.3 <u>No Appeal</u>: Any attorney making a request for attorneys' fees and/or costs in conformity with Section 9.2 shall be bound by the decision of the Court, and expressly waives any right to appeal the Court's Attorney Fee and Expense Award.

9.4 <u>Litigation Expenses and Administrative Costs</u>: With the exception of the payments for the Attorney Fee and Expense Award made pursuant to Sections 5.2.5 and 9.1, all other Litigation Expenses incurred in connection with prosecuting this Action and in the Pending Proceedings shall be borne exclusively by Class Counsel. Under no circumstances shall Defendants be responsible for Litigation Costs that exceed the amount of the maximum Attorney Fee and Expense Award provided for herein; that being one million two hundred thousand dollars ($1,200,000.00). Within fifteen (15) days of entry of the Preliminary Approval Order, Defendants shall remit to the Settlement Administrator, fifty thousand dollars ($50,000.00) for their share of the Administrative Costs, and in particular towards the cost of mailing the Class Notice Documents.

9.5 <u>Enhancement Payments</u>: Class Counsel may apply to the Court for each of the Class Representatives incentive awards for the time, effort and expense that they incurred in securing the Settlement in this Action (in addition to compensating them for their portion of the overall Settlement proceeds available to the Settlement Class). Subject to Court approval, the Enhancement Payments for each of the Class Representatives will have two monetary components. The first, in the amount of five thousand dollars ($5,000.00), will be in recognition of each of the

Class Representative's efforts in coming forward as a Class Representative and her efforts to secure the Settlement in this Action. The second, in the amount of ten thousand dollars ($10,000.00), will act as consideration for a full, general, and comprehensive release of that individual's General Released Claims. The Enhancement Payments as ordered by the Court shall be paid by Defendants out of the Net Cash Payment Settlement Fund within thirty (30) days of the Effective Date, and shall not exceed, in the aggregate, thirty thousand dollars ($30,000.00).

## X. CLASS NOTICE DOCUMENTS

10.1 Information to be Supplied by each Club as identified in Exhibit A: Within thirty (30) days of the entry of the Preliminary Approval Order by the Court, Defendants will provide the Settlement Administrator, to the extent available in Defendants' records, the following information:

10.1.1 Each Class Member's legal name; and

10.1.2 Each Class Member's last known address from the Class Member's Qualifying Club's last Dancer Contract.

10.2 Confidentiality of Information: The Parties agree that the information to be disclosed pursuant to Section 10.1 shall be deemed confidential, attorneys' eyes only. Notwithstanding these restrictions, the Clubs and their representatives may use this information in order to determine entitlement to, and the amount of, Cash Payments and Secondary Pool Remuneration, and the Settlement Administrator may use this information to effectuate Class Notice, determine Class Member's entitlement to a Cash Payment, and track those Class Members who have chosen to Opt Out of the Settlement. The Settlement Administrator shall be required to enter into an agreement to keep such information confidential pursuant to the terms of this Section.

10.3 The Settlement Administrator's Obligations and Duties: As set forth below, the Settlement Administrator shall be responsible for the mailing of the Class Notice Documents and adjudication of all disputes related to the eligibility for or payment of Cash Payments from the Net Cash Payment Settlement Fund.

10.4 Mailing of Class Notice Documents: Within twenty (20) days of receipt of the Class Member information identified in Section 10.1, the Settlement Administrator shall mail the Class Notice Documents to each Class Member. The envelope containing the Class Notice Documents will identify the Settlement Administrator's return address only, and shall not contain *any* Club-related information from which a reader of the envelope could glean that it relates to the adult nightclub industry. The envelope shall include the Class Notice Documents.

10.5 Claims Adjudication: As set forth in Article VI above, the Settlement Administrator shall be responsible for issuing Cash Payments to Class Members seeking payment from the Net Cash Payment Settlement Fund, sending appropriate tax information, and for adjudicating all contested Cash Payment Claims.

10.6 Return of Class Notice: If the Class Notice Documents mailed to a Class Member are returned within twenty-one (21) days of the initial mailing, with a forwarding address provided by the Postal Service, the Class Notice Documents will be re-sent by the Settlement Administrator to the forwarding address within seven (7) days of return, but a Properly Completed Cash Election Form must nevertheless be remitted to the Settlement Administrator and postmarked by the close of the Election Period in order for the Class Member to have a Valid Cash Pool Claim.

10.7 Posted Notice: In addition to the mailed notice identified in Section 10.4, Defendants shall post the details of the Cash Pool and Secondary Pool ("Posted Notice"). Each

Club shall prominently display the Posted Notice in the Club's Entertainer dressing room. The Posted Notice shall remain posted until the Secondary Pool Redemption Period expires.

10.8 Class Notice Verification: No later than thirty (30) days after the Settlement Administrator has completed the mailing of the Class Notice as set forth in Sections 10.4 and 10.6, and before the Fairness Hearing, the Parties shall file with the Court a notice of compliance stating that the Class Notice has been mailed to the Class Members.

**XI. OBJECTIONS AND OPT OUTS.**

11.1 Objections to Settlement: All objections to the Settlement must be in writing and must be filed with the Court in accordance with the Court's Preliminary Approval Order. All objections must be mailed to both Class Counsel and Defense Counsel.

11.2 Procedures for Objections: The procedures of objection shall be as set forth in the Preliminary Approval Order.

11.3 Opting Out of the Settlement: Any Class Member who wishes to be excluded from the Settlement must mail to the Settlement Administrator, at the address that is set forth in the Class Notice, a request for exclusion from the Settlement personally signed by the Class Member and postmarked no later than ninety-five (95) days from the entry of the Preliminary Approval Order or the re-mailing of a particular Class Notice as permitted in Section 10.6. The Settlement Administrator shall date stamp the original of any Opt Out Form and serve copies on both Class Counsel and Defense Counsel via electronic mail and United States Mail within five (5) business days of receipt of any such statement. Class Counsel shall file copies of all timely requests for such exclusion, not timely rescinded, with the Court prior to the Fairness Hearing.

11.4 Failure to Properly Opt Out, and Opt Out Limitations: Any Member of the Settlement Class who does not fully complete, personally sign, and timely mail notice of her

intention to Opt Out of the Settlement will be deemed included as a Settlement Class Member in accordance with this Agreement. All Class Representatives waive any right to Opt Out of the Settlement.

11.5 Conflicting Responses: If a Member of the Settlement Class submits a Cash Election Form and a request for exclusion, the request for exclusion will be invalid and the Class Member will be deemed to be a Participating Class Member and be bound by the terms of the Settlement and this Agreement.

11.6 Notification to Counsel of Opt Outs: Within ten (10) days following the last of the deadlines to Opt Out, the Settlement Administrator shall provide Class Counsel and Defense Counsel with information setting forth the total number of Opt Outs and the identities (which shall include the information required by the terms of this Agreement) of such individuals who have decided to Opt Out.

## XII. RELEASES AND COVENANTS

12.1 Scope of Releases: The Released Claims against each and all of the Released Defendants shall be released and dismissed with prejudice and on the merits (without an award of fees or costs to any Party other than as provided in this Agreement) upon entry of the Final Approval Order and Judgment becoming Final, provided that the General Released Claims shall be released upon the execution of the General Release Form, and provided that a Class Member's FLSA Claims shall be released and dismissed with prejudice on the merits (without an award of fees or costs to any Party other than as provided in this Agreement) only if that Class Member Consents to Join this Action.

12.2 Release of Released Defendants: As of the Effective Date, the Class Representatives and each and every one of the Settlement Class Members, individually and on

behalf of their heirs, estates, trustees, executors, administrators, representatives, agents, successors, and assigns, and anyone claiming through them, or acting or purporting to act on their behalf or for their benefit, shall be deemed to have, and have actually, knowingly and voluntarily, forever released, relinquished, acquitted, discharged, and held harmless, each and every one of the Released Defendants from, and covenanted not to sue each and every one of the Released Defendants regarding, each and every one of the General Released Claims (in the case of the Class Representatives), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the Participating Class Members' Released Claims (in the case of the Participating Class Members), and by operation of the Judgment becoming Final shall have fully and finally released, relinquished, acquitted and forever discharged all such Claims against each and every one of the Released Defendants; and they further agree that they shall not now or hereafter initiate, maintain, or assert any General Released Claims (in the case of the Class Representatives), any Settlement Class Members' Released Claims (in the case of the Settlement Class Members), or any Participating Class Members' Released Claims (in the case of the Participating Class Members) against the Released Defendants or against any one or group of them in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicating body. Without in any way limiting the scope of the releases described in this Section and in this Article XII, these releases cover, without limitation, any and all Claims for attorneys' fees, costs, or disbursements incurred by Class Counsel or by any other counsel representing the Class Members or Settlement Class Members, or by the Class Representatives or Settlement Class Members themselves, or by any one or group of them, in connection with or related in any manner to the Actions, the Settlement of the Action, any other action or proceeding, the administration of the Settlement, and/or the Released Claims, except to the extent otherwise specified in this

Agreement.

12.3 Waiver of Released Claims: For and in return of the complete and full considerations, terms, covenants and conditions as set forth in this Agreement, the Settlement Class Members, the participating Class Members, and the Class Representatives (as well as any Settlement Class Member obtaining an Enhancement Payment pursuant to this Agreement), and each and every one of them, further specifically release and agree to waive each and all of their rights to bring any Claims against the Released Defendants, or against any one or group of them, at any time in the future arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard or fashion whatsoever, the Settlement Class Members' Released Claims (for Settlement Class Members), the Participating Class Members' Released Claims (for Participating Class Members), and the General Released Claims (for Class Representatives and for any Settlement Class Member obtaining an Enhancement Payment pursuant to this Agreement) for any matters arising prior to the Effective Date. As part of the Settlement of this matter, each Settlement Class Member, Participating Class Member, and Class Representative (and any Settlement Class Member obtaining an Enhancement Payment pursuant to this Agreement) acknowledges and agrees that the Court will enjoin, and maintain authority to enforce an injunction precluding, any Claims released by this Agreement from being further litigated, brought or pursued by, as applicable, any Settlement Class Member, Participating Class Member, or Class Representative (and any Settlement Class Member obtaining an Enhancement Payment pursuant to this Agreement).

12.4 Release of FLSA Claims: With respect to those Claims that could be asserted under the FLSA, a Class Member's submission of a Valid Cash Pool Claim or a Valid Secondary Pool Claim shall be deemed as that Class Member's Consent to Join. The filing of the Cash Election Form before the Court shall fully, finally and forever settle and release all such FLSA Claims and

matters as of the Effective Date for Cash Pool Claimants, and the submission by a Class Member of a Secondary Pool Claim Form to her Qualifying Club where the Participating Class Member selects to receive her Monetary Settlement Benefit in the form of Secondary Pool Remuneration shall fully, finally and forever settle and release all such FLSA Claims for Secondary Pool Claimants as of the date upon which she receives the first of her Secondary Pool Remuneration.

12.5 Claims Enjoined: As of the Effective Date, the Class Representatives, all Settlement Class Members and all Participating Class Members, shall be permanently barred and enjoined from initiating, asserting, or prosecuting against the Released Defendants or against any one or group of them, in any federal or state court or before any administrative body, tribunal, arbitration panel, or other adjudicating body, any and all of the General Released Claims (in the case of the Class Members), any Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and any Participating Class Members' Released Claims (in the case of the Participating Class Members).

12.6 Knowing Execution: Each Class Representative acknowledges, agrees, and understands that: (a) she has read and understands the terms of this Agreement; (b) she has been advised in writing to consult with an attorney before executing this Agreement; (c) she has obtained and considered such legal counsel as she deems necessary; and (d) she has been given twenty-one (21) days to consider whether or not to enter into this Agreement (although she may elect not to use the full 21 day period at his/her option).

12.7 Waiver of Additional Compensation: Except as otherwise specifically provided for in this Agreement, the Settlement Class Members, Participating Class Members, and Class Representatives (and any Settlement Class Members receiving an Enhancement Payment pursuant to the terms of this Agreement), and each and every one of them, acknowledge and agree that they will

not seek to enforce, recover or collect upon any damages, awards, remunerations, sanctions, penalties, costs and/or attorney fees assessed against the Released Defendants, or against any one or group of them, arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard or fashion whatsoever, the Settlement Class Members' Released Claims (in the case of Settlement Class Members), the Participating Class Members' Released Claims (in the case of Participating Class Members), and the General Released Claims (in the case of Class Representatives and any Settlement Class Members receiving an Enhancement Payment pursuant to the terms of this Agreement), including but not limited to any investigations, proceedings, lawsuits, Claims, charges, cause and/or causes of actions that she may have or that may be asserted by others, or by any governmental entity, organization or agency, on her behalf, in her interest, or for her benefit, either in whole or in part.

12.8 Claims by Third Parties: Irrespective of the releases, waivers, indemnifications, and satisfactions set forth herein, if any court, tribunal, firm, third person or persons, business entity, or governmental entity, organization or agency brings, asserts, or assumes jurisdiction over any form of investigation, proceeding, lawsuit, Claim, charge or cause of action for or on behalf of any Settlement Class Member, Participating Class Member, or Class Representative (or other Settlement Class Member receiving an Enhancement Payment pursuant to the terms of this Agreement), and/or in her interest or for her benefit, either in whole or in part, against the Released Defendants, or against any one or group of them, arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard or fashion whatsoever, the Settlement Class Members' Released Claims, the Participating Class Members' Released Claims, or the General Released Claims, such Settlement Class Member, Participating Class Member, or Class Representative (or other Settlement Class Member receiving an Enhancement Payment pursuant to the terms of this Agreement), as applicable,

shall reasonably cooperate with any request from the Released Defendants, at the Released Defendants' cost, to demand the dismissal, with prejudice, of any such investigation, proceeding, lawsuit, claim, charge or cause of action, and/or, as may be appropriate, her withdrawal therefrom (by way of example and without limitation, "withdrawal" includes, where applicable, a formal written request for withdrawal of, or non-participation in, an administrative proceeding, formally "opting"-out of an opt out class action lawsuit, and refraining from formally "opting"-in to an opt-in class or collective action matter). In the event, however, that any court, tribunal, or governmental entity, organization or agency should assess any damages, awards, remunerations, sanctions, penalties, costs, and/or attorney fees of any kind whatsoever against any Released Defendant (in this Section, sometimes generally hereinafter simply referred to as "Award") arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard or fashion whatsoever, the Settlement Class Members' Released Claims, the Participating Class Members' Released Claims, or the General Released Claims, the Settlement Class Members, Participating Class Members, and Class Representatives (and other Settlement Class Member receiving an Enhancement Payment pursuant to the terms of this Agreement), as applicable, and each and every one of them, agree to specifically waive entitlement to, and refrain from collecting upon, any such Award.

12.9 Sufficiency of Consideration: Each and every Settlement Class Member, Participating Class Member, and Class Representative (and other Settlement Class Member receiving an Enhancement Payment pursuant to the terms of this Agreement), specifically represents that sufficient and adequate consideration is being conveyed to her through this Agreement and the Settlement to support the releases of, as applicable, any and all of the Settlement Class Members' Released Claims, the Participating Class Members' Released Claims, and the General Released

Claims, irrespective of the fact that the Settlement Class Members are only entitled to one form of remunerative recovery by way of either a Cash Payment or Secondary Pool Remuneration.

12.10 Satisfaction of Class Member Claims: The Settlement Class Members, Participating Class Members, and Class Representative (and other Settlement Class Member receiving an Enhancement Payment pursuant to the terms of this Agreement), specifically acknowledge that the payments made, and other considerations conveyed, by the Defendants as set forth herein represent valid compromises, settlements, resolutions, accords, satisfactions, waivers and releases of, as applicable, any and all claims for FLSA or state wage/labor law coverage; minimum wage; overtime; liquidated, punitive and/or exemplary damage payments; penalties; costs; attorney fees; and/or any other benefits allegedly due the Settlement Class Members, the Participating Class Members, and the Class Representative (and other Settlement Class Member receiving an Enhancement Payment pursuant to the terms of this Agreement) in regard to any matters or conduct arising from, relating to, associated with, based upon, or concerning, in any way, matter, regard or fashion whatsoever, as applicable, the Settlement Class Members' Released Claims, the Participating Class Members' Released Claims, and the General Released Claims.

12.11 Acknowledgement of Other Claims: The Class Representatives, and each and every one of them, specifically represent that to their own personal knowledge: A) There are no other lawsuits, Claims, charges, actions, proceedings, investigations, cause and/or causes of actions of any kind whatsoever, other than those that are set forth in Plaintiffs' First Amended Class Action and Collective Action Complaint and Demand for Jury in this Action and in the Second Amended Complaint for Settlement to be filed as part of this Settlement, pending or anticipated against the Released Defendants, or against any one or group of them, whether filed or unfiled, and whether civil

or criminal, arising from, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the General Released Claims, with the exception of those matters set forth in Section 2.16; B) that none of them have filed, been served with, or have any personal knowledge of any such matters; and C) that they have not participated in, or have provided assistance or cooperation to, such matters.

12.12 Release of Participating Class Members: Subject to any Claims that they may have for libel, slander, business disparagement, damage or destruction of property, assault and/or battery, or the like, each and every Released Defendant hereby, knowingly and voluntarily, releases, acquits, and forever discharges, each and every Participating Class Member from any and all Claims of every conceivable kind or nature whatsoever that they have, had, or may have, against the Participating Class Members, or against any one or group of them, whether known or unknown, whether fixed or contingent, whether asserted or unasserted, and whether filed or unfiled, at law, in equity or otherwise, that arise out of, relate to, are associated with, are based upon, or concern in any way, manner, regard or fashion whatsoever, the business arrangement that the Clubs had or have with the Participating Class Members and which occurred during the Class Period and/or up until the Effective Date of this Settlement, including, but not limited to, any Claim for breach of contract, any Claim purportedly arising out of a Dancer Contract, or any Claim that could exist as a result of the Participating Class Member's election to declare herself an "employee" under the terms of a Dancer Contract. Notwithstanding the foregoing, Defendants retain the right to bring Claims based upon future violations of the terms of Dancer Contracts and for claimed breach of the terms of this Agreement.

12.13 Performing in the Future at the Clubs: The Plaintiffs acknowledge that some of them are no longer Performing at any one of the Clubs and that the considerations conveyed to

them hereby release the Released Defendants, and each and every one of them, from any and all Claims that arise out of, relate to, are associated with, are based upon, or concern in any way, manner, regard or fashion whatsoever, assertions of wrongful termination, failure to "hire," or the like. Nothing in this Agreement shall require any Club to permit any Class Member not under contract at the time of execution of this Agreement to Perform on its premises at any time in the future, and the Plaintiffs release the Released Defendants from, and waive any right to assert at any time in the future, any Claims of any conceivable kind or nature whatsoever that they may have that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, the refusal of any Club to permit the Plaintiffs, or any one or group of them, to Perform on its premises at any time in the future.

12.14 Waiver of California Civil Code Section 1542: To effectuate the full and complete releases as described above, Plaintiffs expressly waive and relinquish all rights and benefits of Section 1542 of the Civil Code of the State of California, and do so understanding and acknowledging the significance and consequence of specifically waiving Section 1542. Section 1542 of the Civil Code of the State of California states as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Thus, notwithstanding the provisions of Section 1542, and to implement the full and complete releases, satisfactions, indemnifications, waivers and discharges set forth above, Plaintiffs expressly acknowledge that, except as specifically reserved above, this Agreement is intended to include in its effect, without limitation, all Claims Plaintiffs do not know or suspect to exist in their favor at the time of their signing this Agreement, and that this Agreement contemplates the extinguishment of any such Claims. Plaintiffs warrant that they have read this

Agreement, including this waiver of California Civil Code Section 1542, and that they have consulted with or had the opportunity to consult with counsel of their choosing about this Agreement, and specifically about the waiver of Section 1542, and that they understand this Agreement and the Section 1542 waiver and that they freely and knowingly enter into this Agreement.

12.15 The General Released Claims: With respect to the General Released Claims, each Class Representative shall be deemed to have expressly, knowingly, and voluntarily waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits she may otherwise have or have had pursuant to Section 1542 of the California Civil Code and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein. In connection with the General Released Claims, the Class Representatives acknowledge that they are aware that they may hereafter discover claims presently unknown and unsuspected or facts in addition to or different from those which they now know or believe to be true with respect to matters released herein. Nevertheless, the Class Representatives acknowledge that a portion of the consideration received herein is for a release with respect to unknown damages and complaints, whether resulting from known injuries and consequences or from unknown injuries or unknown consequences of known or unknown injuries, and state that it is the intention of the Class Representatives in agreeing to this release to fully, finally, and forever to settle and release all matters and all Claims that exist, may exist (currently or hereafter), or might have existed (whether or not previously or currently asserted in any action or proceeding), constituting the General Released Claims.

12.16 <u>Additional Facts</u>: Plaintiffs further acknowledge that they later may discover facts different from or in addition to those that they now know or believe to be true regarding the matters

released or described in this Agreement, and even so they agree that the releases, satisfactions, indemnifications, waivers and discharges contained in this Agreement shall remain effective in all respects, notwithstanding any later discovery of any different or additional facts. Plaintiffs expressly assume any and all risks of any mistake in connection with the true facts involved in the matters, disputes or controversies released or described in this Agreement, or with regard to any facts now unknown to Plaintiffs relating thereto.

12.17 Non-Assignment of Claims: Except as set forth in this Agreement regarding the payment of Indirect Attorneys' Fees, each Participating Class Member and Class Representative (and any other Settlement Class member receiving an Enhancement Payment pursuant to the terms of this Agreement) represents and agrees that she has not and will not assign, as applicable, any of her Participating Class Members' Released Claims or General Released Claims to any other person or entity, and each Settlement Class Member shall be deemed to have, and have actually, knowingly and voluntarily, represented that she has not assigned any of her Settlement Class Members' Released Claims to any other person or entity. These representations shall survive the execution of this Agreement and the approval by the Court of the Settlement contemplated herein.

12.18 Dismissals: Subject to Court approval, the Class Representatives and all Settlement Class Members shall be bound by this Agreement, and all of their Released Claims shall be dismissed with prejudice and fully and forever released, even if such Persons never received actual notice of the Action or this Settlement.

## XIII. TERMINATION OF SETTLEMENT

13.1 Events Permitting Termination: This Agreement and the Settlement shall terminate and be canceled within ten (10) business days if one of the Parties provides written notification of

an election to terminate this Agreement and the Settlement based upon the occurrence of any of the following circumstances:

(a) The Court rescinds preliminary approval of this Agreement, or declines to enter, or materially modifies, the contents of the Preliminary Approval Order;

(b) Each and every one of the Parties has not signed this Agreement at least fifteen (15) days prior to Final Approval;

(c) The Court declines to provide Final Approval of this Agreement, or declines to enter the Judgment that fully adopts the terms of this Agreement, or enters a Judgment that material modifies, or that is at material variance from, the terms of this Agreement;

(d) The Court declines to, or is unable to, enjoin each and every one of the Pending Proceedings identified in Section 2.16 with the Parties acknowledging that the ability of the Court to enjoin all such Pending Proceedings is a condition precedent to the Defendants entering into the Settlement and executing this Agreement;

(e) The Court's Judgment is vacated, reversed or modified in any material respect in any appeal or other review, or in any collateral proceeding occurring prior to the Effective Date;

(f) The Effective Date does not occur for some other reason; or

(g) Any federal or state authorities object to, or request material modifications of, the Agreement and the Court adopts such objections and/or modifications.

13.2 Consequences of Termination*:* In the event this Agreement does not receive Final Approval by the Court, or in the event the Court's Final Approval is overturned, reversed, vacated, or modified in any material way on appeal or review or by or through any collateral proceeding, or in the event the Settlement is terminated or fails to become effective in accordance with the

terms of this Agreement, the Parties shall request the Court to restore them to their respective positions in the Action as of December 27, 2016. In such event: a) the terms and provisions of this Agreement shall have no further force or effect with respect to the Parties; b) neither this Agreement nor any discussions or documents regarding it, or the Settlement prior to the termination/cancellation of this Agreement, shall be used in the Action or in any other proceeding for any purpose except with regard to matters set forth in this Section; c) any order or judgment entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*; d) no prejudice shall attach to the Defendants' pending (at the time of submission of this Agreement) motion to compel the Named Plaintiff into individualized arbitration and to dismiss and/or stay this action.

13.3 *Costs of Termination:* If any Party terminates this Agreement, either separately or together with an opposing Party, both Plaintiffs and Defendants shall be equally responsible for the Administrative Costs incurred (whether Defendants initially paid for them or not).

13.4 *Effects of Termination:* In the event the Settlement is terminated:

(a) The Defendants shall have no obligations to make any payments to any Party, Class Representative, Class Member, attorney, fund, or account, or to the Settlement Administrator;

(b) Any Preliminary Approval Order and the Judgment, including any order of class certification pursuant to the Agreement (provisional or otherwise), shall be vacated and the Second Amended Complaint for Settlement and any answer/counterclaim thereto shall be deemed withdrawn; and

(c) Any monies paid by Defendants to Class Counsel and/or to the Settlement Administrator pursuant to Section 5.2.6, except mailing costs to the extent actually spent on mailing of the Class Notice Documents, shall be immediately returned.

## XIV. NO ADMISSION OF WRONGDOING

14.1 Neither this Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance thereof, is, or may be deemed to be, or may be used as: (a) an admission or evidence of the validity of any of the Released Claims, or any alleged wrongdoing or liability of any of the Released Defendants; (b) an admission or evidence of any fault or omission of any of the Released Defendants in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal, other than such proceedings as may be necessary to consummate or enforce this Agreement, the Settlement memorialized herein, or the Judgment; (c) an admission that Services, Mohney, or Jason Mohney is, or could be held to be, a "joint employer" of the Affiliated Entities; or (d) an admission that each of the Clubs' separate corporate identity is or can be disregarded. Notwithstanding the preceding, however, this Agreement and/or the Judgment may be filed and used in any action or proceeding in any court, administrative agency or other tribunal to support a defense of *res judicata*, collateral estoppel, payment, release, good faith settlement, accord and satisfaction, claim preclusion, issue preclusion, or any similar defense or counterclaim; or in any of the Pending Proceedings (or related proceedings) in order to effectuate the injunctive relief thereof as provided for herein.

## XV. PROTECTIVE ORDER

15.1 All documents and/or things produced or generated through discovery by any Party in this Action (including by way of informal discovery provided for by the Parties) shall be destroyed within thirty (30) days of the Effective Date. Each Party shall promptly certify to the

other that all documents and/or things produced or generated through discovery have been destroyed. No Party shall be required, however, to destroy their own documents and things or any other document that the Protective Order entitles the Party or its Counsel to retain following the termination of litigation.

## XVI. MISCELLANEOUS PROVISIONS

16.1 This Agreement may be amended or modified only by a written instrument signed by or on behalf of all of the signatories hereto or their successors-in-interest. No oral amendment or modification shall be permitted or effective.

16.2 This Agreement and the Settlement were entered into after substantial good faith, arms-length negotiations between the Parties, Class Counsel and Defense Counsel. As such, no Party shall be deemed to have relied upon the representations of any other Party or opposing counsel in relation to the negotiation or execution of this Agreement.

16.3 Each counsel or other person executing this Agreement on behalf of any of the Parties hereto represents that such person has the authority to so execute this Agreement.

16.4 This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same Agreement. This Agreement may be executed by signature delivered by facsimile or PDF, and need not be the original "ink" signature. A complete set of executed counterparts shall be filed with the Court. This Agreement shall become binding upon its execution by the Class Representatives, the Defendants, all counsels of record, and upon approval by the Court.

16.5 This Agreement and the exhibits hereto constitute the entire fully integrated agreement among the Parties. No representations, warranties or inducements have been made to

any Party concerning the Settlement, this Agreement or its exhibits, other than the representations, warranties and covenants contained in such documents.

16.6 The failure of any of the Parties to perform any of their obligations hereunder shall not subject such Party to any liability or remedy for damages, or otherwise, where such failure is occasioned, in whole or in part, by acts of God, fires, accidents, earthquakes, other natural disasters, explosions, floods, wars, interruptions or delays in transportation, power outages, labor disputes or shortages, shortages of material or supplies, governmental laws, restrictions, rules or regulations, sabotage, terrorist acts, acts or failures to act of any third parties, or any other similar or different circumstances or causes beyond the reasonable control of such Party.

16.7 This Agreement shall be governed by the laws of the State of Michigan. All actions or proceedings relating to this Agreement may only be brought in the United States District Court for the Eastern District of Michigan.

16.8 Upon the occurrence of the Effective Date, the Settlement shall be fully enforceable by the Court, and the Court shall retain exclusive and continuous jurisdiction over the Parties and the Members of the Settlement Class to interpret and enforce the terms and conditions of, and rights under, the Settlement until the terms of this Agreement are fully performed.

16.9 Unless otherwise indicated herein, where any Party's exercise of any right under this Agreement requires written notice, the Party shall serve such written notice on the counsel of record for the other Parties by First Class U.S. Mail or any method that is at least as reliable and timely as First Class U.S. Mail.

16.10 Each of the Parties acknowledges and represents that he/she/it has fully and carefully read this Agreement prior to execution; that he/she/it has been fully apprised by his/her/its counsel of the legal effect and meaning of this Agreement and all terms and conditions

hereof; that he/she/it has had the opportunity to make whatever investigation or inquiry he/she/it deemed necessary or appropriate in connection with the subject matter of the Action; that he/she/it has been afforded the opportunity to negotiate any and all terms of this Agreement; and that he/she/it is executing this Agreement voluntarily and free from any undue influence, coercion, duress, or menace of any kind. This Agreement reflects the conclusion of each of the Parties that this Agreement, the Settlement, the Judgment to be entered hereunder, and the releases, waivers and covenants provided for herein, are in the best interest of said Parties, the general public, and the Settlement Class. Except as expressly provided herein, this Agreement is not intended to confer upon any other person or entity any rights or remedies.

16.11 In the event that any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall in no way affect any other provisions if Defense Counsel and Class Counsel, on behalf of the Parties and the Settlement Class, mutually elect in writing to proceed as if such invalid, illegal, or unenforceable provision had never been included in this Agreement, except as otherwise provided herein. However, if any funds have been paid, or other consideration conveyed, to a Class Representative or a Participating Class Member, then the releases and discharges granted, waivers conferred, and satisfactions conveyed by this Agreement may not be terminated.

16.12 The headings and captions inserted in this Agreement are for convenience only and in no way define, limit, or otherwise describe the scope or intent of this Agreement, or any provision hereof, or in any way affect the interpretation of this Agreement.

16.13 Except as otherwise provided in this Agreement, the Parties shall bear their own respective costs and fees.

16.14 None of the Parties, or their respective counsel, shall be deemed to be the drafter of this Agreement or its exhibits for purposes of construing their provisions. The language in all parts of this Agreement and its exhibits shall be interpreted according to its fair meaning, and shall not be interpreted for or against any of the Parties as the drafter of the language.

16.15 All time computations under this Agreement shall be done in accordance with the provisions of the Federal Rules of Civil Procedure, as amended by the Local Rules for the Eastern District of Michigan which govern the calculation of time.

16.16 The waiver by any of the Parties to this Agreement of any provision thereof shall not be deemed a waiver by that Party of any other provision of this Agreement.

16.17 Each and every one of the Parties hereto acknowledges and agrees that he/she/it will, and shall, at all times subsequent to the execution of this Agreement and upon reasonable request, make, do and execute, or cause to be made, done or executed, all such further documents and instruments to effectuate the full intent, purpose, covenants and conditions as set forth herein as any Party may require.

16.18 This Agreement shall be binding upon and inure to the benefit of the Parties, the Settlement Class Members, the Participating Class Members, Class Counsel, Defense Counsel, as well as their assigns, successors-in-interest of any kind whatsoever, purchasers of any of their assets and/or liabilities, heirs, executors, and administrators.

[THIS SPACE INTENTIONALLY LEFT BLANK]

Respectfully submitted,

Dated: 2-23, 2017

Jason J. Thompson (P47184)
Sommers Schwartz, P.C.
Co-Counsel for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
jthompson@sommerspc.com

Dated: 2-23, 2017

Bradley J. Shafer (P36604)
Shafer & Associates, P.C.
Co-Counsel for Defendants

3800 Capital City Blvd., Suite 2
Lansing, MI 48906
(517) 886-6560
brad@bradshaferlaw.com

# Exhibit D

*SUPERIOR COURT OF THE STATE OF CALIFORNIA – COUNTY OF SAN DIEGO*

# Notice of Settlement of Statewide Class Action

***If You Performed at any "Deja Vu-Affiliated Nightclub" as an Exotic Dancer, a Proposed Class Action Settlement May Affect Your Rights. You May Be Entitled to a Cash Payment.***

**A California State Court has authorized this Notice. It is not from a lawyer. You are not being sued.**

You are receiving this notice because there is a proposed settlement of a statewide class action lawsuit brought by Professional Entertainers (hereinafter "Plaintiffs") against Déjà Vu Services, Inc., Harry V. Mohney, and other "Déjà Vu-Affiliated Nightclubs" (referred to below collectively as "Déjà Vu" or "Defendants"). The lawsuit is captioned *Roes, et al. v. Déjà Vu Services, Inc., et al.*, No. 37-2018-00028044-CU-OE-CTL, and is pending before Judge Timothy Taylor in the Superior Court of California, County of San Diego.

In the lawsuit, Plaintiffs have filed suit under the pseudonyms of Jane Roes 1-4 and brought their claims on behalf of all other entertainers (the "Class"). The lawsuit alleges that Defendants failed to pay minimum wages and unlawfully confiscated tips belonging to Plaintiffs and other entertainers performing at nightclubs across the State of California operating under such names as "Adult Superstore," "Déjà Vu," "Déjà Vu Centerfolds," "Déjà Vu Showgirls," "Garden of Eden," "Gold Club," "Hungry I," "Jolar Cinema," "Larry Flynt's Huslter Club," "Little Darlings," "New Century Theatre, "Roaring 20's," "Sam's After Dark, "Temptations, "The Condor Club," and "The Penthouse Club" (f/k/a "Showgirls"), (collectively referred to as "Déjà Vu-Affiliated Nightclubs," or just the "Clubs"). The list of the Clubs subject to this settlement is attached at the end of this Notice.

Defendants have denied and continue to deny all of the allegations in Plaintiffs' Complaint and have threatened counterclaims against Plaintiffs and the Class; including claims that the entertainers should be required to return the mandatory dance fees they retained if the clubs were found to owe them minimum wages.

The Court has not made any determination of the merits of Plaintiffs' claims, or Déjà Vu's defenses or threatened counterclaims.

Rather than continue to litigate these matters, however, the parties have reached a settlement. The settlement contains both monetary and non-monetary relief for the Class. First, as part of this settlement, all entertainers performing in the Clubs are to be converted to employees. Second, a settlement fund has been established in the amount of $1,500,000.00, and Entertainers are entitled to a cash payment out of that fund. Pursuant to the terms of the settlement, entertainers shall be paid a pro-rata share of the net settlement fund based on the number of the days they performed during the Class Periods relative to the performance dates of all other entertainers.

A website with important information and documents is at www.XXXXXXXX.

The Court has preliminarily approved the settlement. However, settlement payments cannot be distributed until after the Court grants final approval of the settlement and after any possible appeals are resolved.

For purposes of this settlement, the Court has certified a settlement class, defined as follows:

> **All entertainers who performed at any Déjà Vu-Affiliated Nightclub located in the State of California identified on *Exhibit A* attached to the settlement agreement during the relevant Class Period(s).**

For purposes of this settlement, "Class Period(s)" means (a) the time period from April 15, 2017 to the Preliminary Approval Date for Entertainers who Performed at one or more of the San Francisco Clubs (the "San Francisco Class Period"); and b) the time period from February 8, 2017 to the Preliminary Approval Date for Entertainers who performed at one or more of the Greater California Clubs (the "Greater California Class Period"). The Exhibit at the end of this Notice identifies which class period applies to each Club.

An Entertainer may be subject to both Class Periods if she performed at one or more San Francisco Clubs during the San Francisco Class Period and at one or more of the Greater California Clubs during the Greater California Class Period.

"San Francisco Clubs" means those Clubs listed on *Exhibit A* that are located in San Francisco, California; those being Chowder House, Inc., d/b/a Hungry I; Déjà Vu – San Francisco, LLC, d/b/a Centerfolds; San Francisco Roaring 20's, LLC, d/b/a Roaring 20's; San Francisco Garden of Eden, LLC, d/b/a Garden of Eden; S.A.W. Entertainment, Ltd., d/b/a Larry Flynt's Hustler Club; S.A.W. Entertainment, Ltd., d/b/a the Condor Club; Déjà Vu Showgirls of San Francisco, LLC, d/b/a Little Darlings of San Francisco; Gold Club - SF, LLC, d/b/a Gold Club; Bijou-Century LLC, d/b/a New Century Theatre; and BT California, LLC, d/b/a The Penthouse Club & Steakhouse (f/k/a Showgirls).

"Greater California Clubs" means those Clubs listed on *Exhibit A* that are not located in San Francisco, California; those being Grapevine Entertainment, Inc., d/b/a Déjà Vu Showgirls; Cathay Entertainment, Inc., d/b/a Déjà Vu Showgirls; Nite Life East, LLC, d/b/a Little Darlings; SP Star Enterprise, Inc., d/b/a Déjà Vu; Coldwater, LLC, d/b/a Déjà Vu Showgirls; Eyefull, Inc., d/b/a Déjà Vu Showgirls; 3610 Barnett Ave., LLC, d/b/a Adult Superstore; Jolar Cinema of San Diego, LTD, d/b/a Jolar Cinema Showgirls; Showgirls of San Diego, Inc., d/b/a Déjà Vu Showgirls; Stockton Enterprises, LLC, d/b/a Déjà Vu Showgirls; Hollywood & Vine Club, LLC, d/b/a Déjà Vu Showgirls; Déjà Vu Showgirls-Sacramento, LLC, d/b/a Déjà Vu Showgirls; DV of LA, LLC, d/b/a Déjà Vu of LA -- Mainstreet; EF5 Acquisitions Group, LLC, d/b/a Déjà Vu Showgirls Torrance; and JGMA, Anaheim Hospitality, Inc., d/b/a Sam's After Dark.

**Your legal rights are affected by the Court's decision to certify a class, and you have a <u>choice</u> to make now. Please read the following pages carefully, including the *Summary of Your Rights and Choices* and the *Settlement Benefits and My Options* sections, which are below.**

## Summary of Your Rights and Choices:

*Your Legal Rights Are Affected Even If You Do Not Act.*
*Read This Notice Carefully.*

| **You May:** | **Effect of Choosing the Option:** | **Due Date:** |
|---|---|---|
| ***Exclude Yourself*** | You can elect to exclude yourself from the Class and keep your right to sue Déjà Vu on your own concerning the claims in the lawsuit. To exclude yourself from participating in the settlement, you **must** follow the exclusion procedure explained below. | ***Postmarked or E-Mailed by TBD*** |
| ***File Objection*** | If you do not exclude yourself, you can remain a Class Member and still write to the Court about why you disagree with the settlement. | ***Postmarked or E-Mailed by TBD*** |
| ***Appear at a Hearing*** | If you do not exclude yourself, you can also ask to speak to the Court about the fairness of the settlement. | ***The Notice of Appearance Must be postmarked on or before TBD, 2019 to appear at the final hearing*** |

| | | |
|---|---|---|
| | | ***On TBD, 2019 at the Superior Court of California in San Diego, CA.*** |
| ***Do Nothing*** | You **will** be bound by the terms of the settlement as to the California state law claims, but not the FLSA, and forfeit your right to sue Déjà Vu yourself on these claims later. | |
| ***Settlement Payment*** | If you do nothing, you will entitled to a settlement payment, and you will receive a pro rata share of the settlement based on the number of days you performed at the Clubs during the Class Periods relative to the performance dates of all other Class Members. This is intended to award higher values to Class Members who performed on more occasions at the Déjà Vu-Affiliated Nightclubs during the Class Periods. However, if a Class Member's pro rata share would result in a payment of less than twenty-five dollars ($25.00), her settlement payment will be increased to equal twenty-five dollars ($25.00) and the other payments will be adjusted accordingly. | ________ |

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**

1. Why did I get this Notice? ....................X
2. What is a Class Action? ....................X
3. What is this Class Action About? ....................X
4. Who are the Class Members? ....................X
5. Why is the Class Action Being Settled? ....................X

**SETTLEMENT BENEFITS AND MY OPTIONS**

6. What are the Settlement Benefits? .......... X
7. What are my options to receive a Settlement Payment? .......... X

**REMAINING IN THE CLASS**

8. What happens if I do nothing and stay in the Class? ....X
9. If I remain in the Class, what am I giving up? ....X

EXCLUDING YOURSELF FROM THE CLASS

10. Why would I want to exclude myself from the Class? ....X
11. How do I exclude myself from the Class? ....X
12. How do I object to the Settlement? ....X

THE LAWYERS REPRESENTING YOU

13. Do I have a lawyer representing my interests in this case? ....X
14. How will the lawyers be paid? ....X
15. How will the Class Representatives be paid? ....X

THE COURT'S FINAL APPROVAL HEARING

16. When and where will the Court decide whether to approve the Settlement? ....X
17. Do I have to attend the Hearing? ....X
18. Can I have my lawyer appear at the Final Approval Hearing to tell the Court about my opinions regarding the Settlement? ....X

GETTING MORE INFORMATION

19. Where do I obtain more information? ....X

## BASIC INFORMATION

### 1. Why did I get This Notice?

The Court directed this Notice be sent to you because you may have performed as an entertainer at a Déjà Vu-Affiliated Nightclub during the Class Period(s), and therefore may be entitled to benefits pursuant to the terms of the settlement.

If you are a member of the Class, the proposed settlement will affect your legal rights. Therefore, it is important that you read this notice carefully. You have choices to make before the Court decides whether to approve the settlement.

### 2. What is a Class Action?

In a class action lawsuit, one or more people called "Representative Plaintiffs" sue one or more defendants on behalf of other people who may have similar claims. All these people

together are a "class" and they are the "class members." The court can determine whether it will allow a lawsuit to proceed as a class action. If it does, a trial then decides the lawsuit for everyone in the class, or the parties may settle without a trial.

In a class action, one court resolves the common issues for everyone in the class - except for those people who choose to exclude themselves from the class.

## 3. What is this Class Action About?

The lawsuit alleges that Déjà Vu-Affiliated Nightclubs misclassified entertainers as non-employees (or independent contractors) and as a result of this misclassification the entertainers were not paid minimum wages and other compensation, and were not provided other employment attributes, required under federal and/or California state wage and hour laws. In addition, the lawsuit alleges that Defendants unlawfully confiscated entertainer tips. Defendants have denied these allegations and have threatened counterclaims to recover the value of mandatory dance fees retained by entertainers if the Clubs are determined to owe minimum wages. In addition, Defendants contend that any and all claims that the entertainers may have are required to be litigated through individualized arbitration, and that, consequently, if these disputes were to move forward, they could not do so either as a "collective" or as a "class" either in court or in arbitration.

Plaintiffs and Defendants have reached a settlement in this case. The Court has not ruled on the merits of Plaintiffs' claims or on Déjà Vu's defenses or counter-claims. Rather, the Court has simply certified a settlement class and tentatively approved the proposed settlement.

## 4. Who are the Class Members?

In order to determine if you are entitled to the monetary benefits from this settlement, you first must determine if you are a Class Member, defined as:

> **All entertainers who performed at any Déjà Vu-Affiliated Nightclub identified on *Exhibit A* attached to the settlement agreement during the relevant Class Period(s).**

If you fall within the definition of a Class Member, you are entitled to a Cash Payment pursuant to the criteria set forth in the settlement agreement. If you are not a Class Member as described above, you do not qualify for a settlement payment.

### 5. Why is the Class Action Being Settled?

This matter is being settled because both sides have agreed to a settlement of this case in order to avoid the costs and risks of trial.

## SETTLEMENT BENEFITS AND MY OPTIONS

### 6. What are the Settlement Benefits?

The settlement agreement, if approved, provides both monetary and nonmonetary benefits to the Class. First, each Class Member is entitled to receive monetary benefits. Second, all present and future entertainers performing at the Déjà Vu-Affiliated Nightclubs will be re-classified as employees (and for those Class Members who do not opt out of the settlement and for all future entertainers, employment will be pursuant to the enhanced terms of employment set forth in the settlement agreement for at least the next year), and will be entitled to the same legal benefits and protections that apply to all other employees under federal and state wage and hour laws. Like all other regularly tipped employees, all entertainers will be required to report all of their tip income to the Club at which they are employed.

As part of the settlement, Defendants have agreed to pay $1,500,000.00 in the form of a "Settlement Pool" to pay: a) enhancement payments to the two Class Representatives; b) fifteen thousand dollars ($15,000.00) to the California Labor and Workforce Development Agency ("LWDA") as civil penalties pursuant to the Labor Code Private Attorney General Act ("PAGA"); c) the administrative costs; d) the attorney fee and expense award; and e) the settlement payments and additional PAGA payments to the Class Members.

The sum of the Settlement Pool remaining after reduction for the enhancement payments, the PAGA payment to the LWDA, the attorney fee and expense award, and the administrative costs (the "Net Settlement Fund"), will be made available to provide cash compensation to Class Members in the form of settlement payments and additional PAGA payments.

Class Members will be paid a pro-rata share of the Net Settlement Fund based on the number of their performance dates relative to all other Class Members. Defendants' records and the information provided by Defendants shall be deemed to be conclusive for purposes of the calculations to be made for the disbursement of settlement payments. The pro rata share of the Net Settlement Fund will be determined by the Settlement Administrator based on a formulaic points system, designed by the parties for ease of administration and in recognition of the limits of Class Members' and Defendants' records and Class Members' memories, in the following manner:

Individual Points Allocation. Each Class Member will receive one (1) point for each of her performance dates in order to determine her Individual Points Allocation. The Individual Points Allocation is intended to award higher values to Class Members who

performed on more occasions at the Déjà Vu-Affiliated Nightclubs during the Class Periods.

Settlement Payments Formula. Once each Class Member's Individual Points Allocation is determined, the Aggregate Points Allocation will be determined by adding together the Individual Points Allocation for all Class Members. The total available Net Settlement Fund will then be divided by the Aggregate Points Allocation to determine a per-point dollar value, which is then multiplied by each Class Member's Individual Points Allocation to determine her pro rata share of the available Net Settlement Fund. For example, someone whose Individual Points Allocation equates to 1% of the Aggregate Points Allocation will receive 1% of the Net Settlement Fund. However, if a Class Member's pro rata share would result in a payment of less than twenty-five dollars ($25.00) under this formula, her settlement payment will be increased to equal twenty-five dollars ($25.00). The Settlement Administrator is authorized to reduce all other Class Member's settlement payments on a pro rata basis under this formula to account for the increases needed to comply with the twenty-five dollar ($25.00) minimum settlement payment threshold to avoid aggregate settlement payments that exceed the available Net Settlement Fund amount.

### 7. How Will I be Paid?

The Settlement Administrator will make all settlement payments, or portions thereof, in accordance with the Individual Points Allocation and Settlement Payments Formula described above and in accordance with the payment schedule set out in the settlement agreement. All settlement checks will contain the following endorsement: "By cashing this check, I Consent to Join (opt in to) the underlying Action and to release any and all Claims that I may have under the Fair Labor Standards Act."

***You should seek the advice of a tax professional if you have any questions about the tax implications of this settlement.***

## REMAINING IN THE CLASS

### 8. What Happens if I do Nothing and Stay in the Class?

If you do nothing, you will be included in the Class, and you will be bound by the terms and conditions of the settlement. Under the terms of the settlement, Class Members shall be paid a pro-rata share of the Net Settlement Fund based on the number of their performance dates relative to all other Class Members as described herein. Please read the *Settlement Benefits and My Options* section.

### 9. If I Remain in the Class, What am I Giving up?

If the Court approves the settlement and you do nothing, you will have released all Defendants, including all of the Déjà Vu–Affiliated Nightclubs, from any further state law claims related to the matters raised in this lawsuit during the Class Periods, and you cannot ever sue any of the Defendants about such state law claims.. By cashing your

settlement check, you will be releasing the Defendants from any further federal law claims under the Fair Labor Standards Act related to the matters raised in the lawsuit during the Class Periods, and you cannot ever sue any of the Defendants about such federal law claims. Should you have any questions about the scope of the releases, you may contact Class Counsel.

## EXCLUDING YOURSELF FROM THE CLASS

### 10. Why Would I Want to Exclude Myself from the Class?

You do not have to take part in the settlement or be a member of the Class. You can exclude yourself from the settlement by "opting out." If you exclude yourself, you will not get the monetary benefits of the settlement, nor can you object to the terms of the settlement. Any Court orders will not apply to you. By excluding yourself, you keep any right that you may have to file or proceed with a lawsuit or arbitration against any of the Defendants regarding the subject of the settlement.

If you have sued any of the Defendants and want to continue with your lawsuit or arbitration, you need to personally ask to be excluded from the Class. If you exclude yourself, you will not be legally bound by the Court's judgments in this case. Similarly, if you wish to start your own lawsuit or arbitration against any of the Defendants, you must exclude yourself from the Class. Should you do so, you will have to hire and pay your own lawyer for that lawsuit or arbitration and prove your own claims. If you do exclude yourself so you can start or continue your own lawsuit or arbitration against Déjà Vu, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

## 11. How do I Exclude Myself From the Class?

If you are a member of the Class and wish to be excluded from the settlement, you must complete and personally sign and send a written request, signed by you personally, which includes all of the following:

- Your legal name, current address and telephone number;
- The name and number of the lawsuit: *Roes, et al. v. Déjà Vu Services, Inc., et al.*, No. 37-2018-00028044-CU-OE-CTL.
- A statement, signed personally by you, clearly stating that that you wish to be excluded from the Class.

All exclusion requests must be mailed first class United States mail, **postmarked on or before [TBD 2019],** to:

Settlement Administrator
In re: Nightclub Litigation
P.O. Box xxx
City, State Zip Code

***Any request for exclusion must contain your personal signature, which shall be an indication to the Court that you wish to be excluded from the Class***. You cannot exclude yourself by phone or by e-mail. Further, if you do not follow these instructions properly, you will lose your right to exclude yourself. There are no exceptions.

UNLESS YOU PROPERLY SIGN AND TIMELY MAIL AN OPT OUT FORM OR REQUEST FOR EXCLUSION, YOU WILL BE BOUND BY ANY JUDGMENT IN THIS CASE AND YOU WILL NOT BE PERMITTED TO PURSUE ANY PENDING OR FUTURE LITIGATION AGAINST DÉJÀ VU REGARDING THE **MATTERS RESOLVED IN THIS SETTLEMENT. SHOULD YOU WISH TO EXCLUDE**

**YOURSELF FROM THIS SETTLEMENT, IT IS IMPORTANT THAT YOU FOLLOW THESE INSTRUCTIONS CAREFULLY.**

## 12. How Do I Object to the Settlement?

If you do not like the settlement, you may file an objection to it. This means you can tell the Court that you disagree with the settlement or some of its terms. For example, you can say you do not think the settlement is fair or adequate, that you don't want to be converted to an employee, or that you object to the amount of the attorneys' fees, costs, or expenses. The Court will consider your views but may approve the settlement anyway.

You can object only if you do not exclude yourself from the Class (i.e., you do not "opt out"). If you opt out, or exclude yourself, you cannot object.

To object, either you or a lawyer of your own choosing must prepare an objection that contains all of the following:

1. The name and title of the lawsuit: *Roes, et al. v. Déjà Vu Services, Inc., et al.*, No. 37-2018-00028044-CU-OE-CTL;

2. A written statement of objections clearly specifying the grounds or reasons for each objection;

3. A statement of whether or not you or your lawyer will ask to appear at the Final Approval Hearing to talk about your objections, and, if so, how long you will need to present your objections; and

4. Copies of documents (if any) you or your lawyer will present at the Final Approval Hearing.

Your objection must be filed with the Court and served on Class Counsel and Counsel for Defendants **no later than [insert date], 2019**. Any objection postmarked after that date will be rejected.

***To File an Objection with the Court, Mail Objection to:***

Clerk of the Court
Superior Court of California
County of San Diego
330 West Broadway
San Diego, CA 92101-3827

***To Serve Class Counsel, Mail Objection to:***

Jason J. Thompson,
(MI Bar #P47184) Sommers
Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076

*and*

Megan A. Bonanni
(MI Bar #P52079)
Pitt McGehee Palmer & Rivers, P.C.
117 West Fourth Street, Suite 200
Royal Oak, MI 48067

***To Serve Defendants' Counsel, Mail Objection to:***

**Tammara N. Bokmuller (CA Bar #192200)**
**Clark Hill, LLP**
**One American Plaza**
**600 West Broadway, Suite 500**
**San Diego, CA 92101**

***and***

Bradley J. Shafer
(MI Bar # P36604) Shafer
& Associates, P.C. 3800
Capitol City Blvd # 2,
Lansing, MI 48906

Objections postmarked after ***[insert date], 2019*** will be untimely and will not be considered by the Court.

## THE LAWYERS REPRESENTING YOU

### 13. Do I Have a Lawyer Representing my Interests in This Case?

Yes. The Court has appointed law firms to represent you and other Class Members. These lawyers are referred to as Class Counsel, and include:

| | |
|---|---|
| Jason J. Thompson,<br>(MI Bar #P47184) Sommers<br>Schwartz, P.C.<br>One Towne Square, Suite 1700<br>Southfield, Michigan 48076 | Megan A. Bonanni<br>(MI Bar # P52079)<br>Pitt McGehee Palmer & Rivers, P.C.<br>117 West Fourth Street, Suite 200<br>Royal Oak, MI 48067 |

You will not be charged directly by Class Counsel for their services, but they will ask the

Court to award them a fee from the settlement. More information about Class Counsel and their experience is available at the websites listed above. (Add Website for Class Counsel Information)

If you so desire, you may hire your own attorney. However, you will be responsible for that attorney's fees and expenses.

## 14. How Will the Lawyers be Paid?

The lawyers who represent the Class will ask the Court for reimbursement of their out of pocket expenses and an award of attorneys' fees based on their work in this litigation. The amount of attorneys' fees to be awarded will be determined solely by the Court. Under the terms of the settlement agreement and subject to Court approval, Class Counsel will submit a request that does not exceed the sum of five hundred thousand dollars ($500,000.00) in attorneys' fees and reimbursement of their out-of-pocket costs associated with prosecuting this case and effectuating the settlement. Attorneys' fees payable to Class Counsel have been factored into the value of the settlement. These fees will be paid from the Settlement Pool.

The settlement agreement provides further details on attorney fees payable to Class Counsel, and a copy of the settlement agreement may be obtained from the website: www.xxxxxx

### 15. How Will the Class Representatives be Paid?

To compensate the Class Representatives (Jane Does 1-2) for their work in this litigation on behalf of the Class, for the unique claims they may have, and for them providing releases far beyond the scope of the releases given by the other Class Members, the named two Class Representatives will share a total award and incentive payment of $20,000.00. Defendants will pay this award to the Class Representatives from the Settlement Pool, and the incentive payments have been factored into the total value of the settlement.

## THE COURT'S FINAL APPROVAL HEARING

### 16. When and Where will the Court Decide Whether to Approve the Settlement?

The Court will hold a Final Approval Hearing on ***INSERT DATE, 2019***. At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate. If there are written objections, the Court will consider them, and the Court will listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to approve the settlement.

The Hearing will be held at: Superior Court of California, County of San Diego, Department C-72, the Honorable Timothy Taylor, 330 W Broadway, San Diego, CA 92101-3827.

### 17. Do I have to Attend the Hearing?

No. Class Counsel will answer questions the Court may have, but you may appear at your own expense. If you send a written objection, the Court will consider it. You may also pay your own lawyer to attend the hearing if you desire.

### 18. Can my Lawyer Appear at the Final Approval Hearing to Tell the Court About my Opinions Regarding the Settlement?

Yes. As long as you do not exclude yourself, you have the right to appear through counsel at the Final Approval Hearing, so long as your Attorney's Notice of Appearance and any written objections you may have are postmarked or received by the Court, Defendants' Counsel, and Class Counsel by TBD, 2019. If you do this, however, the cost of having your lawyer appear will be at your own expense.

## GETTING MORE INFORMATION

### 19. Where do I Obtain More Information?

If you want additional information, you may write Class Counsel at the addresses listed in Section 13 above.

In addition, Class Counsel has created a specific website containing relevant documents, including the operative class action complaint and complete settlement agreement. (INSERT WEB ADDRESS HERE)

The specific terms of the settlement are outlined in the legal documents that have been filed with the Court. You can look at and copy these documents at any time during regular office hours at the Office of the Clerk of Court for the Superior Court of California, County of San Diego, 330 W Broadway, San Diego, CA 92101-3827. If you have a PACER account, you may view the documents on the Court's CM/ECF website.

**PLEASE DO NOT CONTACT THE COURT**
**REGARDING THE CONTENTS OF THIS NOTICE**

# EXHIBIT E

# Class Action Settlement
# You May Qualify for a Cash Payment

Entertainers who performed at any "Deja Vu-Affiliated Nightclub" in San Francisco after April 14, 2017, and after February 7, 2017 at any other Deja Vu-Affiliated Nightclub in the State of California, may qualify for a settlement payment as provided for in a recent Class Action Settlement. Please review this Notice for details.

A class action lawsuit alleges that Deja Vu misclassified Entertainers working at Deja Vu-Affiliated Nightclubs ("Clubs") in California as non-employees (or independent contractors) and because of this misclassification, Entertainers were not paid minimum wages and other compensation, and were not provided other employment attributes, required under federal and/or California state wage and hour laws. In addition, the lawsuit alleges that Deja Vu unlawfully confiscated entertainer tips.

Deja Vu has denied these allegations and has threatened counterclaims to recover the value of mandatory dance fees paid to and retained by Entertainers if the Clubs are determined to owe minimum wages. In addition, Deja Vu contends that any and all claims that Entertainers may have are required to be litigated through individualized arbitration, and that, consequently, if these disputes were to move forward, they could not do so either as a "collective" or as a "class" either in court or in arbitration.

Rather than continue to litigate these matters, the parties have reached a settlement. The settlement contains both monetary and non-monetary relief for the Class. First, as part of this settlement, all Entertainers performing in the Clubs are to be converted to employees. They will be paid as employees under the law (with enhanced terms of employment for all Entertainers who do not opt out of the settlement applying for at least one year), and like all other regularly tipped employees, all Entertainers will be required to report all of their tip income to the Club at which they are employed. Second, a settlement fund has been established in the amount of $1,500,000.00, and Entertainers are entitled to a cash payment out of that fund. Pursuant to the terms of the settlement, Entertainers shall be paid a pro-rata share of the net settlement fund based on the number of days they performed during the Class Periods relative to the performance dates of all other Entertainers.

**Acceptance of a cash payment may be a taxable event, and you may be issued an IRS Form 1099-MISC regarding such payment.**

In order to determine if you are entitled to a cash payment, you first must determine if you are a Class Member, defined as:

> **All Entertainers who performed at any Deja Vu-Affiliated Nightclub located in the State of California during the relevant Class Period(s).**

The list of Clubs subject to this settlement (and the applicable Class Periods) is attached at the end of this Notice.

If you performed at one or more of the San Francisco Clubs at any time from April 15, 2017 to the present, or at one or more of the Greater California Clubs at any time from February 8, 2017 to the present, then you are a member of the Class and are entitled to receive a cash payment.

The pro rata share of the settlement payments will be determined by the Settlement Administrator in the following manner.

- Individual Points Allocation. Each Class Member will receive one (1) point for each day that she performed at one of the Clubs during the Class Periods of her performance dates in order to determine her Individual Points Allocation. The Individual Points Allocation is intended to award higher values to Class Members who performed on more occasions at the Clubs during the Class Periods.

- Settlement Payments Formula. Once each Class Member's Individual Points Allocation is determined, the Aggregate Points Allocation will be determined by adding together the Individual Points Allocation for all Class Members. The total available net settlement fund will then be divided by the Aggregate Points Allocation to determine a per-point dollar value, which is then multiplied by each Class Member's Individual Points Allocation to determine her pro rata share of the available net settlement fund. For example, someone whose Individual Points Allocation equates to 1% of the Aggregate Points Allocation will receive 1% of the net settlement fund. However, if a Class Member's pro rata share would result in a payment of less than twenty-five dollars ($25.00) under this formula, her settlement payment will be increased to equal twenty-five dollars ($25.00). The Settlement Administrator is authorized to reduce all other Class Member's settlement payments on a pro rata basis under this

# Class Action Settlement
# You May Qualify for a Cash Payment

formula to account for the increases needed to comply with the twenty-five dollar ($25.00) minimum settlement payment threshold to avoid aggregate settlement payments that exceed the available net settlement fund amount.

Deja Vu's records and the information provided by Deja Vu shall be deemed to be conclusive for purposes of the calculations to be made for the disbursement of settlement payments.

YOU DO NOT NEED TO MAKE A CLAIM OR TAKE ANY OTHER ACTION TO REDEEEM YOUR CASH PAYMENT.

NOTE: If you have any questions about your eligibility to be in the settlement class, your ability to opt out of the settlement, your ability to object to the terms of settlement, or any details about this Notice, you may visit the website www.___________________________ for more information. In addition, if at any time you believe an error has been made regarding your cash payment, or if you experience any problems in receiving your cash payment, you may telephone 1-800-XXX-XXXX during regular business hours.

## LIST OF CLUBS INVOLVED IN THIS SETTLEMENT

### THE "SAN FRANCISCO CLUBS"

| CLASS PERIOD: 4-15-17 TO PRESENT | DOING BUSINESS AS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| B.T. CALIFORNIA, LLC | THE PENTHOUSE CLUB & STEAKHOUSE | 412 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| BIJOU - CENTURY, LLC | NEW CENTURY THEATRE | 816 LARKING ST | SAN FRANCISCO | CALIFORNIA | 94109 |
| CHOWDER HOUSE, INC. | HUNGRY I | 546 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| DEJA VU - SAN FRANCISCO, LLC | DEJA VU CENTERFOLDS | 391 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC | LITTLE DARLINGS OF SAN FRANCISCO | 312 COLUMBUS AVE | SAN FRANCISCO | CALIFORNIA | 94133 |
| GOLD CLUB - SF, LLC | GOLD CLUB | 650 HOWARD ST | SAN FRANCISCO | CALIFORNIA | 94105 |
| S.A.W. ENTERTAINMENT, LTD. | LARRY FLYNT'S HUSTLER CLUB | 1031 KEARNY ST | SAN FRANCISCO | CALIFORNIA | 94133 |
| S.A.W. ENTERTAINMENT, LTD. -- CONDOR CLUB | CONDOR CLUB | 300 COLUMBUS AVE. | SAN FRANCISCO | CALIFORNIA | 94133 |
| SAN FRANCISCO - GARDEN OF EDEN, LLC | GARDEN OF EDEN | 529 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| SAN FRANCISCO - ROARING 20'S, LLC | ROARING 20'S | 552 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |

### THE "GREATER CALIFORNIA CLUBS"

| CLASS PERIOD: 2-8-17 TO PRESENT | DOING BUSINESS AS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| 3610 BARNETT AVE., LLC | ADULT SUPERSTORE | 3610 BARNETT AVE. | SAN DIEGO | CALIFORNIA | 92110 |
| CATHAY ENTERTAINMENT, INC. | DÉJÀ VU SHOWGIRLS | 16025 GALE AVE, STE A11-A12 | CITY OF INDUSTRY | CALIFORNIA | 91745 |
| COLDWATER, LLC | DÉJÀ VU SHOWGIRLS | 7350 COLDWATER CANYON | N. HOLLYWOOD | CALIFORNIA | 91605 |
| DEJA VU SHOWGIRLS - SACRAMENTO, LLC | DEJA VU SHOWGIRLS | 11252 TRADE CENTER DR | RANCHO CORDOVA | CALIFORNIA | 95742 |
| DV OF LA, LLC | DÉJÀ VU LA - MAIN ST. | 1800 S. MAIN ST | LOS ANGELES | CALIFORNIA | 90015 |
| EF5 ACQUISITIONS GROUP, LLC | DEJA VU SHOWGIRLS | 20320 HAMILTON AVE | TORRANCE | CALIFORNIA | 90502 |
| EYEFULL, INC. | DEJA VU SHOWGIRLS | C/O P.O. BOX 408 | DURAND | MICHIGAN | 48429 |
| GRAPEVINE ENTERTAINMENT, INC. | DÉJÀ VU SHOWGIRLS | 1524 GOLDEN STATE HWY | BAKERSFIELD | CALIFORNIA | 93301 |
| HOLLYWOOD & VINE CLUB, LLC | DEJA VU SHOWGIRLS | 6315 HOLLYWOOD BLVD | LOS ANGELES | CALIFORNIA | 90028 |
| JGMA, ANAHEIM HOSPITALITY, INC. | SAM'S AFTER DARK | 1501 E WASHINGTON BLVD | LOS ANGELES | CALIFORNIA | 90021 |
| JOLAR CINEMA OF SAN DIEGO, LTD | JOLAR CINEMA | 6321 UNIVERSITY AVE | SAN DIEGO | CALIFORNIA | 92115 |
| NITE LIFE EAST, LLC | LITTLE DARLINGS | 8290 BROADWAY | LEMON GROVE | CALIFORNIA | 91945 |
| SHOWGIRLS OF SAN DIEGO INC | DÉJÀ VU SHOWGIRLS | 2720 MIDWAY DR | SAN DIEGO | CALIFORNIA | 92110 |
| SP STAR ENTERPRISE, INC. | DÉJÀ VU LA - UNION STATION | 710 E. COMMERCIAL ST | LOS ANGELES | CALIFORNIA | 90012 |
| STOCKTON ENTERPRISES, LLC | DÉJÀ VU SHOWGIRLS | 4206 WEST LANE | STOCKTON | CALIFORNIA | 95204 |